PAUL B. SALVATY (State Bar No. 171507)
PSalvaty@winston.com
WINSTON & STRAWN LLP
333 S. Grand Ave., 38th Fl.
Los Angeles, CA 90071-1543
Telephone:  (213) 615-1700
Facsimile:   (213) 615-1750

ABBE DAVID LOWELL (*pro hac vice* forthcoming)
AbbeLowellPublicOutreach@winston.com
WINSTON & STRAWN LLP
1901 L St., N.W.
Washington, D.C. 20036-3508
Telephone:  (202) 282-5000
Facsimile:   (202) 282-5100

BRYAN M. SULLIVAN (State Bar No. 209743)
bsullivan@earlysullivan.com
ZACHARY C. HANSEN (State Bar No. 325128)
zhansen@earlysullivan.com
EARLY SULLIVAN WRIGHT GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Fl.
Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

Attorneys for PLAINTIFF
ROBERT HUNTER BIDEN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT HUNTER BIDEN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>PATRICK M. BYRNE, an individual,<br><br>Defendant. | **Case No.** 2:23-cv-09430<br><br>**COMPLAINT FOR DAMAGES FOR DEFAMATION**<br><br>**DEMAND FOR JURY TRIAL** |

1    Plaintiff Robert Hunter Biden (aka Hunter Biden) ("Plaintiff"), for his claims

2    against Defendant Patrick M. Byrne ("Byrne" or "Defendant"), alleges upon

3    knowledge with respect to his own acts and upon information and belief as to all other

4    matters, as follows:

5                                       **INTRODUCTION**

6        1.    Plaintiff brings this action for defamation against Byrne because he has

7    made, published, and repeated false and defamatory statements about Plaintiff,

8    knowing full well that the statements are false, for the purpose of subjecting Plaintiff

9    to harassment, intimidation, and harm.  On or about June 27, 2023, Byrne published

10   false statements that Plaintiff "was reaching out to the Iranian government in the fall of

11   2021" and offering to have Plaintiff's father, President Joe Biden, "unfreeze" $8 billion

12   in Iranian funds "in return for $800 million being funneled into a numbered account for

13   us."  Byrne further stated falsely that Plaintiff urged the Iranian government that, "if

14   you do this deal with us, it will lubricate other negotiations which have recently started

15   between us."  According to Byrne, "[b]y that, the Iranians believed that Hunter meant

16   the [Joint Comprehensive Plan of Action] talks, which had restarted in Geneva a month

17   or two previously."  These statements are completely false, and Byrne knew them to be

18   false at the time he made them.

19       2.    To make matters much worse, on or about October 8, 2023, shortly after

20   news broke of the horrific terrorist attacks by Hamas on Israel that resulted in the

21   slaughter of more than 1,400 civilians, Byrne reposted the false and defamatory

22   statements about Plaintiff's allegedly corrupt and treasonous dealings with Iran on X

23   (formerly known and hereinafter referred to as Twitter), apparently so that his hundreds

24   of thousands of social media followers and others would be reminded of the false

25   statements Byrne initially had published in June.  The clear implication of Byrne's

26   October 8, 2023 posts was that Plaintiff's allegedly criminal and corrupt actions had

27   contributed to the terrorist attacks by Hamas, that Plaintiff's purported crimes had led

28   to the deaths of more than 1,400 innocent civilians, and, more broadly, that Plaintiff

1  was a substantial factor in causing the recent outbreak of violence, war, and tragic death
2  in the Middle East.

3      3.    These defamatory statements by Byrne are not merely false and not merely
4  malicious—they are completely outrageous.  Byrne knows his statements are baseless
5  and yet published and republished them anyway, and he continues to propagate his lies
6  to anyone who will listen, including his hundreds of thousands of social media
7  followers.  Plaintiff would prefer to ignore Byrne and to deprive him of the attention
8  that he so desperately seeks, but the shocking and appalling nature of Byrne's
9  falsehoods needs to be addressed.  Accordingly, Plaintiff brings this defamation action
10  to hold Byrne accountable for his despicable statements and to deter him from engaging
11  in such malicious conduct in the future.

