1  PAUL B. SALVATY (State Bar No. 171507)
   PSalvaty@winston.com
2  WINSTON & STRAWN LLP
   333 S. Grand Ave., 38th Fl.
3  Los Angeles, CA 90071-1543
   Telephone: (213) 615-1700
4  Facsimile: (213) 615-1750

5  ABBE DAVID LOWELL
   AbbeLowellPublicOutreach@winston.com
6  WINSTON & STRAWN LLP
   1901 L St., N.W.
7  Washington, D.C. 20036-3508
   Telephone: (202) 282-5000
8  Facsimile: (202) 282-5100

9  Bryan M. Sullivan, State Bar Number 209743
    bsullivan@earlysullivan.com
10 Zachary C. Hansen, State Bar Number 325128
    zhansen@earlysullivan.com
11 EARLY SULLIVAN WRIGHT
    GIZER & McRAE LLP
12 6420 Wilshire Boulevard, 17th Floor
   Los Angeles, California 90048
13 Telephone:  (323) 301-4660
   Facsimile:  (323) 301-4676

14
   Attorneys for PLAINTIFF
15 ROBERT HUNTER BIDEN

16                **UNITED STATES DISTRICT COURT**

17               **CENTRAL DISTRICT OF CALIFORNIA**

18                     **WESTERN DIVISION**

| | |
|---|---|
| 19  ROBERT HUNTER BIDEN, an individual, | Case No. 2:23-cv-09430-SVW-PD |
| 20 | **PLAINTIFF ROBERT HUNTER** |
| 21        Plaintiff, | **BIDEN'S OPPOSITION TO DEFENDANT PATRICK M.** |
| 22        vs. | **BYRNE'S MOTION FOR SUMMARY JUDGMENT** |
| 23  PATRICK M. BYRNE, an individual, | |
| 24        Defendant. | [*Response To Defendant Patrick Byrne's Statement Of Uncontroverted* |
| 25 | *Facts In Support Of His Motion For Summary Judgment Or, In The Alternative, Summary Adjudication And* |
| 26 | *Plaintiff's Separate Statement Of Controverted Facts*; and *Declaration of* |
| 27 | *Zachary C. Hansen filed and served concurrently herewith*] |
| 28 | |

5791506.2

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Date: November 25, 2024
Time: 1:30 P.M.
Place: Ctrm. 10A

Judge: Hon. Hon. Stephen V. Wilson



EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

**PLAINTIFF ROBERT HUNTER BIDEN'S OPPOSITION TO DEFENDANT PATRICK M. BYRNE'S MOTION FOR SUMMARY JUDGMENT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES..........................................5
I.     INTRODUCTION ...................................................................................5
II.    STATEMENT OF DISPUTED FACTS ................................................6
III.   ARGUMENT .........................................................................................13
    A.    On A Clear And Convincing Evidence Standard, Sufficient Evidence Exists For A Jury To Find That Defendant Acted With Actual Malice In Making The Defamatory Statements. ....................................13
        1.   A Reasonable Jury Could Find That Byrne Failed To Investigate The Claims Made About Plaintiff in Voicemail Messages Left By Random Unidentified Individuals. .............................................18
        2.   Byrne's Past Conduct Shows Anger And Hostility Toward The Plaintiff And His Father, President Joe Biden............................19
        3.   A Reasonable Jury Could Find That Byrne Is Reckless In Making The Statement Based On Other Claims He Makes as Being A Secret Government Operative In the Article. .............................22
        4.   Defendant's Evidence that He Acted Without Actual Malice Is Insufficient To Show That No Genuine Issue Of Fact Exists. ....23
    B.    Rule 56(d) Pending Request For Additional Discovery To Take Byrne's Deposition. ..........................................................................24
IV.    CONCLUSION ....................................................................................26

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1

## <u>TABLE OF AUTHORITIES</u>

2                                                                                                                           <u>Page</u>

**Cases**

3  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159 (1970) .................................13

4  *Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986)..............................................13

5  *Bindrim v. Mitchell*, 92 Cal. App. 3d 61, 73 (1979)..................................................15

*Celotex Corp. v. Cattrett* 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) ...........23

6  *Cf. U.S. v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1970) ................................................15

7  *Chance v. Pac-Tel. Teletrac, Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001)............24

8  *Christian Rsch. Inst. v. Alnor,* 148 Cal. App. 4th 71, 84–85 (2007)........................6

*Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 156-158 (1960) .......................................16

9  *Dodds v. American Broad. Co.*, 145 F.3d 1053, 1060 (9th Cir.1998) ......................13

10  *Eastwood v. Nat'l Enquirer*, 123 F.3d 1249, 1251 (9th Cir. 1997)...........................15

11  *Garrett v. City & Cnty. of S.F.*, 818 F.2d 1515, 1518 (9th Cir.1987) .....................24

*Gomes v Fried* (1982) 136 Cal. App. 3d 924, 934-935 ...........................................16

12  *Grenier v. Taylor*, 234 Cal. App. 4th 471, 486 (2015)..............................................13

13  *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1259 (2017) ..................................13

14  *Jackson v Paramount Pictures Corp.,* 68 Cal. App. 4th 10, 35 (1998) ...................14

*Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998) ................14

15  *Margolis v. Ryan*, 140 F.3d 850, 853 (9th Cir. 1998) ...............................................24

16  *Masson v. New Yorker Magazine,* 501 U.S. 496, 510–511 (1991) ...........................13

17  *Melaleuca, Inc. v. Clark*, 66 Cal. App. 4th 1344, 1365 (1998)................................14

*N.Y. Times v. Sullivan*, 376 U.S. 254, 279–280 (1964)...........................................14

18  *Nissan Fire & Marine Ins. Co. Ltd., v. Fritz Cos., Inc.* 210 F.3d 1099, 1102-03 (9th Cir. 2000).............................................................................................................24

19  *Reader's Dig. Assn. v. Superior Court*, 37 Cal. 3d 244, 257-58 (1984).....................6

20  *Sanborn v. Chronicle Pub. Co.*, 18 Cal. 3d 406, 413 (1976) ...................................16

21  *Sanders v. Walsh*, 219 Cal. App. 4th 855, 873 (2013) ...........................................6, 15

22  *Schoen v Schoen* 48 F.3d 412, 417 (9th Cir. 1995) ..................................................16

*St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ...............................................6, 14

23  *Time, Inc. v Pape,* 401 U.S. 279 (1971) ...................................................................15

