PAUL B. SALVATY (State Bar No. 171507)
*PSalvaty@winston.com*
WINSTON & STRAWN LLP
333 S. Grand Ave., 38th Fl.
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

ABBE DAVID LOWELL (*pro hac vice* forthcoming)
*AbbeLowellPublicOutreach@winston.com*
WINSTON & STRAWN LLP
1901 L St., N.W.
Washington, D.C. 20036-3508
Telephone: (202) 282-5000
Facsimile: (202) 282-5100

Bryan M. Sullivan, State Bar Number 209743
*bsullivan@earlysullivan.com*
Zachary C. Hansen, State Bar Number 325128
*zhansen@earlysullivan.com*
EARLY SULLIVAN WRIGHT
GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

Attorneys for PLAINTIFF
ROBERT HUNTER BIDEN

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

ROBERT HUNTER BIDEN, an individual,

Plaintiff,

vs.

PATRICK M. BYRNE, an individual,

Defendant.

Case No. 2:23-cv-09430-SVW-PD

**PLAINTIFF ROBERT HUNTER BIDEN'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Judge: Hon. Stephen V. Wilson, Ctrm. 10A

# TABLE OF CONTENTS

**Page**

I. CLAIMS AND DEFENSES ... 2
A. Plaintiff's Claim. ... 2
B. Elements Of Plaintiff's Defamation Claim. ... 2
C. Key Evidence In Support Of Plaintiff's Defamation Claim. ... 4
D. Defendant Patrick Byrne's Affirmative Defenses. ... 12
E. Elements Of Byrne's Affirmative Defenses. ... 12
1. Plaintiff Is A Public Figure ... 12
2. Truth ... 13
3. First Amendment ... 13
4. Good Faith/No Malice ... 14
5. Failure to State a Claim ... 14
6. Unclean Hands ... 14
7. Failure to Mitigate ... 14
8. Statute of Limitations ... 15
9. Laches ... 15
F. Key Evidence In Opposition To Each Affirmative Defense. ... 15
II. ANTICIPATED EVIDENTIARY ISSUES ... 16
III. ISSUES OF LAW GERMANE TO THE CASE ... 16
IV. BIFURCATION OF ISSUES ... 16
V. JURY TRIAL ... 16
VI. ATTORNEYS' FEES ... 16
VII. ABANDONED CLAIMS OR ISSUES ... 17

Pursuant to Local Rule 16-4 of the United States District Court for the Central District of California, Plaintiff Robert Hunter Biden ("Biden" or "Plaintiff"), respectfully submits the below Memorandum of Contentions of Fact And Law (the "Memorandum").[1]

## I. CLAIMS AND DEFENSES

### A. Plaintiff's Claim.

First Claim for Relief: Defamation

### B. Elements Of Plaintiff's Defamation Claim.

"The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. 'In general, … a written communication that is false, that is not protected by any privilege, and that exposes a person to contempt or ridicule or certain other reputational injuries, constitutes libel.' The defamatory statement must specifically refer to, or be ' "of [or] concerning," ' the plaintiff." *Jackson v. Mayweather*, 10 Cal.App.5th 1240, 1259 (2017) (internal citations omitted); *Grenier v. Taylor*, 234 Cal.App.4th 471, 486 (2015).

If the person defamed is a public figure,[2] that person cannot recover unless he proves, by clear and convincing evidence "that the libelous statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard

---

[1] Plaintiff reserves the right to amend this Memorandum on the grounds that Plaintiff has not taken the deposition of Defendant because Defendant's deposition has been the subject of two informal discovery conferences and a discovery motion that the Court ruled on October 30, 2024, ordering that Byrne would be required to return to the United States for his deposition before trial and must inform Plaintiff's counsel which federal district he plans to appear in for his deposition by November 4, 2024. (Dkt. #67, 79, 80, 87).

[2] For the purposes of this case, Plaintiff will concede that Plaintiff is a public figure, but the lack of any basis or research or fact-checking for Byrne's totally made-up false charge is the definition of "actual malice."



of whether it was false or not." *Jackson*, 10 Cal.App.5th at 1259 (footnotes and internal citations omitted). "Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will…. In place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity." *Masson v. New Yorker Magazine,* 501 U.S. 496, 510–511 (1991) (internal citations omitted); *see also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *New York Times v. Sullivan*, 376 U.S. 254, 279–280 (1964). Actual malice "does not require that the reporter hold a devout belief in the truth of the story being reported, only that he or she refrain from either reporting a story he or she knows to be false or acting in reckless disregard of the truth." *Jackson,* 68 Cal.App.4th at 35.