12  **JURISDICTION AND VENUE**

13      4.    This Court has jurisdiction over the subject matter of this action pursuant
14  to 28 U.S.C. § 1332.

15      5.    The parties are of diverse citizenship.  Plaintiff is a citizen of the State of
16  California and resides in Los Angeles, California.  Plaintiff is informed and believes
17  that Defendant Byrne is a citizen of the State of Utah or the State of Florida and resides
18  in both states.

19      6.    The amount in controversy exceeds $75,000, exclusive of interest and
20  costs.  Damages that Plaintiff has suffered and will continue to suffer as a result of the
21  claims asserted herein exceed $75,000.

22      7.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 as it
23  is where a substantial part of the events giving rise to the claim alleged in this Complaint
24  occurred, it is where the unlawful conduct by Defendant was directed, and it is where
25  the harm to Plaintiff has been suffered.

26      8.    Plaintiff is informed and believes and thereon alleges that Byrne
27  intentionally directed his illegal conduct to occur in California and has therefore
28  subjected himself to jurisdiction in California.  In fact, Byrne called out to Plaintiff via

1  social media and issued a public challenge to Plaintiff to "[s]ue me," presumably
2  because he wants to be sued and wants the attention that a lawsuit will bring.  At all
3  relevant times, Plaintiff also has been a citizen and resident of California.  He has
4  suffered, and continues to suffer, from the severe impact of the defamatory statements
5  in California.

6  ### PARTIES

7      9.    Plaintiff is a citizen of the State of California and resides in Los Angeles,
8  California.

9      10.    Plaintiff is informed and believes and thereon alleges that Byrne is
10  domiciled in either Utah or Florida and is a resident of both states.  Byrne served as
11  chief executive officer of Overstock.com until 2019, when he was forced to resign due
12  to revelations that he had an affair with a Russian agent (now a Russian politician)
13  named Maria Butina.  Following his resignation from Overstock.com, Byrne spent
14  significant time seeking to challenge and overturn the 2020 presidential election and
15  promoting the idea that the election was "stolen," including through his self-financed
16  film called "The Big Rig."  On or about June 27, 2023, an online publication called
17  "Capitol Times Magazine" published a lengthy profile of and "interview" with Byrne
18  titled "The Emergence of a Controversial Man," which included the defamatory
19  statements about Plaintiff that are the subject of this action.

20      11.    Byrne is no stranger to defamation claims and has shown himself to be a
21  serial liar.  In addition to a pending lawsuit arising from his stolen-election-related
22  claims, Plaintiff is informed and believes and thereon alleges that Byrne was previously
23  court-ordered to pay a substantial judgment (including punitive damages) for falsely
24  accusing a Canadian businessman of being a criminal and of having ties to Osama bin
25  Laden in articles published on his DeepCapture.com website.  See *Nazerali v. Mitchell*,
26  No. 2016 BCSC 810 (Sup. Ct. B.C. Nov. 14, 2016), *Reasons for Judgment* at 97.

27  ### FACTUAL BACKGROUND

28      12.    Since resigning from his position as chief executive officer of

Overstock.com in 2019, Byrne has emerged as a leading promoter of unsupported conspiracy theories, primarily relating to the so-called "Deep State" and to his claim that the 2020 presidential election was "stolen" from former President Donald Trump. Byrne insists that the violent uprising at the Capitol on January 6, 2021 was not an "insurrection," but rather was a "fed-surrection" orchestrated by enemies of President Trump working within his own government.  In a recent interview with the far-right conspiracy theorist and prolific spreader of proven lies, Alex Jones, Byrne described his ongoing fight to "de-Nazi-fy" our federal "institutions" and to rescue America from an ongoing plot by "globalists" to "colonize" the United States and turn it into a "vassal state" that will serve as "a farm to China."