24  *Vandenburg v Newsweek, Inc.,* 507 F.2d 1024, 1028 (5th Cir. 1975)......................15

25  *Young v. CBS Broad., Inc.*, 212 Cal. App. 4th 551, 563 (2012)...............................16

26

27

28

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.    <u>INTRODUCTION</u>

The only question on this Motion for Summary Judgment (the "Motion") is whether Plaintiff Robert Hunter Biden ("Biden" or "Plaintiff") has sufficient evidence that Defendant Patrick M. Byrne ("Byrne" or "Defendant") acted with actual malice in making public defamatory statements that Biden, the son of President Joe Biden, was seeking a bribe from Iran to release $8 billion frozen in South Korea, and to go easy in nuclear talks in 2021 to benefit himself and his family (the "Defamatory Statements").[1] In support of the Motion, Byrne's only evidence is Biden's deposition testimony that Biden did not have personal knowledge of Byrne's actions relating to the Defamatory Statement, which ignores the evidence that Byrne acted with actual malice in making the Defamatory Statement and ignores the relevant legal authority on this issue, all of which show a genuine dispute as to the material facts.

The evidence that Byrne, in making the Defamatory Statement, acted with actual malice, as set forth below, includes, the following: (i) Byrne performed no reasonable investigation into the statements before making them; (ii) Byrne relied on random, unauthenticated voicemails from unidentified individuals which, it turns out, from discovery provided by Defendant, did not even mention Biden or any bribe or any information in the statements made by Byrne; (iii) Byrne has a history of right-wing attacks on President Joe Biden, Plaintiff's father, and Plaintiff himself, which demonstrates that Byrne has anger or hostility towards Plaintiff and/or attacked Plaintiff to attack his father; (iv) Byrne's association and correspondence with other right-wing radicals who also harbor actual malice toward Biden and his family; (v) Byrne's desire to increase his profile in the right-wing online community to sell the

---

[1] For the purposes of this motion, Plaintiff will concede that Plaintiff is a public figure, but the lack of any basis or research or fact-checking for Byrne's totally made-up false charge is the definition of "actual malice."



Capitol Times Magazine article containing his statements, which forms the basis of this lawsuit, his book, and a mini-series about himself and his attacks on President Biden; and (vi) Byrne's history of claiming to be a secret government operative that gives him inside secret information for which he claims he cannot provide proof because of the classified nature of those operations, but apparently has no inhibitions about publicly broadcasting and publishing such claims as far and wide as he possibly can. All this supports a jury's reasonable inference that Byrne acted with reckless disregard for the truth. *See Reader's Dig. Assn. v. Superior Court*, 37 Cal. 3d 244, 257-58 (1984) (actual malice may be proven by inferences drawn from the accumulation of circumstantial evidence including a failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable, or known to be biased against the plaintiff); *Sanders v. Walsh*, 219 Cal.App.4th 855, 873 (2013) (same); *Christian Rsch. Inst. v. Alnor,* 148 Cal. App. 4th 71, 84–85 (2007) (same); *accord St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (actual malice found where a story is the product of imagination or is based wholly on an unverified anonymous telephone call).

Accordingly, the Court should deny Defendant's motion.

## II.    STATEMENT OF DISPUTED FACTS

This lawsuit arises from the false and defamatory statements that Byrne made about Biden in an "interview" that appeared in the "inaugural" issue of "Capitol Times Magazine," which appears originally to have been published on or about June 27, 2023 (the "Article"). (Separate Statement of Controverted Facts ("SSCF") No. 1.) On page 72 of the Article, Byrne makes the following statements about Biden (i.e., the Defamatory Statements):

> So in November 2021, I went back to the Middle East. I met with a group including a special Iranian figure, an old friend who let me know a World War was coming, and had a proposal to avert it. I told them I would relay the proposal but I did not think it would fly.

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

5791506.2                                   6
**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In the course of being there, and through a mechanism I am not going to explain here, I became aware of an additional situation. Hunter Biden was reaching out to the Iranian government in the fall of 2021 with the following offer: *You Iranians have $8 billion frozen in a bank account in South Korea. My father will unfreeze it in return for $800 million being funneled into a numbered account for us. And if you do this deal with us, it will lubricate other negotiations which have recently started between us.* By that, the Iranians believed that Hunter meant the JCPOA talks, which had restarted in Geneva a month or two previously. In other words, something along the lines of, "Pay us $100 million and we let you keep 10 nukes, $200 million for 20 nukes," etc. But I am making up the pricing. Hunter was doing this through a middleman, the son of the Minister of Defense of Pakistan. That son was meeting with Hunter, then relaying messages to someone in Iran. And he was being reckless enough to leave voicemails in Iran about it.

When I returned, the agencies went to work over the weekend. I was told a week later that they had confirmed it all. The voice on the voicemail that I had acquired was voice-matched to the son of the Minister of Defense of Pakistan, who had a connection to Hunter Biden. Anyway, in December, 2021, I was told that the scheme was confirmed across the agencies.

(SSCF No. 2) (emphasis in original). In response to the Defamatory Statements, the "interviewer" for "Capitol Times Magazine" asked Byrne to confirm what he was saying: "Patrick, you are claiming that 18 months ago, the Biden Family was seeking a bribe from Iran to release funds frozen in South Korea, and to go easy in nuclear talks, and that the United States Government has been aware of this since December, 2021?" Byrne responded: "100% correct." (SSCF No. 3.)

In the year or so prior to the publication of the Article, Byrne made numerous posts on social media platforms taunting Biden, such as the following examples:

- On March 20, 2022, Byrne posted on Telegram boasting and celebrating about a possible criminal indictment of Biden with demeaning pictures (SSCF No. 4);

- On April 7, 2022, Byrne reposted on Telegram a Tweet from another person saying "As it stands: Hunter's laptop is real, the Biden family sells access to the President" (SSCF No. 5);

- On October 20, 2022, Byrne posted a video on Telegram with a headline stating "HUNT IS ON Hunter Biden laptop report with evidence of sex & drug 'crimes' sent to Congress & lawmakers are ready to investigate" that included a link to the "Biden Laptop Report" published by right-wing radicals Marco Polo USA and Garrett Ziegler (SSCF No. 6);

- On December 12, 2022, Byrne reposted a post on Telegram with accusations against the Biden family, a demeaning picture of Plaintiff, and a screenshot of a private text thread between Plaintiff and his daughter (SSCF No. 7);