"The law is clear [that] the recklessness or doubt which gives rise to actual or constitutional malice is subjective recklessness or doubt." *Melaleuca, Inc. v. Clark*, 66 Cal.App.4th 1344, 1365 (1998). However, a defendant cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant*, 390 U.S. at 731. Rather, "the finder of fact must determine whether the publication was indeed made in good faith." *Id.* The Ninth Circuit has recognized that "[d]irect evidence to this effect is extremely difficult to obtain, so actual malice may be proven by circumstantial evidence, given the totality of the circumstances surrounding the publication." *Kaelin v. Globe Communications Corp.,* 162 F.3d 1036, 1040 (9th Cir.1998).

So, "[a] defamation plaintiff may rely on inferences drawn from circumstantial evidence to show actual malice. [Citation.] 'A failure to investigate [fn. omitted] [citation], anger and hostility toward the plaintiff [citation], reliance upon sources known to be unreliable [citations], or known to be biased against the plaintiff [citations]—such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.' " *Sanders v. Walsh*,

219 Cal.App.4th 855, 873 (2013) (quoting *Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 84–85, 55 Cal.Rptr.3d 600.).

The U.S. Supreme Court has held that statements "of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, *is the product of his imagination*, or *is based wholly on an unverified anonymous telephone call*." *St. Amant*, 390 U.S. at 732 (emphasis added). Similarly, an inference of actual malice may be drawn "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation[,] ... [or] where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [fn. omitted.]" *Id.*; *see also Eastwood v. Nat'l Enquirer,* 123 F.3d 1249, 1251 (9th Cir. 1997) ("Reckless disregard" also applies if the defendant had "'obvious reasons to doubt the veracity' " of its statements, but engaged in "'purposeful avoidance of the truth.' "); *Cf. U.S. v. Jewell,* 532 F.2d 697, 700 (9th Cir.1976) (en banc) (willful blindness tantamount to knowledge). The accumulation of evidence regarding these factors and the inferences that can be drawn from them "indicate that the publisher himself had serious doubts regarding the truth of his publication" and establishes a defendants' reckless disregard for the truth or of his knowledge of falsity. *Reader's Dig. Assn.,* 37 Cal.3d at 257–258; *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 156-158 (1960) ("The Supreme Court has held that actual malice may be inferred when the investigation for a story which is not 'hot news' was grossly inadequate in the circumstances").

## C. <u>Key Evidence In Support Of Plaintiff's Defamation Claim.</u>

This lawsuit arises from the false and defamatory statements that Byrne made about Biden in an "interview" in the "Capitol Times Magazine," published on or about June 27, 2023 (the "Article") stating (the "Defamatory Statements"):

> So in November 2021, I went back to the Middle East. I met with a group including a special Iranian figure, an old friend who let me know a World War was coming, and had a proposal to avert it. I told them I would relay the proposal but I did not think it would fly.



> In the course of being there, and through a mechanism I am not going to explain here, I became aware of an additional situation. Hunter Biden was reaching out to the Iranian government in the fall of 2021 with the following offer: *You Iranians have $8 billion frozen in a bank account in South Korea. My father will unfreeze it in return for $800 million being funneled into a numbered account for us. And if you do this deal with us, it will lubricate other negotiations which have recently started between us.* By that, the Iranians believed that Hunter meant the JCPOA talks, which had restarted in Geneva a month or two previously. In other words, something along the lines of, "Pay us $100 million and we let you keep 10 nukes, $200 million for 20 nukes," etc. But I am making up the pricing. Hunter was doing this through a middleman, the son of the Minister of Defense of Pakistan. That son was meeting with Hunter, then relaying messages to someone in Iran. And he was being reckless enough to leave voicemails in Iran about it.
>
> When I returned, the agencies went to work over the weekend. I was told a week later that they had confirmed it all. The voice on the voicemail that I had acquired was voice-matched to the son of the Minister of Defense of Pakistan, who had a connection to Hunter Biden. Anyway, in December, 2021, I was told that the scheme was confirmed across the agencies.