13.    Despite the baseless and at times absurd nature of many of his claims, Byrne has a large following on social media and has been able to make money and to generate attention for himself by disseminating his unsupported theories through various means, including his self-published book, a self-financed film, and numerous interviews and appearances on right-wing media outlets.  Byrne is a frequent user of Twitter and currently has more than 285,000 followers on that social media platform. He also posts regularly on Telegram and makes public statements through other means, including but not limited to his "DeepCapture.com" website.

14.    Many of Byrne's public statements consist of factually unsupported and impossible-to-verify claims about himself and the purportedly important role he claims to have played in various clandestine "operations" conducted on behalf of the "United States Government."  According to Byrne, he has carried out numerous secret spy "missions" for "Uncle Sam" (with cloak-and-dagger nicknames such as "Operation Snow Globe") to advance United States interests around the world, including helping to restore "peaceful relations" in Vietnam in 1994, helping to prevent a war with Iran in 2006, assessing the "computer science capabilities" of Venezuela in 2018, and, of course, entering into an intimate relationship with 26 year-old Maria Butina, apparently as a means to help the FBI gather "intel" on Russia.  (Byrne claims he let his FBI

handlers know: "I am not seeing Maria unless you folks use the word 'greenlight' with me. I got back a simple message: 'Greenlight.'")

15. Byrne further claims that, at times, the requests for him to deploy his "unique" skills to help the United States have come directly from the highest levels of the U.S. government, including, without limitation, President Barack Obama and FBI Director James Comey, personally, although they were communicated to Byrne verbally by unnamed special agents for the FBI.

16. Byrne frequently admits he has no documentation to support his self-aggrandizing claims—his "patriotic" activities have been too secret and dangerous for that and, besides, Byrne's motto has always been "the fewer pieces of paper between us the better." In one instance, Byrne claims to have asked his FBI contacts for written documentation reflecting the top-secret orders he was being given, but the request was denied. According to Byrne, "One agent said: 'We've been instructed to inform you that you cannot be *given* a letter [as you have requested], but if you'll come to DC, the Director says you can be *shown* a letter.'" Byrne claims he declined this offer because a verbal directive from Director Comey and President Obama "is good enough for me." On another occasion, Byrne claims that Senator Arlen Spector and other Senate Judiciary Committee members told him that the country's very survival rested entirely on Byrne's shoulders. ("They simply told me that the republic was over unless I agreed to do this for them." Byrne responded: "What can I say, Gentlemen? I won't let you down.")

17. To many people, Byrne's assertions about himself and others are not merely outlandish but patently ridiculous. Unfortunately, however, to hundreds of thousands (at least) of others, Byrne's claims are received in the manner they are intended—*i.e.*, as evidence-based statements of fact that should be accepted as truth. Furthermore, many of Byrne's statements go well beyond merely inflating Byrne's own importance and the role he claims to have played in shaping U.S. foreign policy and "disrupting corruption" within the federal government over the past 35 years—they

include false, defamatory, malicious, and extremely damaging statements of non-fact about others, including Plaintiff.

18.     This lawsuit arises from the false and defamatory statements that Byrne made about Plaintiff in an "interview" that appeared in the "inaugural" issue of "Capitol Times Magazine," which appears originally to have been published on or about June 27, 2023.  *See* Exhibit A.[1]  In the course of that "interview," Byrne defames Plaintiff by making false statements of fact that Plaintiff solicited hundreds of millions of dollars in bribes from the Iranian government in exchange for Plaintiff's "family" releasing to Iran billions of dollars in frozen funds and ensuring that the United States would "go easy" on Iran during "nuclear talks" between the two countries.