- On February 10, 2023, Byrne posted on X a taunt to Plaintiff saying "Hunter: here's the secret. It was I. Rudy [Guiliani] had only acquired a defective copy [of the laptop]. Working with a hacker, I acquired a forensic copy, caused the 400,000 file you bleached to be recovered, and gave it all to Garrett Ziegler" (SSCF No. 8);

- On February 12, 2023, Byrne posted on X a video of an interview he previously gave about Plaintiff in which he made disparaging remarks and in the post stated "Oldie but Goodie. Patrick Byrne Weights In On Jack Maxey's Hunter Biden Laptop Story" (SSCF No. 9);

- On February 24, 2023, Byrne posted on X taunting Plaintiff about Byrne's possession of files that he claims Plaintiff tried to delete and bragging that Byrne handed them over to the ring-wing radical organization Marco Polo USA, which has been on a systemic campaign of harassment against anyone associated with the Biden family for years (SSCF No. 10);

- On March 17, 2023, Byrne posted on X taunting Plaintiff and alluding to his Defamatory Statements that underline this lawsuit by saying "Hey Hunter, I acquired the forensic copy [of the laptop] add [sic] got it distributed to Garrett [Ziegler]. Sue me. While we are at it, let's talk about Iran and the son of the minister of defense of Pakistan." Byrne then posted a comment on this X post accusing Plaintiff of having child pornography (SSCF No. 11);

- On March 17, 2023, Defendant posted a comment to his own post on X from the same day accusing Plaintiff of having and creating child pornography (SSCF No. 12);

- On March 28, 2023, Byrne posted on X taunting Plaintiff by saying "Hunter Biden threatens to sue me. Hunter: be ready to answers [sic] questions about the son of the Pakistani Minister of Defense you used as a go-between & your offer through him (10% X $8 billion + "lubricate other discussions"). He was careless + I have recordings." (SSCF No. 13);

- On May 12, 2023 Byrne posted on X stating: "I have drop [sic] some major truth bombs about Iran and Hunter Biden in the last two days on Emerald Robinson. Start here at minute, 28:45." (SSCF No. 14);

- On June 24, 2023, Byrne reposted an article calling for Plaintiff to be sent to prison (SSCF No. 15).

Shortly before publishing the Defamatory Statements in the Article, Byrne aired the Defamatory Statements during public media appearances. For example, on May 10 and 11, 2023, Byrne appeared on *The Absolute Truth* with Emerald Robinson and then promoted that appearance on social media. (SSCF Nos. 16-18.) The Article was published on June 27, 2023. (SSCF No. 1.) After publishing the Defamatory Statements in the Article, Byrne then repeatedly reposted the Article on various social media platforms encouraging his followers to share it to as many people as possible and promoted the Article during right-wing media appearances, encouraging people to read and purchase copies of the magazine for themselves. (SSCF No. 19.) Byrne made a July 21, 2023 appearance on *The Alex Jones Show*, with infamous host Alex Jones and promoted the Article. (SSCF No. 20-22.) That same day, Byrne posted on X several photographs of a large utility truck driving around Washington, D.C., with TV screens on all sides displaying and promoting the Article and Byrne's Defamatory Statements about Plaintiff. (SSCF No. 23.) On September 8, 2023, Byrne appeared on *The Courtenay Turner Podcast* to promote the Article and his Defamatory Statements about Plaintiff, in which he noted that there was talk of a book and a movie coming out based on the Article. (SSCF No. 24.) He then posted a link to the

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

interview with Courtenay Turner on his Telegram page to promote it as well. (SSCF No. 25.)

Then, on October 8, 2023, shortly after news broke of the horrific terrorist attacks by Hamas against Israel on October 7th, Byrne literally "double-downed" by twice reposting the Defamatory Statements on his social media account on X suggesting that Plaintiff and his alleged criminal dealings with Iran had contributed to the terrorist attacks by Hamas against Israel, which caused more than 1,400 civilian deaths and led to what is currently a massive armed conflict in the Middle East. (SSCF No. 26.) On October 17, 2023, Defendant twice responded to U.S. Rep. Eric Swalwell's posts on social media platform X in response to Defendant's October 8, 2023 posts with the Defamatory Statements, and Defendant included a link to the Article on his deepcapture.com website. (SSCF No. 27.) These re-postings by Byrne have been viewed by more than 100,000 people. (SSCF No. 28.)

The day after Plaintiff filed this lawsuit, on November 9, 2023, Byrne posted on X taunting Plaintiff over the lawsuit and over 72,000 people viewed that post. (SSCF No. 29.) On November 13, 2023, Byrne appeared on Roger Stone's podcast, *The StoneZONE with Roger Stone*, and he once again promoted the Article, taunted Plaintiff about the lawsuit, and reiterated all of the same Defamatory Statements he asserted in the Article. (SSCF No. 30.) In his Roger Stone interview, Byrne made taunting statements such as "I won't lose two minutes of sleep on his lawsuit against me. … I have him dead to rights. … I'll meet Hunter in any court in the land. … So good luck to you, Hunter." (SSCF No. 31.) On November 9, 2023, the same day he appeared on Roger Stone's podcast, Byrne posted a link to the interview on X and promoted the interview across his social media platforms. (SSCF No. 32.)

In February 2024, Byrne published a book called *Danger Close: Domestic Extremist #1 Comes Clean* (the "Book"), which contains the same Defamatory Statements about Plaintiff that were published in the Article. (SSCF No. 33.) Since that time, Byrne has repeatedly promoted and advertised his Book across social media

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

and in various interviews with ring-wing media members. (SSCF No. 34.) Byrne has also continued his taunting of Plaintiff during this litigation, which included more derogatory statements about Plaintiff, posts doubting President Biden's loyalty to the United States, and threats before Plaintiff's deposition of "Let us see how much more prison time I can get you." (SSCF Nos. 35-37.)

Because the Defamatory Statements are completely false,[2] Plaintiff sued Defendant for defamation. In response to written discovery requests asking for Byrne to identify each and every source upon which he relied in making the Defamatory Statements, Byrne admitted that, in making the Defamatory Statements, he only relied on the information set forth in the Affidavit of John Moynihan, information provided to him by David Smith, and the telephone voicemail recordings (the "Recordings"). (SSCF No. 39.) However, ***none*** of these are reliable sources or in any manner support his false statements:

- The Affidavit of John Moynihan does not contain any supporting information about the Defamatory Statements other than just reiterating Byrne's Defamatory Statements, and Mr. Moynihan actually admits his knowledge of the same is based off a recording on a cell phone that Byrne showed him and not from independent sources. (SSCF No. 40.)