In response to the Defamatory Statements, the unidentified "interviewer" asked Byrne to confirm that he was "that 18 months ago, the Biden Family was seeking a bribe from Iran to release funds frozen in South Korea, and to go easy in nuclear talks…." Byrne responded: "100% correct." *Id.* at 73.

Shortly before publishing the Defamatory Statements in the Article, Byrne aired the Defamatory Statements during media appearances on May 10 and 11, 2023, Byrne appeared on *The Absolute Truth* with Emerald Robinson and then promoted that appearance on social media.

Plaintiff denies the Defamatory Statements. Indeed, Plaintiff never contacted or tried to contact directly, or indirectly through any other person or entity, anyone in the Iranian government in the fall of 2021 or at any other time and does not know the son of the Minister of Defense of Pakistan nor has he had any communication, directly or indirectly through any other person or entity, with that person.

Byrne has admitted that, in making the Defamatory Statements, and has identified the information set forth in the Affidavit of John Moynihan, information provided to him by David Smith, and three purported Recordings as the basis for the

Defamatory Statements. However, none of these are reliable and all are of questionable credibility as follows:

- The Affidavit of John Moynihan does not contain any supporting information about the Defamatory Statements other than just reiterating Byrne's statements, and Mr. Moynihan actually admits his knowledge of the same is based off a recording on a cell phone that Byrne showed him and not from independent sources.

- The unauthenticated Recordings do not identify who the caller is nor do they contain anv information about Plaintiff or the Defamatorv Statements and did not even mention the name Hunter Biden or any bride or any information in the statements made by Byrne

- David Smith was identified by Byrne in discovery responses as being an FBI agent and listed the Washington DC field office as contact, but Plaintiff has not provided any statements or documents or evidence of any kind as to what Mr. Smith supposedly confirmed about the Statements.

It is not surprising that Byrne made these false statements about Plaintiff based on unreliable information considering that in the year or so prior to the publication of the Article, Byrne made numerous posts on various social media platforms taunting Plaintiff on various subjects, such as the following examples:

- On March 20, 2022, Byrne posted on Telegram boasting and celebrating about a possible criminal indictment of Plaintiff with demeaning pictures;

- On April 7, 2022, Byrne reposted on Telegram a Tweet from another person saying "As it stands: Hunter's laptop is real, the Biden family sells access to the President";

- On October 20, 2022, Byrne posted a video on Telegram with a headline that states "HUNT IS ON Hunter Biden laptop report with evidence of sex & drug 'crimes' sent to Congress & lawmakers are ready to investigate" that included a link to the "Biden Laptop Report" published by right-wing extremists Marco Polo USA and Garrett Ziegler;

- On December 12, 2022, Byrne reposted a post on Telegram with accusations against the Biden family, a demeaning picture of Plaintiff, and a screenshot of a private text thread between Plaintiff and his daughter;

- On February 10, 2023, Byrne posted on X a taunt to Plaintiff saying "Hunter: here's the secret. It was I. Rudy [Guiliani] had only acquired a defective copy [of the laptop]. Working with a hacker, I acquired a forensic copy, caused the 400,000 file you bleached to be recovered, and gave it all to Garrett Ziegler";

- On February 12, 2023, Byrne posted on X a video of an interview he previously gave about Plaintiff in which he made disparaging remarks and in the post stated "Oldie but Goodie. Patrick Byrne Weights In On Jack Maxey's Hunter Biden Laptop Story";

- On February 24, 2023, Byrne posted on X taunting Plaintiff about Byrne's possession of files that he claims Plaintiff tried to delete and bragging that Byrne handed them over to the ring-wing extremist organization Marco Polo USA, which has been on a systemic campaign of harassment against anyone associated with the Biden family for years;

- On March 28, 2023, Byrne posted on X taunting Plaintiff by saying "Hunter Biden threatens to sue me. Hunter: be ready to answers [sic] questions about the son of the Pakistani Minister of Defense you used as a go-between & your offer through him (10% X $8 billion + "lubricate other discussions"). He was careless + I have recordings.";

- On May 17, 2023, Byrne posted on X taunting Plaintiff and alluding to his defamatory statements that underline this lawsuit by saying "Hey Hunter, I acquired the forensic copy [of the laptop] add [sic] got it distributed to Garrett [Ziegler]. Sue me. While we are at it, let's talk about Iran and the son of the minister of defense of Pakistan." Byrne then posted a comment on this X post accusing Plaintiff of having child pornography.