19.     The profile of and "interview" with Byrne in "Capitol Times Magazine," which spans more than 80 pages, includes a lengthy introductory statement attributed to Michael Flynn, retired U.S. Army lieutenant general and former National Security Advisor under former President Trump, who praises Byrne for his "relentless pursuit of exposing the deep levels of corruption within our government."  Flynn endorses Byrne's "Capitol Times Magazine" interview as follows: "The incredible story of bribery, blackmail, rape, murder and other tales, normally the stuff found in fiction novels, are the truth coming from a man who was asked to enable, encourage or conduct these actions on behalf of our very own government.  Patrick's story is for real, he's for real, the corruption he's exposed is for real, and it only gets worse the further you read."

20.     In the interview, Byrne purports to describe his various exploits advancing American interests and fighting "Deep State" corruption.  On page 72 of the so-called magazine, Byrne turns to the topic of Plaintiff and his family.  After describing his own alleged contacts within the Iranian government, Byrne makes the

---

[1]  Although the profile of Byrne purports to feature a lengthy "interview" conducted during a walk along a "path" that Byrne "used to run in high school," there are indications that the published "interview" is fake and that the answers were written and/or edited by Byrne himself.  Exhibit A is a true and correct copy of excerpts from the "interview" and introductory remarks.

following statements about Plaintiff:

> So in November 2021, I went back to the Middle East. I met with a group including a special Iranian figure, an old friend who let me know a World War was coming, and had a proposal to avert it. I told them I would relay the proposal but I did not think it would fly.
>
> In the course of being there, and through a mechanism I am not going to explain here, I became aware of an additional situation. Hunter Biden was reaching out to the Iranian government in the fall of 2021 with the following offer: *You Iranians have $8 billion frozen in a bank account in South Korea. My father will unfreeze it in return for $800 million being funneled into a numbered account for us. And if you do this deal with us, it will lubricate other negotiations which have recently started between us.* By that, the Iranians believed that Hunter meant the JCPOA talks, which had restarted in Geneva a month or two previously. In other words, something along the lines of, "Pay us $100 million and we let you keep 10 nukes, $200 million for 20 nukes," etc. But I am making up the pricing. Hunter was doing this through a middleman, the son of the Minister of Defense of Pakistan. That son was meeting with Hunter, then relaying messages to someone in Iran. And he was being reckless enough to leave voicemails in Iran about it.
>
> When I returned, the agencies went to work over the weekend. I was told a week later that they had confirmed it all. The voice on the voicemail that I had acquired was voice-matched to the son of the Minister of Defense of Pakistan, who had a connection to Hunter Biden. Anyway, in December, 2021, I was told that the scheme was confirmed across the agencies.

Exhibit A at 72-73 (emphasis in original).

21.     In response to these false and defamatory statements, the unidentified "interviewer" for "Capitol Times Magazine" asked Byrne to confirm what he was saying:

> Patrick, you are claiming that 18 months ago, the Biden Family was seeking a bribe from Iran to release funds frozen in South Korea, and to go easy in nuclear talks, and that the United States Government has been aware of this since December, 2021?

Byrne responded: "100% correct." *Id.* at 73.

22.     Byrne's false statements about Plaintiff were expressed and intended to be understood as statements of fact.  This is apparent from the statements themselves in which Byrne affirms that his allegations about Plaintiff are "100% correct."  This also is apparent from the context in which the false statements appear, including Flynn's introductory comments stating Byrne's story is the "truth" and "real."  The first page of "Capitol Times Magazine" welcomes its readers with the following commitment to providing them with factually accurate information: "We are thrilled to have you join our readership, where we strive to deliver accurate and unbiased news straight from the heart of US Capitol politics to the broader global landscape.  In an era dominated by sensationalism and misinformation, we stand firmly committed to providing you with the truth. . . . Thank you for choosing Capitol Times Magazine as your source for truth news.  We are honored to have you on board, and we look forward to embarking on this journey of knowledge and enlightenment together."  In the "interview" and in media appearances, Byrne frequently states that, although his claims might seem unlikely and hard for people to believe, they are 100% factually true, they are proven by evidence that Byrne at one time possessed, and they have been verified and confirmed by unnamed high-ranking officials in the U.S. and Iranian governments.