- The unauthenticated Recordings do not identify who the caller is nor do they contain any information about Plaintiff or the Defamatory Statements and do not even mention the name Hunter Biden or any bribe or any information in the statements made by Byrne. (SSCF No. 41.)

- David Smith was identified by Defendant in discovery responses as being an FBI agent and listed the Washington DC field office as his contact, but no evidence has been presented as to what Mr. Smith told Defendant about Plaintiff or the Defamatory Statements. (SSCF No. 42.)

Such wild statements without any evidentiary support are common with Byrne, who claims to have played important roles in various clandestine "operations"

---

[2] Plaintiff denies all of the allegations by Defendant in the Defamatory Statements. (SSCF Nos. 38, 47). At his deposition, Plaintiff testified: "Mr. Byrne's statements are patently fiction, completely made up[.]" (SSCF No. 47.)

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

conducted on behalf of the "United States Government." (SSCF No. 43.) According
to Byrne, he has carried out numerous secret spy "missions" for "Uncle Sam" (with
cloak-and-dagger nicknames such as "Operation Snow Globe") to advance United
States interests around the world, including helping to restore "peaceful relations" in
Vietnam in 1994, helping to prevent a war with Iran in 2006, assessing the "computer
science capabilities" of Venezuela in 2018, and, of course, entering into an intimate
relationship with 26 year-old Maria Butina, apparently as a means to help the FBI
gather "intel" on Russia. (SSCF No. 44.) (Byrne claims he let his FBI handlers
know: "I am not seeing Maria unless you folks use the word 'greenlight' with me. I
got back a simple message: 'Greenlight.'") (SSCF No. 44.) Byrne further claims
that, at times, the requests for him to deploy his "unique" skills to help the United
States have come directly from the highest levels of the U.S. government, including,
without limitation, President Barack Obama and FBI Director James Comey,
personally, although they were communicated to Byrne verbally by unnamed special
agents for the FBI. (SSCF No. 45.) Byrne frequently admits he has no documentation
to support his self-aggrandizing claims—his "patriotic" activities have been too secret
and dangerous for documentation. (SSCF No. 46.)

Importantly since resigning from his position as chief executive officer of
Overstock.com in 2019, Byrne has emerged as a leading promoter of unsupported
conspiracy theories, primarily relating to the so-called "Deep State" and to his claim
that the 2020 presidential election was "stolen" from former President Donald Trump
by Plaintiff's father, President Joe Biden. (SSCF Nos. 45, 48-52, 56.) Byrne insists
that the violent uprising at the Capitol on January 6, 2021 was not an "insurrection,"
but rather was a "fed-surrection" orchestrated by enemies of President Trump working
within his own government. (SSCF Nos. 22, 53-55.) In a recent interview with the
far-right conspiracy theorist and prolific spreader of proven lies, Alex Jones, Byrne
described his ongoing fight to "de-Nazi-fy" our federal "institutions" and to rescue
America from an ongoing plot by "globalists" to "colonize" the United States and turn

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1  it into a "vassal state" that will serve as "a farm to China." (SSCF No. 22.) As part

2  of this, Byrne has engaged in a social media campaign against Plaintiff's father,

3  President Biden, and has sought to defame Plaintiff to embarrass President Biden,

4  who Byrne appears to blame for all the problems in the United States.

5  **III.    ARGUMENT**

6       Where the factual dispute concerns actual malice, the appropriate summary

7  judgment question will be whether the evidence in the record could support a

8  reasonable jury finding that the plaintiff has shown actual malice by clear and

9  convincing evidence. *Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986); *see*

10  *also Dodds v. American Broad. Co.*, 145 F.3d 1053, 1060 (9th Cir.1998), *cert.*

11  *denied,* 525 U.S. 1102 (1999). The evidence of the non-movant is to be believed, and

12  all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255-56

13  (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159 (1970)); *Masson v. New*

14  *Yorker Magazine,* 501 U.S. 496, 510–511 (1991)). If a plaintiff can come forward

15  with clear and convincing evidence from which a jury could find actual malice, he is

16  entitled to a trial even if there is conflicting evidence on the issue. *Anderson,* 477

17  U.S. at 257. As described below, Plaintiff has met this burden.

18       **A.    On A Clear And Convincing Evidence Standard, Sufficient**

19          **Evidence Exists For A Jury To Find That Defendant Acted With**

20          **Actual Malice In Making The Defamatory Statements.**

21       "Defamation is the intentional publication of a statement of fact that is false,

22  unprivileged, and has a natural tendency to injure or that causes special damage."

23  *Grenier v. Taylor*, 234 Cal. App. 4th 471, 486 (2015); *Jackson v. Mayweather*, 10

24  Cal. App. 5th 1240, 1259 (2017). If the person defamed is a public figure, that person

25  cannot recover unless he proves, by clear and convincing evidence "that the libelous

26  statement was made with 'actual malice'—that is, with knowledge that it was false or

27  with reckless disregard of whether it was false or not." *Jackson*, 10 Cal. App. 5th at

28  1259 (footnotes and internal citations omitted). "Actual malice under the *New York*

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

*Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will…. In place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity."[3]  *Masson,* 501 U.S. at 510–511 (internal citations omitted); *see also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *N.Y. Times v. Sullivan*, 376 U.S. 254, 279–280 (1964).  Actual malice "does not require that the reporter hold a devout belief in the truth of the story being reported, only that he or she refrain from either reporting a story he or she knows to be false or acting in reckless disregard of the truth." *Jackson v Paramount Pictures Corp.,* 68 Cal. App. 4th 10, 35 (1998).

"The law is clear [that] the recklessness or doubt which gives rise to actual or constitutional malice is subjective recklessness…." *Melaleuca, Inc. v. Clark*, 66 Cal. App. 4th 1344, 1365 (1998).  However, a defendant cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant*, 390 U.S. at 731.  Rather, "the finder of fact must determine whether the publication was indeed made in good faith." *Id.*  The Ninth Circuit recognized: "Direct evidence to this effect is extremely difficult to obtain, so actual malice may be proven by circumstantial evidence, given the totality of the circumstances surrounding the publication." *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998).  In this vein, the California Supreme Court has held:

> "A defamation plaintiff may rely on inferences drawn from circumstantial evidence to show actual malice. [Citation.] 'A failure to investigate [fn. omitted] [citation], anger and hostility toward the plaintiff [citation], reliance upon sources known to be unreliable

---

[3] While the Court's have said "actual malice" is not the same as "malice" (meaning "spite," or "ill will") against the Plaintiff, evidence of the defendant's animosity or hostility may be a factor in analyzing whether the defendant acted with "knowledge of falsity or reckless disregard to truth or falsity," or, in other words, "actual malice." *See Reader's Dig.*, 37 Cal. 3d at 257-258; *Sanders*, 219 Cal. App. 4th at 873; *Christian Rsch.*, 148 Cal. App. 4th at 84–85.



EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

5791506.2

14

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

[citations], or known to be biased against the plaintiff [citations]—such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.' "[4]

*Reader's Dig.*, 37 Cal. 3d at 257-258; *See also Sanders v. Walsh*, 219 Cal. App. 4th 855, 873 (2013) (quoting *Christian Rsch.,* 148 Cal. App. 4th at 84–85).

The U.S. Supreme Court also has held that statements "of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, *is the product of his imagination*, or *is based wholly on an unverified anonymous telephone call*." *St. Amant*, 390 U.S. at 732 (emphasis added). Similarly, an inference of actual malice may be drawn "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation[,] ... [or] where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [fn. omitted.]" *Id.*; *see also Eastwood v. Nat'l Enquirer*, 123 F.3d 1249, 1251 (9th Cir. 1997) ("Reckless disregard" also applies if the defendant had "'obvious reasons to doubt the veracity'" of its statements, but engaged in "'purposeful avoidance of the truth.'"); *Cf. U.S. v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1970) (en banc) (willful blindness tantamount to knowledge). The accumulation of evidence regarding these factors and the inferences that can be drawn from them "indicate that the publisher himself had serious doubts regarding the truth of his publication" and establishes a defendants' reckless disregard for the truth or of his

---

[4] Defendant cites *Bindrim v. Mitchell*, 92 Cal. App. 3d 61, 73 (1979) for the proposition that he had no duty to investigate the Defamatory Statements. *See* Motion, at 7:20-27. But that case is inapplicable because it held that there was no duty to investigate whether a fictional character defames a real person. *Bindrim* did recognize a duty to investigate non-fiction news stories on a defendant. Defendant's other cases cited in that paragraph are also inapplicable or inapposite. *See Time, Inc. v Pape,* 401 U.S. 279 (1971) (reporter's article about incident detailed in a government report was not defamatory because reporter did not use the word "alleged" as was used in the report); *Vandenburg v Newsweek, Inc.,* 507 F.2d 1024, 1028 (5th Cir. 1975) (recognizing actual malice may be inferred when the investigation was grossly inadequate in the circumstances).

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

knowledge of falsity.[5]  *Reader's Dig.,* 37 Cal. 3d at 257–258; *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 156-158 (1960) ("The Supreme Court has held that actual malice may be inferred when the investigation for a story which is not 'hot news' was grossly inadequate in the circumstances").

As an example of a finding of clear and convincing evidence of actual malice, in *Sanders*, 219 Cal. App. 4th at 874, the defendant contended that she held an honest belief that the statements she posted on RipoffReport.com about the plaintiff being a corrupt city official were true based on her experience in circumstances surrounding her small claims with the plaintiff.  However, she offered no other argument, and the Court found that the patently false nature of the claims, the defendant's false denial that she posted the statements were substantial evidence to support the trial court's finding of actual malice.  As further evidence of actual malice, ***the Court highlighted the harsh statements the defendant admitted making about the plaintiff demonstrating a hostile attitude towards plaintiff***.  *Id. (emphasis added.)*

As another example, in *Curtis Publishing,* 388 U.S. at 157-158, the evidence

[5] Defendant cites a litany of cases (many of which are cited herein) on the actual malice standard (Motion at 6:8-8:4) asserting that there was no duty to investigate or write an objective account of the facts or ill will alone will not support a finding of actual malice (Motion at 7:20-27).  However, Defendant ignores the holdings of these cases that "while a failure to investigate alone" or "mere proof of ill will" alone is not conclusive of actual malice, "the combination of multiple factors set forth in this brief, may indicate that the publisher himself had serious doubts regarding the truth of his publication."  *Reader's Dig.*, 37 Cal. 3d at 257-258; *see also Young v. CBS Broad., Inc.*, 212 Cal. App. 4th 551, 563 (2012) (recognizing evidence combination of factors can indicate actual malice); *Melaleuca*, 66 Cal. App. 4th at 1365 (evidence established the defendant's subjective good faith); *Sanborn v. Chronicle Pub. Co.*, 18 Cal. 3d 406, 413 (1976) (evidence established the defendant's lack of good faith in the statements); *Schoen v Schoen* 48 F.3d 412, 417 (9th Cir. 1995) (actual malice may be shown by circumstantial evidence); *Gomes v Fried* (1982) 136 Cal. App. 3d 924, 934-935 (recognizing ill will *alone* does not prove actual malice); *Jackson*, 68 Cal. App. 4th at 33 (recognizing that defendant must have evidence to support his belief in the statement).

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1  showed that the defendant published an unreliable informant's false description of the
2  plaintiff's agreement to "fix" a college football game. Although there was reason to
3  question the informant's veracity, the defendant did not interview a witness who had
4  the same access to the facts as the informant and did not look at film that revealed
5  what actually happened at the "fixed" game. *Id*. This evidence of an intent to avoid
6  the truth was sufficient to satisfy the demanding *New York Times* standard in reversing
7  a jury verdict. *Id*.

8      As a final example, in *Kaelin,* the Court found that the plaintiff met the burden
9  to defeat summary judgment on his defamation claim against a newspaper that
10 asserted in a headline that the plaintiff killed O.J. Simpson's estranged wife. *Id.* at
11 1042. The Ninth Circuit based that finding on the following evidence: (i) The
12 newspaper editor testified he did not think it "was very accurate to the story" from
13 which a reasonable juror could find that the newspaper knew the headline was
14 factually inaccurate or acted with reckless disregard for the truth; (ii) the newspaper
15 ran the headline "COPS THINK KATO DID IT!" *knowing* that it had no reason to
16 believe that Kaelin was a murder suspect; and (iii) the newspaper editor testified at
17 deposition that "the front page of the tabloid paper is what we sell the paper on, not
18 what's inside it," which permitted a reasonable juror to draw the inference that Globe
19 had a pecuniary motive for running an inaccurate headline. *Id.*

20     Based on the evidence set forth below, a reasonable jury could find, by clear
21 and convincing evidence, that Byrne acted with actual malice in making the
22 Defamatory Statements. Indeed, Defendant performed no reasonable investigation
23 (likely none at all) into the Defamatory Statements and relied on phantom voicemails
24 from unidentified individuals which, when listened to, have no reference to Plaintiff
25 or support the Defamatory Statements in any way. Indeed, even after Plaintiff brought
26 the defamatory nature of the allegations to his attention, Byrne still did not research
27 or supplement his basis for making the claims. Further, Defendant's history of
28 unsupported attacks on President Biden, Plaintiff's father, demonstrates Defendant's

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

anger or hostility towards Plaintiff or that he provokes or attacks Plaintiff as a vehicle to target Plaintiff's father.  In addition to those factors, Byrne's own history of claiming with no back-up whatsoever to be a secret government operative with exploits that would make John Le Carré and Robert Ludlum blush would support a jury's inference that Byrne acted with reckless disregard for the truth.