- On June 24, 2023, Byrne reposted an article calling for Plaintiff to be sent to prison.

Furthermore, after the Article was published on June 27, 2023, Byrne repeatedly reposted the Article on various social media platforms encouraging his followers to share it to as many people as possible and promoted the Article during right-wing media appearances, encouraging people to read and purchase copies of the magazine for themselves. Byrne made a July 21, 2023 appearance on *The Alex Jones*

*Show*, with infamous host Alex Jones and promoted the Article. That same day, Byrne posted on X several photographs of a large utility truck driving around Washington, D.C., with TV screens on all sides displaying and promoting the Article and Byrne's Defamatory Statements about Plaintiff. On September 8, 2023, Byrne appeared on *The Courtenay Turner Podcast* to promote the Article and his Defamatory Statements about Plaintiff, in which he noted that there was talk of a book and a movie coming out based on the Article. He then posted a link to the interview with Courtenay Turner on his Telegram page to promote it as well.

Then, on October 8, 2023, shortly after news broke of the horrific terrorist attacks by Hamas against Israel, Byrne twice reposted the Statements on his social media account on Twitter suggesting that Plaintiff and his alleged criminal dealings with Iran had contributed to the terrorist attacks by Hamas against Israel, which caused more than 1,400 civilian deaths and led to what is currently a massive conflict in the Middle East. These re-postings by Byrne have been viewed by more than 100,000 people.

The day after Plaintiff filed this lawsuit Byrne posted on X on November 9, 2023, taunting Plaintiff over the lawsuit and over 72,000 people viewed that post, in which Byrne said: "Hunter's lawsuit against me (my interpretation): "Now that I've got Daddy's DOJ under control… Let's silence Byrne with a lawsuit + gag order." Good luck with that. PS Hunter, my 1st witness is a 35 year federal agent who will attest I told the truth and FBI verified it."

And, on November 13, 2023, Byrne appeared on Roger Stone's podcast, *The Stone ZONE with Roger Stone*, and he once again promoted the Article, taunted Plaintiff about the lawsuit, and reiterated all of the same Defamatory Statements he asserted in the Article. In his Roger Stone interview, Byrne made taunting statements such as "I won't lose two minutes of sleep on his lawsuit against me. … I have him dead to rights. … I'll meet Hunter in any court in the land. … So good luck to you, Hunter." On November 9, 2023, the same day he appeared on Roger Stone's podcast,

Byrne posted a link to the interview on X and promoted the interview across his social media platforms.

In February 2024, Byrne published a book called *Danger Close: Domestic Extremist #1 Comes Clean* (the "Book"), which contains the same Defamatory Statements about Plaintiff that were published in the Article. Since that time, Byrne has repeatedly promoted and advertised his Book across social media and in various interviews with ring-wing media members.

Such wild statements without evidentiary support is common with Byrne, who claims to have played important roles in various clandestine "operations" conducted on behalf of the "United States Government." According to Byrne, he is a member of a secret group called "the league of shadows" and has carried out numerous secret spy "missions" for "Uncle Sam" (with cloak-and-dagger nicknames such as "Operation Snow Globe") to advance United States interests around the world, including helping to restore "peaceful relations" in Vietnam in 1994, helping to prevent a war with Iran in 2006, assessing the "computer science capabilities" of Venezuela in 2018, and, of course, entering into an intimate relationship with 26 year-old Maria Butina, apparently as a means to help the FBI gather "intel" on Russia. (Byrne claims he let his FBI handlers know: "I am not seeing Maria unless you folks use the word 'greenlight' with me. I got back a simple message: 'Greenlight.'"). Byrne further claims that, at times, the requests for him to deploy his "unique" skills to help the United States have come directly from the highest levels of the U.S. government, including, without limitation, President Barack Obama and FBI Director James Comey, personally, although they were communicated to Byrne verbally by unnamed special agents for the FBI. Byrne frequently admits he has no documentation to support his self-aggrandizing claims—his "patriotic" activities have been too secret and dangerous for documentation.