23.     Shortly before publishing his false accusations against Plaintiff in the "Capitol Times Magazine" article, Byrne aired the defamatory statements during media appearances and in public.  For example, on May 10 and 11, 2023, Byrne appeared on

*The Absolute Truth* with Emerald Robinson, a former "White House correspondent" for Newsmax and One America News Network with a significant social media following of her own, and published his lies—later published in the article—accusing Plaintiff of having engaged in a bribery scheme with Iran, again without providing a shred of factual support.  In particular, during the May 10, 2023 interview (which was re-aired on May 11, 2023), Byrne falsely claimed, among other things, that in November 2021 Plaintiff "was reaching out back-channel to the Iranian government with this proposal:  'You Iranians have $8 billion frozen in a South Korean bank, my father will sign to unfreeze it in return for $800 million funneled into a numbered account for us and if you will do this it will lubricate the other discussions which have recently started between us,' by which, since this conversation was late November 2021, the Iranians took to mean the recently started nuclear negotiations. The Bidens were holding up their hand and saying you pay us this you can keep 10 nukes, you pay us this you can keep 20 nukes, they were offering that kind of a deal."

24.    When asked by Robinson during a follow up interview on May 11, 2023 to explain how he came to possess the "information" on which his criminal accusations against Plaintiff were based, Byrne reiterated his defamatory charges: "I met an old friend . . . I don't want to name names . . . I became aware of something that had happened—that Hunter Biden was reaching out to [Iran] back channel and there are actually some voicemails that confirmed everything I am telling you . . . an interagency group centered in the FBI . . . was able to confirm 100% everything I've told you." The on-screen banners that appeared beneath Byrne stated, among other things, "Byrne: Hunter Biden Used Back Channel to Speak to Iran"; "Byrne Maps Out the Biden Family Corruption"; and "Patrick Byrne Drops Bombshell Allegations Regarding Hunter Biden and Iran."  During the interview, Byrne emphatically insisted that his false allegations against Plaintiff are true, that they are based on evidence he "stole" from someone in Iran, and that they have been verified as true by others.  Byrne further claimed that his "evidence"—which he no longer possesses because he purportedly

1   turned it over to the government—is "so politically radioactive" that FBI Director
2   Christopher Wray had to "disband" an "interagency group because it had reached the
3   core of government corruption and I had brought them four massive loads [of
4   evidence], including that Hunter Biden and Joe Biden are selling out the country to
5   Iran." These false statements by Byrne during his interviews on *The Absolute Truth*
6   remain publicly available on-line to this day.

7        25.    In addition, following its original publication, Byrne has repeatedly
8   published the "Capitol Times Magazine" profile on social media and has promoted the
9   article during right-wing media appearances, encouraging people to read and purchase
10  copies of the magazine for themselves. For example, in a July 21, 2023 appearance on
11  *The Alex Jones Show*, infamous host Alex Jones, who has described Byrne as a "friend
12  of [his] show," discusses with Byrne their shared opinion that the January 6 riot was a
13  "fed-surrection" orchestrated by the "Deep State," "antifa," and other anti-Trump
14  forces. Early in the interview, Jones confirms that he had received a copy of the
15  "Capitol Times Magazine" article from Byrne, holds it up for the camera, and
16  recommends it to his viewers as "big news" that Jones personally "can't wait to read."
17  Byrne highlights for Jones the introductory statement by Flynn and persuades Jones to
18  read the statement in its entirety out loud, including Flynn's endorsement that Byrne's
19  "incredible story of bribery, blackmail, rape, murder and other tales . . . are the truth"
20  and that "Patrick's story is for real, he's for real, the corruption he's exposed is for real,
21  and it only gets worse the further you read."