> 1.    **<u>A Reasonable Jury Could Find That Byrne Failed To Investigate The Claims Made About Plaintiff in Voicemail Messages Left By Random Unidentified Individuals.</u>**

Byrne has identified no actual sources and no actual evidence for any of the Defamatory Statements and, as such, Byrne has no reasonable, valid, or factual basis to have made the Defamatory Statements.  In response to written discovery requests, Byrne has admitted that, in making the Defamatory Statements, he only relied on the information set forth in the Affidavit of John Moynihan, information provided to him by David Smith, and three purported Recordings. (SSCF No. 39.)  However, none of these are reliable and all are of questionable credibility.  Indeed, the Affidavit of Mr. Moynihan and the Recordings do not contain any supporting information about the Defamatory Statements and the Recordings do not even mention Plaintiff's name. (SSCF Nos. 40-41.)  As to David Smith, Byrne has not provided any information, statements, or documents that were provided by Mr. Smith. (SSCF No. 42.)

A reasonable jury could infer from the fact that Byrne based his egregious Defamatory Statements entirely on voicemails from unidentified individuals which do not even mention anything relevant to this matter, a self-serving declaration from an affiant that admits he has no independent knowledge of the basis for Byrne's Defamatory Statements, and an FBI agent for whom Byrne has produced no documents, statements, or any other documents demonstrating what it is that person knew and told Byrne, that Defendant acted with actual malice. *See Reader's Dig.*, 37 Cal. 3d at 257-258 (actual malice may be proven by inferences drawn from the accumulation of circumstantial evidence including a failure to investigate or reliance

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

5791506.2

18

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

1   upon sources known to be unreliable); *Sanders*, 219 Cal. App. 4th at 873 (same);

2   *Christian Rsch.*, 148 Cal. App. 4th at 84–85 (same).  These facts fall squarely within

3   the framework set forth by the U.S. Supreme Court in *St. Amant* for finding actual

4   malice because it appears Byrne's Defamatory Statements are "based wholly on an

5   unverified anonymous telephone call."  *St. Amant*, 390 U.S. at 732.

6           **2.      Byrne's Past Conduct Shows Anger And Hostility Toward**

7                   **The Plaintiff And His Father, President Joe Biden.**

8           Since 2019, Byrne has emerged as a leading promoter of unsupported fringe

9   conspiracy theories, primarily relating to the so-called "Deep State" and to his claim

10  that the 2020 presidential election was "stolen" from former President Donald Trump

11  by Plaintiff's father, President Joe Biden, and has published a book about this

12  conspiracy theory.  (SSCF Nos. 45, 48-52, 56.)  In the year or so prior to the

13  publication of the Article, Byrne posted numerous times on various social media

14  platforms taunting Plaintiff on various subjects, which included: (1) demeaning

15  pictures of Plaintiff; (2) private messages between Plaintiff and his daughter; (3)

16  boasting claims about how Byrne was the person who provided a "forensic copy" of

17  the purported "Hunter Biden Laptop" with over 400,000 files to Rudy Guiliani and

18  right-wing radical Garrett Ziegler/Marco Polo USA; (4) celebrations about a potential

19  criminal indictment against Plaintiff and calling for him to be sent to prison; (5) insults

20  directed at Plaintiff's father, President Joe Biden; (6) claims that Plaintiff was in the

21  possession of child pornography; and (7) taunts to Plaintiff to "sue me".  (SSCF Nos.

22  4-15.)

23          After the publication of the Article, Byrne went on a campaign to promote his

24  Defamatory Statements to as many people as he possibly could.  (SSCF Nos. 16-34.)

25  Shortly after the publication of the Article, he raised the Defamatory Statements in an

26  interview with the far-right conspiracy theorist and prolific spreader of proven lies,

27  Alex Jones. (SSCF Nos. 20-22.)  In a subsequent interview with Roger Stone, Byrne

28

once again promoted the Article, taunted Plaintiff about the lawsuit, and reiterated the Defamatory Statements. (SSCF Nos. 29-32.)

In October 2023, after the Article was published, Byrne took his malicious conduct to another level when he posted screenshots on X of his Defamatory Statements insinuating that Plaintiff was complicit in the Hamas terrorist attack on Israel on October 7, 2023, which killed over 1,400 people and was the worst mass murder of the Jewish people since the Holocaust. (SSCF No. 26.) As Byrne knows, Plaintiff's wife and son are both Jewish, a fact that is publicly available, and so this attack by Byrne had a particularly higher level of malicious motivation behind it.

Moreover, since this case was filed, Byrne has regularly taunted Plaintiff about the lawsuit. This included a post on X the day after the lawsuit was filed, in which Byrne said: "Hunter's lawsuit against me (my interpretation): "Now that I've got Daddy's DOJ under control… Let's silence Byrne with a lawsuit + gag order." Good luck with that. PS Hunter, my 1st witness is a 35 year federal agent who will attest I told the truth and FBI verified it." (SSCF Nos. 29-32, 35-37.) No such "witness" was presented in discovery. On June 5, 2024, Byrne put a post on his Telegram account mocking this litigation and once again boasting: "Hey Hunter, don't forget: I was the guy who got the unredacted version of your hard drive into the hands of Marco Polo" and finished the post with calling Plaintiff "beeyatch." (SSCF No. 36.) Then, a few weeks before Plaintiff's deposition in this matter, Byrne posted the following threat to Plaintiff on X: "Hi Hunter. I understand [sic] am going to be deposing you in about three weeks? Hoorah! Wait until you see what I have on you. Let us see how much more prison time I can get you." (SSCF No. 35.) Most recently, on October 7, 2024, Byrne put a post on his Telegram account insinuating that Plaintiff and his father, President Joe Biden, were affiliated with the communist party, stated that he was "starting to doubt Biden loyalty to USA", that "I think (and hope) Biden knows he got ass-rape-humiliated by Obama this year", and then compared him to Darth Vader from the Star Wars franchise. (SSCF No. 37.)