Importantly since resigning from his position as chief executive officer of Overstock.com in 2019, Byrne has emerged as a leading promoter of unsupported

conspiracy theories, primarily relating to the so-called "Deep State" and to his claim that the 2020 presidential election was "stolen" from former President Donald Trump by Plaintiff's father, President Joe Biden. Byrne insists that the violent uprising at the Capitol on January 6, 2021 was not an "insurrection," but rather was a "fed-surrection" orchestrated by enemies of President Trump working within his own government. In a recent interview with the far-right conspiracy theorist and prolific spreader of proven lies, Alex Jones, Byrne described his ongoing fight to "de-Nazi-fy" our federal "institutions" and to rescue America from an ongoing plot by "globalists" to "colonize" the United States and turn it into a "vassal state" that will serve as "a farm to China." As part of this, Defendant has engaged in a social media campaign against Plaintiff's father, President Biden, and has sought to defame Plaintiff to embarrass President Biden, who Byrne appears to blame for all the problems in the United States.

As a result of the Defamatory Statements, Plaintiff has suffered lost economic opportunities, loss of reputation, and severe emotional distress. As to economic damages Plaintiff estimates he lost, at least $450,200.66 on three areas of revenue that Plaintiff has been pursuing over the past four years as follows: (i) sales of Plaintiff's memoir entitled "*Beautiful Things*"; (ii) sales of Plaintiff's artwork; and (iii) paid speaking engagements and paid appearances. Plaintiff assessed the decrease in each category of revenue based on the timing of the Defamatory Statements.

For the artwork sales, Plaintiff calculated the claimed damages by comparing the artwork sales that occurred prior to Defendant making the Defamatory Statements and the few sales that occurred after Defendant made the defamatory Statements and extrapolated a reasonable volume of sales that likely would have occurred compared with the market for Plaintiff's artwork. Before the statements, Plaintiff sold 27 pieces for artwork over three years for an average of nine pieces sold per year, and after the statements, Plaintiff sold one piece of artwork, but based on the average sales over the prior three years, Plaintiff is informed and believes that Plaintiff should have sold

nine pieces of artwork during that time period. The average price of each piece of Plaintiff's artwork is $54,481.48, which multiplied by the annual average sale of nine equals $490,333.33 less the one piece Plaintiff sold since the comments for $36,000 is $454,333.33 of which Plaintiff would receive 50% for a total of $227,166.67 in lost sales of artwork.

For the book sales, Plaintiff calculated the claimed damages for by comparing the book sales that occurred prior to Defendant making the Defamatory Statements and the sales that occurred after Defendant made the Defamatory Statements and extrapolated a reasonable volume of sales that likely would have occurred compared with books on the market based on Plaintiff's research into the general lifespan of a book. For the six month period before the statements (April 1, 2023 through September 30, 2023), based on the September 30, 2023 statement, Plaintiff sold 3,161 books and in the six months after the statements, Plaintiff sold 1,100 books, which is a significant decrease and Plaintiff is informed and believes that Plaintiff should have sold an additional 2,061 books during that time period and the subsequent time period. Using an average unit price of $3.16, this amounts to $13,033.99 in lost book sales for the past 12 months that would have been applicable against Plaintiff's advance.

For the paid speaking engagements and paid appearances, Plaintiff researched the amount he likely would have charged for each speaking engagement or paid appearance given Plaintiff's success as an author and artist which was $35,000. Plaintiff estimates that he could have obtained six such engagements in the past year, which equals a loss of $210,000.

While Plaintiff's reputation has been damaged due to his actions and allegations between the years 2014-2018, all of that occurred while Plaintiff was in the depths of drug addiction and before Plaintiff's father became President of the United States. The Defamatory Statements are the only allegations of misconduct by Plaintiff since his father was elected President of the United States and since he left recovery and after he had engaged on a successful start to careers as a writer and artist.

So, the statements have particular harm to Plaintiff's reputation, which are of a new, particularly egregious variety because they allege, for the first time, that Plaintiff engaged in treason due to his alleged dealings with Iran and was complicit in the October 7th Hamas attacks on Israel, which was the largest mass murder of the Jewish people since the Holocaust.