22       26.    Plaintiff is informed and believes that Byrne has promoted, disseminated,
23  and republished his defamatory statements about Plaintiff many times over the past
24  several months and has falsely claimed on multiple occasions that the defamatory
25  statements contained in the article, including the false accusations against Plaintiff, are
26  factually true and that they have been "confirmed" by Flynn and various federal
27  "agencies." In reality, Byrne's accusations against Plaintiff are completely false, they
28  are untethered from reality, and they have not been "confirmed" by anyone ever.

27.     Byrne made matters much worse on the early morning of October 8, 2023. Shortly after news broke of the horrific terrorist attacks by Hamas against Israel, Byrne twice reposted an excerpt of his "Capitol Times Magazine" profile—including his false and defamatory statements about Plaintiff—on his social media account on Twitter. Byrne's re-postings of his false statements about Plaintiff were intended to suggest that Plaintiff and his alleged criminal dealings with Iran had contributed to the terrorist attacks by Hamas against Israel, had brought about more than 1,400 civilian deaths, and had been a been a substantial factor in causing events that led to what is currently a massive conflict in the Middle East.  These re-postings by Byrne have been viewed by more than 100,000 people.  True and correct copies of these posts are attached hereto as Exhibit B.

28.     Byrne's defamatory claims that Plaintiff engaged in criminal actions with a country whose government is widely considered an enemy of the United States are completely false.  Plaintiff never entered into any negotiations with any Iranian official about anything, let alone about the topics in the article.  Nor did Plaintiff ever engage in any back-channel discussions with Iran—whether through the "son of the Minister of Defense of Pakistan" or otherwise—for the purpose of enriching himself or his family, betraying his country, or any other reason.   Similarly, Plaintiff never communicated anything to any Iranian officials to suggest that he was willing to accept a bribe, or to suggest that he was willing to assist them in releasing billions of dollars in frozen Iranian funds, or to signal that he was willing to help them achieve their nuclear aspirations in negotiations with the United States.  These claims are complete nonsense.  To falsely accuse Plaintiff of engaging in these criminal acts is not only reckless and baseless but utterly outrageous and despicable, and it constitutes defamation per se.

29.     Byrne knew that the statements he made about Plaintiff in "Capitol Times Magazine" and on social media were false, or, at the very least, he had serious doubts as to their truth.  Byrne claims he discovered this information from sources (which he

COMPLAINT AND DEMAND FOR JURY TRIAL

has refused to name) including "an old friend who let me know a World War was coming" and "a mechanism I am not going to explain here." These purported unnamed "sources" are unreliable on their face. Byrne has identified no actual sources and no actual evidence for any of his defamatory claims. This is not surprising because no sources or evidence exist. Byrne has no reasonable, valid, or factual basis to make such outrageous accusations against Plaintiff in the "interview," on social media, or anywhere else.

30.     Byrne has been told that his allegations are false, that they are causing serious harm to Plaintiff, and that they should be retracted immediately. Rather than retract, however, Byrne has doubled down. After his October 8, 2023 post suggesting Plaintiff had facilitated the terrorist attacks by Hamas on Israel, Representative Eric Swalwell responded to Byrne on Twitter that his defamatory post "is sick and is going to get the president's son killed. Israel needs help, not this." Byrne responded by bragging to his social media followers: "Eric Swalwell posting trash about me? I must have touched a nerve," and, "Hey Eric, thanks but you forgot the citation!" followed by a link to his DeepCapture.com website and the "Capitol Times Magazine" article. True and correct copies of these posts are attached hereto as Exhibit C.

31.     By letter dated October 26, 2023, Plaintiff's counsel sent a formal demand for retraction to Byrne identifying the false and defamatory statements at issue in this case. Plaintiff's letter notified Byrne that his accusations against Plaintiff were false, that they were extremely harmful, and that they should be retracted immediately. To date, Byrne has ignored Plaintiff's retraction demand and has taken no steps to disavow his false claims or to mitigate the harm that his claims have caused and are continuing to inflict on Plaintiff.

## FIRST CLAIM FOR RELIEF

### (Defamation)

### (Against Defendant Byrne)

32.     Plaintiff incorporates herein by this reference the allegations in

1    paragraphs 1 through 31, above.