To further spread his disdain and ill-will for the Biden family, Defendant has engaged in a social media campaign against Plaintiff's father, President Biden, and has sought to defame Plaintiff to embarrass President Biden, who Byrne appears to blame for all the problems in the United States. (SSCF Nos. 33-34, 48-58.) Further, Byrne has made clear he has a financial reason to promote his false statements. He posts about the foregoing on his social media platform where he advertises various related merchandise, such as his Book entitled *Domestic Extremist #1 Comes Clean*, in which Byrne includes the same Defamatory Statements that are in the Article as well. (SSCF Nos. 33-34.) Finally, just recently, Byrne announced that his Book with the Defamatory Statements is being turned into a mini-series called *The Enemy Within* that viewers must pay to watch, which is advertised on Byrne's X account, and in a dedicated website for the mini-series. (SSCF Nos. 57-58.)

So, in addition to Byrne's failure to investigate the basis of his claims, Byrne's anger and hostility toward Plaintiff and his family, as well as the fact that he is biased against the Plaintiff and his family, are obvious based on Byrne's conduct and public statements set forth herein, all of which are evidence of actual malice. *See Reader's Dig.*, 37 Cal. 3d at 257-258 (actual malice may be proven by inferences drawn from the accumulation of circumstantial evidence including anger and hostility toward the plaintiff or known to be biased against the plaintiff); *Sanders*, 219 Cal. App. 4th at 873 (same); *Christian Rsch.,* 148 Cal. App. 4th at 84–85 (same). In addition, like the newspaper in *Kaelin*, Byrne has a pecuniary interest in making the Defamatory Statements about Plaintiff, a popular target by the right-wing political spectrum, which Byrne has actively promoted to fuel sales of Byrne's Book, mini-series, and/or grow his platform among his right wing followers. *See Kaelin,* 162 F.3d at 1042 (in denying newspaper's summary judgment motion, the Court relied on evidence showing that the newspaper had a pecuniary motive for running an inaccurate headline that defamed the plaintiff).

///

EARLY SULLIVAN WRIGHT GIZER & MCRAE LLP
ATTORNEYS AT LAW

### 3.    A Reasonable Jury Could Find That Byrne Is Reckless In Making The Statement Based On Other Claims He Makes as Being A Secret Government Operative In the Article.

Throughout his life, Byrne has claimed to have played important roles in various clandestine "operations" conducted on behalf of the United States Government and that, at times, the requests for him to deploy his "unique" skills to help the United States have come directly from the highest levels of the U.S. government, including, without limitation, President Barack Obama and FBI Director James Comey, personally, although they were communicated to Byrne verbally by unnamed special agents for the FBI.  (SSCF Nos. 43-46.)  Byrne frequently admits he has no documentation to support his self-aggrandizing claims—his "patriotic" activities have been too secret and dangerous for documentation although apparently these activities are not so secret that Byrne is precluded from discussing them.  Indeed, for someone involved in so-called covert activity, he appears to forget the covert nature of the activities when trying to promote himself or his work.  (SSCF Nos. 43-46.)

Indeed, even in discovery motions in this litigation, Byrne gave wild and differing claims about why he was now "residing" in Dubai. (SSCF Nos. 61-65.) First, Byrne's counsel said he was informed by unidentified DEA agent that the Venezuelan government placed a $25 million bounty on him, and he did not want to return to the United States due to safety issues.  (SSCF Nos. 61-65.) Then when Plaintiff's counsel questioned that excuse, Byrne claimed in a declaration that he was in Ghana cooperating with an official with the Ghanian Ministry of Security who informed Defendant that criminals in West Africa were cooperating to get him in a position where he could be kidnapped.  (SSCF Nos. 61-65.)

Evidence of these types of actions can permit a jury to infer that Byrne likes the attention of claiming to know "covert" and "secret" information and then makes wild statements to keep up that impression and that such actions led Byrne to make

the Defamatory Statements to continue the impression he is some sort of international man of mystery. Such desire for attention as having "covert" and "secret" information is motive to make the Defamatory Statements with actual malice and supports a jury finding of actual malice. *See Kaelin,* 162 F.3d at 1042 (newspaper had motive for running an inaccurate headline that defamed the plaintiff); *see also Reader's Dig.* 37 Cal. 3d at 257-258 (actual malice may be proven by inferences drawn from the accumulation of circumstantial evidence); *Sanders*, 219 Cal. App. 4th at 873 (same); *Christian Rsch.,* 148 Cal. App. 4th at 84–85 (same).

### 4. Defendant's Evidence that He Acted Without Actual Malice Is Insufficient To Show That No Genuine Issue Of Fact Exists.

The only evidence Byrne presented in support of this Motion involve Plaintiff's lack of personal knowledge as to whether Defendant: (i) ever made statements about Plaintiff with any ill will (Defendant's Undisputed Material Facts ("UMF") No. 43-44); (ii) knew the Defamatory Statements Defendant made were false (UMF No. 38); (iii) harbored serious doubts about the veracity of the Defamatory Statements Plaintiff alleged Defendant made (UMF No.39); (iv) traveled to the Middle East (UMF No. 28); (v) met anyone while in the Middle East (UMF No. 29-30); (vi) actually obtained the voicemail discussions mentioned in the Capitol Times article (UMF No. 31); and (vii) turned over the voicemails to the government (UMF No. 32). Notably, whether or not Plaintiff has personal knowledge of the above facts is irrelevant to the issue of the falsity of the Defamatory Statements and Defendant making the Defamatory Statements with actual malice, on which Plaintiff has presented clear and convincing evidence that would support a jury's finding of such. Moreover, Defendant has not presented any evidence showing that he had any reasonable basis for making the statements. In short, Defendant failed to carry his burden on this Motion. See *Celotex Corp. v. Cattrett* 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (moving party has the initial burden of proof of identifying relevant portions of the record that demonstrate an absence of facts upon which the moving party seeks judgment);

1   *Nissan Fire & Marine Ins. Co. Ltd., v. Fritz Cos., Inc.* 210 F.3d 1099, 1102-03 (9th

2   Cir. 2000) (If the moving party fails to carry its initial burden of production, the

3   nonmoving party has no obligation to produce anything).