As to emotional distress, because the Defamatory Statements are the only allegations of misconduct by Plaintiff since his father was elected President of the United States and since he left recovery and after he had engaged on a successful start to careers as a writer and artist, they have had a particular distress on him. Furthermore, Defendant's attempts to link Plaintiff and the Defamatory Statements to Hamas' terrorist attacks on Israel in October 2023 are even more distressing considering Plaintiff's wife and young son are Jewish and the entire family has been involved in the Jewish community in Los Angeles. Plaintiff has suffered embarrassment and harassment from people in that community referencing the Defamatory Statements.

**D. Defendant Patrick Byrne's Affirmative Defenses.**

Plaintiff Is A Public Figure

Truth

First Amendment

Good Faith/No Malice

Failure To State A Claim

Unclean Hands

Failure To Mitigate

Statute Of Limitations

Laches

**E. Elements Of Byrne's Affirmative Defenses.**

**1. Plaintiff Is A Public Figure**

For the purposes of this case, Plaintiff will concede that Plaintiff is a public



figure. However, Plaintiff notes that if the person defamed is a public figure, he cannot recover unless he proves, by clear and convincing evidence "that the libelous statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Jackson v. Mayweather*, 10 Cal.App.5th 1240, 1259 (2017); *see also Masson v. New Yorker Magazine*, 501 U.S. 496, 510 (1991); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *New York Times v. Sullivan*, 376 U.S. 254, 279–280 (1964). So, this is not an affirmative defense precluding liability; rather, it is a burden shifting element.

**2. Truth**

"Truth, of course, is an absolute defense to any libel action." *Campanelli v. Regents of Univ. of Cal.*, 44 Cal.App.4th 572, 581–582 (1996). "'Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *GetFugu, Inc. v. Patton Boggs LLP*, 220 Cal.App.4th 141, 154 (2013) (internal citation omitted). "Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Jackson v. Mayweather*, 10 Cal.App.5th 1240, 1262-1263 (2017).

**3. First Amendment**

The First Amendment is a basic right and normally applies to all communications (U.S.C.A. First Amendment) and has restricted state law defamation claims. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 12-21 (1990); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Prior to the First Amendment restrictions on state law defamation all that a plaintiff was required to allege and prove was that the statement was sufficiently derogatory as to cause harm to plaintiff's reputation. (*Id.*) So, the First Amendment defense to defamation is included in the elements that a plaintiff has to prove and defenses that a defendant can assert, such as truth as a defense or the doctrine of actual malice for a public person. So, this affirmative

defense is addressed in the description of the elements of defamation set forth in Section I.B.

**4. Good Faith/No Malice**

This affirmative defense is merely a denial that Byrne acted with actual malice, which is described above in Section I.B.

**5. Failure to State a Claim**

To support this defense Defendant must demonstrate that plaintiff has not made a claim with sufficient factual matter that, accepted as true, is "plausible on its face." *Iqball v. Ashcroft*, 566 u.s. 662, 678 (2009).

**6. Unclean Hands**

"To establish unclean hands, a defendant must demonstrate (1) inequitable conduct by the Plaintiff; (2) that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant; and (3) plaintiff's conduct injured the defendant." *Survivor Productions LLC v. Fox Broadcasting Co.,* 2001 WL 35829270, at *3 (C.D. Cal. June 12, 2001); *see also Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 847 (9th Cir.1987) ("[T]he defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.").

**7. Failure to Mitigate**

The defense of failure to mitigate is that Plaintiff could have taken some action that tends to decrease damages may be stated to be a fact in mitigation of the damages, including anything that tends to show: (1) that the plaintiff really has no legally supportable claim or cause of action; (2) that the claimed damages are not as large as plaintiff asserts; or (3) that plaintiff could have avoided reasonably, all or part of his or her claimed damages. 2 American Law of Torts § 8:17. Notably, "one who has harmed another's reputation by defamatory statements cannot show in mitigation of damages that the other has been financially benefited from their publication, unless damages are claimed for harm to pecuniary interests." Restatement Second, Torts §

920, Comment (b).

**8. Statute of Limitations**

To establish this affirmative defense, Defendant must establish that the first defamatory comment was made prior to November 8, 2022—one year before the Complaint in this action was filed. Cal. Code Civ. Proc. § 3409(c); *Cusano v. Klein*, 264 F.3d 936 (9th Cir. 2001).