2        33.    As set forth above, Defendant falsely stated in an "interview" published in
3    the "inaugural" issue of "Capitol Times Magazine" that Plaintiff sought hundreds of
4    millions of dollars in bribes from the Iranian government for the purpose of enriching
5    himself and his family at the expense of the interests of the United States and its allies.
6    Beginning on or about June 27, 2023, Defendant repeatedly published this so-called
7    magazine "interview," including his false statements about Plaintiff, on social media
8    including Twitter and Telegram and through other means including his
9    DeepCapture.com website.

10       34.    Plaintiff is informed and believes that Defendant has taken steps to ensure
11   that the interview, including his defamatory statements about Plaintiff, have been
12   continuously published from the date of their first publication to this day. Byrne has
13   relentlessly promoted the article, including, but not limited to, on social media and
14   during media appearances on shows such as *The Alex Jones Show*; he has marketed and
15   sold the "magazine" on Amazon, Walmart, and Barnes & Noble; and he has encouraged
16   others to purchase the article, download it, and distribute it to as many others as
17   possible. Defendant has also claimed that the article is potentially going to be made
18   into a book and possibly even a movie. The full extent to which Defendant has
19   published, distributed, marketed, and sold the defamatory statements about Plaintiff
20   will be the subject of discovery in this case.

21       35.    Defendant specifically intended and reasonably understood that the false
22   statements that he made were about Plaintiff. Defendant identified Plaintiff by name,
23   made clear that he was accusing Plaintiff of engaging in criminal activity, and, in
24   response to the "interviewer's" question as to whether he was actually leveling such
25   serious charges against Plaintiff, stated the allegations are "100% correct."

26       36.    The statements made by Defendant about Plaintiff in the "interview," and
27   published, republished, and repeated by Byrne on social media and in media
28   appearances, were false.

37.   The published statements are inherently harmful because they falsely impute that Plaintiff committed despicable and treasonous crimes, and they expose Plaintiff to hatred, ridicule, and contempt.

38.   Defendant's defamatory statements about Plaintiff constitute defamation per se because the statements are defamatory on their face, and nothing needs to be added or explained to make their defamatory meaning understood.  Moreover, the defamatory statements are defamatory per se because they explicitly and falsely charge Plaintiff with criminal activity and with engaging in unethical, illegal, and treasonous conduct.  Thus, general damages in favor of Plaintiff are presumed as a matter of law.

39.   Defendant knew that his statements were false, had no basis to believe in their truth, acted in reckless disregard and/or had serious doubts about the truth of his statements, and made these statements with actual malice.

40.   The evidence of actual malice is clear, convincing, and overwhelming. Defendant's accusations against Plaintiff are, by Defendant's own admission, inherently improbable.  Defendant acknowledged the inherent improbability of his allegations in the "interview" itself and during various media appearances.  When Defendant's false claims have been met with skepticism due to their outrageous nature, Defendant has repeatedly doubled down, claiming for example that, despite the over-the-top nature of his claims, they are "100% correct."  At one point in the "interview," Defendant is asked if he knows how "unlikely" aspects of his story sound, and Defendant responds: "Yes I do. . . . It probably checks all the boxes on megalomania with delusions of grandeur.  All I can say is: it happened."

41.   Defendant's actual malice is also proven by the extraordinary lengths to which Defendant has gone to give the false impression that his accusations are based on evidence and have been verified by trusted sources.  For example, Defendant insists that his false allegations are supported by forensic evidence (a "voicemail" that has been "voice-matched") and have been verified by federal law enforcement sources ("I was told the scheme was verified across the agencies.").  Defendant has never identified

any actual source—reliable or otherwise—that supports his outrageous claims.  Instead, Defendant has been intentionally vague, referring to unnamed shadowy figures operating within the U.S. and Iranian governments as well as an unnamed relative of an unnamed government official in Pakistan.  Plaintiff is informed and believes and thereon alleges that Defendant has no legitimate sources for his false allegations against Plaintiff and that, to the extent that any "sources" for any aspect of his claims do exist, they are completely unreliable.