4       **B.    Rule 56(d) Pending Request For Additional Discovery To Take**

5           **Byrne's Deposition.**

6       Still pending and the result of his delays and excuses, Byrne's deposition has

7   not yet been taken.  Just on October 30, 2024, after all of the reasons Byrne put

8   forward to cause his deposition to be taken in the U.A.E. were rejected, this Court

9   ruled he had to be deposed in the United States.  (SSCF No. 63.)  Byrne has until

10  November 4, 2024 to designate the district in which that will occur.

11      With that pending deposition in mind, Rule 56(d) of the Federal Rules of Civil

12  Procedure provides:

13              If a nonmovant shows by affidavit or declaration that, for

14              specified reasons, it cannot present facts essential to justify

15              its opposition, the court may:

16                  (1) defer considering the motion or deny it;

17                  (2) allow time to obtain affidavits or declarations or

18                  to take discovery; or

19                  (3) issue any other appropriate order.

20      "In making a Rule 56(d) request, a party opposing summary judgment 'must

21  make clear what information is sought and how it would preclude summary

22  judgment.' " *Margolis v. Ryan*, 140 F.3d 850, 853 (9th Cir. 1998) (quoting *Garrett*

23  *v. City & Cnty. of S.F.*, 818 F.2d 1515, 1518 (9th Cir.1987)).  "The burden is on the

24  party seeking additional discovery to proffer sufficient facts to show that the evidence

25  sought exists, and that it would prevent summary judgment." *Chance v. Pac-Tel.*

26  *Teletrac, Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001).

27      Here, Plaintiff has diligently pursued discovery and sought the deposition of

28  Byrne immediately after Byrne deposed Plaintiff on August 16, 2024.    After

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

5791506.2                                   24
**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant's counsel's vacation, on September 2, 2024, the Parties spoke about scheduling Byrne's deposition for the month of September in person in Florida, which is Defendant's state of residence. (SSCF Nos. 61-65.) However, on September 11, 2024, Byrne's counsel stated that any in-person deposition would have to be in Dubai or via zoom from Dubai, which Plaintiff had an issue with because of the time it takes to travel to Dubai and, upon legal research, the legality of a deposition in Dubai. (SSCF Nos. 61-65.) Since that time, Byrne's deposition has been the subject of two informal discovery conferences on September 18, 2024 and October 4, 2024, and is the subject of a discovery motion that was filed on October 9, 2024, and which the Court ruled on October 30, 2024, that Byrne would be required to return to the United States for his deposition before trial and was required to inform Plaintiff's counsel by November 4, 2024, what federal district he will choose to appear for his deposition in. (SSCF Nos. 61-65.) Byrne's deposition has not yet occurred due to the foregoing discovery disputes. (SSCF Nos. 61-65.)

While the record set forth above (and lack of anything supporting Defendant) is clear enough to deny his motion for summary judgment as it stands, if there is any doubt about that, then this motion should be continued to allow Plaintiff to depose Byrne before the Court rules on this Motion. Plaintiff anticipates that Byrne's deposition will provide further evidence of actual malice on the part of Byrne, especially considering the evidence presented above in Section B.1-3 of this Opposition. More specifically, Plaintiff would ask about what conversations Defendant had with David Smith as well as more information about David Smith, who was one of the people on whom Defendant claims to have relied in making the Statement. Given the lack of information relating to Plaintiff or the Statements in the Affidavit of John Moynihan and in the Recordings, one can only assume that further questioning would reveal similar insufficient information from David Smith. At Defendant's deposition, Plaintiff would also ask about the issues on which Byrne bases this motion relating to Plaintiff's supposed lack of information.

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

1     Accordingly, should the Court have any hesitancy to deny the summary

2 judgment motion on the record that exists now, Plaintiff requests that the Court

3 continue it to a later date to allow Plaintiff to depose Byrne.[6]

4 **IV.   <u>CONCLUSION</u>**

5     For the foregoing reasons, the Court should deny Defendant's motion for

6 summary judgment in full.

7

8 Dated:  November 4, 2024                    EARLY SULLIVAN WRIGHT
                                             GIZER & MCRAE LLP
9

10                                   By:    */s/ Zachary C. Hansen*

11

12                                          BRYAN M. SULLIVAN (State Bar No.
                                            209743)
13                                          bsullivan@earlysullivan.com
                                            ZACHARY C. HANSEN (State Bar No.
14                                          325128)
                                            zhansen@earlysullivan.com
15                                          EARLY SULLIVAN WRIGHT GIZER
                                            & McRAE LLP
16                                          6420 Wilshire Boulevard, 17th Fl.
                                            Los Angeles, California 90048
17                                          Telephone: (323) 301-4660
                                            Facsimile: (323) 301-4676
18

19                                          PAUL B. SALVATY (State Bar No.
                                            171507)
20                                          PSalvaty@winston.com

21 ───────────────────
[6] Defendant failed to properly meet and confer pursuant to Local Rule 7-3, requiring
22 that counsel must first contact opposing counsel to discuss thoroughly the substance
of the motion.  Without attaching any proof, Defendant's counsel claimed in the
23 Notice of Motion that he made two attempts at a conference of counsel both of which
were ignored by Plaintiff's counsel. This is because Defendant's counsel made no
24 actual good faith attempt to have this conference.  As shown by  the two emails sent
by Defendant's counsel on August 17, 2024 and September 30, 2024, Defendant
25 merely stated an intent to file a summary judgment motion without requesting a
meeting of counsel or stating on what basis such a motion would be made.  (SSCF
26 Nos. 66.)  That is not the notice contemplated under the Local Rule.  Defendant's
27 motion should be denied for this failure and the misrepresentation to the Court.
28

1

2

3

WINSTON & STRAWN LLP
333 S. Grand Ave., 38th Fl.
Los Angeles, CA 90071-1543
Telephone:  (213) 615-1700
Facsimile:  (213) 615-1750

4

5

6

7

8

ABBE DAVID LOWELL (*pro hac vice* forthcoming)
AbbeLowellPublicOutreach@winston.com
WINSTON & STRAWN LLP
1901 L St., N.W.
Washington, D.C. 20036-3508
Telephone:  (202) 282-5000
Facsimile:   (202) 282-5100

9

10

*Attorney for Plaintiff*
*Robert Hunter Biden*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**