**9. Laches**

"Laches is an equitable defense that prevents a plaintiff, who 'with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights.'" *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-951 (2001) (quoting *S. Pac. Co. v. Bogert*, 250 U.S. 483, 500 (1919)). "To demonstrate laches, the 'defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.'" *Danjaq*, *supra*, 263 F.3d at 951 (quoting *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000)).

**F. Key Evidence In Opposition To Each Affirmative Defense.**

As to Byrne's affirmative defense of Plaintiff Is A Public Figure, for the purposes of this case, Plaintiff will concede that Plaintiff is a public figure subject to Plaintiff's right to prove actual malice, which Plaintiff has done as set forth in Section I.C, above.

As to Byrne's affirmative defenses of Plaintiff Is A Public Figure, Truth, First Amendment, Good Faith/No Malice, and Failure To State A Claim, based on the facts set forth in Section I.C, above, Byrne cannot establish the elements of these affirmative defenses.

As to Byrne's affirmative defense of Unclean Hands, Byrne has no evidence to show that Plaintiff engaged in any inequitable conduct let alone that any of Plaintiff's conduct directly related to the claim which Plaintiff has asserted against Byrne. Moreover, Defendant does not have any evidence that any of Plaintiff's conduct injured Byrne.



As to Byrne's affirmative defense of Failure To Mitigate, Byrne has no evidence of any actions that Plaintiff took that increased his damages or any actions that demonstrate Plaintiff has no actionable claim or that his damages are not as large as Plaintiff asserts.

As to Byrne's affirmative defense of Statute Of Limitations, Byrne's comments were first published on June 27, 2023—less than one year before this Complaint was filed on November 8, 2023.

As to Byrne's affirmative defense of Laches, Byrne has no evidence of any unreasonable delay on the part of Plaintiff in pursuing these claims and Byrne has no evidence that he suffered any prejudice as a result of any delay by Plaintiff.

## II. ANTICIPATED EVIDENTIARY ISSUES

The parties reserve all rights to file Motions in Limine detailing the anticipated evidentiary issues. At the time of filing this Statement, Plaintiff does not intend to file any Motions in Limine and Defendant has stated that Defendant intends to file the following Motions in Limine: (i) Preclude any evidence or claim for emotional distress by Plaintiff; (ii) No expert testimony and/or opinion evidence by Plaintiff or by any of his witnesses on the witness list including Plaintiff; (iii) No evidence or claim made by Plaintiff as to lost profits from book sales; (iv) No evidence or claim made by Plaintiff as to lost profits from art sales; and (v) No evidence or claims for lost business opportunities.

## III. ISSUES OF LAW GERMANE TO THE CASE

The discussion above captures the legal issues germane to this case.

## IV. BIFURCATION OF ISSUES

Neither party has requested bifurcation of any issues in this case.

## V. JURY TRIAL

A timely jury trial demand has been made in plaintiff's complaint.

## VI. ATTORNEYS' FEES

Neither party is entitled to recover his or its attorneys' fees either by operation

of law or contract.

## VII. ABANDONED CLAIMS OR ISSUES

Plaintiff has not abandoned any claims and Byrne has not abandoned any affirmative defenses. Byrne did not assert any cross-claims.

Dated: November 5, 2024

EARLY SULLIVAN WRIGHT GIZER & MCRAE LLP

By: */s/ Zachary C. Hansen*

BRYAN M. SULLIVAN (State Bar No. 209743)
bsullivan@earlysullivan.com
ZACHARY C. HANSEN (State Bar No. 325128)
zhansen@earlysullivan.com
EARLY SULLIVAN WRIGHT GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Fl.
Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

PAUL B. SALVATY (State Bar No. 171507)
PSalvaty@winston.com
WINSTON & STRAWN LLP
333 S. Grand Ave., 38th Fl.
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

ABBE DAVID LOWELL (*pro hac vice* forthcoming)
AbbeLowellPublicOutreach@winston.com
WINSTON & STRAWN LLP
1901 L St., N.W.
Washington, D.C. 20036-3508
Telephone: (202) 282-5000
Facsimile: (202) 282-5100

*Attorney for Plaintiff Robert Hunter Biden*