42.     Similarly, Defendant's actual malice is proven by the fact that he has made false claims about his purported efforts to verify information on which the accusations are based.  For example, Defendant claims that he obtained information supporting his false accusations while visiting the "Middle East" in November 2021 and meeting with "a group including a special Iranian figure, an old friend who let me know a World War was coming, and had a proposal to avert it."  Defendant further claims: "In the course of being there, and through a mechanism I am not going to explain here, I became aware of an additional situation.  Hunter Biden was reaching out to the Iranian government in the fall of 2021. . . ".  Defendant also claims somehow to have "stolen" some "evidence" while in Iran, but apparently now says that he no longer has the evidence in his possession because it was "turned over" to the federal government.  Plaintiff is informed and believes and thereon alleges that, in reality, Defendant conducted no meaningful investigation regarding his false allegations, and, to the extent that any "investigation" occurred, it was conducted in a way that was patently unreasonable and not intended to discover the truth.  Moreover, Defendant does not have—and has never possessed—any credible "evidence" to support his false allegations.  Defendant's malice is shown by the fact that he is impervious to reality and common sense, refusing to acknowledge the absurdity of his accusations and the overwhelming evidence that refutes them.

43.     Defendant's actual malice is also proven by the fact Defendant harbors ill will toward Plaintiff and his family.  For the past several years, Defendant has dedicated

himself to proving that the 2020 presidential election was stolen from former President Trump and that the "Biden family," including Plaintiff, are "corrupt" and are actively participating in a "Deep State" conspiracy to destroy the United States. The timing and content of his false statements, particularly after the October 7, 2023 Hamas attacks, are further evidence of his hatred and ill-will toward Plaintiff.

44. Other evidence of Defendant's actual malice includes, without limitation, the fact that Defendant has peddled his false accusations against Plaintiff on programs such as *The Alex Jones Show*, which have demonstrated a propensity for spreading proven lies in the past without regard to the harm those lies inflict upon others; the fact that Defendant continues to share his false accusations on social media platforms; the fact that Defendant has sought to profit from his lies, marketing and selling them on his DeepCapture.com website as well as on Amazon, Walmart, and Barnes & Noble; the fact that Defendant has been found liable for defamation in prior litigation; and the fact that Defendant has refused to comply or even to respond to Plaintiff's demand for retraction.

45. As a result of Defendant's wrongful conduct, Plaintiff has suffered harm to his reputation and has suffered shame, mortification, and embarrassment.

46. Defendant's conduct was a substantial factor in causing Plaintiff's damages, harm, and injuries alleged herein, all in amounts according to proof and in excess of the jurisdictional minimum of this Court.

47. Plaintiff is informed and believes and thereon alleges that the aforementioned acts of Defendant were willful, oppressive, fraudulent, and/or malicious. The conduct of Defendant in publishing these false statements about Plaintiff, with knowledge of their falsity, for the express purpose of harming Plaintiff is intentional and despicable. Plaintiff is therefore entitled to punitive and exemplary damages.

## JURY TRIAL DEMAND

Plaintiff hereby respectfully demands a jury trial in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

    A. For general damages to be proven at trial;

    B. For punitive damages to be proven at trial for Defendant's willful, deliberate, and malicious actions;

    C. For prejudgment interest;

    D. For an order awarding Plaintiff his reasonable attorneys' fees and costs; and

    E. For such other and further relief as this Court may deem to be just and proper.

Respectfully submitted,

Dated: November 8, 2023

WINSTON & STRAWN LLP

By:_____

Paul Salvaty
Abbe David Lowell
Attorneys for Plaintiff

EARLY SULLIVAN WRIGHT
GIZER & McRAE LLP

By:_____

Bryan M. Sullivan
Zachary C. Hansen
Attorneys for Plaintiff