Michael C. Murphy, Esq. (S.B. No. 104872)
    Michael@murphlaw.net
Michael C. Murphy, Jr. Esq. (S.B. No. 305896)
    Michael.jr@murphlaw.net
LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361
Tel.: 818-558-3718
Fax: 805-367-4506

Attorneys for Defendant,
Patrick Byrne

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT HUNTER BIDEN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>PATRICK M. BYRNE, an individual,<br><br>Defendant. | Case No.:    2:23-cv-09430-SVW-PD<br>Judge:    Honorable Stephen V. Wilson<br>Courtroom:  "10A"<br><br>Complaint Filed: November 8, 2023<br><br>**DECLARATION OF MICHAEL C. MURPHY, ESQ. IN SUPPORT OF MOTION IN LIMINE NO. 8 TO EXCLUDE THE DEPOSITION TESTIMONY OF SPECIAL AGENT DAVID SMITH**<br><br>Date:    July 21, 2025<br>Time:    3:00 p.m.<br>Courtroom:  "10A"<br><br>[FILED CONCURRENTLY WITH MOTION IN LIMINE NO. 8 TO EXCLUDE THE DEPOSITION TESTIMONY OF SPECIAL AGENT DAVID SMITH] |

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

DECLARATION OF MICHAEL C. MURPHY, ESQ. IN SUPPORT OF MOTION IN LIMINE NO. 8
Case No.: 2:23-cv-09430-SVW-PD

I, Michael C. Murphy, Esq., declares as follows:

1.    I am an attorney duly authorized and licensed to practice law before this Court and all the state courts located throughout the State of California. I am an attorney with the Law Offices of Michael C. Murphy, attorneys of record for Defendant Patrick Byrne. This Declaration is executed in support of Defendant's Motion in Limine No. 8 to exclude the deposition testimony of Special Agent David Smith ("SA Smith"). I have personal knowledge of the facts stated in this Declaration and if called upon to testify, I would competently do so.

2.    On March 14, 2025, Plaintiff served his Notice of Deposition of FBI Special Agent David Smith on my office. The Notice failed to identify the court reporter and the court reporter's address. (A true and correct copy of the March 14, 2025, notice is attached as Exhibit A, incorporated herein, and made a part hereof.)

3.    On March 18, 2025, the Court denied our ex parte application to exclude Plaintiff from conducting the deposition of SA Smith, but ordered the Parties to exchange written questions and objections according to the schedule in Rule 31. (A true and correct copy of the March 18, 2025, order is attached as Exhibit B, incorporated herein, and made a part hereof.)

4.    Plaintiff's failure to identify the court reporter was the subject of Defendant's March 27, 2025, ex parte application requesting Plaintiff comply with the procedures set out in Rule 31. The Court denied Defendant's ex parte on March 31, 2025, but gave Defendant until April 7, 2025, to serve his cross-examination questions on opposing counsel. (A true and correct copy of the Court's March 31, 2025, Order is attached as Exhibit C, incorporated herein, and made a part hereof.)

5.    On April 3, 2025, I directed my associate attorney, Carmen R. Selame, Esq., to serve our questions and objections on Plaintiff's counsel. (True and correct copies of the email and the objections with the cross-examination questions are attached as Exhibit D, incorporated herein, and made a part hereof.)

6.    On April 7, 2025, Plaintiff served a new deposition notice for the

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

deposition of SA Smith. This notice identified the deposition date as April 15, 2025, identified the court reporter as Sherry Brooks, and provided her address at 1717 K Street, NW, Suite 900, Washington, DC 20006. The deposition notice omitted Defendant's objections to Plaintiff's questions but included rewritten versions of Defendant's cross-examination questions that materially changed the meaning of three of Defendant's questions. (A true and correct copy of the April 7, 2025, deposition notice is attached hereto as Exhibit E, incorporated herein, and made a part hereof.)

7.    On April 7, 2025, I emailed a copy of our original deposition objections and cross-examination questions to the Department of Justice's ("DOJ") counsel, Mr. Sean Bean, Esq., with instructions that he ensure our objections and cross-examination questions as we drafted them are provided to the court reporter. Plaintiff's counsel responded to my email and instructed Mr. Bean to disregard my email and instructions. He advised Mr. Bean that I did not represent the Party noticing the deposition. Plaintiff's counsel also claimed that he was "responsible for making sure the court reporter says what she is supposed to say…" and that Mr. Bean need not worry for "a private party's objections to deposition questions or managing his deposition exhibits." I responded to Plaintiff's email to Mr. Bean and reminded them that we are entitled to participate in the written deposition process pursuant to Rule 31, and pursuant to the Court's order. (A true and correct copy of the email thread is attached as Exhibit F, incorporated herein, and made a part hereof.)

8.    On April 10, 2025, I had an envelope and letter prepared containing a letter to the court reporter, Sherry Brooks, along with a copy of Defendant's original questions and objections, this Court's March 18, 2025, Order, and a copy of Plaintiff's April 7, 2025, deposition notice. The envelope was sent via Federal Express overnight mail, and Ms. Brooks received it on April 11, 2025. (True and correct copies of the letter with its exhibits and the shipping receipt are attached

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

hereto as Exhibit G, incorporated herein, and made a part hereof.)

9.     SA Smith's deposition went forward on April 21, 2025, before an unknown and previously undisclosed "registered professional reporter" by the name of Steven Poulakos. Mr. Poulakos confirmed in an email to my associate that he never received the letter or exhibits sent to the court reporter. We were never notified of the new deposition date. We were notified that the court reporter had been changed and the contact information of the new court reporter. (A true and correct copy of Mr. Poulakos's email is attached hereto as Exhibit H, incorporated herein, and made a part hereof.)

10.     The first session of Defendant's deposition occurred on December 13, 2024. Attached hereto as Exhibit I are true and correct copies of pages 1-4, 213, 224-227 of Volume I of the certified deposition transcript for Defendant Patrick M. Byrne.

11.     The second session of Defendant's deposition occurred on December 14, 2024. Attached hereto as Exhibit J are true and correct copies of pages 238-241, 270-272, 285, 303-305, 308-311, 314-318, 321, 332-333, 347-348, 375-375 of Volume II of the certified deposition transcript for Defendant Patrick M. Byrne.

12.     The third session of Defendant's deposition occurred on February 4, 2025. Attached hereto as Exhibit K are true and correct copies of pages 459-464, 476, 504, 506, 509-512, 514-515, 517, 525, 532, 548-550 of Volume III of the certified deposition transcript for Defendant Patrick M. Byrne.

13.     John Moynihan's deposition occurred on February 14, 2025. Attached hereto as Exhibit L is a true and correct copy of the certified transcript.

14.     SA Smith's deposition occurred on April 21, 2025, before Steven Poulakos. A copy of the certified deposition transcript is attached hereto as Exhibit M.

15.     I object to the use of the deposition transcript of Special Agent David Smith as evidence in the case for any purpose including trial or in support of

4

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

Plaintiff's opposition to Defendant's motion for summary judgment because of Plaintiff's counsel's gamesmanship. Plaintiff's counsel deliberately failed to include our objections to Plaintiff's deposition questions and improperly re-wrote our cross-examination questions, which included material changes to questions 2, 4, and 5. Defendant's original Question 2 asked about one recording, but Plaintiff's counsel's version asked about multiple recordings, rendering SA Smith's testimony misrepresentative of the evidence Defendant sought. Question 4 originally asked whether the NSA confirmed "the voice identification of the individual on the three voicemails *included on the recording...*" Plaintiff's counsel's version asked whether the NSA confirmed "the voice identification of the individual on the three voicemails *including the recording…*" Plaintiff's version changes the meaning of question because it implies that the recording and the three voicemails were separate recordings, whereas Defendant's question identified the three voicemails as being on and part of the original recording. Finally, Plaintiff's version of Question 5 omitted the word "individual," rendering the question vague and ambiguous. The changes to these questions rendered any answer misrepresentative of the evidence sought by Defendant and violated the relevant rules. Plaintiff's counsel's actions handling the deposition of SA Smith violated Federal Rules of Civil Procedure, Rules 28, *et seq.*, 29, *et seq.*, 30(c)(2)-(3), 31(a)(5), 31(b), 31(b)(3), 32(d)(2)(A)-(B), 32 (d)(C), 32(d)(3)(B)(i)(ii).

16.    The actions Plaintiff's counsel has taken in relation to the deposition of SA Smith will result in prejudice to Defendant because the deposition testimony is inadmissible, and Defendant's objections were not preserved on-the-record because of Plaintiff's counsel's deliberate interference and Defense counsel was precluded from participating in the deposition process for the deposition of agent Smith.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This Declaration was executed on

June 27, 2025, at Westlake Village, CA.

By:  /s/ Michael C. Murphy, Esq.

_____

**DECLARATION OF MICHAEL C. MURPHY, ESQ. IN SUPPORT OF MOTION IN LIMINE NO. 8**
**Case No.:** 2:23-cv-09430-SVW-PD

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

# Exhibit A

Bryan M. Sullivan, State Bar Number 209743
  *bsullivan@earlysullivan.com*
Zachary C. Hansen, State Bar Number 325128
  *zhansen@earlysullivan.com*
EARLY SULLIVAN WRIGHT
  GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

Richard A. Harpootlian, *pro hac vice*
  *rah@harpootlianlaw.com*
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Columbia, South Carolina 29201
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

Attorneys for PLAINTIFF
ROBERT HUNTER BIDEN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT HUNTER BIDEN, an individual,<br><br>    Plaintiff,<br><br>    vs.<br><br>PATRICK M. BYRNE, an individual,<br><br>    Defendant. | Case No. 2:23-cv-09430-SVW-PD<br><br>**PLAINTIFF ROBERT HUNTER BIDEN'S NOTICE OF DEPOSITION OF FBI SPECIAL AGENT DAVID SMITH**<br><br>Date:    TBD<br>Time:    TBD<br>Place:    U.S. Department of Justice<br>        1100 L Street, N.W.<br>        Washington, DC 20005<br><br>Complaint Filed: November 8, 2023 |

1

1 **TO ALL INTERESTED PARTIES AND THEIR RESPECTIVE ATTORNEYS**
2 **OF RECORD:**

3     **PLEASE TAKE NOTICE** that, pursuant to Federal Rules of Civil Procedure
4 30, Plaintiff Robert Hunter Biden, by and through his attorneys of record, will take
5 the deposition of FBI Special Agent David Smith, in person to answer the following
6 questions, under oath and in writing on a date to be determined at the U.S.
7 Department of Justice, 1100 L Street, N.W., Washington, DC 20005.

8     **PLEASE TAKE FURTHER NOTICE THAT** the deposition by written
9 questions will be taken in the presence of an officer authorized to administer oaths
10 and will be recorded stenographically.

11     A list of all parties or attorneys upon whom this Notice of Deposition is being
12 served is shown on the accompanying Proof of Service.

13     **PLAINTIFF'S PROPOSED RULE 31 DEPOSITION QUESTIONS**

14 Question 1. Please state your name.

15 Question 2. Do you reside in California?
16

17 Question 3. How are you employed?

18 Question 4. Is your employment located in California?
19

20 Question 5. How long have you been employed with that entity?

21 Question 6. Mr. Byrne testified in this action that in late 2021 or early 2022
22 you met with him and John Moynihan at a parking lot at Reagan National
23
24 Airport where Mr. Byrne played you an audio recording in which there was a
25 conversation between someone and Mr. Byrne in which it was stated that Mr.
26 Robert Hunter Biden, through an intermediary, had approached the Iranian
27 government with an offer to have his father, President Joe Biden, unfreeze $8
28

2

billion in Iranian funds in South Korea in return for the Iranians paying the Biden's 10% of those funds which would go into a numbered account for his family. Is that accurate?

Question 7. Mr. Byrne testified in this action that he gave you in the car a copy of the recording that Mr. Byrne claims to have played for you as described in Question No. 6. Is that accurate?

    a. If yes, did Mr. Byrne give you the recording on a device that he surrendered to you?

        i. If no, did Mr. Byrne give you the recording via AirDrop or through another medium such as the messaging application "Signal"?

Question 8. Mr. Byrne testified in this action that you told him to delete the recording and not keep a copy of it. Is that accurate?

Question 9. Mr. Byrne testified in this action that you confirmed, through various actions by various government agencies, the identity of the voice on the voicemails played on the recording and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

Question 10. Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as the son of a high-ranking official with the Pakistani Minister of Defense and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

3

1  Question 11.Mr. Byrne testified in this action that you confirmed the voice on

2  the voicemails played on the recording was identified as someone who had

3
4  close ties to Mr. Hunter Biden and communicated that to Mr. Byrne either

5  directly or through Mr. Moynihan. Is that accurate?

6  Question 12. Mr. Byrne testified in this action that you confirmed the voice on

7
8  the voicemails played on the recording was identified as someone who acted as

9  a proxy for Hunter Biden and communicated that to Mr. Byrne either directly

10  or through Mr. Moynihan. Is that accurate?
11
12  Question 13.Mr. Byrne testified in this action that you described to Mr. Byrne

13  a letter that FBI Director Christopher Wray sent out to every FBI agent in the

14  bureau saying not to have any contact with Mr. Byrne. Is that accurate?
15
16  Dated:        March 14, 2025              RICHARD A. HARPOOTLIAN, PA

17
                                   By:    /s/ Richard A. Harpootlian
18                                         RICHARD A. HARPOOTLIAN (*pro hac*
19                                         *vice*)
                                           rah@harpootlianlaw.com
20                                         RICHARD A. HARPOOTLIAN, PA
21                                         1410 Laurel Street
                                           Columbia, South Carolina 29201
22                                         Telephone: (803) 252-4848
23                                         Facsimile: (803) 252-4810

24                                         BRYAN M. SULLIVAN, State Bar No.
25                                         209743
                                           bsullivan@earlysullivan.com
26                                         ZACHARY C. HANSEN, State Bar No.
27                                         325128
                                           zhansen@earlysullivan.com
28                                         EARLY SULLIVAN WRIGHT
                                                    4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

*Attorney for Plaintiff*
*Robert Hunter Biden*

5

## CERTIFICATE OF SERVICE

I, Holli Miller, hereby certify that on March 14, 2025, a copy of **Plaintiff Robert Hunter Biden's Notice of Deposition of FBI Special Agent David Smith** was served via email on the following:

*Attorneys for Defendant*
Michael C. Murphy, Esq.
Michael C. Murphy, Jr., Esq.
Law Offices of Michael C. Murphy
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361
michael@murphylaw.net
michael.jr@murphylaw.net

*/s/ Holli Miller*
HOLLI MILLER
Paralegal of Richard A. Harpootlian, P.A.

6

**PLAINTIFF ROBERT HUNTER BIDEN'S NOTICE OF DEPOSITION OF FBI SPECIAL AGENT DAVID SMITH**

# Exhibit B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | | Date | March 18, 2025 |
|---|---|---|---|---|

| Title | Robert Hunter Biden v. Patrick M. Byrne |
|---|---|

| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE | |
|---|---|---|
| Paul M. Cruz | | N/A |
| Deputy Clerk | | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| N/A | | N/A |

**Proceedings:** ORDER DENYING DEFENDANT'S EX PARTE APPLICATION FOR AN ORDER TO REOPEN PLAINTIFF'S DEPOSITION [206]

## I.    Introduction

Before the Court is Patrick M. Byrne's ex parte application for an order to reopen Plaintiff Robert Hunter Biden's deposition. ECF No. 206. For the following reasons, Defendant's application is DENIED.

## II.    Background

On June 27, 2023, Defendant, in an interview with the Capitol Times Magazine, claimed that Plaintiff, through an intermediary, approached the Iranian government with an offer to have his father, President Joe Biden, unfreeze $8 billion in Iranian funds held in South Korea in return for a 10% kickback. ECF No. 1.

On August 16, 2024, Defendant took Plaintiff's deposition. Declaration of Michael Murphy ("Murphy Declaration") ¶ 2, ECF No. 206-1. In that deposition, Defendant's counsel showed Plaintiff "Exhibit 653," which was a website created by a company called Marco Polo, which itself was started by an individual named Garrett Ziegler. *Id.* at 17. Counsel then asked Plaintiff if any of the "photographs and

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | March 18, 2025 |
|----------|-------------------|------|----------------|

| Title | *Robert Hunter Biden v. Patrick M. Byrne* |
|-------|--------------------------------------------|

documents" on the website were taken from his laptop. *Id.* at 18. Plaintiff responded that he couldn't answer that question, as he didn't have "access to the metadata of any of the things that are published" on the website in question, and therefore had no way of knowing whether the website's contents came from his laptop or not. *Id.*

In addition to his case against Defendant, Plaintiff also has a case against Garrett Ziegler, in which he alleged that Ziegler hacked into Plaintiff's iPhone data and "manipulated, altered copied and damaged" that data. *See* Complaint at 3-4, *Biden v. Ziegler, et al.*, No. 2:23-cv-07593-HDV (C.D. Cal. Sept. 13, 2023). In that case, on March 5, 2025, Plaintiff filed a declaration where he claimed that "Garrett Ziegler admitted to hacking [Plaintiff's] iCloud." Murphy Declaration at 54.

Defendant now makes an ex parte application to reopen Plaintiff's deposition, on the grounds that: (1) Plaintiff's declaration confirms that the documents and photographs on the Marco Polo website come from Plaintiff's laptop; and (2) that the contents of Plaintiff's laptop are relevant to his reputation and modus operandi. ECF No. 206.

## III.    Discussion

A party must seek leave of the Court to conduct a deposition when, as is the case here, "the parties have not stipulated to the deposition" and "the deponent has already been deposed in the case." Fed. R. Civ. P. 30(a)(2)(A)(ii). Whether to grant leave "to re-open a deposition lies within the court's discretion." *Laub v. Horbaczewski*, 2019 WL 1744846, at *7 (C.D. Cal. Feb. 8, 2019).

"Although renewed depositions are generally disfavored, a court may re-open a deposition where there is a showing of 'good need'" (a.k.a., good cause). *Aranda v. Nissan Motor Acceptance Corp.*, No. 21-cv-03451, 2022 WL 18284912, at *1 (C.D. Cal. Oct. 14, 2022) (quotations omitted). As is the case with all discovery requests, there is no good cause for a renewed deposition if "(i) the discovery sought is unreasonably cumulative or duplicative;" "(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action;" or "(iii) the proposed discovery is outside the scope

|   | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | March 18, 2025 |
|---|---|---|---|

| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

permitted by Rule 26(b)(1),"—i.e., the information sought by the renewed deposition is not "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1)-(2).

## A. The information Defendant seeks from reopening Plaintiff's deposition is not relevant.

There is no good cause to reopen Plaintiff's deposition in this case, as the information Defendant seeks is not relevant to his defense. Defendant wants to reopen Plaintiff's deposition to "inquire further into the documents and photographs published by Marco Polo from Plaintiff's laptop," as that information is purportedly "relevant to [Plaintiff's] reputational damages and modus operandi." Def. Ex Parte Application at 8, ECF No. 206.

To be sure, Plaintiff's reputation is relevant to this case. First, his reputation is relevant to reputational damages. After all, to determine how much Defendant's statements hurt Plaintiff's reputation, the Court needs to assess the state of Plaintiff's reputation at the time Defendant made the statements.

Second, Plaintiff's reputation is relevant to actual malice. To illustrate, if Plaintiff had a strong reputation for engaging in corruption with foreign entities, it would be more likely that Defendant genuinely believed that Plaintiff engaged in the alleged bribery scheme with Iran, as the scheme would seem consistent with Plaintiff's past behavior. If Defendant made the allegedly defamatory statements while genuinely believing they were true, then he did not act with actual malice.

But while Plaintiff's reputation is relevant, the contents of his laptop are not. At best, the contents of Plaintiff's laptop could show that he actually engaged in corrupt dealings with foreign entities or in other reputation-damaging activities. But whether Plaintiff truly engaged in corrupt dealings or other demeaning activities is irrelevant; what matters is Plaintiff's *reputation* for taking such actions. His reputation depends on what the public *believes* about him, not on what Plaintiff in reality has or has not done. To establish Plaintiff's reputation, Defendant should rely on evidence such as news articles or media

|  |  | : |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | | Date | March 18, 2025 |
|----------|-------------------|---|------|----------------|

| Title | *Robert Hunter Biden v. Patrick M. Byrne* | |
|--------|--------------------------------------------|---|

clips, not new and never-before-heard admissions by Plaintiff about the contents of his laptop. The latter simply provides no information regarding the public's perception of Plaintiff.

### B. Reopening Plaintiff's deposition would be cumulative.

Even if the information Defendant seeks was relevant, a second deposition would be unnecessarily cumulative of Plaintiff's first deposition. In his first deposition, Defendant asked Plaintiff if any of the documents and photographs on Marco Polo's website came from his computer. Plaintiff answered, "I don't know." Later, in his litigation against Garrett Ziegler, Plaintiff declared that "Garrett Ziegler admitted to hacking my iCloud." Murphy Decl. at 54. Defendant contends that this declaration warrants reopening Plaintiff's deposition, as it "confirmed that the data in possession of and published by Marco Polo is in fact Plaintiff's data." Def. Ex Parte Application at 8, ECF No. 206.

Not so. That Garrett Ziegler hacked into Plaintiff's iCloud has nothing to do with whether Plaintiff knows if the documents and photographs on Marco Polo's website came from his laptop. Whether these documents and photographs came from Plaintiff's laptop, rather than some other location, is a chain of custody question that Plaintiff cannot answer by simply looking at a print-out of Marco Polo's website. So just as Plaintiff answered "I don't know" in his first deposition, he would answer the same in his second.

In sum, if Defendant were to reopen Plaintiff's deposition, there is no reason to think that Defendant would obtain any information not available during Plaintiff's first deposition. A second deposition would therefore be unnecessarily cumulative of Defendant's past discovery.

### IV.   Conclusion

For the foregoing reasons, Defendant's ex parte application is DENIED.

### IT IS SO ORDERED.

|  | : |
|--|---|
| Initials of Preparer | PMC |

# Exhibit C

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW-PD | | Date | March 31, 2025 |
|---|---|---|---|---|

| Title | *Robert Hunter Biden v. Patrick M. Byrne* |
|---|---|

Present: The Honorable     STEPHEN V. WILSON, U.S. DISTRICT JUDGE

| Paul M. Cruz | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| N/A | N/A |

**Proceedings:** ORDER DENYING DEFENDANT'S EX PARTE APPLICATION FOR AN ORDER TO COMPEL PLAINTIFF TO COMPLY WITH RULE 31 FOR CONDUCTING THE DEPOSITION OF FBI SPECIAL AGENT DAVID SMITH [219]

## I.    Introduction

Before the Court is Defendant Patrick M. Byrne's ex parte application for an order compelling Plaintiff Robert Hunter Biden to comply with Rule 31 for conducting the deposition of FBI Special Agent David Smith. ECF No. 219. For the following reasons, Defendant's ex parte application is DENIED.

## II.    Background

On June 27, 2023, Defendant, in an interview with the Capitol Times Magazine, claimed that Plaintiff, through an intermediary, approached the Iranian government with an offer to have his father, President Joe Biden, unfreeze $8 billion in Iranian funds held in South Korea in return for the Iranians paying the Biden's 10% of those funds. Plaintiff responded by suing Defendant for defamation. ECF No. 1.

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW-PD | | Date | March 31, 2025 |
|----------|----------------------|---|------|----------------|

| Title | *Robert Hunter Biden v. Patrick M. Byrne* |
|-------|---------------------------------------------|

On March 14, 2025, Plaintiff served Defendant with notice of the written deposition of Agent Smith (hereinafter, the "Notice"). Declaration of Michael Murphy ("Murphy Decl.") ¶ 2, Ex. A, ECF No. 219-1. The Notice explained that Plaintiff planned to take the written deposition of FBI Special Agent David Smith, in person, at the U.S. Department of Justice, 1100 L Street, N.W., Washington, DC 20005. *Id.* Ex. A. at 2. It further provided that the written deposition "will be taken in the presence of an officer authorized to administer oaths and will be recorded stenographically." *Id.*

On March 26, 2025, Defendant emailed Plaintiff's counsel to notify them that the Notice did not comply with Federal Rule of Civil Procedure 31 because it did not include the address of Agent Smith or the name and address of the court reporter that will take Smith's deposition. *Id.* Ex. B. That same day, Defendant's counsel responded and explained that Plaintiff planned to use a DOJ court reporter for Smith's written deposition. *Id.*

On March 27, 2025, Defendant filed the current ex parte application to compel Plaintiff's compliance with Rule 31. ECF No. 219. Plaintiff opposed the next day. ECF No. 220.

### III.    Discussion

The procedure for taking written depositions is governed by Federal Rule of Civil Procedure 31. Under Rule 31, the party taking a written deposition must serve "on every other party" a notice stating: (1) "if known, the deponent's name and address;" and (2) "the name or descriptive title and the address of the officer before whom the deposition will be taken." Fed. R. Civ. P 31(a)(3).

Plaintiff's notice plainly satisfies the first requirement. First, it provides the deponent's name: Special Agent David Smith. *See* Murphy Decl. Ex. A. Second, it provides the Agent Smith's address: the U.S. Department of Justice, 1100 L Street, N.W., Washington, DC 20005. Defendant seems to argue that this is insufficient because the Notice did not contain Agent Smith's personal address. But this conclusion is preposterous. Rule 31 does not require that parties disclose the personal addresses of deponents and court reporters; such information is irrelevant to the litigation process. As is the case in nearly all other

|  |  | : |
|--|--|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW-PD | Date | March 31, 2025 |
|---|---|---|---|

| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

contexts, the deponent's work address—the address of the Department of Justice—is sufficient to satisfy Rule 31. Defendant cites no authority to the contrary.

As to information about the officer taking the deposition, Plaintiff's notice is technically deficient, but not in a way that prejudices Defendant. To start, the Notice sufficiently identifies the officer. While it does not include the court reporter's name, it does explain that the deposition will be taken by "an officer authorized to administer oaths" who will record the deposition "stenographically." Murphy Decl. Ex. A. This is sufficient to satisfy Rule 31, which just requires that notice include a "descriptive title" of "the officer before whom the deposition will be taken." Fed. R. Civ. P. 31(a)(3).

Where the Notice is technically deficient is the address of the court reporter. Rule 31 requires that notice include "the address of the officer before whom the deposition will be taken," and the notice does not include an address for the court reporter.

But while the Notice is technically deficient, this is not the grand error Defendant makes it out to be. After Defendant raised this issue with Plaintiff's counsel on March 26, 2025, he immediately (the very same day) explained that Plaintiff would be using a court reporter from the Department of Justice. *See* Murphy Decl. Ex. B. This makes the court reporter's address obvious: the address of the Department of Justice. So even if the Notice was initially deficient, Defendant was on notice of the court reporter's address by March 26, 2025.

More importantly, Defendant provides no explanation for how failure to receive the court reporter's address prejudiced him in any way. Defendant's ex parte application appears to be nothing more than yet another attempt to delay this litigation. In fact, it is not even clear how Defendant has standing to challenge Plaintiff's notice, since it is for the deposition of a non-party, not Defendant. *See* Fed. R. Civ. P. 26(c) (explaining that only the party/person "from whom discovery is sought may move for a protective order" under Rule 26(c)); *See also Am. Rena Int'l Corp. v. Sis-Joynce Int'l Co.*, No. 12-cv-06972-FMO, 2013 12638502, at *2 (C.D. Cal. Oct. 3, 2013) ("Defendants do not have standing to quash a nonparty subpoena except on grounds of privilege or privacy.").

|  |  | : |
|---|---|---|
| Initials of Preparer | | PMC |

Case 2:23-cv-09430-SVW-PD    Document 232-1    Filed 06/27/25    Page 23 of 332    Page ID #:5842

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW-PD | | Date | March 31, 2025 |
|---|---|---|---|---|

| Title | *Robert Hunter Biden v. Patrick M. Byrne* |
|---|---|

The Court's doubt regarding Defendant's motivations is bolstered by how long he waited before raising this objection. Defendant received the Notice on March 14, 2025. That the Notice did not include the court reporter's address would have been immediately apparent upon receipt. And yet, Defendant waited 12 days, until March 26, 2025—two days before his deadline to send cross-questions to Plaintiff— to raise the issue. Defendant provides no explanation for this delay.

The Court's skepticism as to Defendant's motivations notwithstanding, the Court recognizes that the Notice was technically noncompliant with Rule 31. To that end, the Court will extend Defendant's deadline to serve its cross-questions on Plaintiff to April 7, 2025, which is 12 days after the date on which Defendant received notice of the court reporter's address. Defendant is informed that the Court will not look kindly on any further delays to David Smith's deposition.

### IV.    Conclusion

For the foregoing reasons, Defendant's ex parte application is DENIED. Separately, Defendant's deadline to serve its cross-questions on Plaintiff is extended from March 28, 2025, to April 7, 2025.

Additionally, while the Court is directing the parties, it orders Plaintiff to file John Moynihan's deposition with the Court.

**IT IS SO ORDERED.**

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

# Exhibit D

 Outlook

---

**Re: Biden v. Byrne**

**From** Carmen <Carmen@murphlaw.net>

**Date** Thu 4/3/2025 5:23 PM

**To** Dick Harpootlian <rah@harpootlianlaw.com>; Michael Murphy <michael@murphlaw.net>

**Cc** Phillip Barber <pdb@harpootlianlaw.com>; Zachary Hansen <zhansen@earlysullivan.com>; Bryan Sullivan <bsullivan@earlysullivan.com>; Holli Miller <holli@harpootlianlaw.com>; Robie Atienza-Jones <rjones@earlysullivan.com>

1 attachment (203 KB)

Obj.Depo.Questions.v.2.3.26.25.pdf;

Hi Mr. Harpootlian:

I have once again attached our objections and cross-examination questions here. You have our authority to serve them on the court reporter.

Thank you,

Carmen R. Selame, Esq.



LAW OFFICES OF
**MICHAEL C. MURPHY**
ATTORNEYS AT LAW

2625 Townsgate Road, Suite 330
Westlake Village, CA 91361
Tel.: (818) 558-3718
Fax: (805) 367-4506
Web: http://murphlaw.net
Email: Carmen@murphlaw.net



**CONFIDENTIALITY NOTICE:**

This message contains information which may be confidential and privileged. Unless you are the intended recipient or authorized to receive this message on behalf of the intended recipient, you may not use, copy, distribute, or disclose any information contained herein.

If you are an actual or potential client, any information you disclose by email will be kept in strict confidence. Please be advised that the **Law Offices of Michael C. Murphy** does not represent you until you have signed a written retainer agreement. Until that time, you are responsible for any statutory deadlines that may affect your case.

---

**From:** Dick Harpootlian <rah@harpootlianlaw.com>

**Sent:** Tuesday, April 1, 2025 2:26 PM

**To:** Michael Murphy <michael@murphlaw.net>

**Cc:** Phillip Barber <pdb@harpootlianlaw.com>; Zachary Hansen <zhansen@earlysullivan.com>; Bryan Sullivan <bsullivan@earlysullivan.com>; Holli Miller <holli@harpootlianlaw.com>; Carmen <Carmen@murphlaw.net>; Robie Atienza-Jones <rjones@earlysullivan.com>

**Subject:** Biden v. Byrne

Attached please find the filing of Moynihan's deposition pursuant to the Court's direction.

Dick Harpootlian

Michael C. Murphy, Esq. (S.B. No. 104872)
  Michael@murphlaw.net
Michael C. Murphy, Jr. Esq. (S.B. No. 305896)
  Michael.jr@murphlaw.net
Carmen R. Selame, Esq. (S.B. No. 334098)
  Carmen@murphlaw.net
LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361
Tel.: 818-558-3718
Fax: 805-367-4506

Attorneys for Defendant,
Patrick Byrne

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERT HUNTER BIDEN, an individual,<br><br>               Plaintiff,<br><br>     vs.<br><br>PATRICK M. BYRNE, an individual,<br><br>               Defendant. | Case No.:   2:23-cv-09430-SVW-PD<br>Judge:    Honorable Stephen V. Wilson<br>Courtroom:  "10A"<br><br>Complaint Filed: November 8, 2023<br><br>**OBJECTIONS TO PLAINTIFF'S PROPOSED RULE 31(A) DEPOSITION QUESTIONS; DEFENDANT'S CROSS-EXAMINATION QUESTIONS TO SPECIAL AGENT SMITH** |

/ / /

/ / /

/ / /

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, pursuant to <u>Federal Rules of Civil Procedure</u> 31, *et seq.*, Defendant Patrick Byrne ("Defendant"), by and through his attorneys of record, make the following objections to Plaintiff's proposed Rule 31 Deposition Questions:

As a preliminary matter, Defendant objects to the Notice of Deposition of Agent Smith on the grounds that it fails to comply with <u>Federal Rule of Civil Procedure</u>, Rule 31(a)(3), which *requires* that the deposition notice contain the address of the deponent and the name and address of the court reporter.

Defendant further objects to the Notice of Deposition of Agent Smith on additional grounds that it fails to comply with <u>Federal Rule of Civil Procedure</u>, Rule 31(a)(3), which *requires* that the party who noticed the deposition identify the name or description and the *address* of the deposition officer.

Defendant further objects to the Notice of Deposition of Agent Smith and to the deposition of Agent Smith on the grounds that the court reporter is hired by or employed by the DOJ. Defendant reserves the right to object to the use and admission of the deposition at trial on the grounds stated herein and reserves all objections on any other grounds.

Defendant further objects to the Notice of Deposition of Agent Smith and to the deposition of Agent Smith on the grounds that the deposition fails to comply with the requirements of <u>Federal Rule of Civil Procedure</u>, Rule 31(b), which requires that the noticing party deliver to the deposition officer all the questions and cross-examination questions, and the deposition notice. The deposition must proceed pursuant to <u>Federal Rule of Civil Procedure</u>, Rule 30 (c), (e), and (f). Defendant objects to the service of the notice and questions directly on the DOJ, and Defendant objects to the DOJ accepting service of the notice and questions on behalf of the court reporter. Defendant objects to the deposition should it not

/ / /

2

follow the procedures set forth in <u>Federal Rule of Civil Procedure</u>, Rule 30 (c), (e), and (f).

Defendant further objects to the Notice of Deposition of Agent Smith and to the deposition of Agent Smith on the grounds that the deposition fails to comply with the requirements of <u>Federal Rule of Civil Procedure</u>, Rule 31(c), which requires that the noticing party notify all parties when the deposition is completed.

**PLAINTIFF'S PROPOSED QUESTION 6:**

Question 6. Mr. Byrne testified in this action that in late 2021 or early 2022 you met with him and John Moynihan at a parking lot at Reagan National Airport where Mr. Byrne played you an audio recording in which there was a conversation between someone and Mr. Byrne in which it was stated that Mr. Robert Hunter Biden, through an intermediary, had approached the Iranian government with an offer to have his father, President Joe Biden, unfreeze $8 billion in Iranian funds in South Korea in return for the Iranians paying the Biden's 10% of those funds which would go into a numbered account for his family. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 6:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony of Mr. Byrne that was given during his depositions.

**PLAINTIFF'S PROPOSED QUESTION 7:**

Question 7. Mr. Byrne testified in this action that he gave you in the car a copy of the recording that Mr. Byrne claims to have played for you as described in Question 6. Is that accurate?

    a.  If yes, did Mr. Byrne give you the recording on a device that he surrendered to you?

        i.  If no, did Mr. Byrne give you the recording via AirDrop or through another medium such as the messaging application "Signal"?

3

LAW OFFICES OF MICHAEL C MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

**DEFENDANT'S OBJECTION TO QUESTION 7:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony of Mr. Byrne that was given during his depositions.

**PLAINTIFF'S PROPOSED QUESTION 8:**

Question 8. Mr. Byrne testified in this action that you told him to delete the recording and not keep a copy of it. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 8:**

Objection: Compound. Vague. Ambiguous.

**PLAINTIFF'S PROPOSED QUESTION 9:**

Question 9. Mr. Byrne testified in this action that you confirmed, through various actions by various government agencies, the identity of the voice on the voicemails played in the recording and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 9:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony Mr. Byrne gave during his depositions.

**PLAINTIFF'S PROPOSED QUESTION 10:**

Question 10. Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as the son of a high-ranking official with the Pakistani Minister of Defense and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 10:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony Mr. Byrne gave during his depositions.

/ / /

4

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

**PLAINTIFF'S PROPOSED QUESTION 11:**

Question 11. Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as someone who had close ties to Mr. Hunter Biden and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 11:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony Mr. Byrne gave during his depositions.

**PLAINTIFF'S PROPOSED QUESTION 12:**

Question 12. Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as someone who acted as a proxy for Hunter Biden and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 12:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony Mr. Bryne gave during his depositions.

**PLAINTIFF'S PROPOSED QUESTION 13:**

Question 13. Mr. Byrne testified in this action that you described to Mr. Byrne a letter that FBI Director Christopher Wray sent out to every FBI agent in the bureau saying not to have any contact with Mr. Byrne. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 13:**

Objection: Irrelevant to the subject matter of the litigation. Vague. Ambiguous. Misstates the evidence.

/ / /

/ / /

/ / /

OBJECTION RULE 31(A) DEPOSITION QUESTIONS; PROPOSED CROSS-EXAMINATION QUESTIONS
Case No.: 2:23-cv-09430-SVW-PD

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

PLEASE TAKE NOTICE THAT Defendant hereby issues the following cross-examination questions to Agent Smith. Defendant preserves all objections to the deposition going forward, as outlined above, but submits these questions in an abundance of caution so as to not waive any rights to cross-examine Agent Smith.

Defendant further objects to the distribution of these questions and/or objections to anyone other than a properly selected certified shorthand court reporter, properly selected by Plaintiff's counsel. The properly selected certified shorthand court reporter shall receive the questions and the objections, and upon receipt of all of them, shall schedule the deposition of the deponent, and conduct the deposition in accordance with Federal Rule of Civil Procedure, Rule 31(b), accord. Rule 30(c), (e), and (f). Defendant further objections to the distribution of the questions and objections while Defendant's ex parte application is pending before the Court. Defendant further reserves all rights to amend these cross-examination questions and objections set forth herein should the Court grant Defendant's ex parte request.

Defendant's Proposed Questions are as follows:

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 1:**

Mr. Byrne testified in this action that he provided to you a recording that involved Hunter Biden and Iranian Officials. Do you recall receiving any recording from Mr. Byrne related to or involving Hunter Biden and Iranian officials?

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 2:**

If Mr. Byrne provided any recording to you, did you ask him to delete the recording from any device still in his possession?

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 3:**

Is it common practice for the FBI to advise informants to retain copies of sensitive information or evidence related to national security matters?

/ / /

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 4:**

Did the National Security Agency confirm the voice identification of the individual on the three voicemails included on the recording provided to you by Mr. Byrne?

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 5:**

Did the National Security Agency confirm that the identified individual has or had a relationship or connection to Hunter Biden?

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 6:**

Did the National Security Agency confirm that the identified individual acted as a proxy for Hunter Biden?

Dated: March 28, 2025          LAW OFFICES OF MICHAEL C. MURPHY

By:  /s/ Michael C. Murphy, Esq.

_____

Michael C. Murphy, Esq.
Michael C. Murphy, Jr., Esq.
Carmen R. Selame, Esq.
Attorneys for Defendant,
Patrick Byrne

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

7

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

# PROOF OF SERVICE

## UNITED STATEMENTS OF AMERICA

I am employed and am a resident of the County of Ventura, State of California.

I am over the age of 18 and not a party to the within action.  My business name and address is as follows:

Law Offices of Michael C. Murphy
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

On March 28, 2025, I served the foregoing document(s) on Opposing Counsel in this action described as follows:

**1. OBJECTIONS TO PLAINTIFF'S PROPOSED RULE 31(A) DEPOSITION QUESTIONS; DEFENDANT'S CROSS-EXAMINATION QUESTIONS TO SPECIAL AGENT SMITH**

_____ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list.

_____ by placing a copy of the original enclosed in sealed envelopes addressed as follows ("U.S. Mail"):

__X__ by placing copies of the original through electronic transmission ("e-mail") to all parties appearing on the electronic service list as follows:

_____ by placing copies of the original through facsimile transmission ("fax") to all parties appearing on the service list as follows:

**OBJECTION RULE 31(A) DEPOSITION QUESTIONS; PROPOSED CROSS-EXAMINATION QUESTIONS**
**Case No.:** 2:23-cv-09430-SVW-PD

Richard A. Harpootlian, *pro hac vice*
rah@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Columbia, South Carolina 29201
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

Bryan M. Sullivan, Esq.
Zachary C. Hansen, Esq.
Early Sullivan Wright Gizer & McRae, LLP
6420 Wilshire Blvd., Suite 17th Fl.
Los Angeles, CA 90048
Tel: (323) 301-4660
Fax: (323) 301-4676
Email: rclaudat@earlysullivan.com
Email: zhansen@earlysullivan.com
Email: bsullivan@earlysullivan.com

**Attorneys for Plaintiff**
ROBERT HUNTER BIDEN

The sender's name and email address are as follows:
Name:  Carmen R. Selame, Esq.
Email:  Carmen@murphlaw.net.

_____ (State) I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct.

__X__ (Federal) I declare that I am employed in the office as a member of the bar of this court at whose direction the service was made.

Executed on March 28, 2025 at Westlake Village, California.

By: /s/ Carmen R. Selame, Esq.

_____

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

# Exhibit E

Bryan M. Sullivan, State Bar Number 209743
  bsullivan@earlysullivan.com
Zachary C. Hansen, State Bar Number 325128
  zhansen@earlysullivan.com
EARLY SULLIVAN WRIGHT
  GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

Richard A. Harpootlian, *pro hac vice*
  rah@harpootlianlaw.com
Phillip D. Barber, *pro hac vice*
  pdb@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Columbia, South Carolina 29201
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

Attorneys for PLAINTIFF
ROBERT HUNTER BIDEN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT HUNTER BIDEN, an individual,<br><br>                Plaintiff,<br><br>        vs.<br><br>PATRICK M. BYRNE, an individual,<br><br>                Defendant. | Case No. 2:23-cv-09430-SVW-PD<br><br>**PLAINTIFF ROBERT HUNTER BIDEN'S NOTICE OF DEPOSITION OF FBI SPECIAL AGENT DAVID SMITH**<br><br>Date:        April 15, 2025<br>Time:       10:00 AM (EDT)<br>Place:      U.S. Department of Justice<br>               1100 L Street, N.W.<br>               Washington, DC 20005<br><br>Complaint Filed: November 8, 2023 |

1

**TO ALL INTERESTED PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

    **PLEASE TAKE NOTICE** that, pursuant to Federal Rules of Civil Procedure 30, Plaintiff Robert Hunter Biden, by and through his attorneys of record, will take the deposition of FBI Special Agent David Smith, in person to answer the following questions, under oath and in writing on April 15, 2025, beginning at 10:00 AM (EDT), at the U.S. Department of Justice, 1100 L Street, N.W., Washington, DC 20005.

    **PLEASE TAKE FURTHER NOTICE THAT** the deposition by written questions will be taken in the presence of Sherry Brooks with Esquire Deposition Solutions,  an officer authorized to administer oaths, with offices at 1717 K Street, NW, Suite 900, Washington, DC 20006. The deposition will be  recorded stenographically.

    A list of all parties or attorneys upon whom this Notice of Deposition is being served is shown on the accompanying Proof of Service.

<u>**PLAINTIFF'S RULE 31 DEPOSITION QUESTIONS**</u>

Question 1.   Please state your name.

Question 2.   Do you reside in California?

Question 3.   How are you employed?

Question 4.   Is your employment located in California?

Question 5.   How long have you been employed with that entity?

Question 6.   Mr. Byrne testified in this action that in late 2021 or early 2022 you met with him and John Moynihan at a parking lot at Reagan National Airport where Mr. Byrne played you an audio recording in which there was a conversation between someone and Mr. Byrne in which it was stated that Mr.

2

Robert Hunter Biden, through an intermediary, had approached the Iranian government with an offer to have his father, President Joe Biden, unfreeze $8 billion in Iranian funds in South Korea in return for the Iranians paying the Biden's 10% of those funds which would go into a numbered account for his family. Is that accurate?

Question 7.   Mr. Byrne testified in this action that he gave you in the car a copy of the recording that Mr. Byrne claims to have played for you as described in Question No. 6. Is that accurate?

    a. If yes, did Mr. Byrne give you the recording on a device that he surrendered to you?

        i. If no, did Mr. Byrne give you the recording via AirDrop or through another medium such as the messaging application "Signal"?

Question 8.    Mr. Byrne testified in this action that you told him to delete the recording and not keep a copy of it.  Is that accurate?

Question 9.    Mr. Byrne testified in this action that you confirmed, through various actions by various government agencies, the identity of the voice on the voicemails played on the recording and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

Question 10.  Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as the son of a high-

**PLAINTIFF ROBERT HUNTER BIDEN'S NOTICE OF DEPOSITION OF FBI SPECIAL AGENT DAVID SMITH**

ranking official with the Pakistani Minister of Defense and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

Question 11.   Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as someone who had close ties to Mr. Hunter Biden and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

Question 12.   Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as someone who acted as a proxy for Hunter Biden and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

Question 13.   Mr. Byrne testified in this action that you described to Mr. Byrne a letter that FBI Director Christopher Wray sent out to every FBI agent in the bureau saying not to have any contact with Mr. Byrne. Is that accurate?

## DEFENDANT'S RULE 31 DEPOSITION CROSS-EXAMINATION QUESTIONS

Question 1:   Mr. Byrne testified in this action that he provided to you a recording that involved Hunter Biden and Iranian Officials. Do you recall receiving any recording from Mr. Byrne related to or involving Hunter Biden and Iranian officials?

Question 2:   If Mr. Byrne provided any recordings to you, did you ask him to delete the recordings from any device still in his possession?

Question 3:   Is it common practice for the FBI to advise informants to

4

retain copies of sensitive information or evidence related to national security matters?

Question 4:   Did the National Security Agency confirm the voice identification of the individual on the three voicemails including the recording provided to you by Mr. Byrne?

Question 5:   Did the National Security Agency confirm that the identified has or had a relationship or connection with Hunter Biden?

Question 6:   Did the National Security Agency confirm that the identified individual acted as a proxy for Hunter Biden?

Dated:        April 7, 2025              RICHARD A. HARPOOTLIAN, PA

                                   By:    /s/ Richard A. Harpootlian
                                          RICHARD A. HARPOOTLIAN (*pro hac vice*)
                                          *rah@harpootlianlaw.com*
                                          Phillip D. Barber, *pro hac vice*
                                          *pdb@harpootlianlaw.com*
                                          RICHARD A. HARPOOTLIAN, PA
                                          1410 Laurel Street
                                          Columbia, South Carolina 29201
                                          Telephone: (803) 252-4848
                                          Facsimile: (803) 252-4810

                                          BRYAN M. SULLIVAN, State Bar No. 209743
                                          bsullivan@earlysullivan.com
                                          ZACHARY C. HANSEN, State Bar No. 325128
                                          zhansen@earlysullivan.com
                                          EARLY SULLIVAN WRIGHT GIZER & McRAE LLP
                                          6420 Wilshire Boulevard, 17th Floor

5

Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

*Attorney for Plaintiff*
*Robert Hunter Biden*

## CERTIFICATE OF SERVICE

I, Phillip D. Barber, hereby certify that on , a copy of **Plaintiff Robert Hunter Biden's Notice of Deposition of FBI Special Agent David Smith** was served via email on the following:

*Attorneys for Defendant*
Michael C. Murphy, Esq.
Michael C. Murphy, Jr., Esq.
Law Offices of Michael C. Murphy
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361
michael@murphylaw.net
michael.jr@murphylaw.net

*Attorney for Deponent*
Samuel B. Bean
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
samuel.b.bean2@usdoj.gov

*/s/ Phillip D. Barber*
PHILLIP D. BARBER

6

# Exhibit F

 **Outlook**

**RE: Special Agent David Smith Rule 31 deposition notice Biden v. Byrne, 2:@3-cv-9430-SVW (C.D. Cal.)**

| | |
|---|---|
| **From** | Michael Murphy <michael@murphlaw.net> |
| **Date** | Mon 4/7/2025 6:35 PM |
| **To** | Phillip Barber <pdb@harpootlianlaw.com>; Bean, Samuel B (CIV) <Samuel.B.Bean2@usdoj.gov> |
| **Cc** | Dick Harpootlian <rah@harpootlianlaw.com>; Holli Miller <holli@harpootlianlaw.com>; Carmen <Carmen@murphlaw.net>; Zachary Hansen <zhansen@earlysullivan.com>; Bryan Sullivan <bsullivan@earlysullivan.com>; michael.jr@murphylaw.net <michael.jr@murphylaw.net> |

📎 1 attachment (403 KB)
Xerox Scan_04072025175416_20250407175416.PDF;

Mr. Bean:

Under FRCP 31, my client is a party in the case and entitled to participate in the written question deposition process. The court has already made a ruling to that effect. On March 18, 2025, the court issued its order that we could submit not only written questions but also objections to Plaintiff's questions that are to be given to the court reporter at the same time as our questions for the deposition under the provisions of Under FRCPA 31(b). A copy of the court's order is attached to this e-mail. Therefore, for the deposition to be in compliance with the code and the court's order, you must submit our questions and objections to plaintiff's questions to the court reporter, make them an official part of the deposition transcript by the court reporter and both our questions and objections must be read to the deponent special agent David Smith during the deposition.

Any attempt by plaintiff's counsel that successfully procures a deposition transcript that does not have our objections and questions attached to it and as received by the court reporter and with confirmation in the transcript that our objections and questions as provided were read to Special Agent Smith to respond to during his deposition will be met with a subsequent motion to have the court not consider as evidence for any purpose in this case the deposition transcript of Special Agent Smith that is finally prepared by the court reporter due to the failure and refusal of Plaintiff's counsel to comply with the provisions of FRCP31(b) and the court's order of March 18, 2025 that is attached to this e-mail.


Very truly yours,

Michael C. Murphy, Esq.

**From:** Phillip Barber <pdb@harpootlianlaw.com>
**Sent:** Monday, April 7, 2025 6:02 PM
**To:** Michael Murphy <michael@murphlaw.net>; Bean, Samuel B (CIV) <Samuel.B.Bean2@usdoj.gov>
**Cc:** Dick Harpootlian <rah@harpootlianlaw.com>; Holli Miller <holli@harpootlianlaw.com>; Carmen <Carmen@murphlaw.net>; Zachary Hansen <zhansen@earlysullivan.com>; Bryan Sullivan <bsullivan@earlysullivan.com>; michael.jr@murphylaw.net
**Subject:** RE: Special Agent David Smith Rule 31 deposition notice Biden v. Byrne, 2:@3-cv-9430-SVW (C.D. Cal.)

Mr. Bean,

Please ignore any communications from Mr. Murphy. He does not represent the party noticing this deposition. I do. I am very appreciative of your willingness to work with us to make the witness available and to assist us in forming questions that do not intrude on governmental privileges in this very unusual case. Of course, I am responsible for making sure the court reporter says what she is supposed to say and as counsel for the United States you are not expected to have any concern for a private party's objections to deposition questions or managing his deposition exhibits. If Mr. Murphy has concerns he may address them to the Court.

Sincerely,

Phillip D. Barber
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, South Carolina 29202
(803) 252-4848
(803) 252-4810 (facsimile)
pdb@harpootlianlaw.com

**From:** Michael Murphy <michael@murphlaw.net>
**Sent:** Monday, April 07, 2025 8:08 PM
**To:** Phillip Barber <pdb@harpootlianlaw.com>; Bean, Samuel B (CIV) <Samuel.B.Bean2@usdoj.gov>
**Cc:** Dick Harpootlian <rah@harpootlianlaw.com>; Holli Miller <holli@harpootlianlaw.com>; Carmen <Carmen@murphlaw.net>; Zachary Hansen

<zhansen@earlysullivan.com>; Bryan Sullivan <bsullivan@earlysullivan.com>; michael.jr@murphylaw.net
**Subject:** RE: Special Agent David Smith Rule 31 deposition notice Biden v. Byrne, 2:@3-cv-9430-SVW (C.D. Cal.)

Mr. Bean:

Attached are our deposition objections and questions that Plaintiff's counsel deliberately failed to provide you in violation of FRCP 31. Instead, they rewrote their questions, rewrote our examination questions but not our objections, put them on one documents and then sent you the document with our omitted objections  in violation of FRCP 31.

Please make sure that when the court reporter reads plaintiff's questions during the deposition that the reporter also reads for the record our objections to Plaintiff's questions that we have supplied to you, you can state whatever objections you have to the questions and then Mr. Smith's responses. Our questions should then be asked and either objected to by you and not answered or answered by Agent Smith. We also want our attached questions and objections that we are sending you attached as an exhibit to the deposition transcript and made a part of the record.

Let me know if you have any questions or concerns. We plan to also send an e-mail to the court reporter with a copy of this e-mail and the attachment with the same instructions.


Very truly yours,

Michael C. Murphy, Esq.

**From:** Phillip Barber <pdb@harpootlianlaw.com>
**Sent:** Monday, April 7, 2025 2:25 PM
**To:** Bean, Samuel B (CIV) <Samuel.B.Bean2@usdoj.gov>
**Cc:** Dick Harpootlian <rah@harpootlianlaw.com>; Holli Miller <holli@harpootlianlaw.com>; Carmen <Carmen@murphlaw.net>; Michael Murphy <michael@murphlaw.net>; Zachary Hansen <zhansen@earlysullivan.com>; Bryan Sullivan <bsullivan@earlysullivan.com>; michael.jr@murphylaw.net
**Subject:** Special Agent David Smith Rule 31 deposition notice Biden v. Byrne, 2:@3-cv-9430-SVW (C.D. Cal.)

Mr. Bean,

Attached please find a deposition notice for a Rule 31 written deposition of Special Agent David Smith in the above-referenced matter, to occur at 1100 L Street, NW, Washington, DC 20005, on April 15, 2025, at 10am.  Please let me know if a subpoena is needed in addition to this deposition notice; the previous subpoena for an oral deposition has been withdrawn.  If the government objects to any question, I ask that the objection be stated on the record when the court reporter asks the question so that it is included in the official transcript.

Sincerely,

Phillip D. Barber
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, South Carolina 29202
(803) 252-4848
(803) 252-4810 (facsimile)
pdb@harpootlianlaw.com

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

# Exhibit G

LAW OFFICES OF
# MICHAEL C. MURPHY
ATTORNEYS AT LAW

---

**Westlake Village Office (Main)**
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361
Tel: (818) 558-3718
Email: Michael@murphlaw.net

**Burbank Office**
3500 W. Olive Ave., Suite 300
Burbank, CA 91505
Fax: (805) 367-4506
Email: Michael.jr@murphlaw.net

April 10, 2025

**VIA U.S. MAIL**

Attn: Sherry Brooks
Esquire Deposition Solutions
1100 L Street, N.W.,
Washington, DC 20005

Re:  Hunter Robert Biden v Patrick M. Byrne, Case No. 2:23-cv-09430-SVW-PD
     Re: Deposition of Special Agent David Smith

Dear Ms. Brooks:

This law firm represents Mr. Patrick M. Byrne. Enclosed, we are including our objections and questions to be read to the deponent, Special Agent David Smith.

We object to the use of the version of our questions Plaintiff's counsel included in his amended notice, dated April 7, 2025, because Plaintiff's re-typed versions of our questions include errors in questions 2, 4, and 5.

We respectfully request that our questions as written in our enclosed objections, dated March 28, 2025, be read to the deponent as we have drafted them. We further request that you read our objections to each of Plaintiff's questions to the deponent.

Under FRCP 31, *et seq.*, we are entitled to participate in the written deposition process, and to have our questions and objections submitted to the deponent, and for our questions and objections to be made an official part of the deposition transcript. We ask that you attach our objections and questions to the deposition transcript. We are also attaching the Court's order allowing us to submit our objections and questions to the deponent. We ask that you also attach this Court

April 10, 2025
<u>Hunter Robert Biden v Patrick M. Byrne</u>, Case No. 2:23-cv-09430-SVW-PD
Page | 2

order, dated March 18, 2025, to the transcript. Finally, we are including the amended deposition notice.

Failure to read our questions and objections to the deponent, or to include them in the official transcript, and failure to attach them to the completed transcript will result in a motion to exclude use of the deposition at trial.

Thank you.

      Sincerely,

      /s/  Michael C. Murphy, Esq.

Enclosed:
Exhibit A – Defendant's Objections to Plaintiff's Rule 31(a) Deposition Questions
Exhibit B – March 18, 2025, Court Order
Exhibit C – Plaintiff's Amended Rule 31 Questions

# Exhibit A

Michael C. Murphy, Esq. (S.B. No. 104872)
 Michael@murphlaw.net
Michael C. Murphy, Jr. Esq. (S.B. No. 305896)
 Michael.jr@murphlaw.net
Carmen R. Selame, Esq. (S.B. No. 334098)
 Carmen@murphlaw.net
LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361
Tel.: 818-558-3718
Fax: 805-367-4506

Attorneys for Defendant,
Patrick Byrne

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT HUNTER BIDEN, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>PATRICK M. BYRNE, an individual,<br><br>        Defendant. | Case No.:   2:23-cv-09430-SVW-PD<br>Judge:     Honorable Stephen V. Wilson<br>Courtroom:  "10A"<br><br>Complaint Filed: November 8, 2023<br><br>**OBJECTIONS TO PLAINTIFF'S PROPOSED RULE 31(A) DEPOSITION QUESTIONS; DEFENDANT'S CROSS-EXAMINATION QUESTIONS TO SPECIAL AGENT SMITH** |

/ / /

/ / /

/ / /

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, pursuant to <u>Federal Rules of Civil Procedure</u> 31, *et seq.*, Defendant Patrick Byrne ("Defendant"), by and through his attorneys of record, make the following objections to Plaintiff's proposed Rule 31 Deposition Questions:

As a preliminary matter, Defendant objects to the Notice of Deposition of Agent Smith on the grounds that it fails to comply with <u>Federal Rule of Civil Procedure</u>, Rule 31(a)(3), which *requires* that the deposition notice contain the address of the deponent and the name and address of the court reporter.

Defendant further objects to the Notice of Deposition of Agent Smith on additional grounds that it fails to comply with <u>Federal Rule of Civil Procedure</u>, Rule 31(a)(3), which *requires* that the party who noticed the deposition identify the name or description and the *address* of the deposition officer.

Defendant further objects to the Notice of Deposition of Agent Smith and to the deposition of Agent Smith on the grounds that the court reporter is hired by or employed by the DOJ. Defendant reserves the right to object to the use and admission of the deposition at trial on the grounds stated herein and reserves all objections on any other grounds.

Defendant further objects to the Notice of Deposition of Agent Smith and to the deposition of Agent Smith on the grounds that the deposition fails to comply with the requirements of <u>Federal Rule of Civil Procedure</u>, Rule 31(b), which requires that the noticing party deliver to the deposition officer all the questions and cross-examination questions, and the deposition notice. The deposition must proceed pursuant to <u>Federal Rule of Civil Procedure</u>, Rule 30 (c), (e), and (f). Defendant objects to the service of the notice and questions directly on the DOJ, and Defendant objects to the DOJ accepting service of the notice and questions on behalf of the court reporter. Defendant objects to the deposition should it not

/ / /

2

follow the procedures set forth in <u>Federal Rule of Civil Procedure</u>, Rule 30 (c), (e), and (f).

Defendant further objects to the Notice of Deposition of Agent Smith and to the deposition of Agent Smith on the grounds that the deposition fails to comply with the requirements of <u>Federal Rule of Civil Procedure</u>, Rule 31(c), which requires that the noticing party notify all parties when the deposition is completed.

**PLAINTIFF'S PROPOSED QUESTION 6:**

Question 6. Mr. Byrne testified in this action that in late 2021 or early 2022 you met with him and John Moynihan at a parking lot at Reagan National Airport where Mr. Byrne played you an audio recording in which there was a conversation between someone and Mr. Byrne in which it was stated that Mr. Robert Hunter Biden, through an intermediary, had approached the Iranian government with an offer to have his father, President Joe Biden, unfreeze $8 billion in Iranian funds in South Korea in return for the Iranians paying the Biden's 10% of those funds which would go into a numbered account for his family. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 6:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony of Mr. Byrne that was given during his depositions.

**PLAINTIFF'S PROPOSED QUESTION 7:**

Question 7. Mr. Byrne testified in this action that he gave you in the car a copy of the recording that Mr. Byrne claims to have played for you as described in Question 6. Is that accurate?

  a. If yes, did Mr. Byrne give you the recording on a device that he surrendered to you?
    i. If no, did Mr. Byrne give you the recording via AirDrop or through another medium such as the messaging application "Signal"?

**OBJECTION RULE 31(A) DEPOSITION QUESTIONS; PROPOSED CROSS-EXAMINATION QUESTIONS**
Case No.: 2:23-cv-09430-SVW-PD

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

**DEFENDANT'S OBJECTION TO QUESTION 7:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony of Mr. Byrne that was given during his depositions.

**PLAINTIFF'S PROPOSED QUESTION 8:**

Question 8. Mr. Byrne testified in this action that you told him to delete the recording and not keep a copy of it. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 8:**

Objection: Compound. Vague. Ambiguous.

**PLAINTIFF'S PROPOSED QUESTION 9:**

Question 9. Mr. Byrne testified in this action that you confirmed, through various actions by various government agencies, the identity of the voice on the voicemails played in the recording and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 9:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony Mr. Byrne gave during his depositions.

**PLAINTIFF'S PROPOSED QUESTION 10:**

Question 10. Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as the son of a high-ranking official with the Pakistani Minister of Defense and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 10:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony Mr. Byrne gave during his depositions.

/ / /

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

**PLAINTIFF'S PROPOSED QUESTION 11:**

Question 11. Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as someone who had close ties to Mr. Hunter Biden and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 11:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony Mr. Byrne gave during his depositions.

**PLAINTIFF'S PROPOSED QUESTION 12:**

Question 12. Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as someone who acted as a proxy for Hunter Biden and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 12:**

Objection: Compound. Vague. Ambiguous. Assumes facts not in evidence. Misrepresents and mischaracterizes the testimony Mr. Bryne gave during his depositions.

**PLAINTIFF'S PROPOSED QUESTION 13:**

Question 13. Mr. Byrne testified in this action that you described to Mr. Byrne a letter that FBI Director Christopher Wray sent out to every FBI agent in the bureau saying not to have any contact with Mr. Byrne. Is that accurate?

**DEFENDANT'S OBJECTION TO QUESTION 13:**

Objection: Irrelevant to the subject matter of the litigation. Vague. Ambiguous. Misstates the evidence.

/ / /

/ / /

/ / /

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

PLEASE TAKE NOTICE THAT Defendant hereby issues the following cross-examination questions to Agent Smith. Defendant preserves all objections to the deposition going forward, as outlined above, but submits these questions in an abundance of caution so as to not waive any rights to cross-examine Agent Smith.

Defendant further objects to the distribution of these questions and/or objections to anyone other than a properly selected certified shorthand court reporter, properly selected by Plaintiff's counsel. The properly selected certified shorthand court reporter shall receive the questions and the objections, and upon receipt of all of them, shall schedule the deposition of the deponent, and conduct the deposition in accordance with Federal Rule of Civil Procedure, Rule 31(b), accord. Rule 30(c), (e), and (f). Defendant further objections to the distribution of the questions and objections while Defendant's ex parte application is pending before the Court. Defendant further reserves all rights to amend these cross-examination questions and objections set forth herein should the Court grant Defendant's ex parte request.

Defendant's Proposed Questions are as follows:

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 1:**

Mr. Byrne testified in this action that he provided to you a recording that involved Hunter Biden and Iranian Officials. Do you recall receiving any recording from Mr. Byrne related to or involving Hunter Biden and Iranian officials?

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 2:**

If Mr. Byrne provided any recording to you, did you ask him to delete the recording from any device still in his possession?

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 3:**

Is it common practice for the FBI to advise informants to retain copies of sensitive information or evidence related to national security matters?

/ / /

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 4:**

Did the National Security Agency confirm the voice identification of the individual on the three voicemails included on the recording provided to you by Mr. Byrne?

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 5:**

Did the National Security Agency confirm that the identified individual has or had a relationship or connection to Hunter Biden?

**DEFENDANT'S PROPOSED CROSS-EXAMINATION QUESTION 6:**

Did the National Security Agency confirm that the identified individual acted as a proxy for Hunter Biden?

Dated: March 28, 2025          LAW OFFICES OF MICHAEL C. MURPHY

                                        By: /s/ Michael C. Murphy, Esq.

                                        _____
                                        Michael C. Murphy, Esq.
                                        Michael C. Murphy, Jr., Esq.
                                        Carmen R. Selame, Esq.
                                        Attorneys for Defendant,
                                        Patrick Byrne

**OBJECTION RULE 31(A) DEPOSITION QUESTIONS; PROPOSED CROSS-EXAMINATION QUESTIONS**
**Case No.:** 2:23-cv-09430-SVW-PD

**PROOF OF SERVICE**

**UNITED STATEMENTS OF AMERICA**

I am employed and am a resident of the County of Ventura, State of California.

I am over the age of 18 and not a party to the within action.  My business name and address is as follows:

Law Offices of Michael C. Murphy
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

On March 28, 2025, I served the foregoing document(s) on Opposing Counsel in this action described as follows:

**1. OBJECTIONS TO PLAINTIFF'S PROPOSED RULE 31(A) DEPOSITION QUESTIONS; DEFENDANT'S CROSS-EXAMINATION QUESTIONS TO SPECIAL AGENT SMITH**

_____ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list.

_____ by placing a copy of the original enclosed in sealed envelopes addressed as follows ("U.S. Mail"):

___X___ by placing copies of the original through electronic transmission ("e-mail") to all parties appearing on the electronic service list as follows:

_____ by placing copies of the original through facsimile transmission ("fax") to all parties appearing on the service list as follows:

**OBJECTION RULE 31(A) DEPOSITION QUESTIONS; PROPOSED CROSS-EXAMINATION QUESTIONS**
**Case No.:** 2:23-cv-09430-SVW-PD

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

Richard A. Harpootlian, *pro hac vice*
rah@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Columbia, South Carolina 29201
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

Bryan M. Sullivan, Esq.
Zachary C. Hansen, Esq.
Early Sullivan Wright Gizer & McRae, LLP
6420 Wilshire Blvd., Suite 17th Fl.
Los Angeles, CA 90048
Tel: (323) 301-4660
Fax: (323) 301-4676
Email: rclaudat@earlysullivan.com
Email: zhansen@earlysullivan.com
Email: bsullivan@earlysullivan.com

**Attorneys for Plaintiff**
ROBERT HUNTER BIDEN

The sender's name and email address are as follows:
Name:  Carmen R. Selame, Esq.
Email:  Carmen@murphlaw.net.

_____ (State) I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct.

__X__ (Federal) I declare that I am employed in the office as a member of the bar of this court at whose direction the service was made.

Executed on March 28, 2025 at Westlake Village, California.


By: /s/ Carmen R. Selame, Esq.

_____

LAW OFFICES OF MICHAEL C. MURPHY
2625 Townsgate Road, Suite 330
Westlake Village, CA 91361

9

# Exhibit B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | | Date | March 18, 2025 |
|----------|-------------------|---|------|----------------|
| Title | Robert Hunter Biden v. Patrick M. Byrne | | | |

Present: The Honorable    STEPHEN V. WILSON, U.S. DISTRICT JUDGE

| Paul M. Cruz | N/A |
|--------------|-----|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| N/A | N/A |

**Proceedings:**    ORDER DENYING DEFENDANT'S EX PARTE APPLICATION FOR AN ORDER TO EXCLUDE PLAINTIFF FROM CONDUCTING THE DEPOSITION OF SPECIAL AGENT DAVID SMITH [208]

## I.    Introduction

Before the Court is Defendant Patrick Byrne's ex parte application for an order to exclude Plaintiff Robert Hunter Biden from conducting the deposition of special agent David Smith. ECF No. 208. For the following reasons, Defendant's motion is DENIED.

## II.    Background

On June 27, 2023, Defendant, in an interview with the Capitol Times Magazine, claimed that Plaintiff, through an intermediary, approached the Iranian government with an offer to have his father, President Joe Biden, unfreeze $8 billion in Iranian funds held in South Korea in return for the Iranians paying the Biden's 10% of those funds. Plaintiff responded by suing Defendant for defamation. ECF No. 1.

|  | : |
|--|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | | Date | March 18, 2025 |
|---|---|---|---|---|

| Title | *Robert Hunter Biden v. Patrick M. Byrne* | |
|---|---|---|

During discovery, Plaintiff issued a special interrogatory asking Defendant to "identify each and every source upon which [Defendant] relied when making the" statements at issue. ECF No. 89-53, Ex. 51, Interrogatory No. 18. Defendant responded with three sources: (1) information contained in the affidavit of John Moynihan; (2) a "telephone recording" that is referenced in the affidavit; and (3) information provided to Defendant from David Smith, who is an FBI agent. *Id.* Beyond stating his name in response to Plaintiff's interrogatory, Defendant supplied no additional information about David Smith.

Later, on December 13 and 14, 2024, Plaintiff took Defendant's deposition, in which Defendant identified a plethora of previously undisclosed information. In short, Defendant explained that he learned of the alleged bribery scheme between Plaintiff and Iran through an Iranian official named Mehdi Firouzian (often referred to by Defendant by the moniker "Movie Star"). Defendant claimed that, while meeting with Firouzian in Istanbul in 2021, he secretly recorded Firouzian describing the alleged bribery scheme. He also secretly recorded Firouzian playing out loud three voicemail recordings which purportedly implicated Plaintiff.

According to Defendant, he then returned to the United States and played this secret recording (hereinafter, "the Recording") for two individuals: John Moynihan, Defendant's purported contact to an interagency intelligence group within the U.S. government he calls the "League of Shadows;" and David Smith, who is purportedly a member of that interagency group. Defendant allegedly gave his only copy of the Recording to David Smith, who allegedly analyzed the Recording using voice recognition technology and confirmed to Defendant that the voice on the voicemails included in the Recording belonged to someone close to Plaintiff.

After Defendant's deposition, Plaintiff moved to reopen discovery for the purposes of investigating the new information provided by Defendant. The Court granted this request, and explicitly gave Plaintiff permission to "[c]onduct the deposition of Mr. Smith, based on previously undisclosed information." ECF No. 170 at 3.

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | March 18, 2025 |
|----------|-------------------|------|----------------|

| Title | Robert Hunter Biden v. Patrick M. Byrne |
|-------|------------------------------------------|

On January 7, 2025, Plaintiff served a *Touhy* Request on the FBI and DOJ seeking the oral deposition of Agent David Smith. Declaration of Zachary Hansen in support of Plaintiff's Motion to Compel ("Hansen Decl") ¶ 7, ECF No. 198-1. On February 14, 2025, the DOJ denied Plaintiff's *Touhy* Request. *Id.* ¶ 12. At the Court's pretrial conference, in recognition that Agent Smith was a vital witness to this case, it was agreed that Plaintiff would file a motion to compel Agent Smith's deposition, which Plaintiff did on March 3, 2025. ECF No. 198; Hansen Decl. ¶ 15.

But on March 13, 2025, Plaintiff withdrew his motion to compel and informed the Court he had agreed with the Government to perform a written deposition of Agent Smith under Federal Rule of Civil Procedure 31. ECF No. 207. That written deposition would proceed as follows: first, Plaintiff serves his proposed deposition questions on Defendant. Second, within 14 days of receiving Plaintiff's questions, Defendant serves his cross-questions on Plaintiff as well as any objections to Plaintiff's questions. Then, Plaintiff delivers all questions to a court reporter, who reads the questions to Agent Smith, transcribes his answers, and returns a certified transcript. *Id.*; *see also* Fed. R. Civ. P. 31 (explaining the process for conducting written depositions).

Defendant now moves *ex parte* for an order excluding the written deposition of Agent Smith.

## III. Discussion

Defendant wants the Court to prevent the written deposition of Agent Smith. But there is no reason for the Court to do so. Plaintiff does not need the Court's permission to conduct Smith's deposition. *See Jaramillo v. Tappan*, No. 22-cv-00075, 2023 WL 2717393, at *2 (E.D. Cal. Mar. 30, 2023) ("A party need not obtain leave of court to depose a witness by written questions except in certain instances not present here.") Indeed, leave of the Court is only required if "the parties have not stipulated to the deposition" *and* one of the following three conditions is met: "the deposition would result in more than 10 depositions being taken under this rule or Rule 30;" or "the deponent has already been deposed in the case;" or "the party seeks to take a deposition before the time specified in Rule 26(d)." Fed. R. Civ. P.

:

| Initials of Preparer | PMC |
|----------------------|-----|

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | March 18, 2025 |
|----------|-------------------|------|----------------|

| Title | *Robert Hunter Biden v. Patrick M. Byrne* |
|-------|-------------------------------------------|

31(a)(2). While the parties have not stipulated to this deposition, none of the other circumstances requiring leave of the Court apply here.

Defendant incorrectly argues that leave of the Court is required because "given the nature of the facts, and the scope of the discovery permitted by the Court, . . . this deposition will require multiple rounds of written depositions before being completed." Def. Ex Parte Application at 8, ECF No. 208. But that a deposition may lead to more depositions is not a reason to require leave of the Court. After all, there is a chance in every deposition that new information revealed by the deponent will cause one of the parties to pursue additional depositions. Leave is only required if "*the* deposition would result in more than 10 depositions being taken." Fed. R. Civ. P. 31(a)(2) (emphasis added). That is not the case here—deposing Agent Smith will not bring Plaintiff's total deposition count in this case above 10.

Alternatively, Defendant argues that leave of the Court is required because this deposition constitutes an attempt by Plaintiff "to conduct further discovery" beyond the case's discovery deadline. Def. Ex Parte App. At 7, ECF No. 208. But this is not "further discovery." The Court explicitly gave Plaintiff permission to take Agent Smith's deposition in its order reopening limited non-expert fact discovery on December 26, 2024.[1] ECF No. 170.

And while Defendant complains that it "has been entirely excluded from the [deposition] process," permission from the opposing party is not required to conduct a Rule 31 deposition of a nonparty. *See Parker v. Crown Equip. Corp.*, No. 2:20-cv-0357-KJM, 2022 WL 1541280, at *1 (E.D. Cal. May 13, 2022) ("Although cooperation between the parties is encouraged, defendant does not need plaintiff's agreement to notice and hold a deposition."); *see also Ewalan v. St. Germain*, No. 21-cv-5519, 2022 WL 2541856, at *2 (W.D. Wash. June 21, 2022) (explaining that the plaintiff's "consent was not required

---

[1] As explained in that order, Plaintiff was not at fault for failing to take Smith's deposition earlier. Prior to Defendant's deposition in December 2024 (which Plaintiff would have taken earlier if not for Defendant's delay), Defendant had disclosed no information about David Smith besides his name. It was only after Defendant's deposition that Plaintiff had full view of Agent Smith's involvement in this case. Plaintiff moved for permission to take Smith's deposition less than one week later.

|  |  | : |  |
|--|--|---|--|
|  | Initials of Preparer | PMC |  |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | March 18, 2025 |
|----------|-------------------|------|----------------|

| Title | *Robert Hunter Biden v. Patrick M. Byrne* |
|-------|------------------|

before his deposition could be taken"); Fed. R. Civ. P. 31 (allowing Rule 31 depositions without imposing any requirement to acquire the consent of the opposing party). Rule 31 also explicitly ***includes*** Defendant in the Rule 31 deposition. Just as Plaintiff will have the opportunity to submit written questions to Agent Smith, so will Defendant. *See* Fed. R. Civ. P. 31(a)(5) (explaining that "questions from other parties" including "cross-questions" and "recross-questions" are permitted in a Rule 31 deposition). Defendant will also have the opportunity to submit objections to Plaintiff's questions, similar to how he would in a Rule 30 deposition.

Finally, to the extent that Defendant seeks to block Smith's deposition through traditional means— i.e., a motion for a protective order or a motion to quash—Defendant does not have standing to bring these motions. Regarding a protective order, only the party/person "from whom discovery is sought may move for a protective order" under Rule 26(c). Fed. R. Civ. P. 26(c). The Rule 31 deposition at issue here seeks discovery from Agent Smith, not Defendant. So only Agent Smith may move for a protective order.[2] And with respect to a motion to quash, "[d]efendants do not have standing to quash a nonparty subpoena except on grounds of privilege or privacy." *Am. Rena Int'l Corp. v. Sis-Joynce Int'l Co.*, No. 12-cv-06972-FMO, 2013 12638502, at \*2 (C.D. Cal. Oct. 3, 2013). Neither of those grounds exist here.

## IV.   Conclusion

In sum, Defendant fails to provide adequate grounds to prevent Plaintiff from taking a written deposition of Agent Smith. Accordingly, for the foregoing reasons, Defendant's ex parte application is DENIED.

The parties are ORDERED to exchange written questions according to the schedule laid out in Rule 31. The parties may submit objections to a question's form within the time for serving responsive questions (or, if the objectionable question is a recross-question, within 7 days after being served with it).

---

[2] And even if Agent Smith did move for a protective order, he would have to make such a motion "in the court for the district where the deposition will be taken"—i.e., the United States District Court for the District of Columbia.

|  |  : |
|--|----|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | March 18, 2025 |
|---|---|---|---|

| Title | *Robert Hunter Biden v. Patrick M. Byrne* |
|---|---|

Fed. R. Civ. P. 32(d)(3)(C). Moreover, as clarification, at the March 17, 2025 hearing, the Court mistakenly stated that it would evaluate Defendant's objections to the form of Plaintiff's questions. It will not. Rather, Defendant may object to the form Plaintiff's questions per the procedure outlined in Rules 31 and 32. The Court will then evaluate those objections as required when evaluating the admissibility of deposition testimony at trial.

The Court sets a jury trial in this case for July 29, 2025 at 9:30 a.m. The Court will hold a pretrial conference on July 21, 2025 at 3:00 p.m.

**IT IS SO ORDERED.**

:

| | |
|---|---|
| Initials of Preparer | PMC |

# Exhibit C

Bryan M. Sullivan, State Bar Number 209743
  bsullivan@earlysullivan.com
Zachary C. Hansen, State Bar Number 325128
  zhansen@earlysullivan.com
EARLY SULLIVAN WRIGHT
  GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

Richard A. Harpootlian, *pro hac vice*
  rah@harpootlianlaw.com
Phillip D. Barber, *pro hac vice*
  pdb@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Columbia, South Carolina 29201
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

Attorneys for PLAINTIFF
ROBERT HUNTER BIDEN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT HUNTER BIDEN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>PATRICK M. BYRNE, an individual,<br><br>Defendant. | Case No. 2:23-cv-09430-SVW-PD<br><br>**PLAINTIFF ROBERT HUNTER BIDEN'S NOTICE OF DEPOSITION OF FBI SPECIAL AGENT DAVID SMITH**<br><br>Date: April 15, 2025<br>Time: 10:00 AM (EDT)<br>Place: U.S. Department of Justice<br>1100 L Street, N.W.<br>Washington, DC 20005<br><br>Complaint Filed: November 8, 2023 |

1

**TO ALL INTERESTED PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, pursuant to Federal Rules of Civil Procedure 30, Plaintiff Robert Hunter Biden, by and through his attorneys of record, will take the deposition of FBI Special Agent David Smith, in person to answer the following questions, under oath and in writing on April 15, 2025, beginning at 10:00 AM (EDT), at the U.S. Department of Justice, 1100 L Street, N.W., Washington, DC 20005.

**PLEASE TAKE FURTHER NOTICE THAT** the deposition by written questions will be taken in the presence of Sherry Brooks with Esquire Deposition Solutions,  an officer authorized to administer oaths, with offices at 1717 K Street, NW, Suite 900, Washington, DC 20006. The deposition will be  recorded stenographically.

A list of all parties or attorneys upon whom this Notice of Deposition is being served is shown on the accompanying Proof of Service.

## PLAINTIFF'S RULE 31 DEPOSITION QUESTIONS

Question 1.   Please state your name.

Question 2.   Do you reside in California?

Question 3.   How are you employed?

Question 4.   Is your employment located in California?

Question 5.   How long have you been employed with that entity?

Question 6.   Mr. Byrne testified in this action that in late 2021 or early 2022 you met with him and John Moynihan at a parking lot at Reagan National Airport where Mr. Byrne played you an audio recording in which there was a conversation between someone and Mr. Byrne in which it was stated that Mr.

2

Robert Hunter Biden, through an intermediary, had approached the Iranian government with an offer to have his father, President Joe Biden, unfreeze $8 billion in Iranian funds in South Korea in return for the Iranians paying the Biden's 10% of those funds which would go into a numbered account for his family. Is that accurate?

Question 7.   Mr. Byrne testified in this action that he gave you in the car a copy of the recording that Mr. Byrne claims to have played for you as described in Question No. 6. Is that accurate?

    a. If yes, did Mr. Byrne give you the recording on a device that he surrendered to you?

        i. If no, did Mr. Byrne give you the recording via AirDrop or through another medium such as the messaging application "Signal"?

Question 8.    Mr. Byrne testified in this action that you told him to delete the recording and not keep a copy of it.  Is that accurate?

Question 9.    Mr. Byrne testified in this action that you confirmed, through various actions by various government agencies, the identity of the voice on the voicemails played on the recording and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

Question 10.  Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as the son of a high-

PLAINTIFF ROBERT HUNTER BIDEN'S NOTICE OF DEPOSITION OF FBI SPECIAL AGENT DAVID SMITH

ranking official with the Pakistani Minister of Defense and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

Question 11.   Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as someone who had close ties to Mr. Hunter Biden and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

Question 12.   Mr. Byrne testified in this action that you confirmed the voice on the voicemails played on the recording was identified as someone who acted as a proxy for Hunter Biden and communicated that to Mr. Byrne either directly or through Mr. Moynihan. Is that accurate?

Question 13.   Mr. Byrne testified in this action that you described to Mr. Byrne a letter that FBI Director Christopher Wray sent out to every FBI agent in the bureau saying not to have any contact with Mr. Byrne. Is that accurate?

## DEFENDANT'S RULE 31 DEPOSITION CROSS-EXAMINATION QUESTIONS

Question 1:   Mr. Byrne testified in this action that he provided to you a recording that involved Hunter Biden and Iranian Officials. Do you recall receiving any recording from Mr. Byrne related to or involving Hunter Biden and Iranian officials?

Question 2:   If Mr. Byrne provided any recordings to you, did you ask him to delete the recordings from any device still in his possession?

Question 3:   Is it common practice for the FBI to advise informants to

4

1

2

Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

3

4

*Attorney for Plaintiff*
*Robert Hunter Biden*

5

6

<u>CERTIFICATE OF SERVICE</u>

7

8

I, Phillip D. Barber, hereby certify that on , a copy of **Plaintiff Robert**

9

**Hunter Biden's Notice of Deposition of FBI Special Agent David Smith** was

10

served via email on the following:

11

12

*Attorneys for Defendant*
Michael C. Murphy, Esq.

13

Michael C. Murphy, Jr., Esq.
Law Offices of Michael C. Murphy

14

2625 Townsgate Road, Suite 330

15

Westlake Village, CA 91361
michael@murphylaw.net

16

michael.jr@murphylaw.net

17

18

*Attorney for Deponent*
Samuel B. Bean

19

U.S. Department of Justice

20

1100 L Street, NW
Washington, DC 20005

21

samuel.b.bean2@usdoj.gov

22

23

*/s/ Phillip D. Barber*

24

PHILLIP D. BARBER

25

26

27

28

6

| Invoice Number | Invoice Date | Account Number | Page |
|---|---|---|---|
| 8-834-48966 | Apr 18, 2025 | 1662-1343-6 | 2 of 3 |

## FedEx Express Shipment Summary By Payor Type

### FedEx Express Shipments (Original)

| Payor Type | Shipments | Rated Weight lbs | Transportation Charges | Special Handling Charges | Ret Chg/Tax Credits/Other | Discounts | Total Charges |
|---|---|---|---|---|---|---|---|
| Shipper | 1 | | 97.62 | 16.60 | | | 114.22 |
| **Total FedEx Express** | **1** | | **$97.62** | **$16.60** | | | **$114.22** |

### TOTAL THIS INVOICE          USD          $114.22

## FedEx Express Shipment Detail By Payor Type (Original)

**Ship Date:** Apr 10, 2025          **Cust. Ref.:** NO REFERENCE INFORMATION          **Ref.#2:**
**Payor:** Shipper          **Ref.#3:**

- Fuel Surcharge - FedEx has applied a fuel surcharge of 17.00% to this shipment.
- Business Closed or Adult Recipient Unavailable - Delivery Not Completed.
- Distance Based Pricing, Zone 8
- 1st attempt Apr 11, 2025 at 07:07 AM.

| Automation | AWB | | |
|---|---|---|---|
| Tracking ID | 818574470820 | | |
| Service Type | FedEx First Overnight | | |
| Package Type | FedEx Envelope | | |
| Zone | 08 | | |
| Packages | 1 | | |
| Rated Weight | N/A | | |
| Delivered | Apr 11, 2025 09:21 | | |

**Sender**
MICHAEL MURPHY
MURPHY, MICHAEL C, LAW OFCS OF
2625 TOWNSGATE RD
WESTLAKE VILLAGE CA 91361-5751 US

**Recipient**
THERRY BROOKS
ESQUIRE DEPOSITION SERVICES
1717 K ST NW STE 900
WASHINGTON DC 20006 US

Continued on next page

**Fed**

| Invoice Number | Invoice Date | Account Number | Page |
|---|---|---|---|
| 8-834-48966 | Apr 18, 2025 | 1662-1343-6 | 1 of 3 |

**Billing Address:**
LAW OFCS OF MICHAEL C MURPHY
2625 TOWNSGATE RD STE 330
WESTLAKE VILLAGE CA 91361-5749

**Shipping Address:**
MURPHY, MICHAEL C, LAW OFCS OF
2625 TOWNSGATE RD
WESTLAKE VILLAGE CA 91361-5751

**Invoice Questions?**
**Contact FedEx Revenue Services**
Phone:      800.622.1147
                M-F   7 AM to 8 PM CST
                Sa    7 AM to 6 PM CST
Internet:   fedex.com

---

## Invoice Summary

**FedEx Express Services**

| | | |
|---|---|---|
| Total Charges | USD | $114.22 |
| **TOTAL THIS INVOICE** | **USD** | **$114.22** |

Other discounts may apply.

To pay your FedEx invoice, please go to www.fedex.com/payment. Thank you for using FedEx.





## Account Summary as of Apr 18, 2025

| | |
|---|---|
| Previous Balance | 0.00 |
| Payments | 0.00 |
| Adjustments | 0.00 |
| New Charges | 114.22 |

| | |
|---|---|
| **New Account Balance** | **$114.22** |

*Payments not received by May 03, 2025 are subject to a late fee.*

**Important Service Message:**

Stay alert to fraud targeting your FedEx shipments and accounts. What to Watch For:- Fake tracking numbers.- Suspicious invoices.- Account compromise. How to Protect Yourself:- Track shipments and check invoices only on the official FedEx website/app.- Confirm unexpected invoices with FedEx.- Use strong passwords and enable two-factor authentication. For more info on protecting your account and reporting fraud, visit: www.fedex.com/report-fraud. Stay secure with FedEx!

Detailed descriptions of surcharges can be located at fedex.com

# Exhibit H

 Outlook

---

**exhibits:**

---

**From** steven poulakos <spreporting5@gmail.com>
**Date** Wed 4/30/2025 2:22 PM
**To** Carmen <Carmen@murphlaw.net>

 **IRONSCALES couldn't recognize this email as this is the first time you received an email from this sender spreporting5@gmail.com**

Good afternoon.  My name is Steven Poulakos.  I was the court reporter for the Special Agent.  I did not know that only the DOJ would be at the Q&A session.  Also there were no exhibits with the questions that I received.  If you need the exhibits attached please forward them to me and I will have them attached.  Also if you need a copy of the transcript let me know and I will have my office get a copy with the exhibits that you will be sending me to be attached.  Sorry for any inconvenience.  I have never done a depo  like this with reading the questions and not having counsel present.  Thanks.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

# Exhibit I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
 4
 5    ROBERT HUNTER BIDEN, an        )
      individual,                    )
 6                                   )
                  Plaintiff,         )
 7                                   )
         v.                          ) Case No.
 8                                   ) 2:23-cv-09430-SVW-PD
      PATRICK M. BYRNE, an           )
 9    individual,                    )
                                     )
10                Defendant.         )
                                     )
11
12
13
14      *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
15
16                 REMOTE VIDEO DEPOSITION OF
17                 PATRICK M. BYRNE - VOLUME I
18
19
20
21
22
23
24    DATE TAKEN:  DECEMBER 13, 2024
      REPORTED BY:  RENEE HARRIS, CSR 14168, CCR, RPR
25    JOB NO.  7060629
      PAGES:  1 - 237
```

                                              Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT
2              CENTRAL DISTRICT OF CALIFORNIA
3
4
5    ROBERT HUNTER BIDEN, an        )
     individual,                    )
6                                   )
               Plaintiff,           )
7                                   )
        v.                          ) Case No.
8                                   )  2:23-cv-09430-SVW-PD
     PATRICK M. BYRNE, an           )
9    individual,                    )
                                    )
10             Defendant.           )
                                    )
11
12
13
14      *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
15
16
17
18          Remote Video-recorded Deposition of
19   PATRICK M. BYRNE, Volume I, the witness herein,
20   appearing remotely from DOHA, QATAR at
21   5:40 p.m., Arabian Standard Time on Friday,
22   DECEMBER 13, 2024, before Renee Harris, California
23   Certified Shorthand Reporter No. 14168, New Jersey
24   Certified Court Reporter No. 30XI00241200 and
25   Registered Professional Reporter.

                                        Page 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFF ROBERT HUNTER BIDEN:

 3        WINSTON & STRAWN LLP

 4             BY:  ABBE D. LOWELL, ESQ.

 5             1901 L St., NW

 6             Washington, D.C. 20036

 7             AbbeLowellPublicOutreach@winston.com

 8    -and-

 9             BY:  DAVID A. KOLANSKY, ESQ.

10             200 Park Avenue

11             New York, New York 10166

12             DKolansky@winston.com

13    -and-

14        EARLY SULLIVAN WRIGHT GIZER & McRAE LLP

15             BY:  BRYAN M. SULLIVAN, ESQ.

16                  ZACHARY C. HANSEN, ESQ.

17             6420 Wilshire Blvd., 17th Floor

18             Los Angeles, California 90048

19             Bsullivan@earlysullivan.com

20             Zhansen@earlysullivan.com

21

22

23

24

25

                                         Page  3
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL: (CONTINUED)

 2    FOR DEFENDANT PATRICK M. BYRNE:

 3        MICHAEL C. MURPHY LAW OFFICES

 4              BY:  MICHAEL C. MURPHY, JR., ESQ.

 5              2625 Townsgate Road, Suite 330

 6              Westlake Village, California 91361

 7              michael.jr@murphlaw.net

 8

 9    ALSO PRESENT:

10              Kim Smith, Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                    Page  4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          Q.  Okay.  When you told him that -- what he
 2     asked, "Is it true," or however he phrased the
 3     question, did you identify the person in Iran who
 4     told you it had to do with Hunter Biden?
 5          A.  I don't remember the conversation          09:30:55PM
 6     distinctly enough.
 7              I believe I told him that I had -- that
 8     this has been verified to me by the FBI and CIA.
 9     And NSA had worked through the weekend and had
10     verified the voice and verified it to be a          09:31:07PM
11     compatriot of some kind of Hunter Biden's and that
12     they had verified that to me.
13              I believe I told him that part of the
14     story.
15          Q.  So who did you identify were the contacts  09:31:16PM
16     that you just described you told him about, who in
17     the FBI, who in the other agencies?  He's asking
18     you a question, I'm sure.
19              Go ahead.
20          A.  I'm not sure I gave him names.  I can      09:31:26PM
21     tell you the names are David Smith and John
22     Moynihan.
23          Q.  Okay.  Now --
24              THE VIDEOGRAPHER:  Excuse me, Counsel.
25          I'm losing the top part of Mr. Byrne's head.   09:31:38PM
```

Page 213

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          Q.   Okay.   My question, again, then is --
 2     let's jump to that.
 3              When did the Iranian tell you that?
 4          A.   Would have been when I was over in
 5     Istanbul meeting him November '21, I believe.          09:41:53PM
 6          Q.   And between the time that he told you
 7     this in November of 2021 to the time that you
 8     came, at the solicitation of Ms. Fain or others,
 9     to tell the stories in Washington in 2023, to whom
10     did you tell anyone about what this Iranian told        09:42:09PM
11     you about Hunter Biden?
12          A.   Other than the U.S. government or who are
13     you --
14          Q.   Who in the U.S. government?   I mean, I
15     said, "anybody."   So let's start with an easy          09:42:19PM
16     category.
17              Who in the U.S. government did you tell?
18          A.   John Moynihan.   And then the group of
19     people that I refer to as the "League of Shadows,"
20     who had specifically told me that you can consider      09:42:32PM
21     John Moynihan.   "We're going to handle you through
22     John Moynihan."
23              And when I came back, I met with the
24     league -- I met with Dave Smith and other members
25     of the League of Shadows and turned this over and       09:42:48PM
```

Page 224

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    played this.
 2           And I happen to recall that was on a
 3    Thursday or a Friday because then I heard from
 4    Moynihan the following Thursday or Friday, a week
 5    later, saying that he had heard from Dave Smith      09:43:00PM
 6    and what -- that the CIA and NSA and the national
 7    geo- -- the guys up in Bethesda.  It's called,
 8    like, the national geo something.  It's one of the
 9    intelligence agencies -- had worked through the
10    weekend.                                             09:43:22PM
11           I happen to remember they specifically
12    said that.  They had worked through the weekend.
13    And by Monday, they had confirmed that this is the
14    voicemail -- this is the voice of somebody who is
15    close to Hunter Biden.  And they had voice matched  09:43:34PM
16    it and then matched his movements.  And they
17    believe that he acts as some kind of proxy for
18    Hunter Biden.
19           I believe they said that -- and so he
20    told me that, that they had come back with that     09:43:49PM
21    answer by Monday or Tuesday.  And they had worked
22    through the weekend, and word reached me by
23    Thursday or Friday.  I just happened to remember
24    that's sort of days of the week it lined up.
25           And they told me that this guy had some      09:44:00PM
```

Page 225

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    proximity to Hunter Biden.  I believe they said

 2    that -- that they golfed together.  And they

 3    believe this guy meets with Hunter Biden, like, on

 4    the golf course and goes off into the world and

 5    then does his bitting.                              09:44:12PM

 6           Although it gets a little vague there,

 7    and I think there -- I think -- I wasn't sure --

 8    there was some mention of Georgetown.  Did Hunter

 9    go to Georgetown, and this guy go to Georgetown,

10    something.  It was a little bit blurry for me in    09:44:25PM

11    the call.  But that there was, I believe, a

12    mention of Georgetown and I believe a mention of

13    golf.

14           But they had confirmed, in any case, the

15    voice on the voicemail is the voice of somebody     09:44:34PM

16    who is close to Hunter Biden.  And they have some

17    reason that they meet regularly.  And then they

18    now think that that guy goes off into the world

19    and carries his solicitations and such.

20       Q.  In the last 20 sentences, you used the       09:44:46PM

21    word "they said," "they said," "they said."

22           So let's break that down.  You've

23    identified John Moynihan; you've identified David

24    Smith.

25           Who's the person who is making all these     09:44:59PM
```

Page 226

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      statements about golfing, Georgetown, person who

 2      knows him, going off, geo location.

 3              Who is saying that?

 4          A.  John Moynihan and then confirmed by Dave

 5      Smith when I met him again.                    09:45:10PM

 6          Q.  And Mr. Moynihan is the one who provided

 7      a declaration in this case; right?

 8          A.  Yes.

 9          Q.  Okay.  Are you aware, as you're sitting

10      here in telling me all that, whether any of what  09:45:21PM

11      you just said is contained in what Mr. Moynihan

12      said in his declaration?

13              MR. MURPHY:  Can you say that question

14          again?  I didn't hear it.  I apologize.

15      BY MR. LOWELL:                                 09:45:30PM

16          Q.  Did you review -- sorry.

17              Did you review Mr. Moynihan's declaration

18      before your deposition today?

19          A.  I haven't reviewed it since he first

20      wrote it, and I think I -- I saw it when he first  09:45:38PM

21      wrote it and some months ago, a year ago, whenever

22      it was.  But I haven't reviewed it recently.

23          Q.  Okay.  So you did review it at some

24      point?

25          A.  Yes.                                   09:45:48PM
```

                                                   Page 227

Exhibit J

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                  UNITED STATES DISTRICT COURT
2                 CENTRAL DISTRICT OF CALIFORNIA
3

4

5    ROBERT HUNTER BIDEN, an        )
     individual,                    )
6                                   )
              Plaintiff,            )
7                                   )
        v.                          ) Case No.
8                                   ) 2:23-cv-09430-SVW-PD
     PATRICK M. BYRNE, an           )
9    individual,                    )
                                    )
10            Defendant.            )
                                    )
11

12

13

14     *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
15
16                 REMOTE VIDEO DEPOSITION OF
17                 PATRICK M. BYRNE - VOLUME II
18

19

20

21

22

23

24   DATE TAKEN:  DECEMBER 14, 2024
     REPORTED BY:  RENEE HARRIS, CSR 14168, CCR, RPR
25   JOB NO.  7060637
     PAGES:  238 - 457


                                        Page 238

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
 4
 5    ROBERT HUNTER BIDEN, an          )
      individual,                      )
 6                                     )
                  Plaintiff,           )
 7                                     )
         v.                            ) Case No.
 8                                     ) 2:23-cv-09430-SVW-PD
      PATRICK M. BYRNE, an             )
 9    individual,                      )
                                       )
10                Defendant.           )
                                       )
11
12
13
14      *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
15
16
17
18           Remote Video-recorded Deposition of
19    PATRICK M. BYRNE, Volume II, the witness herein,
20    appearing remotely from DOHA, QATAR at 5:32 p.m.,
21    Arabian Standard Time on Saturday, DECEMBER 14,
22    2024, before Renee Harris, California Certified
23    Shorthand Reporter No. 14168, New Jersey Certified
24    Court Reporter No. 30XI00241200 and Registered
25    Professional Reporter.
```

                                          Page 239

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFF ROBERT HUNTER BIDEN:

 3       WINSTON & STRAWN LLP

 4             BY:  ABBE D. LOWELL, ESQ.

 5             1901 L St., NW

 6             Washington, D.C. 20036

 7             AbbeLowellPublicOutreach@winston.com

 8    -and-

 9             BY:  DAVID A. KOLANSKY, ESQ.

10             200 Park Avenue

11             New York, New York 10166

12             DKolansky@winston.com

13    -and-

14       EARLY SULLIVAN WRIGHT GIZER & McRAE LLP

15             BY:  BRYAN M. SULLIVAN, ESQ.

16                  ZACHARY C. HANSEN, ESQ.

17             6420 Wilshire Blvd., 17th Floor

18             Los Angeles, California 90048

19             Bsullivan@earlysullivan.com

20             Zhansen@earlysullivan.com

21

22

23

24

25

                                      Page 240
```

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

```
 1     APPEARANCES OF COUNSEL: (CONTINUED)
 2    FOR DEFENDANT PATRICK M. BYRNE:
 3        MICHAEL C. MURPHY LAW OFFICES
 4            BY:  MICHAEL C. MURPHY, JR., ESQ.
 5                 CARMEN SELAME, ESQ.
 6            2625 Townsgate Road, Suite 330
 7            Westlake Village, California 91361
 8            michael.jr@murphlaw.net
 9            carmen@murphlaw.net
10
11    ALSO PRESENT:
12            Kim Smith, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 241

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    that this person took instructions from Hunter and

 2    then went out and had made this contact with Iran.

 3         Q.  Will you turn to the next page, please?

 4    Scroll to the next.

 5         MR. MURPHY:  I didn't hear your last              05:55:57PM

 6         comment -- oh, go to the next page.  Okay.

 7    BY MR. LOWELL:

 8         Q.  And then will you read the top of the

 9    paragraph to yourself?

10         Tell me when you're done.                        05:56:04PM

11         A.  Done.

12         Q.  Okay.  When you returned -- how soon

13    after your 36 hours in the hotel did you return?

14         A.  I believe I returned straightaway.  Oh, I

15    returned straightaway to the U.S.                     05:56:20PM

16         But if I recall, it was some days before

17    I got back and was able to turn this over -- was

18    able to turn this over to the government, and I

19    forget why.  I think there was a --

20         Q.  And it says "the agencies went to work."     05:56:36PM

21         Can you identify the agencies that went

22    to work?

23         A.  The league of -- I was told that the

24    league of nations -- the League of Shadows had a

25    dozen agencies.                                       05:56:46PM
```

Page 270

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              But specifically, the agencies who worked

 2      through the weekend, I was told NSA, CIA, and the

 3      National Geospatial -- I forget what they are

 4      called, but they are from Bethesda, Maryland, the

 5      National Geo-something.                        05:57:00PM

 6              And those three were mentioned to me as

 7      having worked through the weekend to line up all

 8      these dots and identify the voice and connect him

 9      and confirm that who -- he, in fact, did have a

10      relationship with Hunter.                      05:57:10PM

11      Q.  Okay.  So you mentioned the three

12      agencies.

13              Who told you that those were the three

14      agencies that went to work over the weekend?

15      A.  Dave Smith and John Moynihan.  Maybe John  05:57:22PM

16      Moynihan -- Dave Smith and John Moynihan.

17      Q.  Both of them told you?

18      A.  I know John Moynihan did.  I forget if

19      that's one of the meetings that Dave Smith was in.

20      Q.  And so that was an in-person thing in      05:57:35PM

21      which he told you what you now claim he said?

22      A.  I don't remember.  I think so.  I think

23      so.

24      Q.  Well, think about it a second, and let me

25      know if you can identify that it was a meeting   05:57:43PM
```

                                                        Page 271

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    versus a call versus another form of

 2    communication.

 3         A.  It could have been that there was a call

 4    on Signal -- Moynihan and I used Signal -- later

 5    confirmed by a face-to-face meeting where it was      05:58:00PM

 6    mentioned.

 7             But I don't -- I don't remember

 8    precisely.

 9         Q.  And again in the next sentence, you state

10    as follows:                                           05:58:07PM

11             "I had acquired was voice-matched to the

12         son of the Minister of Defense of Pakistan."

13             Do you see that you're, again, referring

14    to the Minister of Defense, not a minister of a

15    minister, not something that was garbled --           05:58:18PM

16         A.  Not an assistant minister.

17         Q.  Yes.

18         A.  Yes, I see that I said, "minister," not

19    "assistant minister" or "deputy minister."  I

20    said, "minister."                                     05:58:29PM

21         Q.  And when you say they confirmed it "all,"

22    what is the "all" that they confirmed?

23         A.  That the voice, in fact, matched somebody

24    who was close to Hunter, that they, in fact, had

25    some history together.                                05:58:38PM
```

Page 272

HIGHLY CONFIDENTIAL- ATTORNEYS' EYES ONLY

```
 1              MR. MURPHY:  And I'd like --

 2       BY MR. LOWELL:

 3            Q.  The statements that the defendant --

 4              MR. MURPHY:  Wait a minute --

 5              MR. LOWELL:  Sorry.                   06:10:15PM

 6              MR. MURPHY:  Wait a minute.  Are you

 7          going to read it?  I'm sorry.

 8              Go ahead and read it.

 9       BY MR. LOWELL:

10            Q.  [As read]:                          06:10:19PM

11              "Defendant did not make any defamatory

12          statements.  The statements that the

13          defendant made were done in reliance on

14          information set forth in the affidavit of

15          John Moynihan, information provided by David  06:10:26PM

16          Smith and telephone recording."

17              Those are the three things mentioned;

18       correct?

19            A.  Yes.

20              MR. MURPHY:  And I'd like the record to   06:10:35PM

21          also reflect that there is also an objection

22          to us disclosing confidential, covert

23          sources.

24       BY MR. LOWELL:

25            Q.  Okay.  When you say --               06:10:47PM
```

Page 285

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1              One, for example, you just identified,

 2       which is that he said that this was about funds in

 3       North Korea; right?

 4          A.  Yes.  I'm sure he meant South Korea.  It

 5       was --                                            06:26:46PM

 6          Q.  Well, how do you know that he meant South

 7       Korea if you didn't talk to him about this?

 8          A.  Because we did talk about the funds in

 9       South Korea.

10          Q.  So it's a mistake on his part?            06:26:54PM

11          A.  Yes.

12          Q.  He certainly is somebody that you would

13       have said knows the difference between the two

14       countries; right?

15          A.  Yes.                                       06:27:02PM

16          Q.  And then it says, "The call was to

17       reveal."

18              Which call was to reveal?

19          A.  I don't know.  I can't speak what's -- I

20       think that this was fairly sloppy, and I can't    06:27:19PM

21       speak to what is in John Moynihan's head.

22          Q.  Okay.  If you'll -- it goes on.  It says

23       as follows --

24          A.  I think he may mean the -- I think he may

25       have meant the meeting was to reveal or the       06:27:29PM
```

Page 303

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1    meeting --
 2         Q.  Okay.
 3         A.  -- in the car was to reveal or something
 4    like that.  What I -- if you ask me what he meant,
 5    I think that's what he meant.  He just --          06:27:39PM
 6         Q.  Could you go to -- sorry.
 7              Keep going.
 8              I wanted to go two paragraphs down, where
 9         it says, [as read]:  "Patrick Byrne then
10         proceeded to play the tape on the speaker of   06:27:46PM
11         his telephone."
12              Do you see that?
13         A.  Yes.
14         Q.  So you're the person who then played
15    whatever the recordings were; correct?            06:27:56PM
16         A.  Yes.
17         Q.  And it says he "had not heard of this
18    before"; right?
19         A.  Yeah.
20         Q.  So how do you jibe his saying he hadn't   06:28:12PM
21    heard of it before versus what you had testified
22    to, as to your coming back and providing it to him
23    and Mr. Smith?
24         A.  This is -- I believe he's referring to
25    this meeting.  Yes --                             06:28:25PM
```

                                                    Page 304

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.  This meaning that occurred in a car, as

 2   opposed to the way you described it before?

 3        A.  How did I describe it before differently?

 4        Q.  The League of Shadows, the three

 5   different agencies; that part of the testimony.      06:28:39PM

 6        A.  I don't understand any inconsistency.

 7   There is none.  No.

 8            The tapes were turned over in a meeting

 9   in an automobile near Ronald Reagan Airport.  I

10   turned them over -- I played them, turned them        06:28:53PM

11   over, and then left.  And about -- that was

12   probably on a Thursday or Friday.

13            And about a week later, I was contacted

14   by Mr. Moynihan who told me that Dave Smith had

15   contacted him a couple days earlier to tell him       06:29:04PM

16   that Dave Smith had taken the tapes and turned

17   them into the League of Shadows.

18            And that the NSA, DNA, blah, blah, blah,

19   had worked through the weekend, and they had come

20   back by Monday or Tuesday and had matched            06:29:17PM

21   everything up; that this was, in fact, the voice

22   of somebody who is close to Hunter Biden and

23   everything else.

24        Q.  And about the golf and about Georgetown?

25        A.  Yes --                                       06:29:29PM
```

Page 305

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1         with the witness, where they had a discussion
 2         or where they were meeting with Mr. Smith and
 3         the witness.  And you're asking him to guess
 4         and speculate.
 5    BY MR. LOWELL:                                06:31:21PM
 6         Q.  Did Mr. Moynihan --
 7              MR. MURPHY:  I'm going to instruct -- I'm
 8         going to instruct Mr. Byrne not to answer the
 9         question if he has to speculate.
10    BY MR. LOWELL:                                06:31:28PM
11         Q.  Okay.  I'm not asking you to speculate.
12              Did you come to understand from
13    Mr. Moynihan that he had any information about
14    what was on the tape and who was speaking, other
15    than from what you provided him?              06:31:36PM
16         A.  And the -- the League of Shadows.  We're
17    missing -- we're leaving one thing out.  And
18    I'm -- you're talking around it, and I'm talking
19    around it.  This talks around it.
20         Q.  When you say "League of Shadows," by the  06:31:51PM
21    way, is that an official name or something you
22    made up?
23         A.  I made up to refer to this Inter-Agency
24    Task Force.  The official name was, like -- I
25    have -- something -- Inter-Agency Task Force     06:32:01PM
```

Page 308

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    dealing with international threat, blah, blah,

 2    blah.  I don't know.

 3           But I just started just -- I come up with

 4    mental code words for everything.  I call it

 5    "League of Shadows."  Here is what --          06:32:10PM

 6        Q.  So -- sorry.

 7           You have something else to say?

 8           MR. MURPHY:  Finish your answer.

 9           I want him to finish his answer, and I

10    want to you stop interrupting him.             06:32:19PM

11           Go ahead.

12           THE WITNESS:  I can clear this up very

13    quickly.  I can clear this up very quickly.

14           There's the truth and -- there's -- the

15    truth is since January 4th, John Moynihan      06:32:28PM

16    told me to continue operating --

17    January 2021 -- and working to uncover what

18    was going on and that there were people

19    looking out for me from up above.

20           Then we got to -- and once a month from  06:32:41PM

21    then on, he repeated that.  When we got to

22    May or June, he started explaining to me,

23    "There's this Inter-Agency Task Force looking

24    out for you, Patrick.  No one is going it

25    touch you.  Keep charging."                    06:32:55PM
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

```
 1              We got to, say, September.  The request
 2         comes in from -- oh, somewhere in there, he
 3         was brought in.  And he told me, maybe in
 4         August, he was put through the two- or
 5         three-day course in the career of Patrick      06:33:09PM
 6         Byrne.
 7              He said that the FBI had this voluminous
 8         two- or three-day course to study the whole
 9         intelligence career of Patrick Byrne.  And
10         then I got this mess- -- and that he was to    06:33:20PM
11         act as my handler.
12              Then I got the message from Iran that --
13         I turned that over to John.  That's when
14         Moynihan came back after a few days and said,
15         "They want to meet with you face-to-face."     06:33:32PM
16              Then my first meeting face-to-face was
17         with Dave Smith and John in this steakhouse.
18         And we discussed a variety of things, a
19         variety of subjects.
20              Actually, it's just occurred to me.  I'm  06:33:46PM
21         sorry.  I think everything I just told you
22         was true.  And then -- either that was all
23         exactly the truth, or that was all exactly
24         the truth with one exception.
25              All that happened.  And then a couple     06:33:55PM
```

Page 310

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          weeks later, Iran reached out to me.

 2              One of those two stories -- narratives is

 3          the truth.  But the narrative I just told you

 4          is true.

 5              I forget, when we met in the steakhouse,      06:34:07PM

 6          whether the requests had come in from Iran or

 7          not.

 8              But if not, it came within a couple weeks

 9          of that.  Then I went back to D.C. and met

10          with more people in the League of Shadows.       06:34:16PM

11          They all had a briefing about my relationship

12          with Qasem Soleimani and how it had come

13          about, thanks to John Brennan and the CIA.

14              And -- and they were all briefed up on it

15          and told me they were briefed up on it.          06:34:28PM

16              And then they told me to accept the

17          invitation to go back and see Movie Star, but

18          don't go to Tehran.  Have him come out.

19              So I hope that was a concise way to clear

20          up your confusion.                               06:34:41PM

21   BY MR. LOWELL:

22       Q.  It didn't clear up my confusion, but I'm

23   so glad you stated it all.  So thank you for

24   finishing the answer.

25              Take that down, and let's put up another.    06:34:49PM
```

                                                        Page 311

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1     mention that before?

2          A.  Well, I don't have it.

3          Q.  So you didn't keep a copy of it?

4          A.  No.  I typically do not keep a copy of

5     these things.  It's very rare.                  06:36:44PM

6          Q.  Well, you have the copy of the

7     voicemails; correct?

8          A.  Yes.  Like I say, it's very rare that I

9     keep a copy.  I turn things into the government.

10         Q.  When you came back from Istanbul with   06:36:55PM

11    this recording of you and Movie Star, to whom did

12    you provide it?

13         A.  I provided that to Dave Smith.

14         Q.  Okay.

15         A.  And John Moynihan heard that.           06:37:05PM

16         Q.  When did you provide it to Dave Smith?

17         A.  In the same meeting in the car.

18         Q.  So you played the three tape voicemails

19    in the car; right?

20         A.  Yes.                                    06:37:22PM

21         Q.  And you also now are saying you played

22    the recording of the conversation you had with

23    Movie Star in the car at the same time -- not at

24    the exact same time but in the same car at the

25    same meeting; yes?                               06:37:35PM
```

                                                    Page 314

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          A.  Yes.

 2          Q.  And David Smith and Mr. Moynihan were

 3     there when you did that?

 4          A.  Yes.

 5          Q.  And where was the recording between you      06:37:42PM

 6     and Movie Star, such that you could play it?

 7          A.  It was made in Istanbul.  I'm not in --

 8          Q.  No.  No.

 9              I'm saying where -- how could you play

10     it?  On what device did you play that?               06:37:58PM

11          A.  A different device, a device that I do

12     not have, a device that was surrendered.

13          Q.  What device was that, Mr. Byrne?

14          A.  I'm not going to go into any more

15     about what I'm -- about what I do with the           06:38:08PM

16     government.  I mean, I'm not --

17          Q.  That's not what I asked you.

18              On what kind of device?  Was it your

19     phone?  Was it a tape recording?

20          A.  Dave -- Dave Smith.  Ask Dave Smith.  He     06:38:16PM

21     has --

22          Q.  Okay.

23          A.  He has that.

24          Q.  I have to ask you for the record,

25     Mr. Byrne.  So I apologize for asking.  If you       06:38:22PM
```

Page 315

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    don't want to say it, you can say it.

 2            Are you not going to tell us, having now

 3    described a new conversation, what was the device

 4    on which you played it in the same car meeting?

 5        A.  I'm not going to describe -- I'm not          06:38:36PM

 6    going to answer that.  But it --

 7        Q.  On what basis are you not answering?

 8        A.  It would -- because it's related to

 9    methods of working with the government.  What I

10    have was surrendered -- what I have was             06:38:48PM

11    surrendered to Dave Smith.

12        Q.  You played for us or you provided for us

13    the recordings that you say you took, stole

14    without permission from Movie Star.

15            And now you're saying you're not going to   06:39:01PM

16    explain how or the recorded way that you played it

17    in the car because it has something to do with

18    methods.

19            Is that your answer?

20            MR. MURPHY:  Well, that mischaracterizes    06:39:13PM

21        his testimony.

22            MR. LOWELL:  I'll withdraw the question.

23    BY MR. LOWELL:

24        Q.  I'm just going to ask you straight up the

25    following questions:  In the car, you played this  06:39:21PM
```

Page 316

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    other recording.  True or false?

2         A.  Yes.

3         Q.  Mr. Smith and Mr. Moynihan were in the

4    car when that happened.  True or false?

5         A.  True.                                    06:39:35PM

6         Q.  It was played in the car as well as you

7    played for them the recordings of the voicemails.

8    True or false?

9         A.  True.  It was played -- it was

10   surrendered in that car, whether I was the one who   06:39:47PM

11   played it or someone else is the one who played

12   it.

13        Q.  Okay.  But it was played nevertheless in

14   the car so they could hear it?

15        A.  Yes.                                      06:39:58PM

16        Q.  And you gave it to Mr. Smith, whatever it

17   was?

18        A.  Yes.

19        Q.  And you won't identify what kind of

20   device it was that you handed to Mr. Smith?          06:40:06PM

21        A.  I think it would be inappropriate for me

22   to go into any more detail about methods with the

23   government.

24        Q.  Inappropriate why?

25        A.  Because I'm way already over the line of    06:40:13PM

                                              Page 317

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    describing how things work with the U.S.

2    government.

3         Q.  And then you get to draw the line as to

4    when you're over it?

5         A.  Well, I think I'm probably well over.        06:40:24PM

6    You know, if a judge tells me to reveal more, I'll

7    reveal more.

8         But I don't --

9         Q.  Okay.  Well --

10        A.  -- want to reveal any more.                  06:40:31PM

11        Q.  Why stop on this device?  You've told

12   us about --

13        A.  Wherever I stop, you're going to say, Why

14   stop here?

15        Q.  Okay.  Now, that device that you handed      06:40:42PM

16   over in the same car that you -- said to you --

17   handed over to Mr. Smith, between you and Movie

18   Star, does that have any information that mentions

19   the name Hunter Biden?

20        A.  That has a conversation between me, where    06:40:59PM

21   there's a mention of Hunter Biden from me and

22   Movie Star.

23        Q.  So the name Hunter Biden exists on that

24   recording?

25        A.  I believe so, yes.                           06:41:09PM
```

Page 318

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1     happened.
2          Q.  Okay.  And your testimony today under
3     oath is this recording, distinct from the
4     voicemails, you didn't keep a copy of?
5              MR. MURPHY:  Well, I'm going to object to    06:43:47PM
6          the question.
7              Now you're saying there's a fifth
8          recording, and he never, ever said that.
9          That mischaracterizes his testimony.
10             MR. LOWELL:  Fourth -- fourth recording.    06:43:54PM
11    BY MR. LOWELL:
12         Q.  I'm just saying there are three
13    recordings that you provided in discovery.
14             And this one that you testified to today
15    is one that you say you do not have a copy of.    06:44:03PM
16    True?
17         A.  True.
18         Q.  And that you turned it over to Mr. Smith.
19    True?
20         A.  Yes.  Yes.    06:44:14PM
21         Q.  And that it was played by someone in the
22    car.  True?
23         A.  True.
24         Q.  Okay.  And in that one, which you don't
25    have a copy of, that you say was played in the    06:44:24PM
```

Page 321

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1          A.  Yes.  That would be, like, March of '22.

2          Q.  Okay.  And since March of '22, if that's

3     the date, have you had any contact with him

4     thereafter?

5          A.  Not directly.                              07:05:35PM

6          Q.  How so indirectly?

7          A.  Well, I still talk to Moynihan.

8          Q.  And Mr. Moynihan continues to have

9     conversations with Mr. Smith?

10         A.  Actually, Mr. Smith disappeared for quite  07:05:45PM

11    some time.

12         Q.  When you say he "disappeared," Mr. Smith

13    was mentioned as a potential witness in

14    disclosures made by you through your counsel as

15    being an FBI agent that could be found at the      07:06:00PM

16    Washington Field Office of the FBI.

17              Is that what you mean by "disappeared"?

18              MR. MURPHY:  You know what, Counsel, wait

19         a minute.

20              The question is argumentative.           07:06:07PM

21              And simply because somebody lists an

22         address does not mean they're missing.

23              You can go ahead and answer the question.

24              THE WITNESS:  He was at the Washington

25         headquarters.  Then he disappeared.  Then he   07:06:22PM
```

Page 332

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              reemerged with new -- for quite some time was
 2         difficult to find.
 3              And then he reemerged at the Washington
 4         Field Office, where he is today and where he
 5         can be reached.                              07:06:34PM
 6    BY MR. LOWELL:
 7         Q.  Okay.  But when you say he was "difficult
 8    to find," I asked you when was the last time you
 9    had contact with him, and you said March or so of
10    2022.                                             07:06:44PM
11         A.  No.  You didn't say Hunter --
12         Q.  To whom was --
13              MR. MURPHY:  Wait a minute.
14              You mischaracterized his testimony but...
15    BY MR. LOWELL:                                    07:06:48PM
16         Q.  Mr. Moynihan is in contact with him, but
17    you haven't been since 2022; is that right?
18         A.  That's correct.
19         Q.  So when you say he "disappeared" and was
20    hard to find, you mean Mr. Moynihan could not find  07:06:56PM
21    him?
22         A.  Mr. Moynihan said that he had gone off
23    the grid.  And then he reemerged with duties at
24    the Field Office.
25         Q.  When did Mr. Moynihan tell you that      07:07:07PM
```

Page 333

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1          Tab 26 -- what is it?  I'm sorry for the
2          misunderstanding, then.
3              Could you recall Deposition Exhibit
4          No. 7, put it up on the screen.
5    BY MR. LOWELL:                                    07:18:28PM
6        Q.  And with that, would you please turn to
7    Interrogatory No. 14, please.
8              Interrogatory 14 reads as follows:
9              "If you contend that the defamatory
10         statements are true, please state all the    07:18:47PM
11         facts that support your contention."
12             And then the response is, again:
13             "The defendant did not make any
14         defamatory statements.  The statements are
15         true.  Defendant verified some of the facts   07:18:59PM
16         with the assistance of Mr. David Smith and
17         Mr. John Moynihan.  Doe 1 provided Defendant
18         with the information contained in the alleged
19         defamatory statements.  Defendant had no
20         reason to believe that the statements made to 07:19:10PM
21         him by Doe 1 were false.  Doe 2 is on the
22         voicemails and defendant believes that the
23         statements contained in the voicemails are
24         true."
25             That was your response; correct?         07:19:20PM
```

Page 347

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            Mr. Byrne, that's your response; correct?
 2      A.  Yes.
 3      Q.  Who is Doe 1?
 4            MR. MURPHY:  Okay.  He -- I'm going to
 5      clarify this for you and make it easy.          07:19:35PM
 6            We had a meeting with the magistrate
 7      judge over this issue, and she agreed we did
 8      not have to disclose who Movie Star was or
 9      the identity of the person on the tape.  And
10      she agreed that we could refer to them as      07:19:47PM
11      Doe 1 and 2.
12            So when we provided this response to this
13      interrogatory, it was consistent with her
14      authorization.
15            Doe 1 is going to be Movie Star.  And     07:19:56PM
16      Doe 2, for purposes of the deposition and
17      this discovery, is the son of the Minister of
18      the Defense of Pakistan or Assistant Minister
19      of Defense of Pakistan that's on the
20      recordings that's been covered previously in   07:20:10PM
21      the deposition.
22            MR. LOWELL:  And so is it -- my
23      understanding is you're saying that the
24      Magistrate has said that you don't ever have
25      to identify who Doe 1 is?                       07:20:20PM
```

Page 348

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                THE WITNESS:  I thought that --

 2                MR. MURPHY:  I mean, finish his answer.

 3                Go ahead.

 4                THE WITNESS:  I believe you said,

 5          "Mr. Moynihan or the League of Shadows."      07:45:02PM

 6     BY MR. LOWELL:

 7          Q.  But now I was objected to, so let me just

 8     depict this individually.

 9                Did Mr. Moynihan provide you with any

10     information for you to make the allegation in this   07:45:09PM

11     posting, him specifically?

12          A.  Mr. Moynihan has confirmed to me his

13     belief that your client is influencing --

14     influence peddling around the world.

15          Q.  I didn't ask you that either.  So let's     07:45:24PM

16     be clear.

17                "You can collect more than 30 million

18          from the Chinese government."

19                Did Mr. Moynihan tell you that?

20          A.  Not that specifically.                      07:45:34PM

21          Q.  Okay.  Did he tell you, you can work with

22     "spy chief of China"?

23                Did Mr. Moynihan tell you that?

24          A.  Well, Mr. Moynihan has told me that he

25     believes the allegations about your client           07:45:46PM
```

Page 375

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     influence peddling are true in general.

 2              Now, you go bit by bit, it's not -- he

 3     hadn't given me bit by bit confirmation.  But he

 4     has confirmed to me that he believes your client

 5     is selling his father's influence globally.        07:46:02PM

 6          Q.  Okay.  That's, again, not my question.

 7     So let me just keep coming until I can get the

 8     answer.

 9              Did Mr. Moynihan provide you with the

10     information that you posted on this post?          07:46:12PM

11          A.  Same answer.

12          Q.  "Chinese government," "spy chief of,"

13     "half your salary," etc.

14              Was that from him?

15          A.  Same answer.  Same answer.               07:46:19PM

16          Q.  So he did not -- he just believes it?

17          A.  Same answer.

18          Q.  How about Mr. Smith?  Did he provide you

19     with any information that is in this posting?

20          A.  Mr. Smith also gave me to understand he   07:46:30PM

21     believes the allegations about your client

22     influence peddling on his father's name are true.

23          Q.  Okay.  How about -- about the specifics

24     about the 30 million from the Chinese government?

25     Did Mr. Smith provide you any information about     07:46:43PM
```

Page 376

Exhibit K

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4

5    ROBERT HUNTER BIDEN, an          )
     individual,                      )
6                                     )
                 Plaintiff,           )
7                                     )
        v.                            ) Case No.
8                                     ) 2:23-cv-09430-SVW-PD
     PATRICK M. BYRNE, an             )
9    individual,                      )
                                      )
10               Defendant.           )
                                      )
11

12

13

14     *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

15

16                  REMOTE VIDEO DEPOSITION OF

17               PATRICK M. BYRNE - VOLUME III

18

19

20

21

22

23

24   DATE TAKEN:  February 4, 2025
     REPORTED BY:  RENEE HARRIS, CSR 14168, CCR, RPR
25   JOB NO.  7103502
     PAGES:  459 - 575


                                           Page 459

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY Page ID #:6224

```
 1                UNITED STATES DISTRICT COURT
 2               CENTRAL DISTRICT OF CALIFORNIA
 3
 4
 5   ROBERT HUNTER BIDEN, an        )
     individual,                    )
 6                                  )
                   Plaintiff,       )
 7                                  )
        v.                          ) Case No.
 8                                  ) 2:23-cv-09430-SVW-PD
     PATRICK M. BYRNE, an           )
 9   individual,                    )
                                    )
10                 Defendant.       )
                                    )
11
12
13
14     *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
15
16
17
18          Remote Video-recorded Deposition of
19   PATRICK M. BYRNE, Volume III, the witness herein,
20   appearing remotely from HANOVER, NEW HAMPSHIRE at
21   9:35 a.m., Eastern Standard Time on Tuesday,
22   February 4, 2025, before Renee Harris, California
23   Certified Shorthand Reporter No. 14168, New Jersey
24   Certified Court Reporter No. 30XI00241200 and
25   Registered Professional Reporter.
```

                                        Page 460

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFF ROBERT HUNTER BIDEN:

 3       WINSTON & STRAWN LLP

 4            BY:  ABBE D. LOWELL, ESQ.

 5            1901 L St., NW

 6            Washington, D.C. 20036

 7            AbbeLowellPublicOutreach@winston.com

 8    -and-

 9            BY:  DAVID A. KOLANSKY, ESQ.

10            200 Park Avenue

11            New York, New York 10166

12            DKolansky@winston.com

13    -and-

14       EARLY SULLIVAN WRIGHT GIZER & McRAE LLP

15            BY:  BRYAN M. SULLIVAN, ESQ.

16                 ZACHARY C. HANSEN, ESQ.

17            6420 Wilshire Blvd., 17th Floor

18            Los Angeles, California 90048

19            Bsullivan@earlysullivan.com

20            Zhansen@earlysullivan.com

21

22

23

24

25
```

Page 461

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    APPEARANCES OF COUNSEL: (CONTINUED)

 2    FOR DEFENDANT PATRICK M. BYRNE:

 3       MICHAEL C. MURPHY LAW OFFICES

 4              BY:  MICHAEL C. MURPHY, JR., ESQ.

 5              2625 Townsgate Road, Suite 330

 6              Westlake Village, California 91361

 7              michael.jr@murphlaw.net

 8

 9

10    ALSO PRESENT:

11              Heidi Stuart, Videographer

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 462

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                          INDEX
 2    EXAMINATION BY:                            PAGE
 3    MR. SULLIVAN                                469
 4
 5
 6
 7
 8
 9                        EXHIBITS
10    BYRNE EXHIBIT NO.    DESCRIPTION           PAGE
11    Exhibit 25        Court Order              475
12    Exhibit 26        Airline/hotel receipt    517
13    Exhibit 27        LinkedIn profile         566
14                      Medhi Firouzian
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY

```
1                    EXHIBITS (continued)

2    BYRNE EXHIBIT NO.   DESCRIPTION              PAGE

3    Exhibit A          Stipulation for Protective   467

4                       Order

5    Exhibit B          Amended Court Order          468

6                       January 27, 2025

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1     know something fascinating that's going on?"

 2            And then he -- he brought up this --

 3     these communications and this overture.  And he

 4     explained it to me, and he played the tapes.

 5            Shall I continue, or should -- am I          10:15:29

 6     getting too far ahead of your question?

 7        Q.  Keep going.

 8        A.  He played the tapes once.  And then I

 9     asked him to play them again.

10            But I got -- as I was doing that -- or in    10:15:44

11     the process of that, I got my phone out and

12     fumbled with it in a moment he couldn't see.  And

13     I got the recording function going on my phone.

14            And so I made a recording set -- where I

15     was saying, "I didn't quite catch that.  Would you  10:16:01

16     mind playing that again?"

17            And he -- and he says -- so we were

18     chatting -- so let's -- let's speak of there as

19     being Voicemails A, B and C.  And then there's a

20     Recording D.  And the Recording D is that          10:16:20

21     recording made in my shirt pocket as he plays A,

22     B, and C together.

23            Except I think he only got sort of B to

24     C -- A and B are both, like, one-minute recording,

25     and then C is this five-minute recording.          10:16:36
```

Page 504

Page ID #:6230

```
 1          Q.  And what -- what did Movie Star

 2     specifically say about Hunter Biden?

 3          A.  Oh, well, specifically, he -- he told me

 4     that Hunter Biden had, through an intermediary,

 5     approached -- had approached the U.S. government      10:18:13

 6     with an offer -- through an intermediary had

 7     approached the Iranians with an offer.

 8              And the offer was, Will you guys -- if

 9     you will pay us -- now, I understood it to be 8

10     billion.  You, Iranians, have 8 billion -- or I      10:18:33

11     remember it as being 8 billion, not 6 billion but

12     8 billion frozen in a South Korean bank.  My

13     father will unfreeze that money so you can have it

14     if you will take 10 percent off.  And it will go

15     into a numbered account for us somewhere.  And if    10:18:50

16     you will do this, it will lubricate the other

17     discussions that have recently started between us

18     and Patrick.  And Patrick -- that is what Hunter

19     Biden -- the message he is sending to us through

20     his intermediary.                                    10:19:06

21              And, you know, at -- just two months ago,

22     the JCPOA talks started up again in Geneva.  So he

23     was very clear.  They understood this to be

24     saying, If we give a tenth of what's in that South

25     Korean bank to the Bidens, they will release it,     10:19:19
```

Page 506

```
 1    with for years, I don't record things.  I don't

 2    wear wires.  I can come back, and I tell them

 3    something, and my word is good.

 4         And there was a period where I would get

 5    polygraphed and stuff on that, but I just passed     10:21:42

 6    everything.

 7         So there came a point by 10 or 15 years

 8    ago, where I never had to worry about people

 9    challenging my -- my word on anything.  I came

10    back from meetings and just -- they knew.           10:21:55

11         But this League of Shadows was new to me.

12    And they did not -- they had not worked with me

13    for years.  So I thought it was good to get a

14    recording of those voicemails.

15         And us talking -- Movie Star and I are         10:22:10

16    talking about Hunter.  He's saying something like,

17    "Here" -- he says something to me like, "He's --

18    just listen.  He's coming up to the point where

19    he's talking about Hunter," or something like

20    that.                                                10:22:24

21         So he was getting me to focus on one

22    particular section and basically saying, "Listen.

23    This is where he's talking about Hunter,"

24    something like that.

25         So it was very clear -- so there was --        10:22:34
```

Page 509

```
 1    first of all, the conversation was before the

 2    voicemails were played, by and large where I had

 3    the whole understanding.  Then there's the point

 4    where the voicemails were played.  He's not

 5    telling me that whole conversation over the           10:22:43

 6    voicemails.

 7           But as the voicemail was played, we were

 8    still muttering to each other a little bit about,

 9    Okay, is this -- so he's saying, This is the law

10    firm -- you know, I mean, we were whispering to       10:22:56

11    each other over this with, of course, him not

12    knowing that underneath my jacket, I've got my

13    cell phone recording.

14       Q.  So if you recorded it on your iPhone, was

15    it saved to the cloud?                                10:23:13

16       A.  No.

17       Q.  Wouldn't it automatically be saved to the

18    cloud if it's on your iPhone?

19       A.  Only if you have it set that way.

20       Q.  And you didn't have it set that way?          10:23:20

21       A.  No. I was trained by a group called

22    orange.

23           And, no, that's one of the things you --

24    no.  You -- nothing -- your phone is not

25    automatically -- you don't want it automatically     10:23:29
```

Page 510

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    uploading to the cloud; otherwise, you're always

 2    making -- for just the reason you're saying.

 3            No.  It's bad security.

 4        Q.  And how did you get it from the phone --

 5    because you testified that you gave the -- this is    10:23:46

 6    the fourth recording we're referring to.  You're

 7    saying it's Recording D.

 8            But it's the fourth recording that we've

 9    referred to in your prior depo and the pleadings,

10    the first three being the voicemails.                10:23:57

11            You testified that you gave that to Dave

12    Smith?

13        A.  Yes.

14        Q.  How did you give it to Dave Smith?

15        A.  It would either have been an AirDrop or a    10:24:03

16    Signal message.  But more likely -- an AirDrop

17    would be normal practice and good field craft so

18    you're not even putting it through the wires.

19        Q.  In your prior depo, you said you gave

20    Dave Smith a device with the recording on it.        10:24:21

21            Do you remember that?

22        A.  I don't remember that.  I may have

23    been -- I don't remember.  I didn't hand over the

24    device.

25            I gave him the device -- I hand over --      10:24:31
```

Page 511

```
 1      I'm pretty confident we did an air -- not air --

 2      AirDrop -- an AirDrop right there.  But it was

 3      still off my phone.

 4          Q.  Would there be --

 5          A.  It's also -- okay.                        10:24:45

 6              Where I was hesitant or stumbling a bit

 7      before -- or your guy, your colleague, was doing a

 8      lot of hunt -- hunt-and-peck -- is I didn't feel

 9      super comfortable explaining what standard

10      operating procedure is.                           10:24:58

11              I have now checked.  And this is not

12      considered -- anyway, I'm going to tell you.

13      Standard operating procedure is you turn something

14      like that over.  You AirDrop it, and then they

15      watch you delete it.  They want to see you delete  10:25:09

16      it off your phone.  So that's what happened.

17          Q.  So Dave Smith told you -- instructed you

18      to delete this from your phone?

19          A.  Yes.  In fact, I believe he watched me.

20          Q.  Did they also check the cloud to make     10:25:23

21      sure that it didn't accidentally get uploaded to

22      the cloud?

23          A.  No, but it's standard practice for any of

24      us in this business.  You never have your phone

25      backing up to the cloud.  You never have your     10:25:33
```

Page 512

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1          A.  No.  And again, it wasn't the main event
 2     of what the -- our meeting was about.
 3          Q.  And this, again, was in November 2021?
 4          A.  Yes.
 5          Q.  And then you -- when you came back to the    10:26:44
 6     U.S., you gave it to Dave Smith in November 2021?
 7          A.  I think it was December.  I think it was
 8     about 10 or 15 days and later, before we had our
 9     meeting.
10          And we met in DC, and we met out by DCA    10:26:56
11     airport in a parking lot.  I mean, he pick -- I
12     went into the FBI -- there's a restaurant next
13     door, a burger shack, where all the guys eat.
14     They were there.  I got to meet more of the
15     people, big fellas on this crew, this League of    10:27:15
16     Shadows.
17          And then Dave picked me up -- got a car,
18     and he and John and I drove out to DCA and sat in
19     a parking lot.  And in the parking lot, I
20     debriefed the trip.    10:27:27
21          And then I got to the point about this
22     and told them the story and then played them D.
23     All I had at the time was D, Recording D.  And I
24     played them Recording D.
25          Q.  Okay.  And that was Dave Smith and John    10:27:41
```

Page 514

```
 1    Moynihan, just to be clear?
 2        A.  Yes.  John was in the back.  Dave was in
 3    front of me.
 4        Q.  And you don't -- and you -- and you do
 5    not have a copy of the fourth recording at all?    10:27:52
 6        A.  I don't have a copy of the fourth
 7    recording.  I deleted it right there in front of
 8    him.
 9        Q.  Have you looked for the --
10        A.  I've tried to -- I'm on another phone.    10:28:02
11    That actual phone was retired.  I have a new
12    phone.
13             But I've gone back and tried to do
14    forensics to recover it.  And I cannot -- I have
15    not been able to recover it.                      10:28:13
16        Q.  Okay.  What -- when you say you "tried to
17    do forensics," was this you or some sort of
18    computer tech specialist?
19        A.  No.  This was me.  This was me going
20    through everything that had been deleted, seeing   10:28:27
21    if I could undelete these messages.
22        Q.  And when you say "messages," text
23    messages, Signal, WhatsApp?
24        A.  Yes.
25        Q.  All of the above?                         10:28:39
```

Page 515

```
 1    Star in -- in -- I think it was July of 2023, I

 2    had in mind, I want to recover those three

 3    original voicemails off his phone.

 4            MR. SULLIVAN:  All right.  And, Zach, can

 5        we call up Exhibit 26?  Zach?  Sorry.          10:30:09

 6            (Exhibit 26 was received and marked

 7            for identification on this date and is

 8            attached hereto.)

 9    BY MR. SULLIVAN:

10        Q.  All right.  This -- this was produced by   10:30:34

11    your counsel.

12            Do you recognize --

13            MR. SULLIVAN:  Let's -- Zach, let's

14        scroll through it.

15            THE WITNESS:  Yes.  What I recognize is     10:30:41

16        we stayed in a nice hotel just across from

17        the embassy.  So I went back.

18            I've been to Rome a bunch of times, but I

19        went back through my notes to find the time I

20        had stayed in a hotel by the embassy.  And     10:30:52

21        this was the hotel.

22    BY MR. SULLIVAN:

23        Q.  Okay.  And then -- so -- and then there's

24    an American Express charge from Royal Dutch

25    Airlines?                                          10:31:04
```

Page 517

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    year.
 2         Q.  When was the last time you spoke with
 3    Dave Smith?
 4         A.  It would have been probably, like,
 5    January, February, 2023 -- 2022.                    10:38:52
 6         Q.  And did you talk about the recording that
 7    you gave him at that conversation?
 8         A.  No.  And it was more of a very awkward
 9    meeting because word had gone out from Christopher
10    Wray.  Did not have any -- 35,000 FBI agents         10:39:13
11    received a letter saying, "You cannot talk to
12    Patrick Byrne anymore."  No one is to have any
13    contact with him.
14              So he wasn't really supposed to meet with
15    me, but we -- we saw each other in passing.  Let's  10:39:26
16    say in the lobby of a hotel in DC.  And a quick --
17    I met with Moynihan.
18              Moynihan met with him, and then Moynihan
19    came to this hotel.  And we met in the lobby.  And
20    I met -- Moynihan delivered a message to me.        10:39:42
21              And when I was done, I looked up, and
22    there was Dave Smith sort of across the lobby
23    waving to confirm, yes, this message came from
24    John Moynihan.
25              And then that was the last face-to-face   10:39:54
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      information.

2              So what is Hassan's name?

3          A.  Hassan El Husseini.

4          Q.  Can you spell that?

5          A.  Last name is spelled E-l H-u-s-s-e-i-n-i.    10:56:11

6      He's a Lebanese national.  His telephone number is

7      961-3-777-369.

8          Q.  Do you have his address?

9          A.  I gave it to you.  In the previous

10     deposition, I gave it.  It would have been        10:56:45

11     Baalbek, Lebanon.  Baalbek is B-a-a-l-b-e-k,

12     Baalbek, Lebanon.

13             And you could put it -- what's the name

14     of that lodge there.  Just a moment.  The family

15     owns a -- oh, the Palmyra Hotel -- the Palmyra    10:56:59

16     Lodge, P-a-l-m-y-r-a.

17         Q.  And you said Hassan's family owns it?

18         A.  Yeah.  The Palmyra Hotel, Baalbek,

19     Lebanon.  If you send something to that address,

20     he will get it.                                    10:57:26

21         Q.  Are there any other pseudonyms that he

22     goes by?

23         A.  No.

24         Q.  Are there any pseudonyms that you --

25     pseudonyms or code names that you've given him --    10:57:32

                                                    Page 532

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          Q.  Do you know who Doe 2 is?

2          A.  Not precisely.  I know what I was told by

3     both the Iranian and what I was told by the

4     American, by Dave and John Moynihan.

5          Q.  What were you told by -- and when you say     11:14:27

6     "Iranian," you mean Movie Star?

7          A.  Movie Star.

8          Q.  What were you told by Movie Star?

9          A.  That this was the son of somebody high up

10    in the Pakistani government.  I understood it to     11:14:38

11    be the defense minister or somebody like the

12    defense minister.  And that this was his son and

13    that he was close to Hunter.

14         Q.  Why didn't you ask who -- for Doe 2's

15    identity from Movie Star?                            11:14:56

16         A.  Oh, he may well have said it.  I mean, it

17    was just I didn't catch the name.  He may well

18    have said the name and -- more specifically.

19             That's just the part of the conversation

20    I caught.  I mean, sometimes you don't hear every   11:15:05

21    detail perfectly.

22         Q.  And that was in Istanbul; correct?

23         A.  That was in Istanbul.

24         Q.  And when you went back to meet with him

25    in July 2023, why didn't you ask him for -- who     11:15:16

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Deposition 6241

```
 1    Doe 2 was?
 2         A.  Well -- pardon me.  I'm not a reporter
 3    sitting and doing an interview.  It would not have
 4    been appropriate to come out and say, How do I
 5    spell that fella's name again?  How do I -- it        11:15:30
 6    would not have been appropriate.
 7              I mean, I had to be somewhat vague.
 8    Or...
 9         Q.  And then you don't know who Doe 2's
10    father was; correct?                                  11:15:45
11         A.  Just --
12         Q.  The specific identity.
13         A.  Specific identity.  Other than I was also
14    told by Dave Smith and John Moynihan that they had
15    run that tape when I brought it back and that         11:16:00
16    people had worked through the weekend at National
17    Geo Reconnaissance in Bethesda and NSA and CIA.
18              And they had -- there was even a word
19    they used, like, "voiceprint."  But it wasn't
20    "voiceprint."  It was the name of some system,        11:16:17
21    like televoiceprint or something, that they -- the
22    voice on the tape.
23              They identified the voice on the tape and
24    that it was, in fact, the son of some -- some
25    poobah in Pakistan.  And that they tied -- that he    11:16:33
```

Page 549

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1     was linked to Hunter Biden.
 2          Q.  Did you ask Dave Smith who Doe 2 was?
 3          A.  No.  It's more that that's what they
 4     reported back to me, that they confirmed they had
 5     found him.                                        11:16:51
 6              I'm sorry.  I know this may seem -- I
 7     come back from trips like this -- I may have 20
 8     pieces of information like this, 20 things.  In
 9     this case, there weren't.  There were just a few
10     things.  But there might be 20 things.            11:17:04
11              I'm not -- my job is just sort of to take
12     these things back, give all the detail I can give
13     them.  I hand them to them.  And later I
14     generally -- back when I did this very actively
15     and did this a lot, usually in the next meeting,   11:17:16
16     they would go through and tell me, "Confirm,
17     confirm, confirm.  Okay.  This thing -- we need a
18     little bit more detail on this thing."  But -- so
19     they give you kind of some feedback later.
20              But to me -- it's been, like, 10 or        11:17:30
21     15 years since I've been even at that level.  I
22     hate to sound cocky, but as -- I come back.  I
23     gave them a data dump.  I download all this data I
24     have.  And I don't even really need them to come
25     back.  And it's not like they come back and report 11:17:46
```

Page 550

Exhibit L

**Highly Confidential Filed Under Seal
Pursuant to the Stipulated Protective Order**

# EXHIBIT

(Deposition of John F. Moynihan, Feb 14, 2025)

```
 1                UNITED STATES DISTRICT COURT

 2                        FOR THE

 3                CENTRAL DISTRICT OF CALIFORNIA

 4

 5

 6     ROBERT HUNTER BIDEN

 7               Plaintiff

 8     VS.                              CIVIL ACTION NO.

                                        2:23-cv-09439

 9     PATRICK M. BYRNE

10               Defendant

11

12

13

14             VIDEOTAPED DEPOSITION OF

15                JOHN F. MOYNIHAN

16               FEBRUARY 14, 2025

17                 10:00 A.M.

18

19

               Via Zoom Remotely

20

21

22

         Lisa L. Crompton, CSR (MA)(RI), RPR

23

24

25

                                           Page 1
```

```
 1          APPEARANCES:
 2          For Plaintiff
 3          Early Sullivan Wright Gizer & McRae LLP
            BY:   ZACHARY C. HANSEN, ESQ.
 4          AND:  BRYAN M. SULLIVAN, ESQ.
            6420 Wilshire Boulevard
 5          17th Floor
            Los Angeles, California 90048
 6          323-301-4660
            323-301-4676 Fax
 7          zhansen@earlysullivan.com
            bsullivan@earlysullivan.com
 8
 9
            For Plaintiff
10
            Winston & Strawn LLP
11          BY:   ABBE DAVID LOWELL, ESQ. (pro hac vice
            1901 L. St., N.W.              forthcoming)
12          Washington, D.C. 20036
            202-282-5000
13          202-282-5100 Fax
            abbelowellpublicoutreach@winston.com
14
15
            For Defendant
16
            Law Offices of Michael C. Murphy
17          BY:   MICHAEL C. MURPHY, ESQ.
            2625 Townsgate Road
18          Suite 330
            Westlake Village, California 91361
19          818-558-3718
            805-367-4506 Fax
20          michael@murphlaw.net
21
22
23
24
25
```

Page 2

```
1          APPEARANCES:

2          For John F. Moynihan

3          Della Rocca Law LLC

           BY:   BRIAN R. DELLA ROCCA, ESQ.

4          9801 Washington Boulevard

           Suite 701

5          Gaithersburg, Maryland 20878

           240-455-5090

6          Brian@dellaroccalaw.com

7

8          ALSO PRESENT:  Gayle Ashton, Videographer

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1                    I N D E X
 2      JOHN F. MOYNIHAN                    PAGE NO.
 3      EXAMINATION BY MR. HANSEN              6
 4      EXAMINATION BY MR. MURPHY            131
 5
 6
              * * * Reporter's Note * * *
 7
         ATTORNEYS' EYES ONLY beginning on Page 124, Line 1.
 8
 9
                    E X H I B I T S
10      PLAINTIFF'S
        EXHIBITS            DESCRIPTION         PAGE NO.
11
        EXHIBIT 1          Subpoena To Testify at   134
12                         a Deposition in a
                           Civil Action, 45 pages
13
        EXHIBIT 2          Text message, 1 page     134
14
        EXHIBIT 3          Affidavit, 3 pages       134
15
16
        DEFENDANT'S
17      EXHIBITS
18      EXHIBIT 4          Stipulation for          134
                           Protective Order,
19                         18 pages
20
21
22
23
24
25
                                             Page  4
```

```
 1                        THE VIDEOGRAPHER:  Good
 2      morning.  We are now on the record.
 3                        This is the videographer
 4      speaking, Gayle Ashton, with Veritext Legal
 5      Solutions.  Today's date is February 14th, 2025,
 6      and the time is 10:00 Eastern Standard Time.
 7                        We are here to take the remote
 8      video deposition of John Moynihan in the matter
 9      of Robert Hunter Biden versus Patrick M. Byrne.
10                        Would counsel please introduce
11      themselves for the record.
12                        MR. HANSEN:  Good  morning.
13      Zachary Hansen on behalf of the plaintiff,
14      Robert Hunter Biden, along with Brian Sullivan
15      from my firm Early Sullivan Wright Gizer &
16      McRae, and we also have our co-counsel,
17      Abbe Lowell of Winston Strawn who also
18      represents the plaintiff.
19                        MR. MURPHY:  Good morning.
20      Michael Murphy appearing on behalf of defendant
21      Patrick Byrne.
22                        MR. DELLA ROCCA:  And good
23      morning.  Brian Della Rocca appearing on behalf
24      of deponent John F. Moynihan.
25                        THE VIDEOGRAPHER:  Would the
```

                                                    Page 5

```
 1        court reporter, Lisa Crompton, please swear in
 2        the witness.
 3                         JOHN F. MOYNIHAN, the witness,
 4        having been duly cautioned and sworn, testified
 5        upon his oath as follows:
 6                         EXAMINATION BY MR. HANSEN:
 7   Q.   Good morning, Mr. Moynihan.  I know we kind of
 8        introduced ourselves off the record, but I'll do
 9        it again.
10                         As you just heard, my name is
11        Zachary Hansen.  I am one of the attorneys on
12        behalf of the plaintiff in this case,
13        Robert Hunter Biden, along with Brian Sullivan
14        and Abbe Lowell, who are listening in.
15                         You were just sworn in.  And I
16        want to ask, have you ever had your deposition
17        taken before?
18   A.   I think a couple times, yes.  I have, yes.
19   Q.   Do you recall when the last deposition you sat
20        for was?
21   A.   Probably 17, 18 years ago.
22   Q.   Okay.  Was that a civil case?
23   A.   Yes.
24   Q.   Okay.  I'm going to go over some ground rules.
25        But really quickly, a little bit more of an
```

Page 6

```
 1        introduction.

 2                    The defendant in this case is

 3        Patrick Byrne.  A small background on the case.

 4        My client has sued Mr. Byrne for defamation

 5        stemming from an article that Mr. Byrne authored

 6        with false statements about Mr. Biden.

 7                    This process is going to be, as

 8        you've sat for a deposition, but it's been a

 9        number of years, it's a question and answer

10        session between you and I.  Everything is being

11        taken by down the reporter that'll transcribed

12        in a transcript that'll read somewhat like a

13        screen play with question, answer, question,

14        answer.  You'll get a chance to review it at the

15        end afterwards.

16                    And I'm going to go over a few

17        rules.  As I was saying, the oath you just took

18        bears the same force and effect as if you were

19        testifying in court.  You're obligated to tell

20        the truth under the penalty of perjury today to

21        the best of your ability.  Do you understand

22        that?

23   A.   Yes, sir.

24   Q.   You've done a great job of this already, but

25        I'll continue to ask you to please verbalize all
```

Page 7

```
 1        of your responses, because the court reporter
 2        isn't able to record nods of the head or uh-huhs
 3        or uh-uhs.  So if you answer, please just
 4        verbalize your response.
 5        A.  Yes, sir.
 6   Q.   For that same reason -- Oh, I'm sorry.
 7        A.  I just said yes, sir.  I recognize that,
 8        yeah.
 9   Q.   Okay.  For that same reason, I'll ask that we
10        try not no interrupt each other while we go
11        through this today.  In normal conversation,
12        it's typical to anticipate what the other person
13        is going to say and start answering, I do it all
14        the time, but let's try to not talk over each
15        other so that we have a clean record; okay?
16        A.  Yes, sir.
17   Q.   If you don't understand any of the questions
18        that I ask today, please ask me to repeat them.
19        I'm not trying to trick you or anything like
20        that.  However, if I ask a question, and you
21        provide an answer, I'm going to assume that you
22        understood the question.  Do you understand?
23        A.  Yes, sir.
24   Q.   I'm entitled to your best testimony today to the
25        best of your ability.  That includes any
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1          estimates that you might make.  However, I don't

 2          want you to guess.  So if the answer's I don't

 3          know, that's a perfectly acceptable answer.  But

 4          I may ask, you know, do you have an estimate of

 5          this.  Do you understand the difference between

 6          an estimate and a guess?

 7      A.  Yes.

 8  Q.  Okay.  You'll likely hear counsel today assert

 9          some objections, they're entitled to do so, and

10          you're still required to answer the questions

11          after those objections have been asserted,

12          unless your attorney specifically instructs you

13          not to answer, at which point that becomes a

14          determination between you and your attorney.  Do

15          you understand?

16      A.  Yes, sir.

17  Q.  If you need a break at any time during today's

18          deposition, I'm happy to do so.  I'll also

19          initiate some breaks at various times.  But what

20          I ask is, for you to please just -- if there's a

21          question pending, I'm going to insist on an

22          answer before we take a break; okay?

23      A.  Yes, sir.

24  Q.  Great.  We may take a lunch break at some point.

25          I'm hoping to power through this.  But like I
```

Page 9

```
 1              said, we're going to need to take some breaks
 2              every once in a while.  So we may take a little
 3              bit of an extended one to get a bite to eat, but
 4              we'll talk about that as the deposition goes on.
 5              I know most of us are on the East Coast, so
 6              noon, 1:00 will approach pretty quickly.
 7                             As you just heard previously,
 8              you understand that this deposition is being
 9              recorded on video and it's been transcribed by
10              the court reporter; correct?
11              A.  Yes.
12    Q.   Is there any reason that you can think of that
13         you're not able to give your best testimony
14         today truthfully and honestly as you swore to
15         do?
16         A.  No reason at all.
17    Q.   Are there any medical issues or conditions that
18         may impair your ability to provide truthful
19         testimony?
20         A.  No.
21    Q.   Are you under the influence of any medication,
22         alcohol, or drugs that may impair your
23         recollection or ability to provide your best
24         testimony?
25         A.  No.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    Q.    Other than your own counsel -- I don't want to
 2          know anything that you discussed with your own
 3          counsel, that's attorney/client privilege.
 4          Other than your own counsel, who did you speak
 5          to today about your deposition?
 6    A.    Nobody.
 7    Q.    Or who did you speak to about your deposition
 8          today?
 9    A.    Nobody.
10    Q.    Okay.  Did you mention your deposition to
11          anybody, that you were going to be sitting for a
12          deposition today?
13    A.    Yes.  My wife.
14    Q.    Okay.  You didn't discuss the deposition with
15          Mr. Byrne?
16    A.    Oh, no.  No.
17    Q.    Okay.  How about Mr. Byrne's counsel,
18          Mr. Murphy?
19    A.    No.
20    Q.    All right.  Again, excluding discussions and
21          preparations that you did with your own counsel,
22          how did you prepare for today's deposition?
23    A.    I simply re-read my affidavit that had been
24          submitted.
25    Q.    All right.  Did you review any documents other
```

Page 11

```
 1          than your affidavit in advance of today's

 2          deposition?

 3          A.  No.  I don't have any documents.

 4   Q.     All right.  And the affidavit you mentioned is

 5          the affidavit that you understand was submitted

 6          in this litigation dated in April of 2024;

 7          correct?

 8          A.  Correct.

 9   Q.     Did you listen to any recordings to prepare for

10          today's deposition?

11          A.  No.

12   Q.     Where are you located today, sir?

13          A.  I'm at my home in Wells, Maine.

14   Q.     Is there anyone else in the room with you?

15          A.  No.

16   Q.     Is there anyone else listening in to this

17          deposition?

18          A.  No.

19   Q.     And I'll state for the record that no one on my

20          side is recording this deposition.  Is there

21          anyone on your side recording the deposition?

22          A.  No.

23                    MR. HANSEN:  Mr. Murphy, is

24          anybody on your side recording the deposition?

25                    MR. MURPHY:  No.  Not other
```

Page 12

```
 1           than the videographer that's present and the

 2           court reporter.  Is anybody else on your side

 3           recording anything?

 4                     MR. HANSEN:  No.

 5                     MR. MURPHY:  Okay.

 6   Q.    Mr. Moynihan, did you bring any documents with

 7         you today to produce at the deposition?

 8   A.    No.

 9   Q.    I'm going to start by pulling up a document

10         here.

11                     MR. HANSEN:  It says I have to

12         send a request to share.  I'm going to share my

13         screen a couple times.  I'm going to send that

14         request to the court reporter.

15                     MR. DELLA ROCCA:  Will that

16         come to me as well or...

17                     MR. HANSEN:  It will.  It'll

18         pop up on my screen, on your screen.

19                     MR. DELLA ROCCA:  Yup.

20                     THE REPORTER:  Should be all

21         set.

22                     MR. HANSEN:  Yup.  It's

23         working.  Thank you.

24   Q.    All right.  Do you see the document that's on

25         the screen, Mr. Moynihan?  And I can make it
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        larger.
 2        A.  Yeah.  It's pretty small but...
 3    Q.  Okay.
 4                   MR. MURPHY:  Sorry to
 5        interrupt.  Counsel, are you going to assign an
 6        exhibit number to this?
 7                   MR. HANSEN:  I will, yes.
 8                   MR. MURPHY:  Okay.
 9                   MR. HANSEN:  This will be
10        Exhibit 1.
11    Q.  Can you see the document, Mr. Moynihan?
12        A.  Yeah.  Oh, my God.  This is going to be a
13        disaster, trying to do it -- I'm going to try to
14        enlarge it with my fingers here.  Okay.
15    Q.  I can enlarge it on my screen.
16        A.  I don't actually think that's the problem.  I
17        think it's -- Because I'm on my iPhone.  And my
18        computer is not working the way it's --
19        Yeah.  Okay.  Yeah.  It's the subpoena to
20        testify.  I don't wear glasses, but I can see
21        it.  Yup.  Okay.
22    Q.  Okay.
23        A.  Yup.
24    Q.  I just want to make sure that you can see it.
25        Have you seen this document before?
```

Page 14

```
 1          A.  Yeah.

 2    Q.    And I can scroll through it.

 3          A.  I think Brian sent it to me, yes.

 4    Q.    I'll represent to you that this is the subpoena

 5          that -- And we'll go through the other pages

 6          here in a little bit.  I'll represent to you

 7          this is the subpoena that we served on you for

 8          today's deposition.  Okay?

 9          A.  Yes.

10    Q.    Did you review this deposition prior to today's

11          deposition?

12          A.  Yes.

13    Q.    Did you review -- There are a series of document

14          requests.  Let me scroll down.

15          A.  Yeah.  I guess.  Yes.  Go ahead.

16    Q.    Did you review the document requests that are

17          attached to this subpoena, start on Page 7 of

18          the PDF?

19          A.  Yeah.  I mean, I read it, you know.

20    Q.    Okay.  Did you understand that by way of the

21          subpoena we sought the production of all

22          relevant documents listed herein?

23          A.  Yes.

24    Q.    And did you search for documents that were

25          responsive to these requests?
```

Page 15

```
 1            A.  Yes.
 2    Q.   What did you do to search for those documents?
 3            A.  Well, I don't have any documents.  Part of
 4         that subpoena requested any e-mail or text
 5         messages.  I found a single text message that I
 6         think is relevant, I'm estimating is relevant,
 7         and I sent it to counsel who I think forwarded
 8         to you.  That's all I had.
 9    Q.   All right.  Let me -- I'm going to pull that
10         document up.  Give me one second here.
11                        (PAUSE)
12    Q.   All right.  Can you see this document that I'm
13         displaying on the screen now?  I can blow it up
14         again.
15            A.  Let's see.  Yes.  Yeah.  That's the one I
16         sent to Brian.  Yup.  To counsel, rather.
17    Q.   This appears to be a screenshot of a text
18         thread; is that correct?
19            A.  Correct.  Yes.
20    Q.   Were you the recipient of this text?
21            A.  Yes.
22    Q.   Did you obtain this screenshot yourself?
23            A.  I don't know what that means.
24    Q.   As in like you took the screenshot and produced
25         this yourself to --
```

Page 16

```
 1        A.  Oh, yeah.  Yeah.

 2   Q.   Okay.

 3        A.  I took the -- Yes.

 4   Q.   When was it that you took this screenshot and

 5        produced it?

 6        A.  Oh, boy.  I don't know.  A few days ago.

 7   Q.   An estimate.

 8        A.  Okay.  Yeah.  A few days ago.  Yeah.

 9   Q.   And I just want to confirm.  It's your

10        understanding, after reviewing the document

11        request in the subpoena that I showed you just a

12        little bit ago as Exhibit 1, this is the only

13        document you had in your possession that was

14        responsive to this request; correct?

15        A.  Yes.  That's all I could find.  Yes.

16   Q.   Okay.

17                    MR. MURPHY:  Counsel, just for

18        the record -- And Counsel, just for the record,

19        the text message is dated May 13, 2022.

20                    MR. HANSEN:  Yes.  I see that.

21                    I'm going to mark this as

22        Exhibit 2 to the deposition record.

23                    And I'll send all these

24        exhibits to the court reporter and all counsel

25        after the deposition.
```

```
1    Q.   I'll represent to you --
2                    MR. HANSEN:  And correct me if
3         I'm wrong, Mr. Della Rocca, but my
4         understanding, based on when you produced this,
5         was that this document was responsive to
6         Request for Production Number 18.  Is that your
7         understanding, Mr. Della Rocca?
8                    MR. DELLA ROCCA:  That is, that
9         is my understanding, yes.
10                   MR. HANSEN:  Okay.
11   Q.   And Mr. Moynihan, is that also your
12        understanding?
13   A.   Yes.
14   Q.   I'm just going to read -- I'm displaying the
15        Request for Production Number 18 on the screen.
16        I'm just going to read it for the record.  All
17        Documents constituting any cellular telephone
18        records Related to your Communications with
19        Defendant and/or Smith, including all calls and
20        text messages, and I'll also represent that all
21        of the words in this request that are
22        capitalized are defined terms.
23                   At the top -- I'm going to go
24        back to Exhibit 2, which is the document you
25        produced here.  At the top of the document, it
```

Page 18

```
 1          says Patl Byrne.  Who is that person?
 2          A.  Patrick.
 3   Q.    Patrick Byrne, the defendant in this litigation;
 4          correct?
 5          A.  Yes.
 6   Q.    Why did you feel that this document was
 7          responsive to the subpoena in general but,
 8          specifically, Request Number 18 that I just read
 9          into the record?
10          A.  I actually don't know that it's responsive to
11          your request.  What I'm trying to do is be as
12          helpful as possible and go through all of my
13          text messages and anything like that, that would
14          have possibly related to this, and I don't know
15          that this does.  The only thing I have that had
16          like Middle East on it was this.  So I tried to
17          be as thorough as I could be.  This is literally
18          the only one I could find.
19   Q.    Great.  I appreciate your thoroughness and
20          willing to help.  Very much appreciate it.
21                    So I'm going to ask some
22          questions about this specific document.  We'll
23          kind of get to the bottom of whether it's
24          relevant or not.
25          A.  Yup.
```

Page 19

```
 1   Q.   Do you recall as you sit here today what the

 2        context of these texts were?

 3        A.   No.  I would be guessing if I said yes.  It's

 4        so long ago.

 5   Q.   Okay.  And I don't want you to guess.

 6        A.   I won't.  Yup.

 7   Q.   And just to clarify.  There's two sets of text

 8        messages.  There's one that appears to be dated

 9        May 13th, 2022, and then, just below it,

10        May 15th, 2022.  Was it your intent to produce

11        this screenshot because of the texts towards the

12        top of the page that are with May 13, 2022,

13        listed above it?

14        A.   No.  I don't even know what the relevance of

15        the bottom part is.  Not being very proficient.

16        Yeah.  That has nothing do with any of this.  I

17        just was trying to capture the Middle East

18        component --

19   Q.   Sure.

20        A.   -- to this that -- I don't know how to crop

21        pictures, so I just took a picture and

22        Middle East, whatever, the Middle East, that

23        what I was trying to capture to be responsive to

24        you.

25   Q.   That's what I figured.  I just wanted to have a
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1          clear record on that.
 2          A.  Yup.
 3    Q.    So just to clarify.  Do you remember or recall
 4          who the Middle Eastern contact Mr. Byrne is
 5          referring to in this text is?
 6          A.  Do I -- Say that again.  I don't understand.
 7    Q.    So this text message says, the first text
 8          message in full on the page says:  A Middle
 9          Eastern contact from whom I rarely hear, as in
10          years, he's leaving the Middle East to go to
11          Athens to communicate something important to me.
12          When I get it, I will pass it on.
13          A.  Uh-huh.
14    Q.    My question is, do you remember or recall who
15          the Middle Eastern contact is that Mr. Byrne is
16          referring to?
17          A.  I don't know his name.  I do not, no.
18    Q.    Have you ever at any point in time known that
19          person's name?
20          A.  Never.
21    Q.    Okay.  Is this the only time Mr. Byrne has
22          mentioned this quote-unquote Middle Eastern
23          contact to you?
24          A.  Yes.  For the purposes of me introducing him
25          to the FBI agent, that was the only time that it
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1            ever was brought up to me.
 2   Q.   Okay.  Has he ever brought it up to you for
 3            other purposes?
 4            A.  No.
 5   Q.   Do you happen to know where in the Middle East
 6            this person referenced in this text is from?
 7            A.  I do not know where they're from.  But what I
 8            heard was that he was Iranian, but I don't know
 9            that to be true.
10   Q.   Who did you hear that he was Iranian from?
11            A.  Patrick.
12   Q.   Okay.  Do you recall why Mr. Byrne was texting
13            you about this matter in May of 2022?
14            A.  Yes.  As it relates to my affidavit, I had
15            introduced Patrick at one time, because he said
16            he had all kinds of different things, to this
17            FBI Agent David Smith, and that in the future,
18            as you can see in the affidavit, if there are
19            any matters to be raised, I'd be happy to just
20            reintroduce Patrick back to Mr. Smith, and
21            that's what the purpose of the whole exercise
22            was.
23   Q.   Okay.  I'll dig into what you just said here in
24            a little bit.
25            A.  Sure.
```

```
 1    Q.   Do you know or recall why Mr. Byrne's, quote,
 2         Middle East contact was leaving the Middle East
 3         to go to Athens?
 4         A.  No.
 5    Q.   Is it your understanding that Mr. Byrne was
 6         going to travel to Athens to meet this person
 7         around this time period or shortly thereafter?
 8         A.  No.  No understanding other than that text
 9         message.
10    Q.   Okay.  So your understanding of this
11         Middle Eastern contact going to Athens and
12         apparently Mr. Byrne, it seems like might be
13         going to meet him, is all based on just this
14         text message, what's here; correct?
15         A.  Yeah.  I don't have any context to it.  But
16         you're right.  Yes.  I don't have any other
17         information on that.
18    Q.   Did you and Mr. Byrne have any telephone
19         conversations or in-person conversations with
20         respect to this text message or his -- the
21         substance of this text message?
22         A.  Not that I recall, no.
23    Q.   Do you recall or have you ever known what this
24         Middle Eastern contact was supposed to
25         communicate to Mr. Byrne?
```

Page 23

```
 1        A.  No, not at the time.  Not until we had the
 2        meeting.
 3   Q.   And are you referring to -- I'll get into your
 4        meeting later.  But are you referring to a
 5        meeting with Mr. Byrne?
 6        A.  And the agent.
 7   Q.   "The agent" being David Smith?
 8        A.  David Smith.  Correct.
 9   Q.   Okay.  And like I said, I'll get into those
10        meetings here a little bit later.
11        A.  Sure.
12   Q.   Just to touch on that a little bit.  At that
13        meeting, did Mr. Byrne communicate to you what
14        this Middle Eastern contact was to communicate
15        to him, this something important that he
16        references?
17        A.  At the meeting with the agent?
18   Q.   Yes.
19        A.  Yes, he did.
20   Q.   And what was that that Mr. Byrne told you at
21        that meeting with Agent Smith?
22        A.  That the subject matter that was on the tape
23        would involve the recovery on behalf of Iran of
24        a certain sum of money that was existing in
25        North Korea.
```

Page 24

```
 1   Q.   Okay.  Like I said, I'll dig into that --
 2        A.  Sure.
 3   Q.   -- a little bit further as we go along here.
 4        A.  Sure.
 5   Q.   The next text says:  Okay now you were all
 6        caught up.  Which seems to me to be a -- that
 7        there was a predicate to this conversation.  Do
 8        you recall what that was that led up to
 9        Mr. Byrne saying, okay now you were all caught
10        up?
11        A.  I would, I would venture to say, I would
12        estimate in this, we have a number of things
13        that we were working on, and I think it would be
14        related to all of that, because there was no
15        communication about the subject matter involving
16        the tape, it is likely referring to the 10 other
17        things we were working on.
18   Q.   Those other things that you were working on,
19        those 10 other things, as you just mentioned,
20        did any of them at this point in time in May of
21        2022 involve Hunter Biden?
22        A.  No.
23   Q.   All right.  I'm going to stop sharing my screen
24        for a little bit.  Like I said, we'll dig into
25        all of that a little bit later.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1                        How do you know Patrick Byrne?
 2       A.   I was introduced to Patrick, I think sometime
 3            in like the spring of 2021.
 4    Q.   What were the circumstances of you being
 5            introduced to Patrick Byrne in the spring of
 6            2021?
 7       A.   A number of folks were asking me -- I get
 8            regularly called globally to work on financial
 9            investigative matters, money laundering matters,
10            and what have you.  So I get regularly requested
11            and solicited to do this, an absurd amount of
12            travel miles because of it, and that was part of
13            the delay in even getting to this.  So a request
14            was made of me to meet with regard to several
15            folks involving election related materials.
16            Nothing related to this.
17    Q.   You said several folks asked -- initiated this
18            contact with Mr. Byrne.  Who are those people?
19       A.   Is that something --
20                        MR. DELLA ROCCA:  Objection.  I
21            mean, that's not really relevant, who introduced
22            him before this was even a topic of
23            conversation.  It's not relevant to the topic.
24                        MR. HANSEN:  I'm just trying to
25            get a basis of his relationship with Mr. Byrne
```

Page 26

```
 1        and how it started.  Because Mr. Byrne has
 2        testified extensively about this, and so I'm
 3        just trying to establish a timeline.
 4                      Are you instructing your client
 5        not to answer?
 6                      MR. DELLA ROCCA:  Mr. Moynihan
 7        has a lot of clients that he works with and
 8        deals with them confidentially a lot of times,
 9        so I am instructing him not to answer that.
10                      MR. HANSEN:  Okay.  How about
11        if I do it this way?
12   Q.   Were you instructed by anybody within the
13        U.S. government, not asking for names, just
14        asking generally within the U.S. government, to
15        start communicating with Mr. Byrne or be
16        introduced to Mr. Byrne?
17   A.   No.
18   Q.   Okay.  Around the spring of 2021, as you stated,
19        when you first started communicating with
20        Mr. Byrne, is that around the same time that you
21        first learned who Mr. Byrne was?
22   A.   Yes.
23   Q.   Okay.  And you learned of Mr. Byrne within the
24        context of being introduced to him at that time;
25        correct?
```

Page 27

```
 1         A.  Yeah.  I did my due diligence on who he was
 2         before I met him, yes.
 3    Q.   These individuals that you mentioned that
 4         introduced you or initiated the contact with
 5         Mr. Byrne, did they explain to you who Mr. Byrne
 6         was?
 7         A.  Generally.  Generally.  Not specific.  I do
 8         my own homework.
 9    Q.   Do you recall what those individuals told you?
10         A.  Nothing, other than he was the former CEO
11         of -- what was the thing -- .com, one of these
12         things -- Overstock.com.  Other than that --
13         They know me.  I just got to do my own homework.
14    Q.   Did they explain to you anything about his
15         involvement with the U.S. government or covert
16         operations for the U.S. government?
17         A.  No.
18    Q.   You mentioned just a minute ago that you
19         performed your own due diligence.  What did that
20         due diligence entail?
21         A.  Well, that's when I discovered, you know,
22         Overstock.com, well-traveled guy, multiple
23         degrees from multiple universities.  So that's
24         kind of the background that I wanted to see
25         from, you know, credibility standpoint and who
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1            was this guy and what's it all about.
 2   Q.   Were those just through Internet searches?
 3            A.  Yeah.  Public, public data searches, yeah.
 4   Q.   Did you speak to anybody about Mr. Byrne as part
 5            of that due diligence?
 6            A.  No.
 7   Q.   Okay.  Did you use any other method for that
 8            due diligence other than searching the Internet,
 9            as you've described?
10            A.  No.
11   Q.   Have you ever met Mr. Byrne in person?
12            A.  Multiple times.
13   Q.   When was the first time you met with Mr. Byrne
14            in person?
15            A.  Spring of 2021.
16   Q.   And that was when you were first introduced to
17            him?
18            A.  Correct.
19   Q.   Was there a third party present that introduced
20            you two or was it a prearranged meeting of just
21            the two of you?
22            A.  No.  There were multiple parties.
23   Q.   Where did this first meeting occur?
24            A.  In Washington, D.C.
25   Q.   Okay.  And I'll get into, again, meetings here
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        in just a little bit.  Right now I'm just trying
 2        to establish a timeline.
 3    A.  And Zach, just hold on one second.  Every now
 4        and then I'm going to have multiple text
 5        messages pop up my phone.  So going like that,
 6        I'm trying to just get rid of them, just so --
 7        I'm not waving at you guys, I'm waving at the
 8        text messages that are popping up.
 9    Q.  Okay.  Understood.  No problem.  Thank you.
10    A.  Yup.
11    Q.  And like I said earlier, if you need to take a
12        break or anything, just let me know.
13    A.  Yup.
14    Q.  When was the last time you spoke to Mr. Byrne?
15    A.  I would say probably two or three weeks ago.
16    Q.  What was the purpose of those communications?
17    A.  Nothing to do with this.  Other matters.
18    Q.  Did those other matters involve matters with the
19        United States government or covert operations
20        for the U.S. government?
21    A.  No.
22    Q.  Who initiated that last conversation between you
23        and Mr. Byrne?
24    A.  Probably me.
25    Q.  Why did you initiate those conversations?
```

Page 30

```
 1        A.   Administration.   Administration.   Not
 2        substance to a case, but administration, all the
 3        cases.
 4   Q.   Okay.  When you said that your last
 5        communication with Mr. Byrne had nothing to do
 6        with this, do you mean either you or him did not
 7        mention this lawsuit or Mr. Biden?
 8        A.   Oh, yeah.  No.  No.  It was administration.
 9   Q.   Okay.  And how often do you and Mr. Byrne
10        communicate, typically?
11        A.   Now?  Once a month, maybe.
12   Q.   When was the last time you communicated with
13        Mr. Byrne about either this lawsuit or
14        Hunter Biden?
15        A.   I would say probably sometime, I would
16        estimate 45 to 50 days, sometime before the
17        subpoena came, which was to anticipate a
18        subpoena for a deposition.  I said fine.
19   Q.   Mr. Byrne was notifying you that you can
20        anticipate receiving a subpoena with respect to
21        this litigation?  Do I understand you correctly?
22        A.   Correct.  Yes.
23   Q.   And that was sometime within the last six months
24        or so?
25        A.   Oh, yeah, definitely within the last six
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1           months, for sure.
 2    Q.     Do you have an estimate of approximately when
 3           within the last six months it was?
 4    A.     It's a good -- I'm saying 45 days, maybe 45
 5           to 60 days.  I mean, I really don't know.  That
 6           would be my best estimate.
 7    Q.     Okay.  Sometime in December or so?
 8    A.     I would say that's probably about right.
 9    Q.     Did -- What else did Mr. Byrne tell you at that
10           time with respect to anticipating the subpoena?
11    A.     Nothing, other than just to anticipate a
12           subpoena and likely you'll be deposed.  I said
13           fine, I'll just tell the truth.
14    Q.     Did he tell you what he anticipated the
15           deposition to involve other than like with
16           respect to this lawsuit?
17    A.     Oh, no.  No.
18    Q.     Okay.  Are you and Mr. Byrne involved in any
19           business together, meaning, for financial gain?
20    A.     Patrick has invested a small amount of money
21           in a company that my son runs called Tradol.
22           And it's a start-up company.  Other than that,
23           no.
24    Q.     I don't want to get too far down a rabbit hole
25           here.  But just briefly, what kind of company is
```

Page 32

```
 1          your son's company, Tradol?  What do they do?
 2          A.   What it is, is it's an efficiency software,
 3          that I predominantly financed, for moving
 4          containers, you know, post COVID, the movement
 5          of, you know, shipping containers at ports in an
 6          efficient manner.  So the software creates
 7          efficiency so that, when a truck driver drives
 8          up the port and says, hey, where's my container,
 9          and the guy at the port says, well, it's going
10          to be three weeks, this actually is a queuing
11          software so that, when containers come off of
12          the ship, truck drivers don't need to hang
13          around for three weeks, they get a notification
14          on an app that says your container's going to be
15          ready in three weeks from now or two days from
16          now.  It's like a Resy, like the Resy, when you
17          have reservations, it's like a Resy for
18          containers at ports globally.  Does that make
19          sense?
20     Q.   Yeah, it does.
21          A.   Okay.
22     Q.   That sounds like very useful technology --
23          software.
24          A.   Yeah.  It's kind of fun.  Yeah.
25     Q.   Going back to your last conversation with
```

Page 33

```
 1          Mr. Byrne when he informed you to anticipate the
 2          subpoena.  Did he elaborate in any other way?
 3          Did he explain anything about the attorneys in
 4          this case or what your testimony might be
 5          centered on or anything?
 6          A.  No.  Just that it was a matter that
 7          Hunter Biden was suing him.  And other than
 8          that, no, no elaboration at all, quite frankly,
 9          no.
10    Q.    Was this communication over the telephone?
11          A.  I would say yes.  I think so, yes.
12    Q.    Okay.  And approximately how long did that
13          telephone conversation last?
14          A.  Very short.  I would say maybe a minute.  I
15          guess.  I mean, if that.  A minute, minute
16          15 seconds, minute and a half.  I mean, very
17          short.
18    Q.    Okay.  Did you have any understanding of where
19          Mr. Byrne was located when he made that phone
20          call to you?
21          A.  I don't.
22    Q.    Okay.  Other than what you've testified so far,
23          have you ever discussed this litigation with
24          Mr. Byrne in any other matter --
25          A.  No.
```

Page 34

```
 1   Q.   -- manner?

 2   A.   No.  No.

 3   Q.   Did he notify you when the lawsuit was filed,

 4        for instance?

 5   A.   No.

 6   Q.   And I'm going to get into your affidavit.  But I

 7        presume that he asked you at some point to

 8        submit an affidavit for this litigation;

 9        correct?

10   A.   I think his attorney asked for the affidavit,

11        not him.

12   Q.   Okay.  Like I said, I'll dig into that here in

13        just a little bit.

14                      Has Mr. Byrne ever provided you

15        with any documents related to -- that you

16        understood to be related to this litigation?

17   A.   No.

18   Q.   When was the last time you met with Mr. Byrne in

19        person?

20   A.   Great question.  It's been a while.  It's got

21        to be over six or seven months ago, easy.

22   Q.   Sometime in 2024, though?

23   A.   Yeah, 2024.  But it's probably a good six

24        months.

25   Q.   Where did that meeting take place?
```

Page 35

```
 1        A.  Washington, D.C.
 2   Q.   Where specifically in Washington, D.C.?
 3        A.  It was at -- I'm trying to remember.  What is
 4        the name of the hotel?  Unrelated matter to
 5        this.  If I -- Just let me jog my brain.  I'll
 6        try to remember the hotel.  I'm not sure if it's
 7        Oriental.  It's not the Waldorf.  It's another
 8        hotel.
 9   Q.   Mandarin Oriental?
10        A.  Did you say Mandarin?
11   Q.   The Mandarin?
12        A.  I think that's what it was.  I think that's
13        what it was.  I'd never been in that hotel
14        before.  But I think that's the one.  Yes.
15   Q.   And if you remember at some point in the
16        deposition, just let me know.
17        A.  It's right next to the highway, you know,
18        395 in Washington.  I think it's that Mandarin.
19        I think that's what it was.
20   Q.   Okay.
21        A.  Yup.
22   Q.   And you said that that meeting had nothing to do
23        with this litigation or Hunter Biden; correct?
24        A.  Oh, no.  Yeah.  Nothing to do with this, no.
25   Q.   Was the name Hunter Biden mentioned at all in
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        that meeting?

 2        A.  No.

 3   Q.   Who initiated that last in-person meeting?

 4        A.  I did.

 5   Q.   And it was, like you said, the purpose was

 6        completely unrelated to Mr. Biden or this

 7        litigation; correct?

 8        A.  Correct.  Yes.

 9   Q.   Did it involve anything related to Mr. Byrne's

10        alleged activities with the U.S. government or

11        covert operations?

12        A.  No.

13   Q.   And real quickly.  Just to jog your memory on

14        the hotel.  Is it -- The Mandarin Oriental is I

15        think believe -- I think is called the

16        Salamander now?

17        A.  I don't know that but...

18   Q.   Okay.

19        A.  Could be.  I don't know.  It's literally

20        right next to 395.  Like if I had a map, I could

21        probably figure it out.  But it's literally

22        right next to the highway.

23   Q.   Okay.  All right.

24        A.  Yeah.

25   Q.   No problem.
```

Page 37

```
 1          A.   Mandarin, I think it is, yeah.
 2     Q.   How have you and Mr. Byrne typically
 3          communicated, being over the phone or messaging
 4          apps?
 5          A.   Good question.  I would say typically, you
 6          know, text messages I think would probably be
 7          the most common, most efficient, if I were to
 8          guess.
 9     Q.   Text, not messaging apps, like WhatsApp or
10          Signal; correct?
11          A.   Well, Signal.  I would say predominantly
12          Signal, yes.
13     Q.   Okay.  That's what I'm trying to nail down,
14          whether it's text or Signal.  You would say
15          predominantly Signal --
16          A.   Yes.  Sorry.  Text message over Signal.  Like
17          the one I gave you.  That was a text message
18          over Signal.  That's the text I sent you.
19     Q.   I see what you're saying.  So when you say
20          "text," you're referring to using the app Signal
21          with respect to communications with Mr. Byrne.
22          A.   Yes.  Involving, yeah, texts or phone calls.
23          Either one.
24     Q.   Okay.  Give me just one second here.
25          And you said "or phone calls."  So sometimes
```

Page 38

```
 1        it's over the phone.

 2        A.  Signal.  Over the phone using Signal.

 3   Q.   I see.  Okay.  Other than the text message that

 4        you've produced today that I had displayed and

 5        introduced into this deposition as Exhibit 2, do

 6        you have any other communications with Mr. Byrne

 7        in your possession?

 8        A.  Meaning what?

 9   Q.   Meaning those Signal messages or text messages

10        or e-mails, anything?

11        A.  Oh.  I would have given those to you if I had

12        that.  I wouldn't have even hesitated.  I don't

13        have anything.  I was, I was surprised to

14        actually even found that.  I went diligently

15        trying to find myself relative to I thought

16        might be this, but that's all I could find.

17   Q.   All right.  And like I said, I appreciate your

18        efforts in that regard.  I know that on some of

19        these messaging apps, specifically Signal, they

20        have, you can set up the text thread to

21        automatically delete after a certain period of

22        time.  Is that how your Signal text with

23        Mr. Byrne is set up?

24        A.  It is not set up.  It's not set up that way

25        for anybody, because I don't even know how to
```

Page 39

```
 1          set it up.  So no.  The answer is no.
 2   Q.    Okay.  So the communications that you have with
 3          Mr. Byrne have nothing to do with Mr. Biden or
 4          this litigation, other than the text thread that
 5          you've produced that I've introduced as
 6          Exhibit 2; correct?
 7   A.    Correct.  And once again, not to repeat
 8          myself, I gave that text to you guessing that
 9          that might be, only because of Middle East.  I
10          don't even know if that's the case.  But I tried
11          to do my best.
12   Q.    And when you -- Did you come to the conclusion
13          that, because this text message mentioned the
14          Middle East, that it was relevant to this case
15          based on just your review of the subpoena?
16   A.    Yes.  I wanted to be as responsive as I
17          could, to the best of my ability.  So I found
18          that and sent it to you.  Not even sure if it's
19          related to this or not.  It's so old.  But I
20          just wanted to be responsive, if it did, if it
21          did relate.  I didn't want to hold anything back
22          like that, you know.
23   Q.    I'm going to double back really quickly to your
24          last meeting with Mr. Byrne in D.C.  You said
25          that it happened at the hotel that you believe
```

```
 1          is called the Mandarin.

 2          A.  Yeah.

 3  Q.  Did that happen in a hotel room or in a

 4          conference room or in a lobby?

 5          A.  Well, we met in the lobby and then there was

 6          a group meeting in a room.

 7  Q.  There were more people present than just you and

 8          Mr. Byrne?

 9          A.  Yes.

10  Q.  Okay.  And once again, that had nothing to do

11          with this case or Mr. Byrne's alleged covert

12          activities with the U.S. government.

13          A.  Correct.

14  Q.  Okay.  Are you familiar with the word "handler"

15          to describe the work of government agents?

16          A.  Yes.

17  Q.  What is your understanding of what the word

18          "handler" means?

19          A.  Really, someone who acts as sort of an

20          oversight or a liaison to the person that's

21          being handled.

22  Q.  What is the basis of your understanding in that

23          regard?

24          A.  Well, I worked at the Department of Justice,

25          U.S. Drug Enforcement Administration, for years.
```

Page 41

```
 1   Q.   Are you now or have you ever acted as
 2        Mr. Byrne's handler within the U.S. government
 3        related to Mr. Byrne's supposed covert
 4        activities?
 5   A.   Not, not as a government employee but,
 6        rather, Agent Smith asked me, if Patrick had any
 7        information to bring forward, would I act as
 8        that quote-unquote handler or really
 9        intermediary liaison type person as it relates
10        to this.
11   Q.   And Mr. Smith asked you to act in that regard.
12        So did -- Do you understand how Mr. Smith
13        essentially came to the understanding that
14        Mr. Byrne potentially had information that he
15        would like you to retrieve from Mr. Byrne as his
16        handler or to act as handler?
17   A.   Yeah.  Just to clarify your question.  I
18        understand your question.  I want to be very
19        specific.  Not for me to retrieve any
20        information.  But rather, if Mr. Byrne had
21        information that he wanted to pass Agent Smith,
22        Mr. Byrne was to tell me he had something, and
23        then I would tell Agent Smith, and then put the
24        meeting together and they would exchange the
25        information.  Not me retrieving it and turning
```

Page 42

```
 1        it over.  Just want to be clear on that.  Does
 2        that make sense?
 3   Q.   Yes, it does.
 4        A.   Okay.
 5   Q.   When approximately did Mr. Mr. Smith ask you to
 6        act as Mr. Byrne's quote-unquote handler?
 7        A.   That's a -- After the first meeting at the
 8        restaurant -- And to be honest with you, I can't
 9        remember the dates.  I do so many cases.  I
10        can't remember the dates.  But it was at that
11        first meeting in, you know, it might have been
12        the Town of Westin, one of these towns west of
13        Washington D.C., at that time.
14   Q.   Is that the meeting that you described in your
15        affidavit?
16        A.   Yes, sir.
17   Q.   All right.  Like I said, we'll dig into your
18        affidavit later.
19        A.   Yeah.
20   Q.   Do you know why Agent Smith didn't want to
21        obtain this information directly from Mr. Byrne,
22        why he asked you to act as the conduit?
23        A.   That's a great question.  I don't know why.
24        And having been in the Department of Justice, I
25        didn't question him, because you don't
```

Page 43

```
 1        appreciate that.  You respect, if someone asks
 2        the protocol to be set up that way, you just
 3        respect it.  So the answer is, no, I don't know
 4        why.
 5   Q.   Did you have any sort of suspicion as to why?
 6        A.  No.
 7   Q.   Okay.  Are you currently acting as Mr. Byrne's
 8        handler?
 9        A.  No.
10   Q.   When did that -- your relationship with
11        Mr. Byrne in that regard end?
12        A.  Good question.  There was a major fallout at
13        the FBI with regard to a supervisory special
14        agent, and in or about that time that
15        supervisory special agent basically blew up the
16        group that David Smith was working in and that
17        ended.  So that supervisory agent's name was
18        Timothy Thibault.
19   Q.   Thibault, like the athlete?
20        A.  Good -- I think the spelling is pretty close.
21        I think it's, I think it is pretty close.
22        T-h-i-b-a-u-l-t, I think is his last name,
23        spelled that way.
24   Q.   T-h-i...
25        A.  ...b-a-u-l-t.  I think that's how you spell
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        it.
 2   Q.   Thibault.  Okay.  I gotcha.
 3        A.  Yeah.
 4   Q.   Same first name, too.  That would be like the
 5        coincidence.
 6        A.  Yeah.  It's kind of weird, you know.
 7   Q.   Okay.  And you said it blew up this group that
 8        Agent Smith was working in.  Did you understand
 9        that group to be a group within the FBI?
10        A.  Oh, yes.
11   Q.   Did that group involve, to your understanding,
12        anybody from any other government agency or
13        organization?
14        A.  I don't know that the group within the FBI,
15        but that group certainly worked with other
16        agencies as part of admission.
17   Q.   Do you know if that group had any official name?
18        A.  My best recollection would have been like a
19        human asset group, human asset.  You know, to
20        explain that.  Typically, so many law
21        enforcement agencies have gone towards
22        technology, technology, and have failed to be
23        productive in developing humans as resources,
24        you know, with specific knowledge to this and to
25        that.  And I think that that group's main
```

Page 45

```
 1          mission was specifically to be better at dealing
 2          with human assets as opposed to technological,
 3          you know, AI and all of that stuff.  That's what
 4          I understood that to be.
 5     Q.   And when you say "asset," are you referring to,
 6          in the context of a human, an intelligent asset,
 7          intelligence asset?
 8     A.   I don't know what you mean by that.
 9     Q.   Like somebody that the government may rely on to
10          provide information regarding, you know, in the
11          sense that, in the intelligence agency within
12          the U.S. government, in that -- I'm using
13          "intelligence" in that context.
14     A.   Yeah.  I think you've got it.  I think you've
15          got it.  You know, when you talk about that,
16          you're talking about people with specific
17          knowledge.  It might be a finance knowledge, it
18          might be a geography knowledge, it might be an
19          engineering knowledge.  If that's what you mean,
20          then that would be correct.
21     Q.   And these human assets, are they, to your
22          understanding, people who are typically employed
23          by the U.S. government or can they be private
24          citizens?
25     A.   Yeah.  Usually not employed by the
```

Page 46

```
 1              government.
 2   Q.    Okay.  So usually private citizens.
 3         A.   I would say yes, predominantly, you know.
 4         Unless it's, unless it's a person who's employed
 5         by a foreign government.
 6   Q.    Sure.  Okay.  You said that -- Let me -- I asked
 7         you if there was any official name to the group
 8         that Mr. Smith was operating.  Is there any
 9         unofficial name that you've heard or that you
10         refer to that group or you've heard Mr. Byrne
11         refer to that group as?
12         A.   Well, sort of nomenclature.  Everybody would
13         call groups like that, in general, Team America.
14         Like, in other words, join Team America, because
15         those groups are trying to do things that are
16         productive for America, so they just call it
17         Team America type thing.
18   Q.    That's how you would refer to the group?
19         A.   Yeah.  And 10,000 other groups that are
20         trying to do the same thing.  Team America.
21         It's just kind of like being, you're a member of
22         a baseball team, it's called Team America, you
23         know.
24   Q.    Have you ever heard Mr. Byrne refer to that
25         group as Team America?
```

Page 47

```
 1        A.  I would say he's probably said it, yes.  I
 2        mean, I've said it, so he's probably said it and
 3        the agents have said it.  Everybody just sort of
 4        laughs about it, like join Team America, you
 5        know.  In other words, you're doing things that
 6        are going to be productive for America.
 7   Q.   Just a few minutes ago you said that, when I
 8        asked you why did your relationship with
 9        Mr. Byrne in the context of being Mr. Byrne's
10        handler, why did that end, you said that it
11        ended because of this, this group was disbanded.
12        Why -- What was your understanding that, that
13        group being disbanded, how did that -- why did
14        that impact your relationship with Mr. Byrne as
15        his handler?
16        A.  Well, because those agents in that group were
17        dispersed.  In other words, your baseball team
18        doesn't exist anymore, it's out of business.
19        Like that group ended.  Like so all of a sudden
20        the agents in that group, I guess they relocated
21        to other parts of the country and they're gone.
22        So there's no purpose of it then.
23   Q.   Do you have any understanding what the impetus
24        was for that group disbanding --
25        A.  No.
```

Page 48

```
1   Q.   -- other than the Supervisory Agent Thibault
2        making that decision?
3        A.   I'm not sure Thibault made that decision.
4   Q.   Okay.
5        A.   Thibault was let out the door.  So I don't
6        know.  I don't work at the FBI.  I didn't.  But
7        once he had what I understand to be problems,
8        then everybody sort of in that capacity in those
9        groups was shifted to other places.  That's what
10       I understand.
11  Q.   It's your understanding that this
12       Supervisory Agent Thibault, you said let out the
13       door.  He left the FBI?
14       A.   Yeah.  I understand, if you do public
15       research, that he was fired and let out -- he
16       was walked out the door.
17  Q.   Do you have any understanding as to why?
18       A.   Other than public information, corruption, is
19       what you read in the paper.
20  Q.   Okay.  Did -- While that group that you've
21       referenced, Team America, was operating and you
22       were acting as Mr. Byrne's handler, did you have
23       any understanding that the purpose of that group
24       or maybe one of the purposes of that group was
25       related to Mr. Biden, Mr. Hunter Biden in any
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        sort of way?

 2        A.  No.

 3   Q.   You didn't have the understanding or it was not

 4        related to Mr. Hunter Biden?

 5        A.  Oh, no.  Unrelated.  Completely unrelated.

 6   Q.   Okay.  Did it have anything to do with what you

 7        understand Mr. Byrne's covert activities are?

 8        A.  No.  I -- No.  On all fronts, no.  The group

 9        existed long before Mr. Byrne was introduced

10        into that, to David Smith.

11   Q.   And when Mr. Byrne was introduced into that

12        group, was the purpose of him being introduced

13        into that group have anything to do with

14        Hunter Biden?

15        A.  Well, yeah.  The information, that he had a

16        tape that he wanted to turn over, and I said

17        I'll arrange for a meeting for you to turn it

18        over.

19   Q.   Okay.  And at that time you understood that

20        information he wanted to turn over related to

21        Hunter Biden.

22        A.  Correct.

23   Q.   Okay.  And again, we'll get into all of that

24        here in a little bit.

25                          When you were acting as
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1          Mr. Byrne's handler, as we've discussed, is
 2          there a -- was there a standard operating
 3          procedure for how or where, by what means you
 4          would conduct meetings with Mr. Byrne?
 5     A.   There were no meetings.  If Mr. Byrne had
 6          information, he would tell me, I'd call
 7          Agent Smith and say he has some information, do
 8          you want to meet him or not.  That simple.
 9  Q.      Okay.  The reason why I ask that question is
10          because you've mentioned that you had a meeting
11          with Mr. Byrne at a restaurant in D.C. --
12     A.   Correct.
13  Q.      -- and your affidavit mentions at least one
14          other meeting.  So that's what I'm referencing.
15          Was there a standard operating procedure with
16          respect to when you did meet with Mr. Byrne?
17     A.   No.  It's just, if he had something to turn
18          over, I called Dave Smith, and Dave said let's
19          meet.  That simple.
20  Q.      Okay.  Was there any specific location that was
21          designated for these meetings?  Like, as I said,
22          you mentioned a restaurant.  There's another
23          meeting in your affidavit that's mentioned in a
24          parking lot at an airport.  So I'm just trying
25          to get to like why were these locations
```

Page 51

```
 1          selected.  Out of convenience?  Or was it
 2          just -- Was there a purpose behind them?
 3     A.   Yeah.  I think Dave Smith, maybe he lived out
 4          that way, west of D.C.  He selected that
 5          restaurant location.  But at the D.C. meeting at
 6          the cell phone parking lot of Reagan Airport, at
 7          the time I was leaving.  I have tons of other
 8          business I do in Washington, D.C.  This was just
 9          almost incidental to that.  And so when Dave set
10          the time for the meeting, I said, okay, I'm
11          going back to Boston, so if you want to meet, if
12          you want to meet, I got to get on a plane and
13          get out of there.  So that's the only reason the
14          meeting was held there.
15     Q.   All right.  Were you in D.C. at that time
16          specifically for the meeting or just happened to
17          be that you're in the area?
18     A.   No.  I have 25 meetings every time.  Not 25.
19          I have a bunch of meetings.  Whenever I go to
20          D.C., I try to -- all the cases I do.  And I
21          literally said to Dave, if you want to meet him,
22          I'm going to be here this day, and Dave said,
23          okay, then let's just set the meet up and we'll
24          go from there.  So this was just an incidental
25          meeting to all the other stuff I was working on.
```

Page 52

```
 1    Q.   And the purpose of that meeting was for
 2         Mr. Byrne to pass along information to you
 3         and/or Mr. Smith; correct?
 4         A.  No.  The purpose of the meeting was to pass
 5         along the information to Mr. Smith, not me.
 6    Q.   Okay.  Just doing a Google search of this
 7         Supervisory Agent Thibault.  From what I am able
 8         to tell, it says that he resigned over the
 9         handling of the Hunter Biden case.  Is that your
10         understanding?
11         A.  That is not my understanding.  My
12         understanding was, it was more sort of his
13         procedures inside and working were not DOJ
14         protocols, and I don't know if it's the
15         Hunter Biden case or other cases.
16    Q.   What's the basis for your understanding in that
17         regard?
18         A.  I have other cases that have nothing to do
19         with Hunter Biden, I have other cases that have
20         nothing to do with Pat Byrne, and I have -- and
21         within the context of at least one of those
22         cases, that's my understanding.
23    Q.   Did Agent Smith, Special Agent Smith communicate
24         that to you?
25         A.  No.
```

Page 53

```
 1   Q.   Okay.  Was there a -- When you were acting as
 2        Mr. Byrne's quote-unquote handler, was there, as
 3        you understood it, a standard operating
 4        procedure for how Mr. Byrne would turn over
 5        material to either you or Special Agent Smith?
 6   A.   I want to be very clear.  You keep saying the
 7        same thing, and I want to correct you.  He never
 8        handed anything over to me.
 9   Q.   Okay.
10   A.   There was no standard operating procedure.
11        You told me at the beginning of this deposition
12        you weren't going to try to trick me.  You
13        continue to do that.  I would appreciate you
14        stop doing that.  I've answered that question a
15        number of times.  Any materials turned over were
16        directly between Mr. Byrne and Agent Smith.  Do
17        you understand me?
18   Q.   I do.  And I --
19   A.   Thank you.
20   Q.   -- apologize.  I'm just trying to be thorough.
21        So I'm not trying to implicate you or anything
22        like that.  I will, I'll correct my question.
23   A.   Thank you.
24   Q.   So did you have an understanding of any standard
25        operating procedure by which Mr. Byrne would
```

Page 54

1       turn over materials to Mr. Smith or anybody else

2       in Team America, as you've described it?

3    A.  No.  There was no established protocol or

4       operating procedure.  No, sir.

5  Q.  How about a standard operating procedure with

6       respect to how Mr. Byrne obtained material or

7       made recordings that he would eventually turn

8       over to Mr. Smith or Team America?

9    A.  Yeah.  Nope.  No standard operating

10      procedure.  No discussions of that whatsoever,

11      no.

12  Q.  I'm going to ask some questions about this group

13      that you've mentioned, Team America.

14    A.  Yup.

15  Q.  Did you have any understanding or consider

16      yourself to be a member of that group,

17      Team America?  It sounded like you did, but I

18      just want to clarify.

19    A.  It's a great question.  Because of all the

20      involvement, having nothing to do with

21      Patrick Byrne, and years of involvement in

22      providing consultation and expertise to members

23      of that group, I would say yes.  I was no longer

24      a member of the government.  But the matters

25      that I work on, financial crimes, that they

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1              would ask me about or other types of things
 2              involving immigration or things like that, that
 3              group and I were regularly involved, engaged in
 4              so many matters.  So I hope that puts a little
 5              color on your question.  But yeah.  I was just
 6              really close with the guys and really a liaison
 7              and it was a very bilateral sort of symbiotic
 8              relationship to do the right things in cases.
 9      Q.     I'm going to get into your background when we
10              talk about the affidavit, because you describe
11              your background a little bit in there.
12              A.  Correct.
13      Q.     With respect to your involvement with this
14              group, this Team America, was your involvement
15              in the context as a private citizen?
16              A.  Oh, yes.
17      Q.     Okay.  Approximately how many people did you
18              understand were a part of this Team America?
19              A.  A moving number.  At any meeting there might
20              have been four or five or six different people.
21      Q.     Kind of case specific or context specific --
22              A.  I would say yes.  Yes.  I would say yes.
23              Yes.
24      Q.     Did you ever have any meetings with this
25              Team America group that concerned or involved
```

Page 56

```
 1          Hunter Biden in any way other than -- I'll just
 2          leave it at that.
 3          A.  Yeah.  No.  No, sir.
 4     Q.   Okay.  And forgive me.  I just -- I want to just
 5          get a complete understanding.  Because there's
 6          been testimony in this case about some things,
 7          and so I just want to get a clear understanding
 8          of what was going on with that group.
 9                      You had said that -- and
10          correct me if I'm wrong -- it was essentially a
11          group organized within the FBI but then there
12          might be some coordination with other government
13          agencies; correct?
14          A.  Yes, sir.
15     Q.   Did you have an understanding that any of those
16          agencies or members of that group were CIA or
17          NSA or any other specifics?
18          A.  I can't be specific about that.  But I have,
19          you know, the clearances and all that.  But yes.
20          It's other agencies.  The answer, to be as
21          helpful as I can be, yes, other agencies.
22     Q.   How long were you involved with or a member of
23          this Team America?
24          A.  Probably, in total, I would say probably at
25          least -- probably close to three years.
```

Page 57

```
 1   Q.   Can you give an estimate of that, what three
 2        years you're referring to?
 3        A.  I would say if you -- Let me -- This would be
 4        a guess.  I'm just trying -- '21, '22.
 5   Q.   I don't want you to guess.  If you have an
 6        estimate --
 7        A.  Yeah.  I'll estimate.  I'll estimate for you,
 8        Zach.  I would say, starting -- estimate around
 9        end of 2019, 2020, something like that.
10   Q.   That's when your involvement began?
11        A.  Yes.
12   Q.   Okay.  So then, taking those dates, you said
13        approximately three years, that would take us to
14        approximately 2022, 2023?
15        A.  Yeah.  Right up until the time -- You just
16        Google'd Thibault.
17   Q.   Yes.
18        A.  So pretty much right up until the time he got
19        into trouble.
20   Q.   Okay.  Have you ever heard Mr. Byrne use the
21        term "League of Shadows"?
22        A.  I have, yes.
23   Q.   In what context do you understand Mr. Byrne was
24        using that term?
25        A.  More of another -- I would call it
```

Page 58

```
 1          Team America.  He might call it League of
 2          Shadows.  You know, just, you know, some
 3          pen name he would put on groups like that, yeah.
 4   Q.     It was your understanding that, when he used the
 5          term "League of Shadows," he was referring to
 6          the same group you're referring to as
 7          Team America.
 8   A.     Well, I think he would refer to that group,
 9          yes.  But that could also refer to other groups
10          as well.  I don't know how many times he's used
11          the term.  But at least, when speaking to me,
12          the group that I was working with, he would use
13          that term.  I don't know if he meant that for
14          other groups he's worked with or hasn't worked
15          with.  I have no idea.
16   Q.     Okay.  Have you ever referred to the group as
17          League of Shadows?  Is that a term that members
18          of the group would use --
19   A.     No.
20   Q.     -- or just Mr. Byrne?
21   A.     I wouldn't use that term.  I would use
22          Team America but...  That's not my terminology,
23          no.
24   Q.     Have you heard anybody other than Mr. Byrne use
25          that terminology?
```

Page 59

```
 1          A.  No.
 2                      MR. HANSEN:  Okay.  We've been
 3      going for about an hour.  Do you want to take
 4      a -- We can take a quick break.  Unless you want
 5      to keep going, Mr. Moynihan.
 6                      THE WITNESS:  Yeah.  Take a
 7      quick break.  I'll just hit the head.  I'd
 8      rather keep going because I've got a lot of work
 9      I've got to get done.  But I want to answer all
10      your questions thoroughly and accurately.  So
11      take a five-minute break or something.  But I
12      want to just sort of keep moving so I don't hold
13      up other things, if that --
14                      MR. HANSEN:  Absolutely.
15                      THE WITNESS:  Okay.  Good.
16                      THE VIDEOGRAPHER:  Do you want
17      to go off?
18                      MR. HANSEN:  Yeah.  Let's go
19      off the record, please.
20                      THE VIDEOGRAPHER:  The time is
21      11:04.  We're going off the record.
22                      (Recess taken at 11:04 a.m.
23                      Deposition resumed at
24                      11:14 a.m.)
25                      THE VIDEOGRAPHER:  We are back
```

Page 60

```
 1            on the record.  The time is 11:14.
 2   Q.   Mr. Moynihan, do you understand that the oath
 3        you took earlier this morning is still in full
 4        force and effect?
 5        A.  Yes, sir.
 6   Q.   And are you still able to provide your best
 7        testimony today?
 8        A.  Yes, sir.
 9   Q.   Thank you.
10        We've talked a little bit about this FBI Agent
11        David Smith.  I want to dig into him a little
12        bit.  When did you first meet or have contact
13        with Special Agent Smith?
14        A.  At the beginning of that three-year time
15        period.
16   Q.   So around the 2019, 2020 time period that you
17        referenced before?
18        A.  Yes.
19   Q.   What were the circumstances or reasons for that
20        initial contact with David Smith?
21        A.  I'm regularly solicited by federal agents for
22        my years of experience in financial crimes.  And
23        so I hear from agents in agencies regularly
24        about can you help us with this type of case or
25        that type of case.
```

Page 61

```
 1   Q.   Did Agent Smith initiate that communication with

 2        you, the initial contact?

 3        A.   Another agent.

 4   Q.   Did the initial contact with Special Agent Smith

 5        have anything to do with Hunter Biden or this

 6        litigation, the substance of this litigation?

 7        A.   No.

 8   Q.   Did it have anything to do with Mr. Byrne?

 9        A.   No.

10   Q.   Mr. Byrne came into the picture after you had

11        had a relationship with Mr. Smith.

12        A.   Correct.

13   Q.   Had you -- Other than what you've previously

14        testified about this meeting at the D.C.

15        restaurant and the meeting in the airport

16        parking lot, have you met with Agent Smith in

17        person other than those two incidences?

18        A.   Yes.  To be clear, there was no meeting in a

19        D.C. restaurant.  It was west of D.C.

20   Q.   West of D.C.

21        A.   I think it might have been like the

22        Town of Westin.  And, then, to answer your

23        question, I've had many meetings with agents.

24        Many.

25   Q.   Let me narrow this down a little bit, then.
```

Page 62

```
 1        Other than those two meetings that we just
 2        talked about, have you had any in-person
 3        meetings with Agent Smith concerning
 4        Hunter Biden or the allegations as you
 5        understand them in this lawsuit?
 6     A.  No.
 7  Q.  Have you had any meetings that Mr. Byrne was
 8        present, any meetings with Special Agent Smith,
 9        other than those two that we just talked about,
10        the meeting at the restaurant west of D.C. and
11        the meeting at Ronald Reagan Airport?
12     A.  No.  Not that I can recall, no.
13  Q.  When was the last time you spoke to
14        Special Agent Smith?
15     A.  I'm trying to think when Tim Thibault -- When
16        Tim Thibault had the group disbanded, it was in
17        and about that time.
18  Q.  When the group was disbanded was the last time
19        you had conversation with Special Agent Smith,
20        is what you're saying?
21     A.  Correct.
22  Q.  Okay.  When was the last time you spoke to
23        Special Agent Smith about Hunter Biden or the
24        allegations as you understand them in this
25        lawsuit?
```

Page 63

```
 1          A.  At the meeting at Ronald Reagan Airport, the
 2          cell phone parking lot at Ronald Reagan Airport.
 3     Q.   There haven't been any other not in-person
 4          meetings, meaning, over the phone or via Signal
 5          app with Special Agent Smith concerning
 6          Hunter Biden?
 7          A.  No.
 8     Q.   Okay.  Did you ever communicate to Mr. Byrne
 9          that you understood Special Agent Smith to have,
10          quote, gone off the grid, meaning, that you're
11          unable to contact him?
12          A.  Following the disbanding of the group -- I
13          don't know if I said that to Pat Byrne or not.
14          But to be quite frank, yes, that all of a sudden
15          we don't know what happened to him or his group.
16     Q.   Was that notwithstanding your attempts to
17          contact Mr. Smith, you weren't able to get ahold
18          of him?
19          A.  Correct.
20     Q.   Were you attempting to contact Mr. Smith
21          regarding anything related to Hunter Biden or
22          the allegations in this lawsuit as you
23          understand them?
24          A.  No.
25     Q.   Okay.  Did you ever tell Mr. Byrne that you
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1          and/or others had tried to reach
 2          Special Agent Smith's wife and kids or locate
 3          them?
 4          A.  Say that again.
 5   Q.     Did you ever communicate to Mr. Byrne that you
 6          had -- you or somebody else that you know of had
 7          attempted to contact Special Agent Smith's wife
 8          and kids in an effort to locate him?
 9          A.  I don't recall that.  I don't know.  I don't
10          recall that.
11   Q.     Okay.  So just to clarify.  You just -- You
12          don't recall that that happened or you don't
13          believe that that happened.
14          A.  I just don't recall it.
15   Q.     Okay.
16          A.  So long ago, you know.
17   Q.     Sure.  At some point in time, subsequent point
18          in time, did you -- were you later informed that
19          Special Agent Smith had, quote, -- and I'm just
20          using this as terminology -- came back onto the
21          grid or you knew his whereabouts?
22          A.  I knew that he did come back on the grid or
23          his FBI location.  I learned that later on, yes.
24   Q.     How did you learn that information?
25          A.  Just from other people in the field, not
```

Page 65

```
 1          Mr. Byrne.
 2     Q.   When you say "other people in the field," do you
 3          mean members of this Team America?
 4     A.   Yes.
 5     Q.   Did you ever personally try to contact
 6          Special Agent Smith's wife and kids?
 7     A.   No.  I don't recall trying to contact his
 8          wife and kids.  I don't recall that, no.
 9     Q.   Did anybody else tell you that they had done so
10          or attempted to do so?
11     A.   I don't recall, no.  If I could recall -- I
12          just can't recall that.
13     Q.   And like I said before, if you don't know -- If
14          the answer's I don't know, as long as it's the
15          truth, that's all I want.
16     A.   Yeah.  I just don't recall it.  I don't know.
17     Q.   Okay.  You said that -- When you did learn that
18          this Agent Smith had come back on the grid, as
19          I've been saying, where did you understand that
20          Agent Smith was at that time?  I think you said
21          his field office assignment or something along
22          those lines?
23     A.   Yeah.  He came -- what I understand is he
24          came back quote-unquote onto the grid into a
25          different functioning group.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    Q.    Where specifically was he located, do you
 2          recall?
 3          A.   Well, in the D.C. area.
 4    Q.    Okay.  Did you have an understanding that it was
 5          the Washington, D.C., FBI field office that he
 6          was stationed at?
 7          A.   I didn't have an understanding of that.
 8          There's multiple locations.
 9    Q.    Okay.  Do you know whether Special Agent Smith
10          and Mr. Byrne have had communications between
11          themselves since this -- since that
12          Ronald Reagan meeting, Ronald Reagan Airport
13          meeting?
14          A.   I do not know.
15    Q.    Do you know Special Agent Smith's badge number?
16          A.   I do not, I do not know it.
17    Q.    Do you know his phone number?
18          A.   I knew his phone number.  But the FBI
19          regularly changes their phone numbers.
20    Q.    Okay.  So you don't presently know his phone
21          number.
22          A.   I do not.
23    Q.    How about his e-mail address within the FBI?
24          A.   I never contacted him, that I can remember,
25          so I don't know.
```

Page 67

```
 1   Q.   What was the last phone number that you had that
 2        was associated with the -- that you understood
 3        to be associated with Mr. Smith?
 4        A.   Oh, boy.  Well, I'm going to have to like
 5        take my phone here and -- I hope I don't lose
 6        you guys.  Do you want me to do that?
 7   Q.   Let's do it on maybe a break or something.  We
 8        can double back on that; okay?
 9        A.   Yeah.  And once again, I'll look at it.  But
10        as you know, on the Signal, when you communicate
11        on Signal, a lot of times you don't even know
12        the phone number.  Right?
13   Q.   Yup.  Understood.  Is that how you would
14        communicate --
15        A.   Yeah.  Signal.  So I can try but -- I don't
16        want you to think I'm holding out on you.  If I
17        try -- But I don't know if I can get it out of
18        Signal.  It may not populate, you know.
19   Q.   Okay.  After the deposition, we'll seek that
20        from your attorney, whether or not you have the
21        number.
22        A.   (Witness nods head).
23   Q.   Typically, my experience, if you have someone in
24        Signal, the contact information is in the phone
25        somewhere or something.  But I'll let you look
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        at that.  I want to dig in on these Signal
 2        communications.
 3                      So just to be clear, your
 4        primary means of communication with Mr. Smith
 5        was through Signal?
 6        A.  Yes.
 7   Q.   Did you ever text with him outside of Signal?
 8        A.  I don't recall.
 9   Q.   Did you ever have direct phone calls with him?
10        A.  Via Signal, yes.
11   Q.   Okay.  E-mails with Mr. Smith?
12        A.  No.
13   Q.   All right.  Going back to your role as
14        Mr. Byrne's quote-unquote handler.  Do you have
15        any knowledge of a two- to three-day course that
16        the FBI put together about the intelligence
17        career of Mr. Byrne?
18        A.  No.
19   Q.   Did you ever go through any sort of course that
20        the FBI put together regarding Mr. Byrne?
21        A.  No.
22   Q.   Other than Special Agent Smith, have you
23        introduced Mr. Byrne to any other FBI agent in
24        the context of Mr. Byrne's claims regarding
25        Hunter Biden?
```

Page 69

```
 1         A.  No.
 2    Q.   In and around January 2021, as an estimate, did
 3         you tell Mr. Byrne that this task force or
 4         Team America was looking out for him and to
 5         continue operating with respect to his
 6         investigations?
 7         A.  No.
 8    Q.   How about to keep charging with respect to
 9         investigations into the 2020 election?
10         A.  Repeat the question.
11    Q.   Did you ever, -- Similar question.  -- did you
12         ever tell him that this Team America or this
13         task force essentially had his back and to
14         continue investigations into the 2020
15         presidential election?
16                        MR. MURPHY:  Well, I'm going to
17         object to the question, I'm going to object to
18         the question.  It's irrelevant.  It's not
19         designed to lead to the discovery of admissible
20         evidence.
21                        Go ahead, Counsel.
22                        MR. DELLA ROCCA:  I'm going to
23         double that objection as irrelevant.
24                        MR. HANSEN:  Okay.  I'll just
25         represent that these are, these are claims that
```

Page 70

```
 1          Mr. Byrne has made under sworn testimony.  So I
 2          am following up on claims that Mr. Byrne made.
 3          That's the relevance.
 4                    MR. MURPHY:  Well, whether
 5          Mr. Byrne answered a question at a deposition
 6          doesn't make it relevant.  And because this,
 7          this tape may be used for trial, I'm going to be
 8          stating trial objections.  And any work that was
 9          done in connection with the election or what
10          Mr. Byrne's political views are or that he's a
11          Trumpster, doesn't like President Biden, are all
12          irrelevant, they're character evidence, and
13          they're inadmissible under Federal Rule of
14          Evidence 404(b).  So I'm making my objection.
15          And at the appropriate time, if we use the
16          deposition transcript, I'm going to highlight
17          this passage and testimony and bring it to the
18          judge's attention and ask him to rule the jury
19          can't see it.
20                    MR. DELLA ROCCA:  And Zach, if
21          you can explain the relevance to Hunter, then
22          maybe I'll withdraw my objection.  But I object
23          to this line of questioning.  What does the
24          election have to do with Hunter?
25                    MR. HANSEN:  These are claims
```

Page 71

1        that Mr. Byrne was not asked about.  He

2        volunteered this information at his deposition,

3        with respect to stuff that Mr. Moynihan

4        specifically told him.  So I'm just following up

5        on those things.  So I disagree.  I think that

6        it is very relevant.  But we'll move on.  That's

7        why I asked the question.

8                        MR. MURPHY:  My objection

9        rights are for the record.  My objection is

10        noted for the record and --

11                        MR. HANSEN:  It's noted.  We're

12        going to move on.

13                        Thank you, Mr. Murphy.  We're

14        going to move on.

15   Q.   In and around the spring of 2021, Mr. Moynihan,

16        did you tell Mr. Byrne that this Team America

17        task force was looking out for him and to keep

18        charging forward with unearthing information he

19        was seeking about Iran?

20   A.   I don't recall that, no.

21   Q.   In and around spring of 2021, did you provide

22        directions to Mr. Byrne to obtain certain

23        material being provided by hacking groups for

24        any reason?

25   A.   On behalf of who?

Page 72

```
1    Q.    Quote-unquote hacking groups.

2          A.  No.  I don't know what that is.

3    Q.    Have you ever acted as a conduit for

4          communications between the United States Drug

5          Enforcement Administration and Mr. Byrne?

6          A.  No.

7    Q.    Did you ever communicate to Mr. Byrne that any

8          DEA agent said anything about anyone in

9          Venezuela trying to kill or kidnap Mr. Byrne?

10                        MR. MURPHY:  Okay.  I'm going

11         to --

12                        MR. DELLA ROCCA:  Objection.

13                        MR. MURPHY:  Wait a minute.

14                        I'm going to object to all of

15         these questions about Venezuela on the grounds

16         it's irrelevant to the subject matter of this

17         action, it's not designed to lead to the

18         discovery of admissible evidence, has nothing to

19         with Patrick Byrne, and has to do with the

20         dispute about where he's supposed to have his

21         deposition taken.  And at the appropriate time,

22         I'm going to ask the judge to not allow the jury

23         to see any of this testimony.

24                        MR. DELLA ROCCA:  And I object.

25         I'm not sure what this has to do with this --
```

Page 73

```
 1          what the relevance of these questions are having
 2          to do with Hunter Biden and his defamation case
 3          against Mr. Byrne or Mr. Moynihan's involvement
 4          in connecting Mr. Byrne with Mr. Smith.
 5                         MR. HANSEN:  And your
 6          objections are noted.
 7                         And Mr. Della Rocca, I
 8          understand and I appreciate that you haven't
 9          been present in some of these other depositions.
10                         So I'm asking relevant
11          questions.  I understand that both of you might
12          not think so.  But your objection is noted for
13          the record.  It'll be something for the judge to
14          deal with.
15                         But right now, I'm going to
16          insist on an answer to the question.
17                         MR. DELLA ROCCA:  Okay.  Then
18          I'm going to keep my objection there.
19                         John --
20                         Go ahead and ask the question
21          one more time, please.
22                         MR. HANSEN:  And with your
23          objections noted, I don't want to waste any more
24          time, so I'm going to ask the same question.
25          Your objections are noted.
```

Page 74

```
 1   Q.    Mr. Moynihan, did you at any point in time ever
 2         communicate to Mr. Byrne that any DEA agent said
 3         something to anyone -- or said something about
 4         anyone in Venezuela trying to kill or kidnap
 5         Mr. Byrne?
 6   A.    No.  I don't recall any of that.
 7   Q.    Did you ever communicate to Mr. Byrne that any
 8         person or entity was trying to kill or kidnap
 9         him?
10                   MR. MURPHY:  Okay.  Same
11         objection.  Question seeks information which is
12         irrelevant to the subject matter of this
13         lawsuit.  It's not designed to lead to the
14         discovery of admissible evidence.  This has to
15         do with a dispute about where Mr. Byrne's
16         deposition was supposed to be taken.  Doesn't
17         relate to the defamation claim, doesn't prove
18         anything or have anything to do with the malice
19         issue of the case.  And it's just, once again,
20         character evidence, it's trying to be as
21         improperly under Federal Rule of Evidence
22         404(b).
23                   MR. DELLA ROCCA:  And I object
24         as well.  And because, also, it sounds like it
25         was already asked and answered.
```

Page 75

```
 1                      MR. HANSEN:  My second question
 2      was more broad, not involving Venezuela.
 3      Anybody anywhere.
 4                      But your objections are noted.
 5                      And Mr. Murphy, I understand --
 6      I'm trying to move this along, so you can just
 7      say same objections and I'll note that it's the
 8      same objections you asserted before.
 9   Q. Mr. Moynihan, I'm going to insist on an answer,
10      unless your attorney tells you not to.
11                      MR. DELLA ROCCA:  Go ahead and
12      answer.
13   A.  I don't recall, no.
14   Q. Okay.  Did you meet with -- Or let me -- You
15      don't recall or didn't happen?
16   A.  I don't recall.  I have no idea.
17   Q. Okay.
18   A.  Yeah.
19   Q. Okay.  And like I said, I'm not trying to trick
20      you.  I'm just trying to get a clear record.
21   A.  I'm just trying to be as direct and as honest
22      with you as possible.  I mean, some of these
23      questions, I don't even -- I don't know.  I
24      don't understand any of this, you know.
25   Q. I understand.  I appreciate where it can seem
```

Page 76

```
 1        like it's coming out of left field, having no
 2        context.  So I will move on.  And I appreciate
 3        you're doing everything that you're -- that I
 4        need you to do, and that's just to tell the
 5        truth to the best of your recollection.  So I
 6        appreciate that.
 7     A.  Sure.
 8  Q.  Did you meet with Mr. Byrne in and around
 9        January or February 2022 in a Washington, D.C.,
10        hotel lobby?
11     A.  Possibly.
12  Q.  Do you have any specific recollection of that
13        occurring?
14     A.  No.
15  Q.  Okay.  Do you have any specific recollection --
16        Let me just get a little bit more specific.
17        Same question with respect to a possible meeting
18        at a Washington, D.C., hotel lobby around
19        January or February of 2022 in which David Smith
20        was present?
21                    MR. MURPHY:  I'm going to
22        object to the question as calling for
23        speculation on the part of the witness.  You
24        asked him for the time period --
25                    MR. HANSEN:  I asked if he
```

```
 1          recalled.
 2                      MR. MURPHY:  You're
 3          interrupting, you're interrupting my objection.
 4          Let me state my objection.  You can do your
 5          question.
 6                      I have an objection in that as
 7          to the time parameter as to when the meeting
 8          occurred.  He wasn't able to answer your
 9          question.  And now you're doing a follow-up and
10          asking him to speculate.  He doesn't know.  And
11          on that basis, we object to the question.  And
12          the answer, we'll move to strike it.
13     Q.   Okay.  I'm not asking for any speculation,
14          Mr. Moynihan.  I'm asking whether or not you
15          have a memory.  I'm only adding the detail of
16          Mr. Smith being present to try to refresh your
17          recollection.  That's the only purpose.
18                      MR. MURPHY:  Same objection.
19     A.   I just don't recall.  Counsel is right.  I
20          just don't recall.  I'd be happy to answer yes
21          if I could, but I don't recall it.
22     Q.   Okay.  That's all I, that's all I want.
23          Did you ever inform Mr. Byrne that FBI Director
24          Christopher Wray had sent out a letter to all
25          35,000 or so FBI agents about Mr. Byrne and to
```

Page 78

```
 1        no longer have any contact with him?
 2        A.  I don't recall that.
 3   Q.   Do you have any recollection of the existence of
 4        such a letter?
 5        A.  No.
 6   Q.   Do you contend here today that Mr. Smith -- I
 7        keep saying mister and I keep going back between
 8        special agent.  -- Special Agent Smith is or was
 9        your handler within the U.S. government at any
10        point in time?
11        A.  I would say yes.  He was my main contact with
12        regard to this group, yes.
13   Q.   So when I use the term "handler," you understand
14        that as -- basically, you're interpreting that
15        as, he was your contact within this --
16        A.  Yeah.  As I mentioned before, that liaison
17        contact, yes.
18   Q.   Okay.  Did any third party establish that -- or
19        tell you that Special Agent Smith was going to
20        be your handler?
21        A.  No.
22   Q.   Have you ever traveled with Mr. Byrne to Europe
23        or met with Mr. Byrne in Europe for any reason?
24        A.  Yes.
25   Q.   When?
```

                                                    Page 79

```
 1              A.   Irrelevant.  Has nothing to do with this.
 2    Q.   Okay.  Let me say this:  How many times have you
 3         met with Mr. Byrne in Europe or traveled to
 4         Europe to meet with Mr. Byrne?
 5              A.   Once.  I can only recall once.
 6    Q.   And just to clarify your testimony.  You say
 7         that that occurrence is completely irrelevant,
 8         had nothing do with Hunter Biden or the
 9         allegations as you understand them in this
10         lawsuit.
11              A.   Correct, sir.  Yes.
12    Q.   Did it have to do with whistleblowers regarding
13         a complaint against Special Agent Jack Smith?
14                        MR. DELLA ROCCA:  Objection.
15         What does that have to do with the Hunter Biden
16         matter?
17                        MR. HANSEN:  That was, again,
18         the testimony --
19                        MR. MURPHY:  Also -- Let me
20         state my objection, and then you can respond,
21         Counsel.
22                        I'm also going to object on the
23         grounds that it's irrelevant, it's not designed
24         to lead to the discovery of admissible evidence.
25         It involves a collateral matter.  It could lead
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1            to confuse the jury about what they're supposed
 2            to be deciding in the case.  It's designed to
 3            mislead the jury.  And on that basis, I'm going
 4            to object to it on the Federal Rules of
 5            Evidence.
 6                          MR. DELLA ROCCA:  And I object
 7            based on relevance and because Mr. Moynihan
 8            works with a lot of people on a lot of different
 9            matters.  He's already told you he works with
10            Mr. Byrne on other matters.  So it is
11            irrelevant.  I'm going to object.  And I'm going
12            to tell him not to answer.
13    Q.    First and foremost, Mr. Moynihan, are you going
14            to take your attorney's advice and not answer
15            the question?
16    A.    Yes.
17                          MR. HANSEN:  Okay.  Just to
18            clarify, Mr. Murphy, there's no jury present.
19            This is a discovery matter.  And discovery is a
20            fishing expedition to obtain anything that is
21            potentially relevant and can potentially lead to
22            the discovery of admissible evidence.  That's --
23                          MR. MURPHY:  Okay.  I'm going
24            to, I'm going to respond.
25                          MR. HANSEN:  Don't, don't
```

Page 81

```
 1          interrupt me.  I am talking the same way I let
 2          you talk, so let me finish.
 3                         MR. MURPHY:  Okay.
 4                         MR. HANSEN:  It is designed to
 5          lead to the discovery of admissible evidence.
 6          Once again, these are statements and voluntary
 7          comments that your client made under oath.
 8          That's all I'm doing to follow up.  I'm not
 9          trying to confuse Mr. Moynihan or delve into
10          irrelevant matters.  His attorney has instructed
11          him not to answer.  I will accept that and I
12          will move on.
13                         MR. MURPHY:  No.  I want to, I
14          want to respond to your statement.
15                         This tape is going to be used
16          as evidence during trial, so the Federal Rules
17          of Evidence apply.  The judge ruled that the
18          Federal Rules of Evidence apply.  And one of the
19          Federal Rules of Evidence say, when somebody
20          tries to introduce evidence to confuse the jury,
21          and its relevance is minimal, that the court can
22          instruct you not to present that evidence to the
23          jury.
24                         So that's one of the objections
25          that we are going to be making when we submit
```

Page 82

```
 1          the deposition transcript.  We're going to ask
 2          the Court to not read it, any of these questions
 3          to the jury.
 4                         So the judge said both rules
 5          apply.  And this is potential trial testimony.
 6          I'm not instructing him not to answer.  All I'm
 7          doing is stating my objections for later.
 8                         MR. HANSEN:  As is your right,
 9          and your objection is noted.
10                         We'll move on.
11     Q.   Mr. Moynihan, we've touched on this a little
12          bit.  But did you sign an affidavit that you
13          understood was going to be submitted in this
14          lawsuit?
15          A.  Yes.
16     Q.   Who drafted that affidavit?
17          A.  I did.
18     Q.   Do you recall approximately when you drafted
19          that affidavit?
20          A.  Goodness.  I'd have to go into my computer.
21          I don't know.  A couple months ago probably.
22     Q.   Okay.  I'm just asking for if you remember.  If
23          you don't, that's fine.
24                         And I believe you testified
25          earlier that it was Mr. Byrne's attorney who
```

Page 83

```
 1            asked you to submit that affidavit; is that
 2            correct?
 3            A.  Yes.
 4      Q.    And is that person Mr. Murphy, who's present
 5            during this deposition?
 6            A.  No.
 7      Q.    Who was it that asked you to submit that
 8            affidavit?
 9            A.  Attorney Stefanie Lambert.
10      Q.    Okay.  Attorney Stefanie Lambert asked you to
11            submit an affidavit in this lawsuit.
12            A.  Yes.
13      Q.    Did you understand that that affidavit was going
14            to be submitted in any other lawsuit?
15            A.  No.
16      Q.    What did Ms. Lambert tell you about this
17            affidavit and what it needed to include, if
18            anything?
19            A.  Nothing.  She said to me, can you submit an
20            affidavit with regard to Mr. Byrne meeting
21            Mr. Smith.  I said absolutely.
22      Q.    That was the extent of the conversation?
23            A.  That's it.
24      Q.    Did Mr. Byrne tell you or communicate to you in
25            any way why he wanted you to submit an affidavit
```

Page 84

```
 1          or why his attorney did?
 2                         MR. MURPHY:  I'm going to
 3          object to the question as assuming facts not in
 4          evidence, had Mr. Byrne ever told him that.
 5                         MR. HANSEN:  I said, did he.
 6                         MR. MURPHY:  There's no, -- let
 7          me finish -- there's no foundation for that
 8          question.
 9                         MR. HANSEN:  Okay.  That's why
10          I said, did he ever tell you that.
11     Q.   Mr. Moynihan?
12     A.   He had called me and said I think there's
13          going to be a need for you to submit an
14          affidavit.  I said fine, have the lawyer call
15          me.
16     Q.   Did he tell you anything else about what needed
17          to be in the affidavit or what the purpose was?
18     A.   No.
19     Q.   As you sit here today -- And I'm going to show
20          you the affidavit here in just a moment.  But as
21          you sit here today and as you can recall, is
22          everything that you put into that affidavit the
23          truth to the best of your understanding?
24     A.   Yes, sir.
25                         MR. HANSEN:  All right.  I'm
```

Page 85

```
 1           going to mark the document that was produced by
 2           Mr. Byrne in this litigation as Bates Number
 3           Byrne_00001 through Byrne_00000 -- Five zeroes.
 4           I don't know if I've done more or not.   -- 3.
 5           And this will be Exhibit 3 to this deposition.
 6    Q.   Give me just a moment.  I'm going to put it on
 7           the screen for you.
 8                       (PAUSE)
 9    Q.   All right.  Mr. Moynihan, can you see the
10           document I'm displaying on my screen?
11           A.  Well, if it's the same one I have.  But let
12           me see.  I have it up on my screen.
13    Q.   I prefer if you'd look at my version, please,
14           because this is what has been submitted in this
15           litigation.
16           A.  Yeah.  I've got to blow this thing up because
17           it looks like it -- Oh, my God.
18                       MR. MURPHY:  Mr. Moynihan, can
19           you now read it?  Is it blown up or big enough
20           for you?
21                       THE WITNESS:  I'm trying to
22           blow it up.  If I blow it up, I can't keep the
23           whole thing on my phone.  I have to --
24                       MR. MURPHY:  Mr. Moynihan,
25           Mr. Moynihan, counsel will control the blowing
```

Page 86

```
 1          up because he -- That's the way the system works
 2          in the computer.
 3                          I'm not suggesting anything
 4          otherwise, Mr. Hansen.
 5                          So if you need Mr. Hansen to
 6          blow it up, ask him to blow it up and he'll do
 7          it for you.
 8     Q.   At your assistance --
 9     A.   Go ahead.  Yup.  Go ahead.
10     Q.   So I'm going to ask you questions about it.  All
11          I'm asking right now, tell me if you need to me
12          to blow it up or anything.
13     A.   Go ahead.  I think I can read it pretty good
14          now.  I'm fine.  Yup.
15     Q.   So my question right now is, do you recognize
16          this document?
17     A.   Okay.
18     Q.   I'll scroll through real quickly.  Three pages.
19                          MR. MURPHY:  Yeah.  I'm going
20          to object to him being questioned about a
21          document he hasn't looked at.  And I think he
22          should be, --
23                          MR. HANSEN:  I'm showing it to
24          him literally right now.
25                          MR. MURPHY:  Wait a minute.  --
```

Page 87

```
 1        I think he should be allowed to read it before

 2        you question him, to make sure that he's

 3        satisfied this is his affidavit.

 4                     MR. HANSEN:  Mr. Murphy, I

 5        appreciate your commentary.  But this is my

 6        deposition.  If you have objections to assert,

 7        assert your objections.

 8                     I'm just asking him if he read

 9        the document.  We'll get into the substance here

10        in just a moment.

11                     MR. MURPHY:  You asked him if

12        he read -- Counsel, the problem I have is,

13        you're asking him if he's read a document, and

14        he hasn't even --

15                     MR. HANSEN:  I didn't ask if he

16        read the document.  I asked if he recognizes the

17        document.  That's not what I asked.

18                     MR. MURPHY:  Well, he hasn't

19        even looked at it.

20                     MR. HANSEN:  Please keep your

21        commentary to a minimum so that we can move this

22        along.

23                     MR. MURPHY:  Counsel, you've

24        got to let him look at every single page.  If

25        you're going to ask him the question, have you
```

Page 88

1          read the document, he has to be able to see it.

2                         MR. HANSEN:  Mr. Murphy, please

3          limit your commentary to relevant objections.

4                         MR. MURPHY:  No.  I'm going to

5          state my objections for the record.

6                         I'm going to object to the

7          question on the grounds it calls for

8          speculation, because the witness has not been

9          shown the document and allowed to look at it,

10         each page, to make sure that is his affidavit.

11                        MR. HANSEN:  Are you done?

12                        MR. MURPHY:  And I'll move to

13         strike his testimony he has to render on this

14         document until he's looked at it.

15                        MR. HANSEN:  Are you finished?

16    Q.   I'll repeat my question.  Do you recognize this

17         document, Mr. Moynihan?

18    A.   Yes.  So why don't you just scroll all three

19         pages, just let me get to the bottom, see my

20         signature.

21    Q.   Yup.  And I'm going to ask you very specific

22         questions about your signature and everything.

23         Here's the signature page.  And there's nothing

24         below it.  This is the third page.

25    A.   Okay.  I recognize the document.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1                      THE WITNESS:  Oh, God.

 2          A.  Yeah, I recognize it.

 3      Q.  Based on what you've viewed on the screen thus

 4          far, is it your understanding that this is the

 5          affidavit you drafted for the purpose of being

 6          submitted in this litigation?

 7          A.  Yeah.  Just scroll it down or make sure

 8          there's no edits to it.  Just stop right there a

 9          a second.

10      Q.  I'm going to go through it in detail as well.

11          So you can let me know if anything's changed as

12          well.

13          A.  Just scroll to the next page.  Scroll to the

14          next page.

15      Q.  Okay.

16          A.  Let me just read it quick.  I'm a pretty good

17          reader.

18                      (PAUSE)

19          A.  Go to the bottom, please.

20                      (PAUSE)

21          A.  There you go.  Hold on.  Hold on.

22      Q.  Oh, sorry.

23          A.  Go ahead.  Go ahead.  Got it.  Good.  Yup.

24      Q.  In your review just now, did you see anything

25          that you believe was altered or -- as you said?
```

Page 90

```
 1          A.  I don't see anything altered, no.
 2     Q.   Okay.  And just to repeat my question.  Is it
 3          your understanding, based on what you've seen,
 4          that this is the affidavit that you drafted for
 5          the purpose of being submitted in this
 6          litigation?
 7          A.  Yes.
 8     Q.   Okay.  I'm going to scroll down to the last page
 9          where your signature is.
10          A.  Uh-huh.
11     Q.   Do you see this area where it looks like there's
12          signatures --
13          A.  Yes.
14     Q.   -- on this document?
15          A.  Yes.
16     Q.   Is that your signature above the line that says
17          John Moynihan?
18          A.  Yes.
19     Q.   And next to your signature, the date, April 2nd,
20          2024.
21          A.  Yes.
22     Q.   Is that correct?
23          A.  Correct.
24     Q.   Is that, to the best of your recollection, the
25          date that you signed this document?
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        A.  Yes.
 2   Q.   And it appears that you signed this document in
 3        the presence of a notary; is that correct?
 4        A.  Yes.
 5   Q.   I notice that this document, this affidavit is
 6        not signed under the penalty of perjury, as is
 7        standard practice when submitting affidavits in
 8        litigation.  Is there any specific reason why
 9        your affidavit was not signed under the penalty
10        of perjury?
11        A.  No.
12   Q.   Okay.  Was there any specific reason why you had
13        the document notarized?
14        A.  Just as a formality.
15   Q.   I'm going to scroll back up here.  And like I
16        said, we'll go through this.
17                    Did anyone assist you in
18        drafting this affidavit in any way?
19        A.  No.
20   Q.   Did you review any documents or audio recordings
21        to prepare this affidavit?
22        A.  No.
23   Q.   All right.  I'm going to direct your attention
24        to the first paragraph that starts with:  My
25        name is John Moynihan.  Do you see that?
```

Page 92

```
 1        A.  Yes.
 2   Q.   And once again, let me know if I need to blow it
 3        up; okay?
 4        A.  Go ahead.
 5   Q.   All right.  I'm going to read this portion to
 6        you.  It says:  My name is John Moynihan, and I
 7        am a private sector consultant.  Early in my
 8        career, I was the head intelligence analyst of
 9        money laundering investigations for the
10        U.S.  Drug Enforcement Administration's New York
11        field division.  I began this part of my career
12        in 1992.  Is that an accurate statement?
13        A.  Yes.
14   Q.   Before 1992, were you employed in any capacity
15        with the U.S. government?
16        A.  No.
17   Q.   How long were you the head intelligence analyst
18        and money laundering for the DEA's New York
19        office?
20        A.  Probably like three and a half years.
21   Q.   Until around 1995, 1996-ish?
22        A.  Yeah.  End of '95, into '96, yes.
23   Q.   Thereafter, did you transition to another
24        position within the DEA or the U.S. government?
25        A.  I was a private sector person, but they
```

Page 93

```
 1        maintained my clearances to be a consultant back
 2        to the money laundering group.
 3   Q.   Okay.  So if I understand you correctly, after
 4        your stent as the head intelligence analyst of
 5        money laundering in the New York office, you
 6        went -- your involvement with U.S. government
 7        thereafter was in your capacity in the private
 8        sector; correct?
 9   A.   Yes.
10   Q.   Okay.  I'm going to move on to the next portion
11        of that paragraph that says: -- let me see it --
12        I have continued...  And I can highlight this if
13        it's better.  I have continued to assist, --
14        That's where I'm starting.  -- I have continued
15        to assist the U.S. Department of Justice,
16        Homeland Security, and the DEA with financial
17        analytical support on worldwide money laundering
18        investigations, and I have counseled governments
19        and financial institutions around the world in
20        developing and implementing anti-money
21        laundering initiatives over the last 32 years.
22        Is that an accurate statement?
23   A.   Yes.
24   Q.   Were these activities as -- that are described
25        in the portion I just read in your capacity as a
```

Page 94

```
 1        private sector consultant, --
 2        A.  Yes.
 3   Q.   -- as you state --
 4        A.  Yes.
 5   Q.   Were these paid assignments?
 6        A.  Yes.
 7   Q.   Who was paying you for these assignments?
 8        A.  I can't get into that.
 9   Q.   Okay.
10                    MR. DELLA ROCCA:  I'm going to
11        object.
12   Q.   U.S. government?
13        A.  Yes.
14   Q.   Okay.  Were you working with Patrick Byrne in
15        doing any of these assignments at that time?
16        A.  No.
17   Q.   Are you currently employed by the law firm
18        Clark Hill as a special advisor?
19        A.  I'm not employed by them.  I'm a contractor
20        to Clark Hill.
21   Q.   Okay.  What are your primary responsibilities as
22        a contractor for Clark Hill?
23        A.  Litigation support.
24   Q.   And would that be involved in your
25        investigations in the private sector regarding
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1          money laundering, as you've described herein?
 2          A.  Yes.
 3   Q.     Okay.  In your role as a contractor special
 4          advisor for Clark Hill, you testified before the
 5          House Oversight Committee in 2018, did you not?
 6          A.  Yes.
 7   Q.     And that was regarding your investigation of the
 8          Clinton Foundation, a 501(c)(3) non-profit;
 9          correct?
10          A.  Yes.
11                       MR. DELLA ROCCA:  And I'm going
12          to -- I'm objecting.  And I'm wondering what the
13          relevance has to do with --
14                       MR. HANSEN:  I'm establishing
15          background.  That's really all that I was going
16          to go into that.
17                       MR. DELLA ROCCA:  Okay.
18                       MR. HANSEN:  I'm just trying to
19          get some of Mr. Moynihan's professional
20          background here.
21   Q.     Have you ever -- Have you had any other type of
22          employment or involvement other than what you've
23          described with the U.S. government since 1992
24          outside of what is described here?
25          A.  No.  Just personal consultation.
```

Page 96

```
 1    Q.   You are the principal of a company called

 2         JFN & Associate, LLC; is that correct?

 3         A.   Yes.

 4    Q.   What is the nature of the work that that company

 5         does?

 6         A.   Litigation support.  Globally, it's money

 7         laundering, assistance with transnational global

 8         crime of, you know, hoarding it, stopping it.

 9         That's the main thing.

10    Q.   Is that essentially just your LLC with respect

11         to your private sector work?

12         A.   Yes.

13    Q.   Okay.  I'm going to jump down to the fourth

14         paragraph here.  I'm going to scroll down.  It

15         starts with:  On or about the spring of 2021.

16         Do you see that?

17         A.   Yes.

18    Q.   And I'm going to read a portion to you.

19         On or about the spring of 2021, I met

20         Patrick Byrne.  That's what you described

21         previously, correct, your initial meeting with

22         Patrick Byrne?

23         A.   Correct.

24    Q.   And I believe you said that was the first time

25         you met Patrick Byrne or had any contact with
```

Page 97

```
 1        him; correct?
 2        A.  Yes.
 3   Q.   And again, I just want to clarify.  I know we
 4        went over this, so I'll breeze through this.
 5        But that initial meeting, the impetus for it was
 6        because Mr. Byrne had information regarding
 7        Hunter Biden; is that correct?
 8        A.  No.
 9   Q.   Okay.  I apologize for using that wrong.
10        Can you please explain to me what the initial
11        impetus was?  Was it completely unrelated to
12        Hunter Biden?
13        A.  Yes.
14   Q.   And the allegations that you understand them in
15        this lawsuit?
16        A.  Completely unrelated.
17   Q.   Okay.  Moving on with this paragraph.  You said
18        that Patrick Byrne discussed matters he had been
19        involved in in the past.  Subsequently Mr. Byrne
20        stated several matters to which I advised
21        Mr. Byrne that I would graciously introduce him
22        to an agent of the Federal Bureau of
23        Investigation if needed.  Mr. Byrne agreed that
24        he would like to be introduced to the FBI agent.
25        Is that an accurate statement?
```

Page 98

```
 1          A.  Yes.
 2   Q.   Did these matters that you described,
 3        subsequently Mr. Byrne stated several matters to
 4        me, did those matters involve Hunter Biden or
 5        the allegations as you understand them in this
 6        complaint -- in this --
 7                     MR. MURPHY:  Objection.  Asked
 8        and answered.
 9          A.  Nope.
10   Q.   In that meeting, did he mention anything about
11        Hunter Biden?
12                     MR. MURPHY:  Objection.  Asked
13        and answered.
14          A.  No.
15   Q.   So when you called Mr. Byrne, as described
16        herein, that you had introduced him to an FBI
17        agent, again, that had nothing to do with
18        Hunter Biden at that time; correct?
19                     MR. MURPHY:  Objection.  Asked
20        and answered.
21          A.  No.
22   Q.   Okay.  Just trying to get a clear record.
23                     MR. MURPHY:  I'm just trying to
24        get a clear objection.
25                     MR. HANSEN:  Thank you.
```

Page 99

```
 1   Q.    Is the FBI agent that you referenced herein
 2         Special Agent Smith?
 3         A.  It should say agents.  But yeah.  It would
 4         be, it would be Dave Smith, yes.
 5   Q.    Moving on to the next paragraph.  It says:  In
 6         turn, I requested.  I'm going to read this
 7         portioner.  In turn, I requested of that FBI
 8         agent if he had any interest in meeting
 9         Patrick Byrne.  And then moving on, it says:
10         The agent requested of me the matters Mr. Byrne
11         would discuss.  I did not know the matters to
12         which Mr. Byrne would present.  Is that an
13         accurate statement?
14         A.  Yes.
15   Q.    Okay.  Then it says:  The agent, sometime later,
16         stated to me that he would meet Mr. Byrne.
17         A.  Just where are you now?  Let's see.
18   Q.    Over to the second --
19         A.  Okay.  All right.
20   Q.    Right here.
21         A.  I did not know the matters...  Yes.
22   Q.    And this is all in that initial meeting or the
23         subsequent -- regarding the subsequent meeting
24         you had with Mr. Byrne that had nothing to do
25         with Hunter Biden; correct?
```

Page 100

1      A.  Correct.  Correct.  Yes.

2                       MR. HANSEN:  Okay.  Give me

3      just a moment here.

4                       (PAUSE)

5   Q.  Moving on to the next paragraph.  It states:  A

6      meeting was set up at a restaurant west of

7      Washington, D.C., district.  Do you see this

8      portion?

9      A.  Yes.

10  Q.  And it says:  The agent, myself, and Mr. Byrne

11     attended this meeting.  Is that an accurate

12     statement?

13     A.  Yes.

14                      (INTERRUPTION)

15                      MR. HANSEN:  What was that?

16                      THE WITNESS:  I don't know.

17  Q.  Going back to this meeting.  When approximately

18     did this meeting at the restaurant occur?

19     A.  I don't know.  I can't remember the date.

20  Q.  And you've described it being west of D.C., in a

21     town -- I can't remember what you said.  But do

22     you remember what the restaurant was?

23     A.  I can't remember the name, no.

24  Q.  Okay.  Was anyone else present at this meeting

25     other than you, Mr. Byrne, and Special

                                        Page 101

```
 1          Agent Smith?
 2     A.   I don't believe so, no.
 3  Q.  Are you aware of any prior communications
 4     between Mr. Byrne and Agent Smith prior to that
 5     meeting?
 6     A.   I am not.
 7  Q.  Was Hunter Biden discussed at this meeting?
 8     A.   No.
 9  Q.  Was anything related to the allegations in this
10     lawsuit as you understand them discussed at this
11     meeting at this restaurant west of D.C.?
12     A.   I'm not aware of it.  As my affidavit states,
13     multiple times I left the meeting because I had
14     other phone calls and business of my own to take
15     care of.
16  Q.  So you read my mind.  That's what I was going to
17     ask next.  It says -- Later on in this paragraph
18     it says:  Any discussions they had during my
19     absence were not germane to me.  Do you see
20     that?
21     A.   Yes, sir.
22  Q.  Okay.  How do you know that those discussions
23     were not germane to you?  Did they explain to
24     you what they discussed when you returned?
25     A.   No.  If they had been germane to me, they
```

Page 102

```
 1          would have raised them to me.
 2   Q.     Okay.  Moving on to the next paragraph.  Starts
 3          with:  Some time later.
 4          A.  Sometime later, yes.
 5   Q.     Sometime later, Patrick Byrne revealed to me he
 6          had in his possession a taped telephone
 7          conversation involving sensitive material
 8          involving high level Politically Exposed
 9          Persons.  Is that an accurate statement?
10          A.  Yes.
11   Q.     It says:  Sometime later.  So when
12          approximately -- How long after that meeting did
13          Mr. Byrne reveal that information to you?
14          A.  I can't remember exactly.
15   Q.     Do you recall how he communicated that
16          information to you or this statement?
17          A.  I can't recall whether it was in person or on
18          the phone.  I can't remember.
19   Q.     Did Mr. Byrne explain at that time what the
20          sensitive material on the tape was beyond what
21          is described here?
22          A.  No.
23   Q.     You said it was a taped telephone conversation.
24          Is that correct?  Is that your understanding?
25          A.  That's what he told me, yes.
```

Page 103

```
 1   Q.   Did he say anything about it being a recording

 2        of an in-person conversation or anything like

 3        that?

 4        A.   He did not.

 5                        MR. DELLA ROCCA:   Okay.   Zach,

 6        if we could take five minutes.

 7                        MR. HANSEN:   Yup.

 8                        MR. DELLA ROCCA:   It's noon.

 9        If we could just take a quick five minutes.   I'm

10        going to log in on my phone and then we can

11        proceed.

12                        MR. HANSEN:   Perfect.   However

13        much time you need.

14                        MR. DELLA ROCCA:   All right.

15        I'll let you know as soon as I'm ready to go.

16                        MR. HANSEN:   All right.   Let's

17        go off the record.

18                        THE VIDEOGRAPHER:   The time is

19        11:59.   We're going off the record.

20                        (Recess taken at 11:59 a.m.

21                        Deposition resumed at

22                        12:04 p.m.)

23                        THE VIDEOGRAPHER:   We are back

24        on the record.   The time is 12:04.

25   Q.   All right.   Mr. Moynihan, do you understand that
```

Page 104

```
 1          the oath you took this morning carries the same
 2          force and effect?
 3          A.  Yes.
 4    Q.    And are you still able to provide your best
 5          testimony today?
 6          A.  Yes.
 7    Q.    Okay.  When we left off -- Do you still see this
 8          document that's displayed on the screen, your
 9          affidavit?
10          A.  I actually don't see it now.  I don't know
11          where it is.  I got a big black corner in my
12          thing here.  There it is.  Just came up.
13    Q.    Got it?
14          A.  Yeah.  Let me...  There it is.  Got it.
15          Okay.  Got it.
16    Q.    Okay.  When we left off, we were talking about
17          this paragraph that starts with:  Sometime
18          later, and it describes Mr. Byrne had sensitive
19          material involving high level Politically
20          Exposed Persons.  That's where I'm going to pick
21          up; okay?
22          A.  Yes.
23    Q.    At this time, did Mr. Byrne elaborate on who he
24          was referring to as politically exposed persons?
25          A.  No.
```

Page 105

| 1 | Q. | Did he mention Hunter Biden? |
|---|---|---|
| 2 | | A.  I don't recall. |
| 3 | Q. | The next paragraph that starts with:  I |
| 4 | | contacted.  Let me see if I can -- Right here. |
| 5 | | It says:  -- Do you see this paragraph? |
| 6 | | A.  I do, yes. |
| 7 | Q. | -- I contacted the FBI agent to establish a |
| 8 | | meeting for Mr. Patrick Byrne to provide the |
| 9 | | taped telephone evidence directly to the Federal |
| 10 | | agent.  The evidence was to be in the form of a |
| 11 | | taped phone call recorded on Mr. Byrne's own |
| 12 | | telephone.  Is that an accurate statement? |
| 13 | | A.  Yes. |
| 14 | Q. | Is this FBI agent that you're referring to here |
| 15 | | Special Agent Smith? |
| 16 | | A.  Yes. |
| 17 | Q. | Did Mr. Byrne tell you before the meeting that |
| 18 | | the evidence was going to be in the form of a |
| 19 | | taped phone call? |
| 20 | | A.  Yes. |
| 21 | Q. | Okay.  And this is that same recording that we |
| 22 | | discussed before; right? |
| 23 | | A.  Yeah.  That's the only recording I know, yes. |
| 24 | Q. | Okay.  You go on to state -- Let me see here. |
| 25 | | Let me find my place.  Right here.  The phone |

Page 106

```
 1        call was, is where I'm looking at.  The phone
 2        call was to be a conversation between the son of
 3        the current Minister of Defense from Pakistan
 4        and a cabinet member of the Iran government.
 5        What is the basis -- What was the basis for
 6        making this statement?
 7                    THE WITNESS:  Just hold on a
 8        minute.  My phone is blowing up here.  This is a
 9        disaster.  I just had to respond to that phone
10        call to me.
11   A.   Sorry, Zach.  Could you just ask me the
12        question again.  I got all these calls coming
13        in.
14   Q.   Of course.  Of course.  And if you need a
15        minute, just let me know.
16   A.   No.  I don't.  I had a couple text messages.
17        I'm good.
18   Q.   So my question was, this statement, the phone
19        call was to be a conversation between the son of
20        the current Minister of Defense from Pakistan
21        and a cabinet member from the Iran government.
22        And my question is, what's the basis for you
23        making this statement?
24   A.   So that's what I recall sitting in the car.
25        Remember, I'm writing an affidavit
```

Page 107

```
 1          retrospectively.  What I remember in the car,
 2          that's what this was supposed to be between,
 3          what I heard Patrick say to David.
 4    Q.    Okay.  So Mr. Byrne didn't tell you prior to you
 5          listening to the recording.
 6    A.    No, I don't believe so, no.  I just remember
 7          it from the car meeting.  That's what I
 8          remember.
 9    Q.    Okay.  I'm going to move on to:  The call was to
10          reveal.  This next portion --
11    A.    Yeah.
12    Q.    -- of the statement.  The call was to reveal the
13          request by the Iranian person of the Pakistani
14          man to work on the release of Iranian government
15          funds seized in a bank account in North Korea.
16          Is this also a retroactive account having
17          listened to the conversation --
18    A.    Yes, yes, yes.
19    Q.    Mr. Byrne didn't tell you before the meeting any
20          of this substance, about an Iranian person or a
21          Pakistani man?
22    A.    Yeah.  I don't recall that, Zach.  No.  I
23          don't recall that.
24    Q.    Okay.  The last sentence says:  The call was to
25          involve Hunter Biden's assistance in getting the
```

Page 108

```
 1           funds released.  Once again, is this your
 2           retroactive account?
 3           A.  Yes.
 4   Q.  The next paragraph says that Patrick Byrne,
 5           myself, and the FBI agent met.  The purpose of
 6           the meeting, as stated before, was to turn over
 7           this agent the taped phone call between the
 8           above identified persons.  The meeting took
 9           place in the agent's automobile in the cell
10           phone parking lot of Ronald Reagan National
11           Airport.  Is that an accurate statement?
12           A.  Yes.
13   Q.  Do you recall approximately when that meeting
14           took place?
15           A.  I don't remember the date, no.
16   Q.  And I believe you testified earlier that the
17           location, being the parking lot at Ronald Reagan
18           National Airport, was because you were flying
19           somewhere; correct?
20           A.  Yeah.  The cell phone parking lot.
21   Q.  Cell phone parking lot.
22           A.  It's right before you enter the, you know,
23           the airport grounds, on the right.
24   Q.  Yup.  So you're the one that picked that
25           location out of convenience.
```

Page 109

```
 1          A.  Well, David Smith picked that location.  I

 2          just told him, I said, I'm going to introduce

 3          you to Pat, I got to get on the plane to get out

 4          of here, what do you want to do, and he said,

 5          we'll go there.  He picked that location, the

 6          agent.

 7     Q.   That was the only reason that location was

 8          selected --

 9          A.  Yes.

10     Q.   All right.  And the last paragraph here on this

11          page, it says:  Patrick Byrne proceeded to play

12          the tape on the speaker of his telephone.  I had

13          not heard the tape prior to this moment.  Is

14          that an accurate statement?

15          A.  Yes, sir.

16     Q.   And you said earlier that there's only one tape

17          you've ever heard.  Is that this tape?

18          A.  Yes.

19     Q.   Is that correct?

20          A.  Yes, sir.  In that moment.  At that time.

21          That's the only --

22     Q.   At that time.

23          A.  Correct.

24     Q.   Okay.  Have you heard the tape that is

25          referenced here played at any point in time
```

Page 110

```
 1          since that meeting at the Ronald Reagan Airport?
 2          A.  I have not.
 3     Q.   All right.  The rest of the paragraph says,
 4          starting with:  The contents of, the contents of
 5          the tape did in fact reveal the exchange between
 6          the participants involving the request to seek
 7          assistance of the release of Iranian government
 8          monies banked in North Korea.  One participant
 9          in the conversation did reveal the name
10          Hunter Biden and that assistance involving him
11          would be requested.  The tape also included a
12          statement by one person that assistance through
13          Hunter Biden would necessitate the involvement
14          of law firms in the Washington, D.C., area.  The
15          names of those law firms were not revealed.  Is
16          that an accurate statement?
17          A.  Yes.  That's exactly how I remember it, yes.
18     Q.   And I know you said you don't recall necessarily
19          when this meeting took place.  Was it before
20          this Team America was disbanded, as you've
21          described?
22          A.  Yes.
23     Q.   So that would have been sometime around 2022 or
24          so?
25          A.  Yes.  Before the disbanding, yes.
```

Page 111

```
 1   Q.   Okay.  When you actually heard the recording,
 2        based on your own recollection, having listened
 3        to it, did it sound to you like it was a
 4        recording of a telephone conversation as
 5        described by Mr. Byrne previously?
 6        A.  I would say yes.
 7   Q.   And why do you believe that to be the case, when
 8        you say "I would say yes"?
 9        A.  It seemed like there were pauses.  You know,
10        is the describe blue?  Yes.  Almost like, almost
11        like the people were not in the same room.
12   Q.   Okay.  Almost like it was a one-sided telephone
13        conversation, like you're only hearing one side
14        of it?
15        A.  No.
16   Q.   Okay.
17        A.  That's not what I said.
18   Q.   Okay.
19        A.  It seemed like there were pauses between the
20        questions and responses, yeah, which would
21        indicate to me telecommunications.
22   Q.   Did you hear Mr. Byrne's voice on the recording?
23        A.  No.
24   Q.   How many voices did you hear on the recording?
25        A.  Two.
```

Page 112

```
 1    Q.    Were those voices, based on your recollection,

 2          were they speaking over the playing of like an

 3          underlying recording, if that makes sense?

 4          A.  I'm not that technologically sound.  I

 5          wouldn't know.

 6    Q.    No.  I appreciate that.

 7          Based on your own perception, did it sound like,

 8          to you, that there was a conversation going on

 9          and then there was some sort of a recording

10          being played under the conversation that the

11          conversation was about?

12          A.  No.  I can't -- That would be speculation.

13          No.

14    Q.    Okay.  And again, I don't want you to speculate.

15          So if the answer is I don't know, then...

16          A.  Yeah.  I don't know.

17    Q.    Do you recall approximately how long the

18          recording was?

19          A.  Would be speculative.  20 minutes,

20          15, 20 minutes, maybe.

21    Q.    Is that your best estimate?  I don't want you to

22          guess.

23          A.  Yeah.  It would only be a guess, Zach.  It

24          would only be a guess.

25    Q.    Okay.  You know, was it 30 seconds or was it
```

Page 113

```
 1              closer to 10 minutes, 20 minutes?
 2        A.    It was a few minutes, for sure.  It was few
 3              minutes.
 4   Q.   Longer than five minutes?
 5        A.    I would say longer than five minutes, yes.
 6                        MR. MURPHY:  Yeah.  I'm going
 7              to object to the line of questioning as to how
 8              long.  He's already said he doesn't know.
 9                        THE WITNESS:  Yeah.  Right.
10                        MR. MURPHY:  And I'm going to
11              move to strike all of his testimony as to
12              speculating it might be five minutes, it might
13              be 10 minutes, it might be five seconds.
14                        MR. HANSEN:  Thank you.
15   Q.   Based on your recollection as you sit here
16        today -- Well, first off, let me ask you this:
17        So you only heard the recording one time.  Do I
18        understand that correctly?
19        A.    Yes.
20   Q.   Based on your recollection, what was the quality
21        of the recording?  Could you clearly hear the
22        voices?
23        A.    Yes, you could.
24   Q.   Okay.  And were some voices more muffled than
25        others or were they all just basically the same
```

Page 114

```
 1        quality?
 2        A.  No.  None of it was muffled.
 3   Q.   Okay.  As you sit here today, under oath, can
 4        you confirm that you heard the name Hunter Biden
 5        on that recording?
 6        A.  Yes.  I recall hearing that name, yes.
 7   Q.   How many times do you recall the name
 8        Hunter Biden being mentioned?
 9        A.  For sure, once.  But I can't be sure more
10        than once.
11   Q.   Do you recall what the context of Hunter Biden
12        being mentioned in that recording was?
13        A.  The context was for assistance.
14   Q.   Assistance regarding what?
15        A.  The repatriation of money from a
16        North Korean bank account.
17   Q.   When you say "the repatriation of money," can
18        you please elaborate what you mean by that?
19        A.  That it would -- That assistance would be for
20        the purpose of money being removed from a
21        North Korean bank account and sent to Iran.
22   Q.   And you, -- and correct me if I'm wrong -- you
23        said that there were two voices on this
24        recording.  Do you recall -- Let me see here.  I
25        know it's hard to identify the voices, it sounds
```

Page 115

```
 1          like, especially since one of them wasn't

 2          Mr. Byrne.  But did one person over the other

 3          mention this Hunter Biden or was it kind of a

 4          conversation was it mentioned by both people?

 5          That might be a confusing question.

 6          A.  No, no, no, it's not confusing.  One person

 7          mentioned his name to the other person.

 8    Q.    Okay.  In the context of Hunter Biden and

 9          seeking assistance, did you recall if the voice

10          on the tape said that Hunter Biden's assistance

11          would be requested?

12          A.  That's how I understood it, yes.

13                     THE WITNESS:  Oh, God.  Here

14          goes my battery.  Hold on.  I got to keep this

15          thing plugged in, guys.  This is really getting

16          old here.

17                     MR. HANSEN:  If you need a

18          sec --

19                     THE WITNESS:  Couple seconds.

20          Stupid charger.  Hold on.  Let me see this

21          charger.  All right.  I'm back charging.  Go

22          ahead.  Yup.

23    Q.    So just to clarify.  Based on your

24          understanding, the mention of Hunter Biden was

25          that they were going to need to get Hunter Biden
```

Page 116

```
 1        involved, not that they had already done so.  Is
 2        that your understanding?
 3        A.  Yes.  That's what I understood, yes.
 4   Q.   Based on the context of what you heard, did
 5        you -- did it seem to you that Hunter Biden knew
 6        about any of this or these were just preliminary
 7        discussions about his eventual assistance?
 8        A.  From what I heard, it was not that he knew
 9        about this.  At least that's what I heard.
10   Q.   It was your understanding that Hunter Biden
11        hadn't agreed to do anything based on your
12        hearing of this recording at that time.
13        A.  Well, that's a different question.  I just
14        said to you, when I heard the recording, it was
15        as if he wasn't aware of it.  I don't know.
16        That would be speculative.  But per the
17        conversation I heard, like no.  Yeah.
18                    MR. DELLA ROCCA:  Objection.
19        That's speculative --
20                    MR. MURPHY:  Let me join in the
21        objection first, Zachary.  I also agree, it
22        calls for speculation as to what Hunter Biden
23        knew or didn't know.
24                    THE WITNESS:  Right.
25                    MR. MURPHY:  And he's already
```

Page 117

```
 1        said he doesn't know what he knew or didn't
 2        know.
 3                    THE WITNESS:  That's right.
 4                    MR. HANSEN:  I'm going to move
 5        on.
 6   Q.   Do you recall the tape including the words
 7        "North Korea" as opposed to "South Korea"?
 8        A.  My recollection was North Korea.
 9   Q.   Do you recall the word "bride" being mentioned?
10        A.  I can't remember that.
11   Q.   Do you recall Joe Biden or President Biden being
12        mentioned?
13        A.  I can't remember that, no.
14   Q.   Do you recall the word "father" being mentioned?
15        A.  I can't remember that, no.
16   Q.   Do you recall $8 billion being mentioned?
17        A.  My best recollection was $10 billion.
18   Q.   Okay.  Do you recall $800 million being
19        mentioned?
20        A.  No.
21   Q.   Or any variation in the millions of dollars?
22        A.  No.
23   Q.   Okay.  Do you recall JCPOA being mentioned?
24        A.  No.
25   Q.   How about 10 percent?
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1          A.  I don't remember that, no.
 2    Q.    Okay.  I'm going to move on to the last page of
 3          this affidavit where it says:  The meeting ended
 4          with Mr. Byrne requested, by the FBI agent, to
 5          send the phone call to him via Signal.  So just
 6          to clarify, it was the FBI agent, being Special
 7          Agent Smith, that requested Mr. Byrne send him
 8          the recording, not the other way around; right?
 9          A.  Yes.
10    Q.    Okay.  Did you see Mr. Byrne send Special
11          Agent Smith the recording?
12          A.  No.
13    Q.    And you say that it was to be sent to him via
14          Signal.  That's just your recollection of the
15          conversation that occurred in the car?
16          A.  Yes.
17    Q.    Did Mr. Byrne send you a copy of the recording?
18          A.  No.
19    Q.    Okay.  Have you ever been in possession of a
20          copy of that recording?
21          A.  No.
22    Q.    Do you recall what kind of device Mr. Byrne had
23          in his possession to play the recordings for you
24          and Mr. Smith in that meeting in the car?
25          A.  Just a phone.  But be very clear.  He was
```

Page 119

```
1              playing it for Mr. Smith, not me.
2    Q.    Okay.  I apologize.
3              Just the playing of the recording.  Was it an
4              iPhone?
5              A.  I don't know.  It was a telephone.  I don't
6              know if it was a Samsung or an iPhone.  I don't
7              know.
8    Q.    Do you have any understanding of how the audio
9              was recorded?
10             A.  None.
11   Q.    Did Mr. Byrne explain in any way who he obtained
12             the recording from?
13             A.  No.
14   Q.    Or where he obtained the recording?
15             A.  No.
16   Q.    When he obtained the recording?
17             A.  No.
18   Q.    Do you recall a meeting -- I know you said that
19             there was just these two meetings in which it
20             was you, Mr. Byrne, and Special Agent Smith.
21             Correct me if I have that wrong.  But just to
22             refresh your recollection, do you recall any
23             meeting that occurred at a burger restaurant
24             near the FBI headquarters in Washington, D.C.,
25             around September of 2021?
```

Page 120

```
 1        A.  I don't recall it.  It could have happened,
 2        but I just don't recall it.
 3    Q.  Okay.  Just to be clear, you didn't see --
 4        Mr. Byrne didn't literally give Special
 5        Agent Smith the device that the recording was
 6        on.  It was your understanding that he was going
 7        to send it to him, correct, that recording?
 8        A.  Yes.
 9    Q.  Okay.  Did you ever instruct Mr. Byrne to travel
10        to Iran for any purpose?
11        A.  No.
12    Q.  Did you ever -- Did Mr. Byrne ever tell you that
13        he had been contacted by someone in the
14        Middle East who asked him to come to Iran
15        because quote-unquote we were on the verge of a
16        world war?
17        A.  No.  I don't know anything about that.
18    Q.  Did you ever instruct Mr. Byrne to travel to
19        Ikdam for any purpose?
20        A.  No.
21    Q.  Did you ever instruct him Mr. Byrne to travel to
22        Rome for any purpose?
23        A.  No.
24                    MR. DELLA ROCCA:  Objection.
25        Relevance.
```

Page 121

1      MR. HANSEN:  Yup.  Once again,
2    Mr. Della Rocca --
3                    MR. MURPHY:  Why don't we wait
4    a second.
5                    Brian, your objections didn't
6    come in clear.  Do you want to state it again?
7                    MR. DELLA ROCCA:  Yes.
8                    MR. MURPHY:  Let him restate
9    it.  I didn't hear it.
10                    Go ahead.
11                    MR. DELLA ROCCA:  I don't see
12    the relevance of the questions.  We're all over
13    the map at this point.
14  Q.   Mr. Moynihan, are you aware of a trip Mr. Byrne
15       took to Rome in July of 2023?
16  A.   No.
17  Q.   Did -- And going back to this meeting in the car
18       with Special Agent Smith, you, and Mr. Byrne.
19       Or at any time.  Did Mr. Byrne ask Special
20       Agent Smith to authenticate the recording that
21       he had played?
22  A.   Oh, I don't know.
23  Q.   You have no recollection or --
24  A.   No.  I have no idea.
25  Q.   Okay.  And just to be clear, is that an I don't

                                    Page 122

```
 1        know, you don't recall, or you --

 2        A.  No.  I don't know.

 3   Q.   Okay.  Did you have any understanding whatsoever

 4        that Special Agent Smith or what Special

 5        Agent Smith was going to do with the recording

 6        that Mr. Byrne sent to him?

 7        A.  I have no idea what he was going to do with

 8        it.

 9   Q.   Do you have any understanding as to whether

10        Special Agent Smith had that recording

11        authenticated in any way?

12        A.  I do not know.

13   Q.   And just to be clear, you never communicated any

14        result of authentication of the recording to

15        Mr. Byrne; correct?

16        A.  No.

17                  MR. MURPHY:  Correct, no, or

18        correct, yes?

19        A.  Well, correct relative to the way the

20        question was asked.

21                  MR. HANSEN:  Yup.  The

22        transcript will speak for itself.

23

24

25
```

Page 123

```
 1              * * * ATTORNEYS' EYES ONLY * * *
 2   Q.    Mr. Moynihan, have you ever had heard the
 3         pseudonym or alias Movie Star before?
 4         A.  No.
 5   Q.    Does the name Mehdi Firouzian mean anything to
 6         you?
 7                      MR. HANSEN:  And I can spell it
 8         for the record.  It's M-e-h-d-i.  Next word,
 9         F-i-r-o-u-z-i-a-n.
10         A.  That doesn't mean anything to me, no.
11   Q.    How about the name --
12                      MR. MURPHY:  Wait a minute.  If
13         we're going to get into these names, which
14         everybody agreed is attorneys only, and you're
15         now doing this, then I'm going to ask the
16         court reporter to attach to this deposition as
17         Exhibit Number 4 the stipulations for protective
18         order signed by the judge and the attorneys, and
19         we have to have an agreement that Mr. Moynihan
20         and his counsel are going to be bound by that
21         before you can question him about these names.
22         And you haven't done that.  And so I think the
23         questioning of him about these names is improper
24         without the proper procedures being followed to
25         keep this information attorney only, because
```

Page 124

```
 1            that was done in -- the discovery that we did on
 2            these names was done with that understanding.
 3                          MR. HANSEN:  And I'll represent
 4            that the Court's order in that regard said that
 5            we can depose Mr. Moynihan regarding this
 6            deposition.  So we will --
 7                          MR. MURPHY:  The Court said you
 8            can depose him.  That doesn't excuse him from
 9            complying with the terms and conditions of the
10            protect order.  You'll have to comply with
11            those.
12                          MR. HANSEN:  Mr. Murphy, the
13            names in a vacuum are not covered.  You're the
14            one that connected it -- you're connecting it to
15            something.  So I just asked the names.  I didn't
16            ask anything about the rest.  You've attached
17            the protective order to this deposition
18            transcript.  I agree with your proposal that
19            this testimony will be subject to that
20            protective order and deemed highly confidential,
21            if that's what you're proposing.
22                          I'm going to move on with my
23            questioning.
24    Q.      Does the name Brandon Hogan mean anything to
25            you, Mr. Moynihan?
```

Page 125

```
 1        A.  No.
 2   Q.  Does the name Hassan Elhusseini mean anything to
 3        you?
 4                        MR. HANSEN:  And I can spell it
 5        for the record.  H-a-s-s-a-n.  Next word,
 6        E-l-h-u-s-s-e-i-n-i.
 7        A.  No.
 8   Q.  Have you ever heard the pseudonym or alias
 9        King Kong before?
10        A.  Well, I've heard of the movie, but I don't
11        know the alias.
12   Q.  Sure.
13        A.  No.
14   Q.  With respect to this matter.
15        A.  No.
16   Q.  Have you ever heard the pseudonym or alias Mr. Z
17        before?
18        A.  No.
19   Q.  Does the name Martin Rodil mean anything to you?
20        A.  No.
21   Q.  Have you ever passed along any messages to
22        Mr. Byrne that you understood came from
23        President Obama?
24                        MR. MURPHY:  Wait a minute.
25        Wait a minute.  I'm going to object to the
```

Page 126

```
 1          question on the grounds that it's seeking
 2          information which is irrelevant to the subject
 3          matter of this lawsuit.  It's not designed to
 4          lead to the discovery of any admissible
 5          evidence.
 6                          MR. HANSEN:  Your objection is
 7          noted.
 8                          MR. DELLA ROCCA:  And I'm going
 9          to second that objection, for relevance.
10                          MR. HANSEN:  All right.  And
11          just to clarify, relevance is not an appropriate
12          objection in a deposition.  But you guys'
13          objections are noted.
14                          MR. MURPHY:  Counsel, Counsel,
15          once again, there's also Federal Rules of
16          Evidence.  And I want to add to it also, --
17                          MR. HANSEN:  I know you're
18          well-versed in those.
19                          MR. MURPHY:  -- I want to add
20          to it, also, since this could be a trial
21          testimony, and the judge agreed Federal Rules of
22          Evidence would apply for that purpose, is also
23          that this is a collateral issue, it's got
24          nothing to do with defaming your client or our
25          client acting with malice or that your client
```

Page 127

1    sustained any damages, and all that's being done

2    is used to attack our client's character under

3    Evidence Code 404(b) and also to confuse the

4    jury about what they're supposed to be deciding

5    in this case.

6              But you can go ahead and ask

7    him the question, and he can answer it.

8              MR. HANSEN:  I'm glad I have

9    your permission.  I'll just note that this

10   entire cases boils down to whether or not your

11   client tells lies.  And these are things that he

12   has made, statements that he has made in the

13   context of Mr. Byrne.  They are highly relevant.

14   And I will continue to asking the question.

15   Your objections are noted.

16              Let's move on --

17              MR. MURPHY:  I want to respond,

18   I want to respond to that comment.  No.  You're

19   wrong.  Read 404(b).

20              MR. HANSEN:  Thank you for

21   that.

22              MR. MURPHY:  It does not

23   allow -- No.  It does not allow any prior acts

24   to come in where you're trying to prove my

25   client's a liar so you could open up the whole

Page 128

```
 1          door and bring in everything in the world in.
 2                    MR. HANSEN:  There's
 3          credibility --
 4                    MR. MURPHY:  You have to focus
 5          on the issues of your case, and those issues are
 6          not going to be allowed.  And if they are, we'll
 7          go up on appeal and have the Ninth Circuit
 8          overturn any judgment.
 9                    But for now, I've stated my
10          objection for the record, and I disagree with
11          your representations as to what my objections
12          mean or don't mean.
13                    MR. HANSEN:  Prior acts are
14          allowed in as evidence.  This will be something
15          that the judge determines.  I appreciate your
16          position.
17                    We'll move on.
18     Q.   Mr. Moynihan, have you ever passed along any
19          messages to Mr. Byrne that you understood came
20          from FBI Director James Comey?
21     A.   No.
22     Q.   Have you ever passed along any messages to
23          Mr. Byrne that you understood came from CIA
24          Director John Brennan?
25     A.   No.
```

Page 129

```
 1                           MR. MURPHY:  Same objection.
 2         Move to strike all the stuff about Comey and the
 3         CIA director.
 4                           MR. HANSEN:  It's noted.
 5                           Let's move on.
 6    Q.   Has Mr. Byrne ever mentioned to you the name
 7         Stephen Muldrow?
 8    A.   No.
 9                           MR. MURPHY:  Same objection.
10         Move to strike.
11                           MR. HANSEN:  All right.  Let me
12         take a quick break here, Mr. Moynihan.  I think
13         I'm finished.  I just need to check my notes to
14         see if there's anything I want to follow up on.
15         But we're basically there.  So give me just five
16         minutes, if you would, please, and we'll wrap up
17         in short order when we come back.
18                           MR. MURPHY:  Zach, Counsel, if
19         you need even a little bit more time, that's
20         fine.  We don't have an objection.
21                           THE WITNESS:  Well, actually,
22         I'm trying to move it on along.  So if you need
23         five minutes, please move it along.  And I
24         appreciate that.  My phone is blowing up here.
25         I'm losing juice.
```

Page 130

```
 1                      MR. HANSEN:  I'll do this, --
 2                      THE WITNESS:  Okay.  Thank you.
 3                          MR. HANSEN:  -- I'll do this as
 4           quick as possible.  I just need a moment to look
 5           at my notes.
 6                          But let's go off the record for
 7           a minute.  I'll come back on when I'm ready.
 8                          THE WITNESS:  All right.  Thank
 9           you.
10                          THE VIDEOGRAPHER:  The time is
11           12:34.  We are going off the record.
12                          (Recess taken  at 12:34 p.m.
13                          Deposition resumed at
14                          12:38 p.m.)
15                          THE VIDEOGRAPHER:  We are back
16           on the record.  The time is 12:38.
17                          MR. HANSEN:  All right.
18           Mr. Moynihan, I want to thank you for your time.
19           I have no further questions today.
20                          MR. MURPHY:  Mr. Moynihan, I
21           have just a couple of questions for you.
22                          EXAMINATION BY MR. MURPHY:
23      Q.   Do you know a gentleman by the name of
24           Martin Rodil?
25      A.   No.
```

Page 131

```
 1                    MR. HANSEN:  Asked and

 2        answered.

 3   Q.   You don't know who that person is at all?

 4        A.  No.

 5   Q.   Okay.  And --

 6        A.  I mean, I know a Martin, but I don't know his

 7        last name.

 8   Q.   But you don't know -- How do you know the

 9        Martin?

10        A.  I don't know if it's the same Martin, but I

11        know him from other cases.

12   Q.   And who is the Martin that you're referring to

13        that you know?

14        A.  Well, it's an individual that's involved in

15        other cases that I've worked on.

16   Q.   Okay.  And do you know what his last name is?

17        A.  I do not.

18   Q.   Okay.  And do you know if he worked -- where he

19        worked on those cases?

20        A.  I'm not sure what you mean.

21   Q.   In a country?

22        A.  If it's the same Martin, yes, I do know where

23        he's from.

24   Q.   And what country would that have been that he

25        might have been involved in?
```

Page 132

```
 1            A.  If it's the same Martin, it would have been
 2       Venezuela.
 3  Q.   Okay.  Great.
 4       The only other question I have is, do you know
 5       if Mr. Smith ever came back and verified who the
 6       persons were on the tape that was played in the
 7       car?
 8       A.  Not to me, no.  I don't know that.
 9  Q.   And do you remember if Mr. Dave Smith ever told
10       you who the voices were on the tape that was
11       played in the car?
12       A.  No.
13  Q.   And do you recall ever telling Mr. Byrne who the
14       persons were on the tapes in the car?
15       A.  No.
16  Q.   Could that have happened and you just don't
17       recall?
18       A.  It could have happened but -- No.  It could
19       have happened, and it wouldn't be a matter of
20       recall because I was never told anything because
21       I had no interest in it.
22                   MR. MURPHY:  Okay.  Thank you.
23       That's it.  Those are the only questions I have.
24                   MR. HANSEN:  Great.  Once
25       again, Mr. Moynihan, I just want to thank you
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1        for your time.  Really appreciate it.
 2                       THE VIDEOGRAPHER:  The time is
 3        12:41.  We are going off the record.  This is
 4        the end of today's deposition of John Moynihan.
 5                       (The deposition concluded
 6                       at 12:41 p.m.)
 7                       EXHIBITS 1 THROUGH 3 (DOCUMENTS
 8                       SUBSEQUENTLY MARKED AS
 9                       PLAINTIFF'S EXHIBITS 1 THROUGH
10                       3 FOR IDENTIFICATION)
11                       EXHIBIT 4 (DOCUMENT
12                       SUBSEQUENTLY MARKED AS
13                       DEFENDANT'S EXHIBIT 4 FOR
14                       IDENTIFICATION)
15
16
17
18
19
20
21
22
23
24
25
```

Page 134

```
 1                    C E R T I F I C A T E
 2          I, LISA L. CROMPTON, a Notary Public in and
        for the Commonwealth of Massachusetts, duly
 3      commissioned and qualified to administer oaths,
        do hereby certify that the foregoing Deposition
 4      of John Moynihan, a witness in the above-titled
        cause, was taken before me on behalf of the
 5      Plaintiff Via Zoom Remotely, on February 14,
        2025, at 10:00 a.m.; that previous to examination
 6      of said witness who was of lawful age, he was
        first sworn by me and duly cautioned to testify
 7      to the truth, the whole truth, and nothing but
        the truth, and that he thereupon testified in the
 8      foregoing manner as set out in the aforesaid
        transcript.
 9
            I further certify that the foregoing
10      Deposition was taken down by me in machine
        shorthand and transcribed by computer, and that
11      the foregoing Deposition is a true and accurate
        record of the testimony of said witness.
12
            Pursuant to Rules 5(d) and 30(f) of the
13      Federal Rules of Civil Procedure, original
        transcripts shall not be filed in Court;
14      therefore, the original is delivered to and
        retained by Plaintiff's Attorney,
15      Zachary C. Hansen, Esq.
16          Reading and signing of the transcript was
        requested by the witness or by any parties
17      involved upon completion of the deposition.
18          IN WITNESS WHEREOF, I have hereunto set my
        hand and seal this 14th day of February, 2025.
19
20
21
22
                <%33863,Signature%>
23              LISA L. CROMPTON
            REGISTERED PROFESSIONAL REPORTER
24          MY COMMISSION EXPIRES 1/17/2031
25
```

Page 135

1    ZACHARY C. HANSEN, ESQ.

2    zhansen@earlysullivan.com

3                                    February 17, 2025

4    RE: Biden Hunter, Robert v. Byrne M, Patrick

5    2/14/2025, John F. Moynihan, (#7171048).

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    ___ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   ___ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

13      Transcript – The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, notating the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20      Contact Veritext when the sealed original is required.

21   ___ Waiving the CA Code of Civil Procedure per Stipulation of

22      Counsel – Original transcript to be released for signature

23      as determined at the deposition.

24   ___ Signature Waived – Reading & Signature was waived at the

25      time of the deposition.

                                              Page 136

1     __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, notating the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    _X_ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 137

**[& - 7171048]**

| & |
|---|
| **&** 2:3,10 5:15 97:2 136:24 137:9 |

| 0 |
|---|
| **00000** 86:3 |
| **00001** 86:3 |
| **09439** 1:8 |

| 1 |
|---|
| **1** 4:7,11,13 14:10 17:12 134:7,9 137:1 |
| **1/17/2031** 135:24 |
| **10** 25:16,19 114:1,13 118:17,25 |
| **10,000** 47:19 |
| **10:00** 1:17 5:6 135:5 |
| **11:04** 60:21,22 |
| **11:14** 60:24 61:1 |
| **11:59** 104:19 104:20 |
| **124** 4:7 |
| **12:04** 104:22 104:24 |
| **12:34** 131:11 131:12 |
| **12:38** 131:14 131:16 |
| **12:41** 134:3,6 |

**13** 17:19 20:12
**131** 4:4
**134** 4:11,13,14 4:18
**13th** 20:9
**14** 1:16 135:5
**14th** 5:5 135:18
**15** 34:16 113:20
**15th** 20:10
**17** 6:21 136:3
**17th** 2:5
**18** 4:19 6:21 18:6,15 19:8
**1901** 2:11
**1992** 93:12,14 96:23
**1995** 93:21
**1996** 93:21
**1:00** 10:6

| 2 |
|---|
| **2** 4:13 17:22 18:24 39:5 40:6 |
| **2/14/2025** 136:5 |
| **20** 113:19,20 114:1 |
| **20036** 2:12 |
| **2018** 96:5 |
| **2019** 58:9 61:16 |
| **202-282-5000** 2:12 |

**202-282-5100** 2:13
**2020** 58:9 61:16 70:9,14
**2021** 26:3,6 27:18 29:15 70:2 72:15,21 97:15,19 120:25
**2022** 17:19 20:9,10,12 22:13 25:21 58:14 77:9,19 111:23
**2023** 58:14 122:15
**2024** 12:6 35:22,23 91:20
**2025** 1:16 5:5 135:5,18 136:3
**2025.520** 136:9 136:12
**20878** 3:5
**21** 58:4
**22** 58:4
**240-455-5090** 3:5
**25** 52:18,18
**2625** 2:17
**2:23** 1:8
**2nd** 91:19

| 3 |
|---|
| **3** 4:14,14 86:4 86:5 96:8 134:7,10 |

**30** 113:25 135:12 137:1
**32** 94:21
**323-301-4660** 2:6
**323-301-4676** 2:6
**330** 2:18
**33863** 135:22
**35,000** 78:25
**395** 36:18 37:20

| 4 |
|---|
| **4** 4:18 124:17 134:11,13 |
| **404** 71:14 75:22 128:3,19 |
| **45** 4:12 31:16 32:4,4 |

| 5 |
|---|
| **5** 135:12 |
| **50** 31:16 |
| **501** 96:8 |

| 6 |
|---|
| **6** 4:3 |
| **60** 32:5 |
| **6420** 2:4 |

| 7 |
|---|
| **7** 15:17 |
| **701** 3:4 |
| **7171048** 136:5 |

Page 1

**[8 - agent]**

| 8 |
| --- |
| **8** 118:16 |
| **800** 118:18 |
| **805-367-4506** 2:19 |
| **818-558-3718** 2:19 |

| 9 |
| --- |
| **90048** 2:5 |
| **91361** 2:18 |
| **95** 93:22 |
| **96** 93:22 |
| **9801** 3:4 |

| a |
| --- |
| **a.m.** 1:17 60:22 60:24 104:20 135:5 |
| **abbe** 2:11 5:17 6:14 |
| **abbelowellpu...** 2:13 |
| **ability** 7:21 8:25 10:18,23 40:17 |
| **able** 8:2 10:13 53:7 61:6 64:17 78:8 89:1 105:4 |
| **above** 20:13 91:16 109:8 135:4 136:6 |
| **absence** 102:19 |
| **absolutely** 60:14 84:21 |

**absurd** 26:11
**accept** 82:11
**acceptable** 9:3
**account** 108:15 108:16 109:2 115:16,21
**accurate** 93:12 94:22 98:25 100:13 101:11 103:9 106:12 109:11 110:14 111:16 135:11
**accurately** 60:10
**act** 42:7,11,16 43:6,22
**acted** 42:1 73:3
**acting** 44:7 49:22 50:25 54:1 127:25
**action** 1:8 4:12 73:17
**activities** 37:10 41:12 42:4 50:7 94:24
**acts** 41:19 128:23 129:13
**actually** 14:16 19:10 33:10 39:14 105:10 112:1 130:21
**add** 127:16,19
**adding** 78:15
**address** 67:23

**administer** 135:3
**administration** 31:1,1,2,8 41:25 73:5
**administratio...** 93:10
**admissible** 70:19 73:18 75:14 80:24 81:22 82:5 127:4
**admission** 45:16
**advance** 12:1
**advice** 81:14
**advised** 98:20
**advisor** 95:18 96:4
**affidavit** 4:14 11:23 12:1,4,5 22:14,18 35:6 35:8,10 43:15 43:18 51:13,23 56:10 83:12,16 83:19 84:1,8 84:11,13,17,20 84:25 85:14,17 85:20,22 88:3 89:10 90:5 91:4 92:5,9,18 92:21 102:12 105:9 107:25 119:3

**affidavits** 92:7
**aforesaid** 135:8
**age** 135:6
**agencies** 45:16 45:21 57:13,16 57:20,21 61:23
**agency** 45:12 46:11
**agent** 21:25 22:17 24:6,7 24:17,21 42:6 42:21,23 43:20 44:14,15 45:8 49:1,12 51:7 53:7,23,23 54:5,16 61:10 61:13 62:1,3,4 62:16 63:3,8 63:14,19,23 64:5,9 65:2,7 65:19 66:6,18 66:20 67:9,15 69:22,23 73:8 75:2 79:8,8,19 80:13 98:22,24 99:17 100:1,2 100:8,10,15 101:10 102:1,4 106:7,10,14,15 109:5,7 110:6 119:4,6,7,11 120:20 121:5 122:18,20 123:4,5,10

Page 2

**[agent's - arrange]**

| | | | |
|---|---|---|---|
| **agent's** 44:17 109:9 | **allegations** 63:4,24 64:22 80:9 98:14 99:5 102:9 | 74:16 76:9,12 78:8,12,20 81:12,14 82:11 83:6 113:15 128:7 | **appeal** 129:7 **appearances** 2:1 3:1 |
| **agents** 41:15 48:3,16,20 61:21,23 62:23 78:25 100:3 | **alleged** 37:10 41:11 | **answer's** 9:2 66:14 | **appearing** 5:20 5:23 136:18 137:7 |
| **ago** 6:21 17:6,8 17:12 20:4 28:18 30:15 35:21 48:7 65:16 83:21 | **allow** 73:22 128:23,23 **allowed** 88:1 89:9 129:6,14 | **answered** 54:14 71:5 75:25 99:8,13 99:20 132:2 | **appears** 16:17 20:8 92:2 **apply** 82:17,18 83:5 127:22 |
| **agree** 117:21 125:18 | **altered** 90:25 91:1 | **answering** 8:13 **anti** 94:20 | **appreciate** 19:19,20 39:17 44:1 54:13 74:8 76:25 77:2,6 88:5 113:6 129:15 130:24 134:1 |
| **agreed** 98:23 117:11 124:14 127:21 | **america** 47:13 47:14,16,17,20 47:22,25 48:4 48:6 49:21 55:2,8,13,17 56:14,18,25 57:23 59:1,7 59:22 66:3 70:4,12 72:16 111:20 | **anticipate** 8:12 31:17,20 32:11 34:1 | |
| **agreement** 124:19 | | **anticipated** 32:14 | **approach** 10:6 |
| **ahead** 15:15 70:21 74:20 76:11 87:9,9 87:13 90:23,23 93:4 116:22 122:10 128:6 | | **anticipating** 32:10 | **appropriate** 71:15 73:21 127:11 |
| | | **anybody** 11:11 12:24 13:2 27:12 29:4 39:25 45:12 55:1 59:24 66:9 76:3 | **approximately** 32:2 34:12 43:5 56:17 58:13,14 83:18 101:17 103:12 109:13 113:17 |
| **ahold** 64:17 | **amount** 26:11 32:20 | **anymore** 48:18 | **apps** 38:4,9 39:19 |
| **ai** 46:3 | **analyst** 93:8,17 94:4 | **anything's** 90:11 | **april** 12:6 91:19 |
| **airport** 51:24 52:6 62:15 63:11 64:1,2 67:12 109:11 109:18,23 111:1 | **analytical** 94:17 **angeles** 2:5 **answer** 7:9,13 7:14 8:3,21 9:3 9:10,13,22 27:5,9 40:1 44:3 57:20 60:9 62:22 | **apologize** 54:20 98:9 120:2 | **area** 52:17 67:3 91:11 111:14 |
| | | **app** 33:14 38:20 64:5 | |
| **alcohol** 10:22 | | **apparently** 23:12 | **arrange** 50:17 |
| **alias** 124:3 126:8,11,16 | | | |

Page 3

[article - believe]

| | | | |
|---|---|---|---|
| **article** 7:5 | 111:7,10,12 | 124:1,14,18 | **badge** 67:15 |
| **ashton** 3:8 5:4 | 115:13,14,19 | **audio** 92:20 | **bank** 108:15 |
| **asked** 26:17 | 116:9,10 117:7 | 120:8 | 115:16,21 |
| 35:7,10 42:6 | **associate** 97:2 | **authenticate** | **banked** 111:8 |
| 42:11 43:22 | **associated** 68:2 | 122:20 | **baseball** 47:22 |
| 47:6 48:8 72:1 | 68:3 | **authenticated** | 48:17 |
| 72:7 75:25 | **assume** 8:21 | 123:11 | **based** 18:4 |
| 77:24,25 84:1 | **assuming** 85:3 | **authentication** | 23:13 40:15 |
| 84:7,10 88:11 | **athens** 21:11 | 123:14 | 81:7 90:3 91:3 |
| 88:16,17 99:7 | 23:3,6,11 | **authored** 7:5 | 112:2 113:1,7 |
| 99:12,19 | **athlete** 44:19 | **automatically** | 114:15,20 |
| 121:14 123:20 | **attach** 124:16 | 39:21 | 116:23 117:4 |
| 125:15 132:1 | **attached** 15:17 | **automobile** | 117:11 |
| **asking** 26:7 | 125:16 | 109:9 | **basically** 44:15 |
| 27:13,14 74:10 | **attack** 128:2 | **aware** 102:3,12 | 79:14 114:25 |
| 78:10,13,14 | **attempted** 65:7 | 117:15 122:14 | 130:15 |
| 83:22 87:11 | 66:10 | **b** | **basis** 26:25 |
| 88:8,13 128:14 | **attempting** | **b** 4:9 44:22,25 | 41:22 53:16 |
| **asks** 44:1 | 64:20 | 71:14 75:22 | 78:11 81:3 |
| **assert** 9:8 88:6 | **attempts** 64:16 | 128:3,19 137:1 | 107:5,5,22 |
| 88:7 | **attended** | **back** 18:24 | **bates** 86:2 |
| **asserted** 9:11 | 101:11 | 22:20 33:25 | **battery** 116:14 |
| 76:8 | **attention** 71:18 | 40:21,23 52:11 | **bears** 7:18 |
| **asset** 45:19,19 | 92:23 | 60:25 65:20,22 | **began** 58:10 |
| 46:5,6,7 | **attorney** 9:12 | 66:18,24 68:8 | 93:11 |
| **assets** 46:2,21 | 9:14 11:3 | 69:13 70:13 | **beginning** 4:7 |
| **assign** 14:5 | 35:10 68:20 | 79:7 92:15 | 54:11 61:14 |
| **assignment** | 76:10 82:10 | 94:1 101:17 | **behalf** 5:13,20 |
| 66:21 | 83:25 84:9,10 | 104:23 116:21 | 5:23 6:12 |
| **assignments** | 85:1 124:25 | 122:17 130:17 | 24:23 72:25 |
| 95:5,7,15 | 135:14 | 131:7,15 133:5 | 135:4 |
| **assist** 92:17 | **attorney's** | **background** | **believe** 37:15 |
| 94:13,15 | 81:14 | 7:3 28:24 56:9 | 40:25 65:13 |
| **assistance** 87:8 | **attorneys** 4:7 | 56:11 96:15,20 | 83:24 90:25 |
| 97:7 108:25 | 6:11 34:3 | | 97:24 102:2 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[believe - byrne]**

108:6 109:16
112:7
**best** 7:21 8:24
8:25 10:13,23
32:6 40:11,17
45:18 61:6
77:5 85:23
91:24 105:4
113:21 118:17
**better** 46:1
94:13
**beyond** 103:20
**biden** 1:6 5:9
5:14 6:13 7:6
25:21 31:7,14
34:7 36:23,25
37:6 40:3
49:25,25 50:4
50:14,21 53:9
53:15,19 57:1
62:5 63:4,23
64:6,21 69:25
71:11 74:2
80:8,15 98:7
98:12 99:4,11
99:18 100:25
102:7 106:1
111:10,13
115:4,8,11
116:3,8,24,25
117:5,10,22
118:11,11
136:4
**biden's** 108:25
116:10

**big** 86:19
105:11
**bilateral** 56:7
**billion** 118:16
118:17
**bit** 6:25 10:3
15:6 17:12
22:24 24:10,12
25:3,24,25
30:1 35:13
50:24 56:11
61:10,12 62:25
77:16 83:12
130:19
**bite** 10:3
**black** 105:11
**blew** 44:15
45:7
**blow** 16:13
86:16,22,22
87:6,6,12 93:2
**blowing** 86:25
107:8 130:24
**blown** 86:19
**blue** 112:10
**boils** 128:10
**boston** 52:11
**bottom** 19:23
20:15 89:19
90:19
**boulevard** 2:4
3:4
**bound** 124:20
**boy** 17:6 68:4

**brain** 36:5
**brandon**
125:24
**break** 9:17,22
9:24 30:12
60:4,7,11 68:7
130:12
**breaks** 9:19
10:1
**breeze** 98:4
**brennan**
129:24
**brian** 3:3,6
5:14,23 6:13
15:3 16:16
122:5
**bride** 118:9
**briefly** 32:25
**bring** 13:6 42:7
71:17 129:1
**broad** 76:2
**brought** 22:1,2
**bryan** 2:4
**bsullivan** 2:7
**bunch** 52:19
**bureau** 98:22
**burger** 120:23
**business** 32:19
48:18 52:8
102:14
**byrne** 1:9 5:9
5:21 7:3,4,5
11:15 19:1,3
21:4,15,21
22:12 23:5,12

23:18,25 24:5
24:13,20 25:9
26:1,5,18,25
27:1,15,16,20
27:21,23 28:5
28:5 29:4,11
29:13 30:14,23
31:5,9,13,19
32:9,18 34:1
34:19,24 35:14
35:18 38:2,21
39:6,23 40:3
40:24 41:8
42:14,15,20,22
43:21 44:11
47:10,24 48:9
48:14 50:9,11
51:4,5,11,16
53:2,20 54:4
54:16,25 55:6
55:21 58:20,23
59:20,24 62:8
62:10 63:7
64:8,13,25
65:5 66:1
67:10 69:17,20
69:23 70:3
71:1,2,5 72:1
72:16,22 73:5
73:7,9,19 74:3
74:4 75:2,5,7
77:8 78:23,25
79:22,23 80:3
80:4 81:10
84:20,24 85:4

Page 5

**[byrne - clark]**

| | c | | chance 7:14 |
|---|---|---|---|
| 86:2,3,3 95:14 | | 119:24 122:17 | changed 90:11 |
| 97:20,22,25 | c 2:3,16,17 96:8 | 133:7,11,14 | changes 67:19 |
| 98:6,18,19,21 | 135:1,1,15 | care 102:15 | character |
| 98:23 99:3,15 | 136:1 | career 69:17 | 71:12 75:20 |
| 100:9,10,12,16 | ca 136:9,12,21 | 93:8,11 | 128:2 |
| 100:24 101:10 | cabinet 107:4 | carries 105:1 | charger 116:20 |
| 101:25 102:4 | 107:21 | case 6:12,22 | 116:21 |
| 103:5,13,19 | california 1:3 | 7:2,3 31:2 34:4 | charging 70:8 |
| 105:18,23 | 2:5,18 | 40:10,14 41:11 | 72:18 116:21 |
| 106:8,17 108:4 | call 34:20 | 53:9,15 56:21 | check 130:13 |
| 108:19 109:4 | 47:13,16 51:6 | 57:6 61:24,25 | christopher |
| 110:11 112:5 | 58:25 59:1 | 74:2 75:19 | 78:24 |
| 116:2 119:4,7 | 85:14 106:11 | 81:2 112:7 | cia 57:16 |
| 119:10,17,22 | 106:19 107:1,2 | 128:5 129:5 | 129:23 130:3 |
| 120:11,20 | 107:10,19 | cases 31:3 43:9 | circuit 129:7 |
| 121:4,9,12,18 | 108:9,12,24 | 52:20 53:15,18 | circumstances |
| 121:21 122:14 | 109:7 119:5 | 53:19,22 56:8 | 26:4 61:19 |
| 122:18,19 | called 26:8 | 128:10 132:11 | citizen 56:15 |
| 123:6,15 | 32:21 37:15 | 132:15,19 | citizens 46:24 |
| 126:22 128:13 | 41:1 47:22 | caught 25:6,9 | 47:2 |
| 129:19,23 | 51:18 85:12 | cause 135:4 | civil 1:8 4:12 |
| 130:6 133:13 | 97:1 99:15 | cautioned 6:4 | 6:22 135:13 |
| 136:4 | calling 77:22 | 135:6 | 136:19,21 |
| byrne's 11:17 | calls 18:19 | ccp 136:9,12 | claim 75:17 |
| 23:1 37:9 | 38:22,25 69:9 | cell 52:6 64:2 | claims 69:24 |
| 41:11 42:2,3 | 89:7 102:14 | 109:9,20,21 | 70:25 71:2,25 |
| 43:6 44:7 48:9 | 107:12 117:22 | cellular 18:17 | clarify 20:7 |
| 49:22 50:7 | capacity 49:8 | centered 34:5 | 21:3 42:17 |
| 51:1 54:2 | 93:14 94:7,25 | central 1:3 | 55:18 65:11 |
| 69:14,24 71:10 | capitalized | ceo 28:10 | 80:6 81:18 |
| 75:15 83:25 | 18:22 | certain 24:24 | 98:3 116:23 |
| 106:11 112:22 | capture 20:17 | 39:21 72:22 | 119:6 127:11 |
| | 20:23 | certainly 45:15 | clark 95:18,20 |
| | car 107:24 | certify 135:3,9 | 95:22 96:4 |
| | 108:1,7 119:15 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[clean - contact]**

clean  8:15
clear  21:1 43:1
  54:6 57:7
  62:18 69:3
  76:20 99:22,24
  119:25 121:3
  122:6,25
  123:13
clearances
  57:19 94:1
clearly  114:21
client  7:4 11:3
  27:4 82:7
  127:24,25,25
  128:11
client's  128:2
  128:25
clients  27:7
clinton  96:8
close  44:20,21
  56:6 57:25
closer  114:1
coast  10:5
code  128:3
  136:9,12,19,21
coincidence
  45:5
collateral  80:25
  127:23
color  56:5
com  28:11
come  13:16
  33:11 40:12
  65:22 66:18
  121:14 122:6

128:24 130:17
  131:7
comey  129:20
  130:2
coming  77:1
  107:12
comment
  128:18
commentary
  88:5,21 89:3
comments  82:7
commission
  135:24
commissioned
  135:3
committee  96:5
common  38:7
commonwealth
  135:2
communicate
  21:11 23:25
  24:13,14 31:10
  53:23 64:8
  65:5 68:10,14
  73:7 75:2,7
  84:24
communicated
  31:12 38:3
  103:15 123:13
communicating
  27:15,19
communication
  25:15 31:5
  34:10 62:1
  69:4

communicati...
  18:18 30:16
  38:21 39:6
  40:2 67:10
  69:2 73:4
  102:3
company  32:21
  32:22,25 33:1
  97:1,4
complaint
  80:13 99:6
complete  57:5
completed
  136:7,17 137:6
completely
  37:6 50:5 80:7
  98:11,16
completion
  135:17 137:10
comply  125:10
complying
  125:9
component
  20:18
computer
  14:18 83:20
  87:2 135:10
concerned
  56:25
concerning
  63:3 64:5
concluded
  134:5
conclusion
  40:12

conditions
  10:17 125:9
conduct  51:4
conduit  43:22
  73:3
conference
  41:4
confidential
  125:20
confidentially
  27:8
confirm  17:9
  115:4
confuse  81:1
  82:9,20 128:3
confusing
  116:5,6
connected
  125:14
connecting
  74:4 125:14
connection
  71:9
consider  55:15
constituting
  18:17
consultant  93:7
  94:1 95:1
consultation
  55:22 96:25
contact  21:4,9
  21:15,23 23:2
  23:11,24 24:14
  26:18 28:4
  61:12,20 62:2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[contact - d.c.]**

| | | | |
|---|---|---|---|
| 62:4 64:11,17 64:20 65:7 66:5,7 68:24 79:1,11,15,17 97:25 136:9,20 | **conversation** 8:11 25:7 26:23 30:22 33:25 34:13 63:19 84:22 | 97:2,21,23 98:1,7 99:18 100:25 101:1,1 103:24 109:19 110:19,23 | **course** 69:15,19 107:14,14 **court** 1:1 6:1 7:19 8:1 10:10 13:2,14 17:24 |

contacted 67:24 106:4,7 121:13
container 33:8
container's 33:14
containers 33:4 33:5,11,18
contend 79:6
contents 111:4 111:4
context 20:2 23:15 27:24 46:6,13 48:9 53:21 56:15,21 58:23 69:24 77:2 115:11,13 116:8 117:4 128:13
continue 7:25 54:13 70:5,14 128:14
continued 94:12,13,14
contractor 95:19,22 96:3
control 86:25
convenience 52:1 109:25

103:7,23 104:2 107:2,19 108:17 111:9 112:4,13 113:8 113:10,11 116:4 117:17 119:15
conversations 23:19,19 30:25
coordination 57:12
copy 119:17,20
corner 105:11
correct 10:10 12:7,8 16:18 16:19 17:14 18:2 19:4 23:14 24:8 27:25 29:18 31:22 35:9 36:23 37:7,8 38:10 40:6,7 41:13 46:20 50:22 51:12 53:3 54:7,22 56:12 57:10,13 62:12 63:21 64:19 80:11 84:2 91:22,23 92:3 94:8 96:9

115:22 120:21 121:7 123:15 123:17,18,19
corrections 136:14,15 137:3,4
correctly 31:21 94:3 114:18
corruption 49:18
counsel 5:10,16 9:8 11:1,3,4,17 11:21 14:5 16:7,16 17:17 17:18,24 70:21 78:19 80:21 86:25 88:12,23 124:20 127:14 127:14 130:18 136:18,22 137:7
counseled 94:18
country 48:21 132:21,24
couple 6:18 13:13 83:21 107:16 116:19 131:21

82:21 83:2 124:16 125:7 135:13
court's 125:4
covered 125:13
covert 28:15 30:19 37:11 41:11 42:3 50:7
covid 33:4
creates 33:6
credibility 28:25 129:3
crime 97:8
crimes 55:25 61:22
crompton 1:22 6:1 135:2,23
crop 20:20
csr 1:22
current 107:3 107:20
currently 44:7 95:17
cv 1:8

**d**

d 4:1 124:8 135:12
d.c. 2:12 29:24 36:1,2 40:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[d.c. - device]

| | | | |
|---|---|---|---|
| 43:13 51:11 | **dealing** 46:1 | 117:18 121:24 | **depositions** |
| 52:4,5,8,15,20 | **deals** 27:8 | 122:2,7,11 | 74:9 |
| 62:14,19,19,20 | **december** 32:7 | 127:8 | **describe** 41:15 |
| 63:10 67:3,5 | **deciding** 81:2 | **dellaroccala...** | 56:10 112:10 |
| 77:9,18 101:7 | 128:4 | 3:6 | **described** 29:9 |
| 101:20 102:11 | **decision** 49:2,3 | **delve** 82:9 | 43:14 55:2 |
| 111:14 120:24 | **deemed** 125:20 | **department** | 94:24 96:1,23 |
| **damages** 128:1 | **defamation** 7:4 | 41:24 43:24 | 96:24 97:20 |
| **data** 29:3 | 74:2 75:17 | 94:15 | 99:2,15 101:20 |
| **date** 5:5 91:19 | **defaming** | **deponent** 5:24 | 103:21 111:21 |
| 91:25 101:19 | 127:24 | **depose** 125:5,8 | 112:5 |
| 109:15 136:16 | **defendant** 1:10 | **deposed** 32:12 | **describes** |
| 137:5 | 2:15 5:20 7:2 | **deposition** 1:14 | 105:18 |
| **dated** 12:6 | 18:19 19:3 | 4:12 5:8 6:16 | **description** |
| 17:19 20:8 | **defendant's** | 6:19 7:8 9:18 | 4:10 |
| **dates** 43:9,10 | 4:16 134:13 | 10:4,8 11:5,7 | **designated** |
| 58:12 | **defense** 107:3 | 11:10,12,14,22 | 51:21 |
| **dave** 51:18,18 | 107:20 | 12:2,10,17,20 | **designed** 70:19 |
| 52:3,9,21,22 | **defined** 18:22 | 12:21,24 13:7 | 73:17 75:13 |
| 100:4 133:9 | **definitely** 31:25 | 15:8,10,11 | 80:23 81:2 |
| **david** 2:11 | **degrees** 28:23 | 17:22,25 31:18 | 82:4 127:3 |
| 22:17 24:7,8 | **delay** 26:13 | 32:15 36:16 | **detail** 78:15 |
| 44:16 50:10 | **delete** 39:21 | 39:5 54:11 | 90:10 |
| 61:11,20 77:19 | **delivered** | 60:23 68:19 | **determination** |
| 108:3 110:1 | 135:14 | 71:5,16 72:2 | 9:14 |
| **day** 52:22 | **della** 3:3,3 5:22 | 73:21 75:16 | **determined** |
| 69:15 135:18 | 5:23 13:15,19 | 83:1 84:5 86:5 | 136:18,23 |
| **days** 17:6,8 | 18:3,7,8 26:20 | 88:6 104:21 | 137:7 |
| 31:16 32:4,5 | 27:6 70:22 | 124:16 125:6 | **determines** |
| 33:15 | 71:20 73:12,24 | 125:17 127:12 | 129:15 |
| **dea** 73:8 75:2 | 74:7,17 75:23 | 131:13 134:4,5 | **developing** |
| 93:24 94:16 | 76:11 80:14 | 135:3,10,11,17 | 45:23 94:20 |
| **dea's** 93:18 | 81:6 95:10 | 136:19,23,25 | **device** 119:22 |
| **deal** 74:14 | 96:11,17 104:5 | 137:8,10 | 121:5 |
| | 104:8,14 | | |

Page 9

[difference - either]

| | | | e |
|---|---|---|---|
| **difference** 9:5 | 75:14 80:24 | 91:14,25 92:2 | **e** 4:1,9 16:4 |
| **different** 22:16 | 81:19,19,22 | 92:5,13 105:8 | 39:10 67:23 |
| 56:20 66:25 | 82:5 125:1 | 134:11 | 69:11 124:8 |
| 81:8 117:13 | 127:4 | **documents** | 126:6,6 135:1 |
| **dig** 22:23 25:1 | **discuss** 11:14 | 11:25 12:3 | 135:1 136:9,12 |
| 25:24 35:12 | 100:11 | 13:6 15:22,24 | 137:1 |
| 43:17 61:11 | **discussed** 11:2 | 16:2,3 18:17 | **earlier** 30:11 |
| 69:1 | 34:23 51:1 | 35:15 92:20 | 61:3 83:25 |
| **diligence** 28:1 | 98:18 102:7,10 | 134:7 | 109:16 110:16 |
| 28:19,20 29:5 | 102:24 106:22 | **doing** 48:5 53:6 | **early** 2:3 5:15 |
| 29:8 | **discussions** | 54:14 77:3 | 93:7 |
| **diligently** 39:14 | 11:20 55:10 | 78:9 82:8 83:7 | **earlysullivan....** |
| **direct** 69:9 | 102:18,22 | 95:15 124:15 | 2:7,7 136:2 |
| 76:21 92:23 | 117:7 | **doj** 53:13 | **east** 10:5 19:16 |
| **directions** | **dispersed** | **dollars** 118:21 | 20:17,22,22 |
| 72:22 | 48:17 | **door** 49:5,13,16 | 21:10 22:5 |
| **directly** 43:21 | **displayed** 39:4 | 129:1 | 23:2,2 40:9,14 |
| 54:16 106:9 | 105:8 | **double** 40:23 | 121:14 |
| **director** 78:23 | **displaying** | 68:8 70:23 | **eastern** 5:6 |
| 129:20,24 | 16:13 18:14 | **drafted** 83:16 | 21:4,9,15,22 |
| 130:3 | 86:10 | 83:18 90:5 | 23:11,24 24:14 |
| **disagree** 72:5 | **dispute** 73:20 | 91:4 | **easy** 35:21 |
| 129:10 | 75:15 | **drafting** 92:18 | **eat** 10:3 |
| **disaster** 14:13 | **district** 1:1,3 | **driver** 33:7 | **edits** 90:8 |
| 107:9 | 101:7 | **drivers** 33:12 | **effect** 7:18 61:4 |
| **disbanded** | **division** 93:11 | **drives** 33:7 | 105:2 |
| 48:11,13 63:16 | **document** 13:9 | **drug** 41:25 | **efficiency** 33:2 |
| 63:18 111:20 | 13:24 14:11,25 | 73:4 93:10 | 33:7 |
| **disbanding** | 15:13,16 16:10 | **drugs** 10:22 | **efficient** 33:6 |
| 48:24 64:12 | 16:12 17:10,13 | **due** 28:1,19,20 | 38:7 |
| 111:25 | 18:5,24,25 | 29:5,8 | **effort** 65:8 |
| **discovered** | 19:6,22 86:1 | **duly** 6:4 135:2 | **efforts** 39:18 |
| 28:21 | 86:10 87:16,21 | 135:6 | **either** 31:6,13 |
| **discovery** | 88:9,13,16,17 | | 38:23 54:5 |
| 70:19 73:18 | 89:1,9,14,17,25 | | |

Page 10

**[elaborate - fbi]**

elaborate 34:2 105:23 115:18
elaboration 34:8
election 26:15 70:9,15 71:9 71:24
elhusseini 126:2
employed 46:22,25 47:4 93:14 95:17,19
employee 42:5
employment 96:22
ended 44:17 48:11,19 119:3
enforcement 41:25 45:21 73:5 93:10
engaged 56:3
engineering 46:19
enlarge 14:14 14:15
entail 28:20
enter 109:22
entire 128:10
entitled 8:24 9:9
entity 75:8
errata 136:14 136:16 137:3,5
especially 116:1

esq 2:3,4,11,17 3:3 135:15 136:1
essentially 42:13 57:10 70:13 97:10
establish 27:3 30:2 79:18 106:7
established 55:3
establishing 96:14
estimate 9:4,6 17:7 25:12 31:16 32:2,6 58:1,6,7,7,8 70:2 113:21
estimates 9:1
estimating 16:6
europe 79:22 79:23 80:3,4
eventual 117:7
eventually 55:7
everybody 47:12 48:3 49:8 124:14
evidence 70:20 71:12,14 73:18 75:14,20,21 80:24 81:5,22 82:5,16,17,18 82:19,20,22 85:4 106:9,10 106:18 127:5

127:16,22 128:3 129:14
exactly 103:14 111:17
examination 4:3,4 6:6 131:22 135:5
exchange 42:24 111:5
excluding 11:20
excuse 125:8
exercise 22:21
exhibit 4:11,13 4:14,18 14:6 14:10 17:12,22 18:24 39:5 40:6 86:5 124:17 134:11 134:13
exhibits 4:10 4:17 17:24 134:7,9
exist 48:18
existed 50:9
existence 79:3
existing 24:24
expedition 81:20
experience 61:22 68:23
expertise 55:22
expires 135:24
explain 28:5,14 34:3 45:20

71:21 98:10 102:23 103:19 120:11
exposed 103:8 105:20,24
extended 10:3
extensively 27:2
extent 84:22
eyes 4:7 124:1

**f**

f 1:15 3:2 4:2 5:24 6:3 124:9 135:1,12 136:5
fact 111:5
facts 85:3
failed 45:22
fallout 44:12
false 7:6
familiar 41:14
far 32:24 34:22 90:4
father 118:14
fax 2:6,13,19
fbi 21:25 22:17 44:13 45:9,14 49:6,13 57:11 61:10 65:23 67:5,18,23 69:16,20,23 78:23,25 98:24 99:16 100:1,7 106:7,14 109:5 119:4,6 120:24 129:20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[february - go]**

| | | | |
|---|---|---|---|
| **february** 1:16 5:5 77:9,19 135:5,18 136:3 | **fired** 49:15 **firm** 5:15 95:17 **firms** 111:14,15 **firouzian** 124:5 | **foreign** 47:5 **foremost** 81:13 **forgive** 57:4 **form** 106:10,18 | **gayle** 3:8 5:4 **general** 19:7 47:13 **generally** 27:14 |
| **federal** 61:21 71:13 75:21 81:4 82:16,18 82:19 98:22 106:9 127:15 127:21 135:13 137:1,8,9 | **first** 21:7 27:19 27:21 29:13,16 29:23 43:7,11 45:4 61:12 81:13 92:24 97:24 114:16 117:21 135:6 | **formality** 92:14 **former** 28:10 **forthcoming** 2:11 **forward** 42:7 72:18 **forwarded** 16:7 | 28:7,7 **gentleman** 131:23 **geography** 46:18 **germane** 102:19,23,25 |
| **feel** 19:6 **field** 65:25 66:2 66:21 67:5 77:1 93:11 | **fishing** 81:20 **five** 56:20 60:11 86:3 104:6,9 114:4 114:5,12,13 130:15,23 | **found** 16:5 39:14 40:17 **foundation** 85:7 96:8 **four** 56:20 | **getting** 26:13 108:25 116:15 **give** 10:13 16:10 38:24 58:1 86:6 |
| **figure** 37:21 **figured** 20:25 **filed** 35:3 135:13 | **floor** 2:5 **flying** 109:18 **focus** 129:4 **folks** 26:7,15 26:17 | **fourth** 97:13 **frank** 64:14 **frankly** 34:8 **frcp** 137:1 | 101:2 121:4 130:15 **given** 39:11 **gizer** 2:3 5:15 |
| **finance** 46:17 **financed** 33:3 **financial** 26:8 32:19 55:25 61:22 94:16,19 | **follow** 78:9 82:8 130:14 **followed** 124:24 | **fronts** 50:8 **full** 21:8 61:3 **fun** 33:24 **functioning** 66:25 | **glad** 128:8 **glasses** 14:20 **global** 97:7 **globally** 26:8 33:18 97:6 |
| **find** 17:15 19:18 39:15,16 106:25 | **following** 64:12 71:2 72:4 **follows** 6:5 136:8 | **funds** 108:15 109:1 **further** 25:3 131:19 135:9 | **go** 6:24 7:16 8:10 15:5,15 18:23 19:12 21:10 23:3 |
| **fine** 31:18 32:13 83:23 85:14 87:14 130:20 | **force** 7:18 61:4 70:3,13 72:17 105:2 | **future** 22:17 | 25:3 52:19,24 60:17,18 69:19 70:21 74:20 76:11 83:20 |
| **fingers** 14:14 **finish** 82:2 85:7 **finished** 89:15 130:13 | **foregoing** 135:3,8,9,11 | **g** | 87:9,9,13 90:10,19,21,23 |
| | | **gain** 32:19 **gaithersburg** 3:5 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[go - hand]**

| | | | |
|---|---|---|---|
| 90:23 92:16 | 81:11,13,23,24 | **government** | 50:12,13 55:12 |
| 93:4 96:16 | 82:15,25 83:1 | 27:13,14 28:15 | 55:16,23 56:3 |
| 104:15,17 | 83:13 84:13 | 28:16 30:19,20 | 56:14,25 57:8 |
| 106:24 110:5 | 85:2,13,19 | 37:10 41:12,15 | 57:11,16 59:6 |
| 116:21 122:10 | 86:1,6 87:10 | 42:2,5 45:12 | 59:8,12,16,18 |
| 128:6 129:7 | 87:19 88:25 | 46:9,12,23 | 63:16,18 64:12 |
| 131:6 | 89:4,6,21 | 47:1,5 55:24 | 64:15 66:25 |
| **god** 14:12 | 90:10 91:8 | 57:12 79:9 | 79:12 94:2 |
| 86:17 90:1 | 92:15,23 93:5 | 93:15,24 94:6 | **group's** 45:25 |
| 116:13 | 94:10 95:10 | 95:12 96:23 | **groups** 47:13 |
| **goes** 10:4 | 96:11,15 97:13 | 107:4,21 | 47:15,19 49:9 |
| 116:14 | 97:14,18 100:6 | 108:14 111:7 | 59:3,9,14 |
| **going** 6:24 7:7 | 101:17 102:16 | **governments** | 72:23 73:1 |
| 7:16 8:13,21 | 104:10,19 | 94:18 | **guess** 9:2,6 |
| 9:21 10:1 | 105:20 106:18 | **graciously** | 15:15 20:5 |
| 11:11 13:9,12 | 108:9 110:2 | 98:21 | 34:15 38:8 |
| 13:13 14:5,12 | 113:8 114:6,10 | **great** 7:24 9:24 | 48:20 58:4,5 |
| 14:13 16:9 | 116:25 118:4 | 19:19 35:20 | 113:22,23,24 |
| 17:21 18:14,16 | 119:2 121:6 | 43:23 55:19 | **guessing** 20:3 |
| 18:23 19:21 | 122:17 123:5,7 | 133:3,24 | 40:8 |
| 23:6,11,13 | 124:13,15,20 | **grid** 64:10 | **guy** 28:22 29:1 |
| 25:23 30:4,5 | 125:22 126:25 | 65:21,22 66:18 | 33:9 |
| 33:9,14,25 | 127:8 129:6 | 66:24 | **guys** 30:7 56:6 |
| 35:6 40:23 | 131:11 134:3 | **ground** 6:24 | 68:6 116:15 |
| 48:6 52:11,22 | **good** 5:1,12,19 | **grounds** 73:15 | 127:12 |
| 54:12 55:12 | 5:22 6:7 32:4 | 80:23 89:7 | **h** |
| 56:9 57:8 60:3 | 35:23 38:5 | 109:23 127:1 | |
| 60:5,8,21 68:4 | 44:12,20 60:15 | **group** 41:6 | **h** 4:9 44:22,24 |
| 69:13 70:16,17 | 87:13 90:16,23 | 44:16 45:7,9,9 | 124:8 126:5,6 |
| 70:22 71:7,16 | 107:17 | 45:11,14,15,17 | **hac** 2:11 |
| 72:12,14 73:10 | **goodness** 83:20 | 45:19 47:7,10 | **hacking** 72:23 |
| 73:14,22 74:15 | **google** 53:6 | 47:11,18,25 | 73:1 |
| 74:18,24 76:9 | **google'd** 58:16 | 48:11,13,16,19 | **half** 34:16 |
| 77:21 79:7,19 | **gotcha** 45:2 | 48:20,24 49:20 | 93:20 |
| 80:22 81:3,11 | | 49:23,24 50:8 | **hand** 135:18 |

Page 13

**[handed - hunter]**

| | | | |
|---|---|---|---|
| **handed** 54:8 | 127:6,10,17 | 117:9,14,17 | **homeland** |
| **handled** 41:21 | 128:8,20 129:2 | 124:2 126:8,10 | 94:16 |
| 136:8 | 129:13 130:4 | 126:16 | **homework** 28:8 |
| **handler** 41:14 | 130:11 131:1,3 | **hearing** 112:13 | 28:13 |
| 41:18 42:2,8 | 131:17 132:1 | 115:6 117:12 | **honest** 43:8 |
| 42:16,16 43:6 | 133:24 135:15 | **held** 52:14 | 76:21 |
| 44:8 48:10,15 | 136:1 | **help** 19:20 | **honestly** 10:14 |
| 49:22 51:1 | **happen** 22:5 | 61:24 | **hope** 56:4 68:5 |
| 54:2 69:14 | 41:3 76:15 | **helpful** 19:12 | **hoping** 9:25 |
| 79:9,13,20 | **happened** | 57:21 | **hotel** 36:4,6,8 |
| **handling** 53:9 | 40:25 52:16 | **hereunto** | 36:13 37:14 |
| **hang** 33:12 | 64:15 65:12,13 | 135:18 | 40:25 41:3 |
| **hansen** 2:3 4:3 | 121:1 133:16 | **hesitated** 39:12 | 77:10,18 |
| 5:12,13 6:6,11 | 133:18,19 | **hey** 33:8 | **hour** 60:3 |
| 12:23 13:4,11 | **happy** 9:18 | **high** 103:8 | **house** 96:5 |
| 13:17,22 14:7 | 22:19 78:20 | 105:19 | **huh** 21:13 |
| 14:9 17:20 | **hard** 115:25 | **highlight** 71:16 | 91:10 |
| 18:2,10 26:24 | **hassan** 126:2 | 94:12 | **huhs** 8:2 |
| 27:10 60:2,14 | **he'll** 87:6 | **highly** 125:20 | **human** 45:19 |
| 60:18 70:24 | **head** 8:2 60:7 | 128:13 | 45:19 46:2,6 |
| 71:25 72:11 | 68:22 93:8,17 | **highway** 36:17 | 46:21 |
| 74:5,22 76:1 | 94:4 | 37:22 | **humans** 45:23 |
| 77:25 80:17 | **headquarters** | **hill** 95:18,20,22 | **hunter** 1:6 5:9 |
| 81:17,25 82:4 | 120:24 | 96:4 | 5:14 6:13 |
| 83:8 85:5,9,25 | **hear** 9:8 21:9 | **hit** 60:7 | 25:21 31:14 |
| 87:4,5,23 88:4 | 22:10 61:23 | **hoarding** 97:8 | 34:7 36:23,25 |
| 88:15,20 89:2 | 112:22,24 | **hogan** 125:24 | 49:25 50:4,14 |
| 89:11,15 96:14 | 114:21 122:9 | **hold** 30:3 40:21 | 50:21 53:9,15 |
| 96:18 99:25 | **heard** 6:10 10:7 | 60:12 90:21,21 | 53:19 57:1 |
| 101:2,15 104:7 | 22:8 47:9,10 | 107:7 116:14 | 62:5 63:4,23 |
| 104:12,16 | 47:24 58:20 | 116:20 | 64:6,21 69:25 |
| 114:14 116:17 | 59:24 108:3 | **holding** 68:16 | 71:21,24 74:2 |
| 118:4 122:1 | 110:13,17,24 | **hole** 32:24 | 80:8,15 98:7 |
| 123:21 124:7 | 112:1 114:17 | **home** 12:13 | 98:12 99:4,11 |
| 125:3,12 126:4 | 115:4 117:4,8 | | 99:18 100:25 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[hunter - involved]**

102:7 106:1
108:25 111:10
111:13 115:4,8
115:11 116:3,8
116:10,24,25
117:5,10,22
136:4

**i**

**idea** 59:15
76:16 122:24
123:7
**identification**
134:10,14
**identified**
109:8
**identify** 115:25
**ikdam** 121:19
**immigration**
56:2
**impact** 48:14
**impair** 10:18
10:22
**impetus** 48:23
98:5,11
**implementing**
94:20
**implicate** 54:21
**important**
21:11 24:15
**improper**
124:23
**improperly**
75:21
**inadmissible**
71:13

**incidences**
62:17
**incidental** 52:9
52:24
**include** 84:17
**included**
111:11 136:14
137:3
**includes** 8:25
**including** 18:19
118:6
**indicate** 112:21
**individual**
132:14
**individuals**
28:3,9
**influence** 10:21
**inform** 78:23
**information**
23:17 42:7,14
42:20,21,25
43:21 46:10
49:18 50:15,20
51:6,7 53:2,5
65:24 68:24
72:2,18 75:11
98:6 103:13,16
124:25 127:2
**informed** 34:1
65:18
**initial** 61:20
62:2,4 97:21
98:5,10 100:22
**initiate** 9:19
30:25 62:1

**initiated** 26:17
28:4 30:22
37:3
**initiatives**
94:21
**inside** 53:13
**insist** 9:21
74:16 76:9
**instance** 35:4
**institutions**
94:19
**instruct** 82:22
121:9,18,21
**instructed**
27:12 82:10
**instructing**
27:4,9 83:6
**instructs** 9:12
**intelligence**
46:7,11,13
69:16 93:8,17
94:4
**intelligent** 46:6
**intent** 20:10
**interest** 100:8
133:21
**intermediary**
42:9
**internet** 29:2,8
**interpreting**
79:14
**interrupt** 8:10
14:5 82:1
**interrupting**
78:3,3

**interruption**
101:14
**introduce** 5:10
82:20 98:21
110:2
**introduced** 6:8
22:15 26:2,5
26:21 27:16,24
28:4 29:16,19
39:5 40:5 50:9
50:11,12 69:23
98:24 99:16
**introducing**
21:24
**introduction**
7:1
**invested** 32:20
**investigation**
96:7 98:23
**investigations**
70:6,9,14 93:9
94:18 95:25
**investigative**
26:9
**involve** 24:23
25:21 30:18
32:15 37:9
45:11 99:4
108:25
**involved** 32:18
56:3,25 57:22
95:24 98:19
117:1 132:14
132:25 135:17

Page 15

**[involvement - know]**

| involvement | j | k | 43:23 44:3 |
|---|---|---|---|
| 28:15 55:20,21 | **jack** 80:13 | **keep** 54:6 60:5 | 45:6,14,17,19 |
| 56:13,14 58:10 | **james** 129:20 | 60:8,12 70:8 | 45:24 46:3,8 |
| 74:3 94:6 | **january** 70:2 | 72:17 74:18 | 46:10,15 47:3 |
| 96:22 111:13 | 77:9,19 | 79:7,7 86:22 | 47:23 48:5 |
| **involves** 80:25 | **jcpoa** 118:23 | 88:20 116:14 | 49:6 53:14 |
| **involving** 25:15 | **jfn** 97:2 | 124:25 | 57:19 59:2,2 |
| 26:15 38:22 | **job** 7:24 | **kidnap** 73:9 | 59:10,13 64:13 |
| 56:2 76:2 | **joe** 118:11 | 75:4,8 | 64:15 65:6,9 |
| 103:7,8 105:19 | **jog** 36:5 37:13 | **kids** 65:2,8 | 65:16 66:13,14 |
| 111:6,10 | **john** 1:15 3:2 | 66:6,8 | 66:16 67:9,14 |
| **iphone** 14:17 | 4:2 5:8,24 6:3 | **kill** 73:9 75:4,8 | 67:15,16,17,20 |
| 120:4,6 | 74:19 91:17 | **kind** 6:7 19:23 | 67:25 68:10,11 |
| **iran** 24:23 | 92:25 93:6 | 28:24 32:25 | 68:17,18 73:2 |
| 72:19 107:4,21 | 129:24 134:4 | 33:24 45:6 | 76:23,24 78:10 |
| 115:21 121:10 | 135:4 136:5 | 47:21 56:21 | 83:21 86:4 |
| 121:14 | **join** 47:14 48:4 | 116:3 119:22 | 90:11 93:2 |
| **iranian** 22:8,10 | 117:20 | **kinds** 22:16 | 97:8 98:3 |
| 108:13,14,20 | **judge** 73:22 | **king** 126:9 | 100:11,21 |
| 111:7 | 74:13 82:17 | **knew** 65:21,22 | 101:16,19 |
| **irrelevant** | 83:4 124:18 | 67:18 117:5,8 | 102:22 104:15 |
| 70:18,23 71:12 | 127:21 129:15 | 117:23 118:1 | 105:10 106:23 |
| 73:16 75:12 | **judge's** 71:18 | **know** 6:7 9:3,4 | 107:15 109:22 |
| 80:1,7,23 | **judgment** | 10:5 11:2 | 111:18 112:9 |
| 81:11 82:10 | 129:8 | 15:19 16:23 | 113:5,15,16,25 |
| 127:2 | **juice** 130:25 | 17:6 19:10,14 | 114:8 115:25 |
| **ish** 93:21 | **july** 122:15 | 20:14,20 21:17 | 117:15,23 |
| **issue** 75:19 | **jump** 97:13 | 22:5,7,8 23:1 | 118:1,2 120:5 |
| 127:23 | **jury** 71:18 | 26:1 28:13,21 | 120:6,7,18 |
| **issues** 10:17 | 73:22 81:1,3 | 28:25 30:12 | 121:17 122:22 |
| 129:5,5 | 81:18 82:20,23 | 32:5 33:4,5 | 123:1,2,12 |
| **it'll** 13:17 74:13 | 83:3 128:4 | 36:16,17 37:17 | 126:11 127:17 |
|  | **justice** 41:24 | 37:19 38:6 | 131:23 132:3,6 |
|  | 43:24 94:15 | 39:18,25 40:10 | 132:6,8,8,10,11 |
|  |  | 40:22 43:11,20 | 132:13,16,18 |

Page 16

**[know - lot]**

|  |  |  |  |
|---|---|---|---|
| 132:22 133:4,8 | **lawyer** 85:14 | **lines** 66:22 | **locate** 65:2,8 |
| **knowledge** | **lead** 70:19 | **lisa** 1:22 6:1 | **located** 12:12 |
| 45:24 46:17,17 | 73:17 75:13 | 135:2,23 | 34:19 67:1 |
| 46:18,19 69:15 | 80:24,25 81:21 | **listed** 15:22 | **location** 51:20 |
| **known** 21:18 | 82:5 127:4 | 20:13 | 52:5 65:23 |
| 23:23 | **league** 58:21 | **listen** 12:9 | 109:17,25 |
| **kong** 126:9 | 59:1,5,17 | **listened** 108:17 | 110:1,5,7 |
| **korea** 24:25 | **learn** 65:24 | 112:2 | **locations** 51:25 |
| 108:15 111:8 | 66:17 | **listening** 6:14 | 67:8 |
| 118:7,7,8 | **learned** 27:21 | 12:16 108:5 | **locked** 136:12 |
| **korean** 115:16 | 27:23 65:23 | **literally** 19:17 | 137:1 |
| 115:21 | **leave** 57:2 | 37:19,21 52:21 | **log** 104:10 |
| | **leaving** 21:10 | 87:24 121:4 | **long** 20:4 34:12 |
| **l** | 23:2 52:7 | **litigation** 12:6 | 50:9 57:22 |
| **l** 1:22 2:11 | **led** 25:8 | 19:3 31:21 | 65:16 66:14 |
| 44:22,25 126:6 | **left** 49:13 77:1 | 34:23 35:8,16 | 93:17 103:12 |
| 135:2,23 | 102:13 105:7 | 36:23 37:7 | 113:17 114:8 |
| **lambert** 84:9 | 105:16 | 40:4 62:6,6 | **longer** 55:23 |
| 84:10,16 | **legal** 5:4 136:7 | 86:2,15 90:6 | 79:1 114:4,5 |
| **larger** 14:1 | **letter** 78:24 | 91:6 92:8 | **look** 68:9,25 |
| **laughs** 48:4 | 79:4 | 95:23 97:6 | 86:13 88:24 |
| **laundering** | **level** 103:8 | **little** 6:25 10:2 | 89:9 131:4 |
| 26:9 93:9,18 | 105:19 | 15:6 17:12 | **looked** 87:21 |
| 94:2,5,17,21 | **liaison** 41:20 | 22:24 24:10,12 | 88:19 89:14 |
| 96:1 97:7 | 42:9 56:6 | 25:3,24,25 | **looking** 70:4 |
| **law** 2:16 3:3 | 79:16 | 30:1 35:13 | 72:17 107:1 |
| 45:20 95:17 | **liar** 128:25 | 50:24 56:4,11 | **looks** 86:17 |
| 111:14,15 | **lies** 128:11 | 61:10,11 62:25 | 91:11 |
| **lawful** 135:6 | **likely** 9:8 25:16 | 77:16 83:11 | **los** 2:5 |
| **lawsuit** 31:7,13 | 32:12 | 130:19 | **lose** 68:5 |
| 32:16 35:3 | **limit** 89:3 | **lived** 52:3 | **losing** 130:25 |
| 63:5,25 64:22 | **line** 4:7 71:23 | **llc** 3:3 97:2,10 | **lot** 27:7,8 51:24 |
| 75:13 80:10 | 91:16 114:7 | **llp** 2:3,10 | 52:6 60:8 |
| 83:14 84:11,14 | 136:15 137:4 | **lobby** 41:4,5 | 62:16 64:2 |
| 98:15 102:10 | | 77:10,18 | 68:11 81:8,8 |
| 127:3 | | | |

Page 17

**[lot - members]**

| | | | |
|---|---|---|---|
| 109:10,17,20 109:21 | **man** 108:14,21 | 30:18,18 55:24 | 40:24 41:6 |
| **lowell** 2:11 | **mandarin** 36:9 | 56:4 81:9,10 | 42:24 43:7,11 |
| 5:17 6:14 | 36:10,11,18 | 82:10 98:18,20 | 43:14 50:17 |
| **lunch** 9:24 | 37:14 38:1 | 99:2,3,4 | 51:10,14,23 |
| | 41:1 | 100:10,11,21 | 52:5,10,14,16 |
| **m** | **manner** 33:6 | **mcrae** 2:3 5:16 | 52:25 53:1,4 |
| | 35:1 135:8 | **mean** 15:19 | 56:19 62:14,15 |
| **m** 1:9 2:4 5:9 | **map** 37:20 | 26:21 31:6 | 62:18 63:10,11 |
| 124:8 136:4 | 122:13 | 32:5 34:15,16 | 64:1 67:12,13 |
| **ma** 1:22 | **mark** 17:21 | 46:8,19 48:2 | 77:17 78:7 |
| **machine** | 86:1 | 66:3 76:22 | 84:20 97:21 |
| 135:10 | **marked** 134:8 | 115:18 124:5 | 98:5 99:10 |
| **made** 26:14 | 134:12 | 124:10 125:24 | 100:8,22,23 |
| 34:19 49:3 | **martin** 126:19 | 126:2,19 | 101:6,11,17,18 |
| 55:7 71:1,2 | 131:24 132:6,9 | 129:12,12 | 101:24 102:5,7 |
| 82:7 128:12,12 | 132:10,12,22 | 132:6,20 | 102:11,13 |
| **mail** 16:4 67:23 | 133:1 | **meaning** 32:19 | 103:12 106:8 |
| **mails** 39:10 | **maryland** 3:5 | 39:8,9 64:4,10 | 106:17 108:7 |
| 69:11 | **massachusetts** | **means** 16:23 | 108:19 109:6,8 |
| **main** 45:25 | 135:2 | 41:18 51:3 | 109:13 111:1 |
| 79:11 97:9 | **material** 54:5 | 69:4 | 111:19 119:3 |
| **maine** 12:13 | 55:6 72:23 | **meant** 59:13 | 119:24 120:18 |
| **maintained** | 103:7,20 | **medical** 10:17 | 120:23 122:17 |
| 94:1 | 105:19 | **medication** | **meetings** 24:10 |
| **major** 44:12 | **materials** 26:15 | 10:21 | 29:25 51:4,5 |
| **make** 9:1 13:25 | 54:15 55:1 | **meet** 23:6,13 | 51:21 52:18,19 |
| 14:24 33:18 | **matter** 5:8 | 26:14 51:8,16 | 56:24 62:23 |
| 43:2 71:6 88:2 | 22:13 24:22 | 51:19 52:11,12 | 63:1,3,7,8 64:4 |
| 89:10 90:7 | 25:15 34:6,24 | 52:21,23 61:12 | 120:19 |
| 136:14 137:3 | 36:4 73:16 | 76:14 77:8 | **mehdi** 124:5 |
| **makes** 113:3 | 75:12 80:16,25 | 80:4 100:16 | **member** 47:21 |
| **making** 49:2 | 81:19 126:14 | **meeting** 24:2,4 | 55:16,24 57:22 |
| 71:14 82:25 | 127:3 133:19 | 24:5,13,17,21 | 107:4,21 |
| 107:6,23 | **matters** 22:19 | 29:20,23 35:25 | **members** 55:22 |
| **malice** 75:18 | 26:9,9 30:17 | 36:22 37:1,3 | 57:16 59:17 |
| 127:25 | | | |

Page 18

**[members - murphy]**

| | | | |
|---|---|---|---|
| 66:3 | 97:19,25 109:5 | **moment** 85:20 | 101:5 103:2 |
| **memory** 37:13 | **method** 29:7 | 86:6 88:10 | **moynihan** 1:15 |
| 78:15 | **michael** 2:16 | 101:3 110:13 | 3:2 4:2 5:8,24 |
| **mention** 11:10 | 2:17,20 5:20 | 110:20 131:4 | 6:3,7 13:6,25 |
| 31:7 99:10 | **middle** 19:16 | **money** 24:24 | 14:11 18:11 |
| 106:1 116:3,24 | 20:17,22,22 | 26:9 32:20 | 27:6 60:5 61:2 |
| **mentioned** 12:4 | 21:4,8,10,15,22 | 93:9,18 94:2,5 | 72:3,15 75:1 |
| 21:22 25:19 | 22:5 23:2,2,11 | 94:17,20 96:1 | 76:9 78:14 |
| 28:3,18 36:25 | 23:24 24:14 | 97:6 115:15,17 | 81:7,13 82:9 |
| 40:13 51:10,22 | 40:9,14 121:14 | 115:20 | 83:11 85:11 |
| 51:23 55:13 | **miles** 26:12 | **monies** 111:8 | 86:9,18,24,25 |
| 79:16 115:8,12 | **million** 118:18 | **month** 31:11 | 89:17 91:17 |
| 116:4,7 118:9 | **millions** 118:21 | **months** 31:23 | 92:25 93:6 |
| 118:12,14,16 | **mind** 102:16 | 32:1,3 35:21 | 104:25 122:14 |
| 118:19,23 | **minimal** 82:21 | 35:24 83:21 | 124:2,19 125:5 |
| 130:6 | **minimum** | **morning** 5:2,12 | 125:25 129:18 |
| **mentions** 51:13 | 88:21 | 5:19,23 6:7 | 130:12 131:18 |
| **message** 4:13 | **minister** 107:3 | 61:3 105:1 | 131:20 133:25 |
| 16:5 17:19 | 107:20 | **move** 72:6,12 | 134:4 135:4 |
| 21:7,8 23:9,14 | **minute** 28:18 | 72:14 76:6 | 136:5 |
| 23:20,21 38:16 | 34:14,15,15,16 | 77:2 78:12 | **moynihan's** |
| 38:17 39:3 | 60:11 73:13 | 82:12 83:10 | 74:3 96:19 |
| 40:13 | 87:25 107:8,15 | 88:21 89:12 | **muffled** 114:24 |
| **messages** 16:5 | 124:12 126:24 | 94:10 108:9 | 115:2 |
| 18:20 19:13 | 126:25 131:7 | 114:11 118:4 | **muldrow** 130:7 |
| 20:8 30:5,8 | **minutes** 48:7 | 119:2 125:22 | **multiple** 28:22 |
| 38:6 39:9,9 | 104:6,9 113:19 | 128:16 129:17 | 28:23 29:12,22 |
| 107:16 126:21 | 113:20 114:1,1 | 130:2,5,10,22 | 30:4 67:8 |
| 129:19,22 | 114:2,3,4,5,12 | 130:23 | 102:13 |
| **messaging** 38:3 | 114:13 130:16 | **movement** 33:4 | **murphlaw.net** |
| 38:9 39:19 | 130:23 | **movie** 124:3 | 2:20 |
| **met** 28:2 29:11 | **mislead** 81:3 | 126:10 | **murphy** 2:16 |
| 29:13 35:18 | **mission** 46:1 | **moving** 33:3 | 2:17 4:4 5:19 |
| 41:5 62:16 | **mister** 79:7 | 56:19 60:12 | 5:20 11:18 |
| 79:23 80:3 | | 98:17 100:5,9 | 12:23,25 13:5 |

Page 19

**[murphy - objection]**

14:4,8 17:17
70:16 71:4
72:8,13 73:10
73:13 75:10
76:5 77:21
78:2,18 80:19
81:18,23 82:3
82:13 84:4
85:2,6 86:18
86:24 87:19,25
88:4,11,18,23
89:2,4,12 99:7
99:12,19,23
114:6,10
117:20,25
122:3,8 123:17
124:12 125:7
125:12 126:24
127:14,19
128:17,22
129:4 130:1,9
130:18 131:20
131:22 133:22

**n**

**n** 4:1 124:9
126:5,6
**n.w.** 2:11
**nail** 38:13
**name** 6:10
21:17,19 36:4
36:25 44:17,22
45:4,17 47:7,9
59:3 92:25
93:6 101:23
111:9 115:4,6

115:7 116:7
124:5,11
125:24 126:2
126:19 130:6
131:23 132:7
132:16
**names** 27:13
111:15 124:13
124:21,23
125:2,13,15
**narrow** 62:25
**national** 109:10
109:18
**nature** 97:4
**near** 120:24
**necessarily**
111:18
**necessary**
136:14 137:3
**necessitate**
111:13
**need** 9:17 10:1
30:11 33:12
77:4 85:13
87:5,11 93:2
104:13 107:14
116:17,25
130:13,19,22
131:4
**needed** 84:17
85:16 98:23
**never** 21:20
36:13 54:7
67:24 123:13
133:20

**new** 93:10,18
94:5
**ninth** 129:7
**nods** 8:2 68:22
**nomenclature**
47:12
**non** 96:8
**noon** 10:6
104:8
**nope** 55:9 99:9
**normal** 8:11
**north** 24:25
108:15 111:8
115:16,21
118:7,8
**notarized**
92:13
**notary** 92:3
135:2
**notating**
136:15 137:4
**note** 4:6 76:7
128:9
**noted** 72:10,11
74:6,12,23,25
76:4 83:9
127:7,13
128:15 130:4
**notes** 130:13
131:5
**notice** 92:5
**notification**
33:13
**notify** 35:3

**notifying** 31:19
**notwithstandi...**
64:16
**nsa** 57:17
**number** 7:9
14:6 18:6,15
19:8 25:12
26:7 54:15
56:19 67:15,17
67:18,21 68:1
68:12,21 86:2
124:17 136:15
137:4
**numbers** 67:19

**o**

**o** 124:9
**oath** 6:5 7:17
61:2 82:7
105:1 115:3
**oaths** 135:3
**obama** 126:23
**object** 70:17,17
71:22 73:14,24
75:23 77:22
78:11 80:22
81:4,6,11 85:3
87:20 89:6
95:11 114:7
126:25
**objecting** 96:12
**objection** 26:20
70:23 71:14,22
72:8,9 73:12
74:12,18 75:11
78:3,4,6,18

Page 20

**[objection - original]**

| | | | |
|---|---|---|---|
| 80:14,20 83:9 | **oh** 8:6 11:16 | 60:2,15 63:22 | 131:2 132:5,16 |
| 99:7,12,19,24 | 14:12 17:1,6 | 64:8,25 65:11 | 132:18 133:3 |
| 117:18,21 | 31:8,25 32:17 | 65:15 66:17 | 133:22 |
| 121:24 127:6,9 | 36:24 39:11 | 67:4,9,20 68:8 | **old** 40:19 |
| 127:12 129:10 | 45:10 50:5 | 68:19 69:11 | 116:16 |
| 130:1,9,20 | 56:16 68:4 | 70:24 73:10 | **once** 10:2 31:11 |
| **objections** 9:9 | 86:17 90:1,22 | 74:17 75:10 | 40:7 41:10 |
| 9:11 71:8 74:6 | 116:13 122:22 | 76:14,17,19 | 49:7 68:9 |
| 74:23,25 76:4 | **okay** 6:22,24 | 77:15 78:13,22 | 75:19 80:5,5 |
| 76:7,8 82:24 | 8:9,15 9:8,22 | 79:18 80:2 | 82:6 93:2 |
| 83:7 88:6,7 | 11:10,14,17 | 81:17,23 82:3 | 109:1 115:9,10 |
| 89:3,5 122:5 | 13:5 14:3,8,14 | 83:22 84:10 | 122:1 127:15 |
| 127:13 128:15 | 14:19,21,22 | 85:9 87:17 | 133:24 |
| 129:11 | 15:8,20 17:2,8 | 89:25 90:15 | **open** 128:25 |
| **obligated** 7:19 | 17:16 18:10 | 91:2,8 92:12 | **operating** 47:8 |
| **obtain** 16:22 | 20:5 21:21 | 93:3 94:3,10 | 49:21 51:2,15 |
| 43:21 72:22 | 22:2,12,23 | 95:9,14,21 | 54:3,10,25 |
| 81:20 | 23:10 24:9 | 96:3,17 97:13 | 55:4,5,9 70:5 |
| **obtained** 55:6 | 25:1,5,9 27:10 | 98:9,17 99:22 | **operations** |
| 120:11,14,16 | 27:18,23 29:7 | 100:15,19 | 28:16 30:19 |
| **occur** 29:23 | 29:25 30:9 | 101:2,24 | 37:11 |
| 101:18 | 31:4,9 32:7,18 | 102:22 103:2 | **opposed** 46:2 |
| **occurred** 78:8 | 33:21 34:12,18 | 104:5 105:7,15 | 118:7 |
| 119:15 120:23 | 34:22 35:12 | 105:16,21 | **order** 4:18 |
| **occurrence** | 36:20 37:18,23 | 106:21,24 | 124:18 125:4 |
| 80:7 | 38:13,24 39:3 | 108:4,9,24 | 125:10,17,20 |
| **occurring** | 40:2 41:10,14 | 110:24 112:1 | 130:17 |
| 77:13 | 43:4 44:7 45:2 | 112:12,16,18 | **organization** |
| **office** 66:21 | 45:7 47:2,6 | 113:14,25 | 45:13 |
| 67:5 93:19 | 49:4,20 50:6 | 114:24 115:3 | **organized** |
| 94:5 136:11 | 50:19,23 51:9 | 116:8 118:18 | 57:11 |
| **offices** 2:16 | 51:20 52:10,23 | 118:23 119:2 | **oriental** 36:7,9 |
| **official** 45:17 | 53:6 54:1,9 | 119:10,19 | 37:14 |
| 47:7 | 56:17 57:4 | 120:2 121:3,9 | **original** 135:13 |
| | 58:12,20 59:16 | 122:25 123:3 | 135:14 136:10 |

Page 21

**[original - phone]**

136:20,22
**outside** 69:7
  96:24
**oversight** 41:20
  96:5
**overstock.com**
  28:22
**overstock.com.**
  28:12
**overturn** 129:8
**own** 11:1,2,4
  11:21 28:8,13
  28:19 102:14
  106:11 112:2
  113:7

## p

**p.m.** 104:22
  131:12,14
  134:6
**page** 4:2,7,10
  4:13 15:17
  20:12 21:8
  88:24 89:10,23
  89:24 90:13,14
  91:8 110:11
  119:2 136:15
  137:4
**pages** 4:12,14
  4:19 15:5
  87:18 89:19
  136:14,17,17
  137:3,6,6
**paid** 95:5
**pakistan** 107:3
  107:20

**pakistani**
  108:13,21
**paper** 49:19
**paragraph**
  92:24 94:11
  97:14 98:17
  100:5 101:5
  102:17 103:2
  105:17 106:3,5
  109:4 110:10
  111:3
**parameter** 78:7
**parking** 51:24
  52:6 62:16
  64:2 109:10,17
  109:20,21
**part** 16:3 20:15
  26:12 29:4
  45:16 56:18
  77:23 93:11
**participant**
  111:8
**participants**
  111:6
**parties** 29:22
  135:16
**parts** 48:21
**party** 29:19
  79:18
**pass** 21:12
  42:21 53:2,4
**passage** 71:17
**passed** 126:21
  129:18,22

**past** 98:19
**pat** 53:20 64:13
  110:3
**patl** 19:1
**patrick** 1:9 5:9
  5:21 7:3 19:2,3
  22:11,15,20
  26:1,2,5 32:20
  42:6 55:21
  73:19 95:14
  97:20,22,25
  98:18 100:9
  103:5 106:8
  108:3 109:4
  110:11 136:4
**pause** 16:11
  86:8 90:18,20
  101:4
**pauses** 112:9
  112:19
**paying** 95:7
**pdf** 15:18
  136:12 137:1
**pen** 59:3
**penalty** 7:20
  92:6,9 136:16
  137:5
**pending** 9:21
**people** 26:18
  41:7 46:16,22
  56:17,20 65:25
  66:2 81:8
  112:11 116:4
**percent** 118:25

**perception**
  113:7
**perfect** 104:12
**perfectly** 9:3
**performed**
  28:19
**period** 23:7
  39:21 61:15,16
  77:24 136:18
  137:7
**perjury** 7:20
  92:6,10 136:17
  137:6
**permission**
  128:9
**person** 8:12
  19:1 22:6 23:6
  23:19 29:11,14
  35:19 37:3
  41:20 42:9
  47:4 62:17
  63:2 64:3 75:8
  84:4 93:25
  103:17 104:2
  108:13,20
  111:12 116:2,6
  116:7 132:3
**person's** 21:19
**personal** 96:25
**personally** 66:5
**persons** 103:9
  105:20,24
  109:8 133:6,14
**phone** 30:5
  34:19 38:3,22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[phone - probably]**

38:25 39:1,2
52:6 64:2,4
67:17,18,19,20
68:1,5,12,24
69:9 86:23
102:14 103:18
104:10 106:11
106:19,25
107:1,8,9,18
109:7,10,20,21
119:5,25
130:24
**pick** 105:20
**picked** 109:24
110:1,5
**picture** 20:21
62:10
**pictures** 20:21
**place** 35:25
106:25 109:9
109:14 111:19
**places** 49:9
**plaintiff** 1:7 2:2
2:9 5:13,18
6:12 135:5
**plaintiff's** 4:10
134:9 135:14
**plane** 52:12
110:3
**play** 7:13
110:11 119:23
**played** 110:25
113:10 122:21
133:6,11

**playing** 113:2
120:1,3
**please** 5:10 6:1
7:25 8:3,18
9:20 60:19
74:21 86:13
88:20 89:2
90:19 98:10
115:18 130:16
130:23
**plugged** 116:15
**point** 9:13,24
21:18 25:20
35:7 36:15
65:17,17 75:1
79:10 110:25
122:13
**political** 71:10
**politically**
103:8 105:19
105:24
**pop** 13:18 30:5
**popping** 30:8
**populate** 68:18
**port** 33:8,9
**portion** 93:5
94:10,25 97:18
101:8 108:10
**portioner**
100:7
**ports** 33:5,18
**position** 93:24
129:16
**possession**
17:13 39:7

103:6 119:19
119:23
**possible** 19:12
76:22 77:17
131:4
**possibly** 19:14
77:11
**post** 33:4
**potential** 83:5
**potentially**
42:14 81:21,21
**power** 9:25
**practice** 92:7
**prearranged**
29:20
**predicate** 25:7
**predominantly**
33:3 38:11,15
47:3
**prefer** 86:13
**preliminary**
117:6
**preparations**
11:21
**prepare** 11:22
12:9 92:21
**presence** 92:3
**present** 3:8
13:1 29:19
41:7 63:8 74:9
77:20 78:16
81:18 82:22
84:4 100:12
101:24

**presently** 67:20
**president** 71:11
118:11 126:23
**presidential**
70:15
**presume** 35:7
**pretty** 10:6
14:2 44:20,21
58:18 87:13
90:16
**previous** 135:5
**previously** 10:7
62:13 97:21
112:5
**primary** 69:4
95:21
**principal** 97:1
**prior** 15:10
102:3,4 108:4
110:13 128:23
129:13
**private** 46:23
47:2 56:15
93:7,25 94:7
95:1,25 97:11
**privilege** 11:3
**pro** 2:11
**probably** 6:21
30:15,24 31:15
32:8 35:23
37:21 38:6
48:1,2 57:24
57:24,25 83:21
93:20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[problem - rabbit]**

**problem** 14:16 30:9 37:25 88:12
**problems** 49:7
**procedure** 51:3 51:15 54:4,10 54:25 55:4,5 55:10 135:13 136:19,21
**procedures** 53:13 124:24
**proceed** 104:11
**proceeded** 110:11
**process** 7:7
**produce** 13:7 20:10
**produced** 16:24 17:5 18:4,25 39:4 40:5 86:1
**production** 15:21 18:6,15
**productive** 45:23 47:16 48:6
**professional** 96:19 135:23
**proficient** 20:15
**profit** 96:8
**proper** 124:24
**proposal** 125:18

**proposing** 125:21
**protect** 125:10
**protective** 4:18 124:17 125:17 125:20
**protocol** 44:2 55:3
**protocols** 53:14
**prove** 75:17 128:24
**provide** 8:21 10:18,23 46:10 61:6 72:21 105:4 106:8
**provided** 35:14 72:23 136:19 137:8
**providing** 55:22
**pseudonym** 124:3 126:8,16
**public** 29:3,3 49:14,18 135:2
**pull** 16:9
**pulling** 13:9
**purpose** 22:21 30:16 37:5 48:22 49:23 50:12 52:2 53:1,4 78:17 85:17 90:5 91:5 109:5 115:20 121:10 121:19,22

127:22
**purposes** 21:24 22:3 49:24
**pursuant** 135:12
**put** 42:23 59:3 69:16,20 85:22 86:6
**puts** 56:4

**q**

**qualified** 135:3
**quality** 114:20 115:1
**question** 7:9,13 7:13 8:20,22 9:21 21:14 35:20 38:5 42:17,18 43:23 43:25 44:12 51:9 54:14,22 55:19 56:5 62:23 70:10,11 70:17,18 71:5 72:7 74:16,20 74:24 75:11 76:1 77:17,22 78:5,9,11 81:15 85:3,8 87:15 88:2,25 89:7,16 91:2 107:12,18,22 116:5 117:13 123:20 124:21 127:1 128:7,14 133:4

**questioned** 87:20
**questioning** 71:23 114:7 124:23 125:23
**questions** 8:17 9:10 19:22 55:12 60:10 73:15 74:1,11 76:23 83:2 87:10 89:22 112:20 122:12 131:19,21 133:23
**queuing** 33:10
**quick** 60:4,7 90:16 104:9 130:12 131:4
**quickly** 6:25 10:6 37:13 40:23 87:18
**quite** 34:8 64:14
**quote** 21:22 23:1 42:8 43:6 54:2 64:10 65:19 66:24 69:14 73:1 121:15

**r**

**r** 3:3 124:9 135:1
**r&s** 137:1,9
**rabbit** 32:24

Page 24

**[raised - referring]**

| | | | |
|---|---|---|---|
| **raised** 22:19 | **reason** 8:6,9 | **recess** 60:22 | 13:3 104:1 |
| 103:1 | 10:12,16 51:9 | 104:20 131:12 | 106:21,23 |
| **rarely** 21:9 | 52:13 72:24 | **recipient** 16:20 | 108:5 112:1,4 |
| **rather** 16:16 | 79:23 92:8,12 | **recognize** 8:7 | 112:22,24 |
| 42:6,20 60:8 | 110:7 | 87:15 89:16,25 | 113:3,9,18 |
| **reach** 65:1 | **reasons** 61:19 | 90:2 | 114:17,21 |
| **read** 7:12 11:23 | **recall** 6:19 20:1 | **recognizes** | 115:5,12,24 |
| 15:19 18:14,16 | 21:3,14 22:12 | 88:16 | 117:12,14 |
| 19:8 49:19 | 23:1,22,23 | **recollection** | 119:8,11,17,20 |
| 83:2 86:19 | 25:8 28:9 | 10:23 45:18 | 120:3,12,14,16 |
| 87:13 88:1,8 | 63:12 65:9,10 | 77:5,12,15 | 121:5,7 122:20 |
| 88:12,13,16 | 65:12,14 66:7 | 78:17 79:3 | 123:5,10,14 |
| 89:1 90:16 | 66:8,11,11,12 | 91:24 112:2 | **recordings** |
| 93:5 94:25 | 66:16 67:2 | 113:1 114:15 | 12:9 55:7 |
| 97:18 100:6 | 69:8 72:20 | 114:20 118:8 | 92:20 119:23 |
| 102:16 128:19 | 75:6 76:13,15 | 118:17 119:14 | **records** 18:18 |
| **reader** 90:17 | 76:16 78:19,20 | 120:22 122:23 | **recovery** 24:23 |
| **reading** 135:16 | 78:21 79:2 | **record** 5:2,11 | **refer** 47:10,11 |
| 136:24 137:9 | 80:5 83:18 | 6:8 8:2,15 | 47:18,24 59:8 |
| **ready** 33:15 | 85:21 103:15 | 12:19 17:18,18 | 59:9 |
| 104:15 131:7 | 103:17 106:2 | 17:22 18:16 | **referenced** 22:6 |
| **reagan** 52:6 | 107:24 108:22 | 19:9 21:1 | 49:21 61:17 |
| 63:11 64:1,2 | 108:23 109:13 | 60:19,21 61:1 | 100:1 110:25 |
| 67:12,12 | 111:18 113:17 | 72:9,10 74:13 | 136:6 |
| 109:10,17 | 115:6,7,11,24 | 76:20 89:5 | **references** |
| 111:1 | 116:9 118:6,9 | 99:22 104:17 | 24:16 |
| **real** 37:13 | 118:11,14,16 | 104:19,24 | **referencing** |
| 87:18 | 118:18,23 | 124:8 126:5 | 51:14 |
| **really** 6:25 | 119:22 120:18 | 129:10 131:6 | **referred** 59:16 |
| 26:21 32:5 | 120:22 121:1,2 | 131:11,16 | **referring** 21:5 |
| 40:23 41:19 | 123:1 133:13 | 134:3 135:11 | 21:16 24:3,4 |
| 42:8 56:6,6 | 133:17,20 | **recorded** 10:9 | 25:16 38:20 |
| 96:15 116:15 | **recalled** 78:1 | 106:11 120:9 | 46:5 58:2 59:5 |
| 134:1 | **receiving** 31:20 | **recording** | 59:6 105:24 |
| | | 12:20,21,24 | 106:14 132:12 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[refresh - restaurant]**

| | | | |
|---|---|---|---|
| **refresh**  78:16<br>120:22<br>**regard**  26:14<br>39:18 41:23<br>42:11 44:11,13<br>53:17 79:12<br>84:20 125:4<br>**regarding**<br>46:10 64:21<br>69:20,24 80:12<br>95:25 96:7<br>98:6 100:23<br>115:14 125:5<br>**registered**<br>135:23<br>**regularly**  26:8<br>26:10 56:3<br>61:21,23 67:19<br>**reintroduce**<br>22:20<br>**relate**  40:21<br>75:17<br>**related**  18:18<br>19:14 25:14<br>26:15,16 35:15<br>35:16 37:9<br>40:19 42:3<br>49:25 50:4,20<br>64:21 102:9<br>**relates**  22:14<br>42:9<br>**relationship**<br>26:25 44:10<br>48:8,14 56:8<br>62:11 | **relative**  39:15<br>123:19<br>**release**  108:14<br>111:7<br>**released**  109:1<br>136:22<br>**relevance**<br>20:14 71:3,21<br>74:1 81:7<br>82:21 96:13<br>121:25 122:12<br>127:9,11<br>**relevant**  15:22<br>16:6,6 19:24<br>26:21,23 40:14<br>71:6 72:6<br>74:10 81:21<br>89:3 128:13<br>**relocated**  48:20<br>**rely**  46:9<br>**remember**  21:3<br>21:14 36:3,6<br>36:15 43:9,10<br>67:24 83:22<br>101:19,21,22<br>101:23 103:14<br>103:18 107:25<br>108:1,6,8<br>109:15 111:17<br>118:10,13,15<br>119:1 133:9<br>**remote**  5:7<br>**remotely**  1:19<br>135:5 | **removed**<br>115:20<br>**render**  89:13<br>**repatriation**<br>115:15,17<br>**repeat**  8:18<br>40:7 70:10<br>89:16 91:2<br>**reporter**  6:1<br>7:11 8:1 10:10<br>13:2,14,20<br>17:24 124:16<br>135:23<br>**reporter's**  4:6<br>**represent**  15:4<br>15:6 18:1,20<br>70:25 125:3<br>**representations**<br>129:11<br>**represents**  5:18<br>**request**  13:12<br>13:14 17:11,14<br>18:6,15,21<br>19:8,11 26:13<br>108:13 111:6<br>**requested**  16:4<br>26:10 100:6,7<br>100:10 111:11<br>116:11 119:4,7<br>135:16 137:1,9<br>137:10<br>**requests**  15:14<br>15:16,25<br>**required**  9:10<br>136:20 | **research**  49:15<br>**reservations**<br>33:17<br>**resigned**  53:8<br>**resources**<br>45:23<br>**respect**  23:20<br>31:20 32:10,16<br>38:21 44:1,3<br>51:16 55:6<br>56:13 70:5,8<br>72:3 77:17<br>97:10 126:14<br>**respond**  80:20<br>81:24 82:14<br>107:9 128:17<br>128:18<br>**response**  8:4<br>**responses**  8:1<br>112:20<br>**responsibilities**<br>95:21<br>**responsive**<br>15:25 17:14<br>18:5 19:7,10<br>20:23 40:16,20<br>**rest**  111:3<br>125:16<br>**restate**  122:8<br>**restaurant**  43:8<br>51:11,22 52:5<br>62:15,19 63:10<br>101:6,18,22<br>102:11 120:23 |

Page 26

**[result - scroll]**

| | | | |
|---|---|---|---|
| **result** 123:14 | **right** 11:20,25 | 74:17 75:23 | **salamander** |
| **resumed** 60:23 | 12:4 13:24 | 76:11 80:14 | 37:16 |
| 104:21 131:13 | 16:9,12 23:16 | 81:6 95:10 | **samsung** 120:6 |
| **resy** 33:16,16 | 25:23 30:1 | 96:11,17 104:5 | **sat** 6:19 7:8 |
| 33:17 | 32:8 36:17 | 104:8,14 | **satisfied** 88:3 |
| **retained** | 37:20,22,23 | 117:18 121:24 | **saying** 7:17 |
| 135:14 | 39:17 43:17 | 122:2,7,11 | 25:9 32:4 |
| **retrieve** 42:15 | 52:15 56:8 | 127:8 | 38:19 54:6 |
| 42:19 | 58:15,18 68:12 | **rodil** 126:19 | 63:20 66:19 |
| **retrieving** | 69:13 74:15 | 131:24 | 79:7 |
| 42:25 | 78:19 83:8 | **role** 69:13 96:3 | **says** 13:11 19:1 |
| **retroactive** | 85:25 86:9 | **rome** 121:22 | 21:7,8 25:5 |
| 108:16 109:2 | 87:11,15,24 | 122:15 | 33:8,9,14 53:8 |
| **retrospectively** | 90:8 92:23 | **ronald** 63:11 | 91:16 93:6 |
| 108:1 | 93:5 100:19,20 | 64:1,2 67:12 | 94:11 100:5,9 |
| **return** 136:17 | 104:14,16,25 | 67:12 109:10 | 100:15 101:10 |
| 137:6 | 106:4,22,25 | 109:17 111:1 | 102:17,18 |
| **returned** | 109:22,23 | **room** 12:14 | 103:11 106:5 |
| 102:24 | 110:10 111:3 | 41:3,4,6 | 108:24 109:4 |
| **reveal** 103:13 | 114:9 116:21 | 112:11 | 110:11 111:3 |
| 108:10,12 | 117:24 118:3 | **rpr** 1:22 | 119:3 |
| 111:5,9 | 119:8 127:10 | **rule** 71:13,18 | **schedule** |
| **revealed** 103:5 | 130:11 131:8 | 75:21 | 136:10 |
| 111:15 | 131:17 | **ruled** 82:17 | **screen** 7:13 |
| **review** 7:14 | **rights** 72:9 | **rules** 6:24 7:17 | 13:13,18,18,25 |
| 11:25 15:10,13 | **road** 2:17 | 81:4 82:16,18 | 14:15 16:13 |
| 15:16 40:15 | **robert** 1:6 5:9 | 82:19 83:4 | 18:15 25:23 |
| 90:24 92:20 | 5:14 6:13 | 127:15,21 | 86:7,10,12 |
| 136:8,10,13 | 136:4 | 135:12,13 | 90:3 105:8 |
| 137:2 | **rocca** 3:3,3 | 137:8 | **screenshot** |
| **reviewing** | 5:22,23 13:15 | **runs** 32:21 | 16:17,22,24 |
| 17:10 | 13:19 18:3,7,8 | | 17:4 20:11 |
| **ri** 1:22 | 26:20 27:6 | **s** | **scroll** 15:2,14 |
| **rid** 30:6 | 70:22 71:20 | **s** 4:9 126:5,5,6 | 87:18 89:18 |
| | 73:12,24 74:7 | 126:6 | 90:7,13,13 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[scroll - sir]

91:8 92:15
97:14
**seal** 135:18
**sealed** 136:20
**search** 15:24
16:2 53:6
**searches** 29:2,3
**searching** 29:8
**sec** 116:18
**second** 16:10
30:3 38:24
76:1 90:9
100:18 122:4
127:9
**seconds** 34:16
113:25 114:13
116:19
**sector** 93:7,25
94:8 95:1,25
97:11
**security** 94:16
**see** 13:24 14:11
14:20,24 16:12
16:15 17:20
22:18 28:24
38:19 39:3
71:19 73:23
86:9,12 89:1
89:19 90:24
91:1,11 92:25
94:11 97:16
100:17 101:7
102:19 105:7
105:10 106:4,5
106:24 115:24

116:20 119:10
121:3 122:11
130:14
**seek** 68:19
111:6
**seeking** 72:19
116:9 127:1
**seeks** 75:11
**seem** 76:25
117:5
**seemed** 112:9
112:19
**seems** 23:12
25:6
**seen** 14:25 91:3
**seized** 108:15
**selected** 52:1,4
110:8
**send** 13:12,13
17:23 119:5,7
119:10,17
121:7
**sense** 33:19
43:2 46:11
113:3
**sensitive** 103:7
103:20 105:18
**sent** 15:3 16:7
16:16 38:18
40:18 78:24
115:21 119:13
123:6
**sentence**
108:24

**september**
120:25
**series** 15:13
**served** 15:7
**session** 7:10
**set** 13:21 39:20
39:23,24,24
40:1 44:2 52:9
52:23 101:6
135:8,18
**sets** 20:7
**seven** 35:21
**several** 26:14
26:17 98:20
99:3
**shadows** 58:21
59:2,5,17
**share** 13:12,12
**sharing** 25:23
**shifted** 49:9
**ship** 33:12
**shipping** 33:5
**short** 34:14,17
130:17
**shorthand**
135:10
**shortly** 23:7
**show** 85:19
**showed** 17:11
**showing** 87:23
**shown** 89:9
**side** 12:20,21
12:24 13:2
112:13

**sided** 112:12
**sign** 83:12
136:16 137:5
**signal** 38:10,11
38:12,14,15,16
38:18,20 39:2
39:2,9,19,22
64:4 68:10,11
68:15,18,24
69:1,5,7,10
119:5,14
**signature** 89:20
89:22,23 91:9
91:16,19
135:22 136:22
136:24,24
137:9
**signatures**
91:12
**signed** 91:25
92:2,6,9
124:18
**signing** 135:16
**similar** 70:11
**simple** 51:8,19
**simply** 11:23
**single** 16:5
88:24
**sir** 7:23 8:5,7
8:16,23 9:16
9:23 12:12
43:16 55:4
57:3,14 61:5,8
80:11 85:24
102:21 110:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[sir - started]**

| | | | |
|---|---|---|---|
| 110:20 | 120:20 121:5 | **south** 118:7 | **specifics** 57:17 |
| **sit** 20:1 85:19 | 122:18,20 | **speak** 11:4,7 | **speculate** 78:10 |
| 85:21 114:15 | 123:4,5,10 | 29:4 123:22 | 113:14 |
| 115:3 | 133:5,9 | **speaker** 110:12 | **speculating** |
| **sitting** 11:11 | **smith's** 65:2,7 | **speaking** 5:4 | 114:12 |
| 107:24 | 66:6 67:15 | 59:11 113:2 | **speculation** |
| **six** 31:23,25 | **software** 33:2,6 | **special** 44:13 | 77:23 78:13 |
| 32:3 35:21,23 | 33:11,23 | 44:15 53:23 | 89:8 113:12 |
| 56:20 | **solicited** 26:11 | 54:5 61:13 | 117:22 |
| **small** 7:3 14:2 | 61:21 | 62:4 63:8,14 | **speculative** |
| 32:20 | **solutions** 5:5 | 63:19,23 64:5 | 113:19 117:16 |
| **smith** 18:19 | 136:7 | 64:9 65:2,7,19 | 117:19 |
| 22:17,20 24:7 | **somebody** 46:9 | 66:6 67:9,15 | **spell** 44:25 |
| 24:8,21 42:6 | 65:6 82:19 | 69:22 79:8,8 | 124:7 126:4 |
| 42:11,12,21,23 | **somewhat** 7:12 | 79:19 80:13 | **spelled** 44:23 |
| 43:5,20 44:16 | **son** 32:21 107:2 | 95:18 96:3 | **spelling** 44:20 |
| 45:8 47:8 | 107:19 | 100:2 101:25 | **spoke** 30:14 |
| 50:10 51:7,18 | **son's** 33:1 | 106:15 119:6 | 63:13,22 |
| 52:3 53:3,5,23 | **soon** 104:15 | 119:10 120:20 | **spring** 26:3,5 |
| 53:23 54:5,16 | **sorry** 8:6 14:4 | 121:4 122:18 | 27:18 29:15 |
| 55:1,8 61:11 | 38:16 90:22 | 122:19 123:4,4 | 72:15,21 97:15 |
| 61:13,20 62:1 | 107:11 | 123:10 | 97:19 |
| 62:4,11,16 | **sort** 41:19 44:5 | **specific** 19:22 | **st** 2:11 |
| 63:3,8,14,19,23 | 47:12 48:3 | 28:7 42:19 | **standard** 5:6 |
| 64:5,9,17,20 | 49:8 50:1 | 45:24 46:16 | 51:2,15 54:3 |
| 65:19 66:18,20 | 53:12 56:7 | 51:20 56:21,21 | 54:10,24 55:5 |
| 67:9 68:3 69:4 | 60:12 69:19 | 57:18 77:12,15 | 55:9 92:7 |
| 69:11,22 74:4 | 113:9 | 77:16 89:21 | **standpoint** |
| 77:19 78:16 | **sought** 15:21 | 92:8,12 | 28:25 |
| 79:6,8,19 | **sound** 112:3 | **specifically** | **star** 124:3 |
| 80:13 84:21 | 113:4,7 | 9:12 19:8 36:2 | **start** 8:13 13:9 |
| 100:2,4 102:1 | **sounded** 55:17 | 39:19 46:1 | 15:17 27:15 |
| 102:4 106:15 | **sounds** 33:22 | 52:16 67:1 | 32:22 |
| 110:1 119:7,11 | 75:24 115:25 | 72:4 | **started** 27:1,19 |
| 119:24 120:1 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[starting - taken]**

starting 58:8
94:14 111:4
starts 92:24
97:15 103:2
105:17 106:3
state 12:19
78:4 80:20
89:5 95:3
106:24 122:6
136:9,12
stated 27:18
98:20 99:3
100:16 109:6
129:9
statement
82:14 93:12
94:22 98:25
100:13 101:12
103:9,16
106:12 107:6
107:18,23
108:12 109:11
110:14 111:12
111:16
statements 7:6
82:6 128:12
states 1:1 30:19
73:4 101:5
102:12
stating 71:8
83:7
stationed 67:6
stefanie 84:9,10
stemming 7:5

stent 94:4
stephen 130:7
stipulation
4:18 136:21
stipulations
124:17
stop 25:23
54:14 90:8
stopping 97:8
strawn 2:10
5:17
strike 78:12
89:13 114:11
130:2,10
stuff 46:3 52:25
72:3 130:2
stupid 116:20
subject 24:22
25:15 73:16
75:12 125:19
127:2
submit 35:8
82:25 84:1,7
84:11,19,25
85:13
submitted
11:24 12:5
83:13 84:14
86:14 90:6
91:5
submitting
92:7
subpoena 4:11
14:19 15:4,7
15:17,21 16:4

17:11 19:7
31:17,18,20
32:10,12 34:2
40:15
subsequent
65:17 100:23
100:23
subsequently
98:19 99:3
134:8,12
substance
23:21 31:2
62:6 88:9
108:20
sudden 48:19
64:14
sued 7:4
suggesting 87:3
suing 34:7
suite 2:18 3:4
sullivan 2:3,4
5:14,15 6:13
sum 24:24
supervisory
44:13,15,17
49:1,12 53:7
support 94:17
95:23 97:6
supposed 23:24
42:3 73:20
75:16 81:1
108:2 128:4
sure 14:24
20:19 22:25
24:11 25:2,4

32:1 36:6
40:18 47:6
49:3 65:17
73:25 77:7
88:2 89:10
90:7 114:2
115:9,9 126:12
132:20
surprised
39:13
suspicion 44:5
sustained 128:1
swear 6:1
swore 10:14
sworn 6:4,15
71:1 135:6
symbiotic 56:7
system 87:1

**t**

t 4:9 44:22,22
44:24,25 135:1
135:1
take 5:7 9:22
9:24 10:1,2
30:11 35:25
58:13 60:3,4,6
60:11 68:5
81:14 102:14
104:6,9 130:12
taken 6:17 7:11
60:22 73:21
75:16 104:20
131:12 135:4
135:10

[talk - third]

| | | | |
|---|---|---|---|
| **talk** 8:14 10:4 | **technology** | 135:7 | **thibault** 44:18 |
| 46:15 56:10 | 33:22 45:22,22 | **testify** 4:11 | 44:19 45:2 |
| 82:2 | **telecommuni...** | 14:20 135:6 | 49:1,3,5,12 |
| **talked** 61:10 | 112:21 | **testifying** 7:19 | 53:7 58:16 |
| 63:2,9 | **telephone** | **testimony** 8:24 | 63:15,16 |
| **talking** 46:16 | 18:17 23:18 | 10:13,19,24 | **thing** 19:15 |
| 82:1 105:16 | 34:10,13 103:6 | 34:4 57:6 61:7 | 28:11 47:17,20 |
| **tape** 24:22 | 103:23 106:9 | 71:1,17 73:23 | 54:7 86:16,23 |
| 25:16 50:16 | 106:12 110:12 | 80:6,18 83:5 | 97:9 105:12 |
| 71:7 82:15 | 112:4,12 120:5 | 89:13 105:5 | 116:15 |
| 103:20 110:12 | **tell** 7:19 32:9 | 114:11 125:19 | **things** 22:16 |
| 110:13,16,17 | 32:13,14 42:22 | 127:21 135:11 | 25:12,17,18,19 |
| 110:24 111:5 | 42:23 51:6 | **text** 4:13 16:4,5 | 28:12 47:15 |
| 111:11 116:10 | 53:8 64:25 | 16:17,20 17:19 | 48:5 56:1,2,8 |
| 118:6 133:6,10 | 66:9 70:3,12 | 18:20 19:13 | 57:6 60:13 |
| **taped** 103:6,23 | 72:16 77:4 | 20:7 21:5,7,7 | 72:5 128:11 |
| 106:9,11,19 | 79:19 81:12 | 22:6 23:8,14 | **think** 6:18 |
| 109:7 | 84:16,24 85:10 | 23:20,21 25:5 | 10:12 14:16,17 |
| **tapes** 133:14 | 85:16 87:11 | 30:4,8 38:6,9 | 15:3 16:6,7 |
| **task** 70:3,13 | 106:17 108:4 | 38:14,16,17,18 | 25:13 26:2 |
| 72:17 | 108:19 121:12 | 38:20 39:3,9 | 34:11 35:10 |
| **team** 47:13,14 | **telling** 133:13 | 39:20,22 40:4 | 36:12,12,14,18 |
| 47:17,20,22,22 | **tells** 76:10 | 40:8,13 69:7 | 36:19 37:15,15 |
| 47:25 48:4,17 | 128:11 | 107:16 | 38:1,6 44:20 |
| 49:21 55:2,8 | **term** 58:21,24 | **texting** 22:12 | 44:21,21,22,25 |
| 55:13,17 56:14 | 59:5,11,13,17 | **texts** 20:2,11 | 45:25 46:14,14 |
| 56:18,25 57:23 | 59:21 79:13 | 38:22 | 52:3 59:8 |
| 59:1,7,22 66:3 | **terminology** | **thank** 13:23 | 62:21 63:15 |
| 70:4,12 72:16 | 59:22,25 65:20 | 30:9 54:19,23 | 66:20 68:16 |
| 111:20 | **terms** 18:22 | 61:9 72:13 | 72:5 74:12 |
| **technological** | 125:9 | 99:25 114:14 | 85:12 87:13,21 |
| 46:2 | **testified** 6:4 | 128:20 131:2,8 | 88:1 124:22 |
| **technologically** | 27:2 34:22 | 131:18 133:22 | 130:12 |
| 113:4 | 62:14 83:24 | 133:25 | **third** 29:19 |
| | 96:4 109:16 | | 79:18 89:24 |

Page 31

**[thorough - truthfully]**

| | | | |
|---|---|---|---|
| **thorough** 19:17 | 97:24 99:18 | **together** 32:19 | 136:22 137:2,2 |
| 54:20 | 103:3,19 | 42:24 69:16,20 | **transcripts** |
| **thoroughly** | 104:13,18,24 | **told** 24:20 28:9 | 135:13 |
| 60:10 | 105:23 110:20 | 54:11 72:4 | **transition** |
| **thoroughness** | 110:22,25 | 81:9 85:4 | 93:23 |
| 19:19 | 114:17 117:12 | 103:25 110:2 | **transnational** |
| **thought** 39:15 | 122:19 130:19 | 133:9,20 | 97:7 |
| **thread** 16:18 | 131:10,16,18 | **tons** 52:7 | **travel** 23:6 |
| 39:20 40:4 | 134:1,2 136:10 | **took** 7:17 16:24 | 26:12 121:9,18 |
| **three** 30:15 | 136:18,25 | 17:3,4 20:21 | 121:21 |
| 33:10,13,15 | 137:7 | 61:3 105:1 | **traveled** 28:22 |
| 57:25 58:1,13 | **timeline** 27:3 | 109:8,14 | 79:22 80:3 |
| 61:14 69:15 | 30:2 | 111:19 122:15 | **trial** 71:7,8 |
| 87:18 89:18 | **times** 6:18 9:19 | **top** 18:23,25 | 82:16 83:5 |
| 93:20 | 13:13 27:8 | 20:12 | 127:20 |
| **tim** 63:15,16 | 29:12 54:15 | **topic** 26:22,23 | **trick** 8:19 |
| **time** 5:6,6 8:14 | 59:10 68:11 | **total** 57:24 | 54:12 76:19 |
| 9:17 21:18,21 | 80:2 102:13 | **touch** 24:12 | **tried** 19:16 |
| 21:25 22:15 | 115:7 | **touched** 83:11 | 40:10 65:1 |
| 23:7 24:1 | **timothy** 44:18 | **towards** 20:11 | **tries** 82:20 |
| 25:20 27:20,24 | **titled** 135:4 | 45:21 | **trip** 122:14 |
| 29:13 30:14 | **today** 7:20 8:11 | **town** 43:12 | **trouble** 58:19 |
| 31:12 32:10 | 8:18,24 9:8 | 62:22 101:21 | **truck** 33:7,12 |
| 35:18 39:22 | 10:14 11:5,8 | **towns** 43:12 | **true** 22:9 |
| 43:13 44:14 | 11:12 12:12 | **townsgate** 2:17 | 135:11 |
| 50:19 52:7,10 | 13:7 20:1 39:4 | **tradol** 32:21 | **trumpster** |
| 52:15,18 58:15 | 61:7 79:6 | 33:1 | 71:11 |
| 58:18 60:20 | 85:19,21 105:5 | **transcribed** | **truth** 7:20 |
| 61:1,14,16 | 114:16 115:3 | 7:11 10:9 | 32:13 66:15 |
| 63:13,17,18,22 | 131:19 | 135:10 | 77:5 85:23 |
| 65:17,18 66:20 | **today's** 5:5 | **transcript** 7:12 | 135:7,7,7 |
| 71:15 73:21 | 9:17 11:22 | 71:16 83:1 | **truthful** 10:18 |
| 74:21,24 75:1 | 12:1,10 15:8 | 123:22 125:18 | **truthfully** |
| 77:24 78:7 | 15:10 134:4 | 135:8,16 136:6 | 10:14 |
| 79:10 95:15 | | 136:8,10,13,13 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[try - venezuela]**

**try** 8:10,14
14:13 36:6
52:20 54:12
66:5 68:15,17
78:16
**trying** 8:19
14:13 19:11
20:17,23 26:24
27:3 30:1,6
36:3 38:13
39:15 47:15,20
51:24 54:20,21
58:4 63:15
66:7 73:9 75:4
75:8,20 76:6
76:19,20,21
82:9 86:21
96:18 99:22,23
128:24 130:22
**turn** 50:16,17
50:20 51:17
54:4 55:1,7
100:6,7 109:6
**turned** 54:15
**turning** 42:25
**two** 20:7 29:20
29:21 30:15
33:15 62:17
63:1,9 69:15
112:25 115:23
120:19
**type** 42:9 47:17
61:24,25 96:21
**types** 56:1

**typical** 8:12
**typically** 31:10
38:2,5 45:20
46:22 68:23

**u**

**u** 44:22,25
124:9 126:6
**u.s.** 27:13,14
28:15,16 30:20
37:10 41:12,25
42:2 46:12,23
79:9 93:10,15
93:24 94:6,15
95:12 96:23
**uh** 8:2,3 21:13
91:10
**uhs** 8:3
**unable** 64:11
**under** 7:20
10:21 71:1,13
75:21 82:7
92:6,9 113:10
115:3 128:2
**underlying**
113:3
**understand**
7:21 8:17,22
9:5,15 10:8
12:5 15:20
21:6 31:21
42:12,18 45:8
49:7,10,14
50:7 54:17
56:18 58:23
61:2 63:5,24

64:23 66:19,23
74:8,11 76:5
76:24,25 79:13
80:9 84:13
94:3 98:14
99:5 102:10
104:25 114:18
**understanding**
17:10 18:4,7,9
18:12 23:5,8
23:10 34:18
41:17,22 42:13
45:11 46:22
48:12,23 49:11
49:17,23 50:3
53:10,11,12,16
53:22 54:24
55:15 57:5,7
57:15 59:4
67:4,7 85:23
90:4 91:3
103:24 116:24
117:2,10 120:8
121:6 123:3,9
125:2
**understood**
8:22 30:9
35:16 46:4
50:19 54:3
64:9 68:2,13
83:13 116:12
117:3 126:22
129:19,23
**unearthing**
72:18

**united** 1:1
30:19 73:4
**universities**
28:23
**unofficial** 47:9
**unquote** 21:22
42:8 43:6 54:2
66:24 69:14
73:1 121:15
**unrelated** 36:4
37:6 50:5,5
98:11,16
**use** 29:7 58:20
59:12,18,21,21
59:24 71:15
79:13
**used** 59:4,10
71:7 82:15
128:2
**useful** 33:22
**using** 38:20
39:2 46:12
58:24 65:20
98:9
**usually** 46:25
47:2

**v**

**v** 136:4
**vacuum** 125:13
**variation**
118:21
**various** 9:19
**venezuela** 73:9
73:15 75:4
76:2 133:2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[venture - word]

| venture 25:11 | **w** | washington | whatsapp 38:9 |
|---|---|---|---|
| verbalize 7:25 | | 2:12 3:4 29:24 | whatsoever |

venture 25:11
verbalize 7:25
  8:4
verge 121:15
verified 133:5
veritext 5:4
  136:7,9,11,20
versed 127:18
version 86:13
versus 5:9
vice 2:11
video 5:8 10:9
videographer
  3:8 5:1,3,25
  13:1 60:16,20
  60:25 104:18
  104:23 131:10
  131:15 134:2
videotaped
  1:14
viewed 90:3
views 71:10
village 2:18
voice 112:22
  116:9
voices 112:24
  113:1 114:22
  114:24 115:23
  115:25 133:10
voluntary 82:6
volunteered
  72:2
vs 1:8

**w**

wait 73:13
  87:25 122:3
  124:12 126:24
  126:25
waived 136:24
  136:24
waiving 136:21
waldorf 36:7
walked 49:16
want 6:16 9:2
  11:1 14:24
  17:9 20:5
  32:24 40:21
  42:18 43:1,20
  51:8 52:11,12
  52:21 54:6,7
  55:18 57:4,7
  58:5 60:3,4,9
  60:12,16 61:11
  66:15 68:6,16
  69:1 74:23
  78:22 82:13,14
  98:3 110:4
  113:14,21
  122:6 127:16
  127:19 128:17
  128:18 130:14
  131:18 133:25
wanted 20:25
  28:24 40:16,20
  42:21 50:16,20
  84:25
war 121:16

washington
  2:12 3:4 29:24
  36:1,2,18
  43:13 52:8
  67:5 77:9,18
  101:7 111:14
  120:24
waste 74:23
waving 30:7,7
way 14:18
  15:20 27:11
  34:2 39:24
  44:2,23 50:1
  52:4 57:1 82:1
  84:25 87:1
  92:18 119:8
  120:11 123:11
  123:19
we've 51:1 60:2
  61:10 83:11
wear 14:20
weeks 30:15
  33:10,13,15
weird 45:6
wells 12:13
went 39:14
  94:6 98:4
west 43:12 52:4
  62:19,20 63:10
  101:6,20
  102:11
westin 43:12
  62:22
westlake 2:18

whatsapp 38:9
whatsoever
  55:10 123:3
whereabouts
  65:21
whereof 135:18
whistleblowers
  80:12
wife 11:13 65:2
  65:7 66:6,8
willing 19:20
wilshire 2:4
winston 2:10
  5:17
winston.com
  2:13
withdraw
  71:22
witness 6:2,3
  60:6,15 68:22
  77:23 86:21
  89:8 90:1
  101:16 107:7
  114:9 116:13
  116:19 117:24
  118:3 130:21
  131:2,8 135:4
  135:6,11,16,18
  136:13,16
  137:2,5
wondering
  96:12
word 41:14,17
  118:9,14 124:8
  126:5

Page 34

**[words - zoom]**

| words 18:21 | **y** | york 93:10,18 |
|---|---|---|
| 47:14 48:5,17 | | 94:5 |
| 118:6 | yeah 8:8 14:2 | yup 13:19,22 |
| work 26:8 | 14:12,19,19 | 14:21,23 16:16 |
| 41:15 49:6 | 15:1,15,19 | 19:25 20:6 |
| 55:25 60:8 | 16:15 17:1,1,8 | 21:2 30:10,13 |
| 71:8 97:4,11 | 17:8 20:16 | 36:21 55:14 |
| 108:14 | 23:15 28:1 | 68:13 87:9,14 |
| worked 41:24 | 29:3,3 31:8,25 | 89:21 90:23 |
| 45:15 59:14,14 | 33:20,24,24 | 104:7 109:24 |
| 132:15,18,19 | 35:23 36:24 | 116:22 122:1 |
| working 13:23 | 37:24 38:1,22 | 123:21 |
| 14:18 25:13,17 | 41:2 42:17 | **z** |
| 25:18 44:16 | 43:19 45:3,6 | z 124:9 126:16 |
| 45:8 52:25 | 46:14,25 47:19 | zach 30:3 58:8 |
| 53:13 59:12 | 49:14 50:15 | 71:20 104:5 |
| 95:14 | 52:3 55:9 56:5 | 107:11 108:22 |
| works 27:7 | 57:3 58:7,15 | 113:23 130:18 |
| 81:8,9 87:1 | 59:3 60:6,18 | zachary 2:3 |
| world 94:19 | 66:16,23 68:9 | 5:13 6:11 |
| 121:16 129:1 | 68:15 76:18 | 117:21 135:15 |
| worldwide | 79:16 86:16 | 136:1 |
| 94:17 | 87:19 90:2,7 | zeroes 86:3 |
| wrap 130:16 | 93:22 100:3 | zhansen 2:7 |
| wray 78:24 | 105:14 106:23 | 136:2 |
| wright 2:3 5:15 | 108:11,22 | zoom 1:19 |
| writing 107:25 | 109:20 112:20 | 135:5 |
| wrong 18:3 | 113:16,23 | |
| 57:10 98:9 | 114:6,9 117:17 | |
| 115:22 120:21 | year 61:14 | |
| 128:19 | years 6:21 7:9 | |
| **x** | 21:10 41:25 | |
| x 4:1,9 137:9 | 55:21 57:25 | |
| | 58:2,13 61:22 | |
| | 93:20 94:21 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit M

**In the Matter Of:**

ROBERT HUNTER BIDEN vs PATRICK M. BYRNE

2:23-cv-09430-SVW-PD

---

**SPECIAL AGENT DAVID SMITH**

*April 21, 2025*

---



800.211.DEPO (3376)
EsquireSolutions.com

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3    ROBERT HUNTER BIDEN, an

4    individual,

5              Plaintiff,

6    vs.                          Case No.

7    PATRICK M. BYRNE, an         2:23-cv-09430-SVW-PD

8    individual,

9              Defendant.

10   _____/

11

12      The Deposition of FBI SPECIAL AGENT DAVID SMITH

13              10:00 a.m. - 10:11 a.m.

14                 April 21, 2025

15

16

17

18

19

20

21

22

23   REPORTED BY:

24   STEVEN POULAKOS, RPR

25   JOB NO:  J12703813



```
 1

 2

 3

 4

 5

 6

 7

 8              The deposition of FBI SPECIAL AGENT DAVID

 9    SMITH was held on Monday, April 21, 2025, commencing at

10    10:00 a.m., at the Law Offices of The U.S. Department

11    of Justice, 1100 L Street, N.W., Washington, D.C.

12    20005, before Steven Poulakos, Notary Public.

13

14

15

16

17

18

19

20    REPORTED BY:  Steven Poulakos, RPR

21

22

23

24

25
```



SPECIAL AGENT DAVID SMITH                                    April 21, 2025
ROBERT HUNTER BIDEN vs PATRICK M. BYRNE                                3

```
 1   APPEARANCES:

 2        ON BEHALF OF THE DEPONENT:

 3        JACQUELINE COLEMAN SNEAD, ESQUIRE

 4           U.S. Department of Justice

 5           1100 L Street, N.W.

 6           Washington, D.C.  20005

 7           Telephone:  202.514.3418

 8           Email:  jacqueline.snead@usdoj.gov

 9

10

11

12

13

14   ALSO PRESENT:  POOJA PATEL

15

16

17

18

19

20

21

22

23

24

25
```



```
                    FBI SPECIAL AGENT DAVID SMITH

 2   DEPOSITION QUESTIONS                                    PAGE

 3   PLAINTIFF'S RULE 31 QUESTIONS                            5

 4   DEFENDANT'S RULE 31 CROSS-EXAMINATION QUESTIONS         11

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



SPECIAL AGENT DAVID SMITH                                    April 21, 2025
ROBERT HUNTER BIDEN vs PATRICK M. BYRNE                              5

```
 1              P R O C E E D I N G S

 2                       - - -

 3

 4   Whereupon,

 5            FBI SPECIAL AGENT DAVID SMITH,

 6   called as a witness, having been first duly sworn to

 7   tell the truth, the whole truth, and nothing but the

 8   truth, was examined and testified as follows:

 9       PLAINTIFF'S RULE 31 DEPOSITION QUESTIONS

10       Q     Please state your name.

11       A     Dave Smith.

12       Q     Do you reside in California?

13       A     No.

14       Q     How are you employed?

15       A     With the United States government.

16       Q     Is your employment located in California?

17       A     No.

18       Q     How long have you been employed with that

19   entity?

20       A     Twelve years.

21       Q     Mr. Byrne testified in this action that in

22   late 2021 or early 2022 you met with him and John

23   Moynihan at a parking lot at Reagan National Airport

24   where Mr. Byrne played you an audio recording in which

25   there was a conversation between someone and Mr. Byrne
```



 1  in which it was stated that Mr. Robert Hunter Biden,

 2  through an intermediary, had approached the Iranian

 3  government with an offer to have his father, President

 4  Joe Biden, unfreeze $8 billion in Iranian funds in

 5  South Korea in return for the Iranians paying the

 6  Biden's 10 percent of those funds which would go into a

 7  numbered account for his family.  Is that accurate?

 8           MS. SNEAD:  This is Jacqueline Coleman

 9  Snead.  I'm an attorney with the Department of Justice.

10  I'm here appearing on behalf of Special Agent Smith.

11  Special Agent Smith is appearing pursuant to a

12  subpoena.  The Department has authorized certain of his

13  testimony.  I am here to ensure that he complies with

14  the authorization.

15           The Department of Justice objects to this

16  question on the grounds that the information sought is

17  subject to the law enforcement privilege and/or may

18  implicate classified information to which the parties

19  are not entitled.

20           Subject to this objection, Special Agent

21  Smith may respond.

22      A     No.

23      Q     Mr. Byrne testified in this action that he

24  gave you in the car a copy of the recording that Mr.

25  Byrne claims to have played for you as described in



1    Question Number 6.  Is that accurate?

2              MS. SNEAD:  The Department of Justice

3    objects to the question on the grounds that information

4    sought is subject to the law enforcement privilege

5    and/or may implicate classified information to which

6    the parties are not entitled.

7              Subject to that objection, Special Agent

8    Smith may respond.

9       A     I do not recall.

10      Q     Did Mr. Byrne give you the recording via

11   AirDrop or through another medium such as the messaging

12   application "Signal"?

13             MS. SNEAD:  The Department objects to this

14   question on the grounds that the information sought is

15   subject to the law enforcement privilege and/or may

16   implement classified information to which the parties

17   are not entitled.

18             Subject to this objection, Special Agent

19   Smith may respond.

20      A     I do not recall.

21      Q     Mr. Byrne testified in this action that you

22   told him to delete the recording and not keep a copy of

23   it.  Is that accurate?

24             MS. SNEAD:  The Department objects to this

25   question on the grounds that the information sought is



SPECIAL AGENT DAVID SMITH                                    April 21, 2025
ROBERT HUNTER BIDEN vs PATRICK M. BYRNE                              8

 1   subject to the law enforcement privilege and/or it may

 2   implicate classified information to which the parties

 3   are not entitled.

 4           Subject to that objection, Special Agent

 5   Smith may respond.

 6      A    No.

 7      Q    Mr. Byrne testified in this action that you

 8   confirmed, through various actions by various

 9   government agencies, the identity of the voice on the

10   voicemails played on the recording and communicated

11   that to Mr. Byrne either directly or through Mr.

12   Moynihan.  Is that accurate?

13           MS. SNEAD:  The Department objects to this

14   question on the grounds that the information sought is

15   subject to the law enforcement privilege and/or it may

16   implicate classified information to which the parties

17   are not entitled.

18           Subject to this objection, Special Agent

19   Smith may respond.

20      A    No.

21      Q    Mr. Byrne testified in the action that you

22   confirmed the voice on the voicemails played on the

23   recording was identified as the son of a high-ranking

24   official with the Pakistani Minister of Defense and

25   communicated that to Mr. Byrne either directly or



SPECIAL AGENT DAVID SMITH                                    April 21, 2025
ROBERT HUNTER BIDEN vs PATRICK M. BYRNE                              9

```
 1  through Mr. Moynihan.  Is that accurate?
 2              MS. SNEAD:  The Department objects to this
 3  question on the ground that the information sought is
 4  subject to the law enforcement privilege and/or may
 5  implicate classified information to which the parties
 6  are not entitled.
 7              Subject to that objection, Special Agent
 8  Smith may respond.
 9       A    No.
10       Q    Mr. Byrne testified in this action that you
11  confirmed the voice on the voicemails played on the
12  recording was identified as someone who had close ties
13  to Mr. Hunter Biden and communicated that to Mr. Byrne
14  either directly or through Mr. Moynihan.  Is that
15  accurate?
16              MS. SNEAD:  The Department objects to this
17  question on the grounds that the information sought is
18  subject to the law enforcement privilege and/or may
19  implicate classified information to which the parties
20  are not entitled.
21              Subject that objection, Special Agent Smith
22  may respond.
23       A    No.
24       Q    Mr. Byrne testified in this action that you
25  confirmed the voice on the voicemail played on the
```



1  recording was identified as someone who acted as a

2  proxy for Hunter Biden and communicated that to Mr.

3  Byrne either directly or through Mr. Moynihan.  Is that

4  accurate?

5          MS. SNEAD:  The Department objects to this

6  question on the grounds that the information sought is

7  subject to the law enforcement privilege and/or may

8  implicate classified information to which the parties

9  are not entitled.

10         Subject to that objection, Special Agent

11 Smith, you may respond.

12    A     No.

13    Q     Mr. Byrne testified in this action that you

14 described to Mr. Byrne a letter that FBI Director

15 Christopher Wray sent out to every FBI agent in the

16 bureau saying not to have any contact with Mr. Byrne.

17 Is that accurate?

18         MS. SNEAD:  The Department objects to this

19 question on the grounds that the information sought is

20 subject to the law enforcement privilege and/or may

21 implicate classified information to which the parties

22 are not entitled.

23         Subject to that objection, Special Agent

24 Smith may respond.

25    A     No.



```
 1   DEFENDANT'S RULE 31 CROSS-EXAMINATION QUESTIONS
 2        Q      Mr. Byrne testified in this action that he
 3   provided to you a recording that involved Hunter Biden
 4   and Iranian Officials.  Do you recall receiving any
 5   recording from Mr. Byrne related to or involving Hunter
 6   Biden and Iranian Officials?
 7        A      No.
 8        Q      If Mr. Byrne provided any recordings to
 9   you, did you ask him to delete the recordings from any
10   device still in his possession?
11        A      No.
12        Q      Is it common practice for the FBI to advise
13   informants to retain copies of sensitive information or
14   evidence related to national security matters?
15             MS. SNEAD:  The Department of Justice
16   objects to Defendant's proposed cross-examination
17   question 3 because it seeks the FBI's law enforcement
18   method and, therefore, is protected by privilege from
19   disclosure.
20             Accordingly, I am instructing Special Agent
21   Smith not to respond to Question Number 3.
22        Q      Did the National Security Agency confirm
23   the voice identification of the individual on the three
24   voicemails including the recording provided to you by
25   Mr. Byrne?
```



 1              MS. SNEAD:  The Department of Justice lacks

 2     authority to authorize the disclosure of official

 3     information belonging to another federal agency.

 4              Moreover, Special Agent Smith, as an

 5     employee of the Department of Justice, is not a proper

 6     witness to testify about the National Security Agency.

 7              Accordingly, Special Agent Smith is not

 8     authorized to respond to this question and I'm

 9     instructing him not to answer.

10     Q     Did the National Security Agency confirm

11     that the identified has or had a relationship or

12     connection with Hunter Biden?

13              MS. SNEAD:  The Department of Justice lacks

14     authority to authorize the disclosure of official

15     information belonging to another federal agency.

16              Moreover, Special Agent Smith, as an

17     employee of the Department of Justice, is not a proper

18     witness to testify about the national Security Agency.

19              Accordingly, Special Agent Smith is not

20     authorized to respond to Defendant's proposed

21     cross-examination Question Number 5 and I'm instructing

22     him not to answer.

23     Q     Did the National Security Agency confirm

24     that the identified individual acted as a proxy for

25     Hunter Biden?



SPECIAL AGENT DAVID SMITH                                    April 21, 2025
ROBERT HUNTER BIDEN vs PATRICK M. BYRNE                              13

1              MS. SNEAD:  The Department of Justice lacks

2      authority to authorize the disclosure of official

3      information belonging to another federal agency.

4              Moreover, Special Agent Smith, as an

5      employee of the Department of Justice, is not a proper

6      witness to testify about the National Security Agency.

7              Accordingly, Special Agent Smith is not

8      authorized to respond to Defendant's proposed

9      cross-examination Question 6 and I'm instructing him

10     not to answer.

11              (Deposition was concluded at 10:11 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



SPECIAL AGENT DAVID SMITH                                    April 21, 2025
ROBERT HUNTER BIDEN vs PATRICK M. BYRNE                              14

```
 1              CERTIFICATE OF DEPONENT

 2          I hereby certify that I have read and

 3   examined the foregoing transcript, and the same is a

 4   true and accurate record of the testimony given by me.

 5

 6          Any additions or corrections that I feel

 7   are necessary will be made on the Errata Sheet.

 8

 9

10              _____

11              FBI Special Agent David Smith

12

13

14              _____

15                        Date

16

17   (If needed, make additional copies of the Errata Sheet

18   on the next page or use a blank piece of paper.)

19

20

21

22

23

24

25
```



SPECIAL AGENT DAVID SMITH                                    April 21, 2025
ROBERT HUNTER BIDEN vs PATRICK M. BYRNE                              15

```
  1                        ERRATA SHEET

  2   Case:  Robert Hunter Biden V Patrick M. Byrne

  3   Witness:  FBI Special Agent David Smith

  4   Date:     04/21/2025

  5   PAGE/LINE         SHOULD READ         REASON FOR CHANGE

  6   _____

  7   _____

  8   _____

  9   _____

 10   _____

 11   _____

 12   _____

 13   _____

 14   _____

 15   _____

 16   _____

 17   _____

 18   _____

 19   _____

 20   _____

 21   _____

 22   _____

 23   _____

 24   _____

 25   _____
```



SPECIAL AGENT DAVID SMITH                                    April 21, 2025
ROBERT HUNTER BIDEN vs PATRICK M. BYRNE                              16

```
 1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2                  I, Steven Poulakos, registered

 3    Professional Reporter, the officer before whom the

 4    foregoing proceedings were taken, do hereby certify

 5    that the foregoing transcript is a true and correct

 6    record of the proceedings; that said proceedings were

 7    taken by me stenographically and thereafter reduced to

 8    typewriting under my supervision; and that I am neither

 9    counsel for, related to, nor employed by any of the

10    parties to this case and have no interest, financial or

11    otherwise, in its outcome.

12                  IN WITNESS WHEREOF, I have hereunto set my

13    hand and affixed my notarial seal this 21st day of

14    April 2025.

15    My commission expires:

16    August 14, 2029

17

18

19    _____

20

21    _____

22    NOTARY PUBLIC IN AND FOR

23    THE DISTRICT OF COLUMBIA

24

25
```

**$**

**$8**
  6:4

**1**

**10**
  6:6

**2**

**2021**
  5:22

**2022**
  5:22

**3**

**3**
  11:17,21

**31**
  11:1

**5**

**5**
  12:21

**6**

**6**
  7:1 13:9

**A**

**account**
  6:7

**accurate**
  6:7 7:1,
  23 8:12
  9:1,15
  10:4,17

**acted**
  10:1
  12:24

**action**
  5:21 6:23
  7:21 8:7,
  21 9:10,
  24 10:13
  11:2

**actions**
  8:8

**advise**
  11:12

**agencies**
  8:9

**agency**
  11:22
  12:3,6,
  10,15,18,
  23 13:3,6

**agent**
  6:10,11,
  20 7:7,18
  8:4,18
  9:7,21
  10:10,15,
  23 11:20
  12:4,7,
  16,19
  13:4,7

**Airdrop**
  7:11

**Airport**
  5:23

**and/or**
  6:17 7:5,
  15 8:1,15

**9:4,18**
  10:7,20

**appearing**
  6:10,11

**application**
  7:12

**approached**
  6:2

**attorney**
  6:9

**audio**
  5:24

**authority**
  12:2,14
  13:2

**authorizati
on**
  6:14

**authorize**
  12:2,14
  13:2

**authorized**
  6:12
  12:8,20
  13:8

**B**

**behalf**
  6:10

**belonging**
  12:3,15
  13:3

**Biden**
  6:1,4
  9:13 10:2
  11:3,6
  12:12,25

**Biden's**
  6:6

**billion**
  6:4

**bureau**
  10:16

**Byrne**
  5:21,24,
  25 6:23,
  25 7:10,
  21 8:7,
  11,21,25
  9:10,13,
  24 10:3,
  13,14,16
  11:2,5,8,
  25

**C**

**California**
  5:12,16

**car**
  6:24

**Christopher**
  10:15

**claims**
  6:25

**classified**
  6:18 7:5,
  16 8:2,16
  9:5,19
  10:8,21

**close**
  9:12

**Coleman**
  6:8

**common**
  11:12

**communicate
d**
  8:10,25
  9:13 10:2

**complies**
  6:13

**confirm**
  11:22
  12:10,23

**confirmed**
  8:8,22
  9:11,25

**connection**
  12:12

**contact**
  10:16

**conversatio
n**
  5:25

**copies**
  11:13

**copy**
  6:24 7:22

**cross-
examination**
  11:1,16
  12:21
  13:9

**D**

**Dave**
  5:11

**Defendant's**
  11:1,16
  12:20
  13:8

**Defense**
  8:24

**delete**
  7:22 11:9

**Department**
  6:9,12,15
  7:2,13,24



8:13 9:2,
16 10:5,
18 11:15
12:1,5,
13,17
13:1,5

**device**
11:10

**directly**
8:11,25
9:14 10:3

**Director**
10:14

**disclosure**
11:19
12:2,14
13:2

_____

**E**

**early**
5:22

**employed**
5:14,18

**employee**
12:5,17
13:5

**employment**
5:16

**enforcement**
6:17 7:4,
15 8:1,15
9:4,18
10:7,20
11:17

**ensure**
6:13

**entitled**
6:19 7:6,
17 8:3,17
9:6,20

10:9,22

**entity**
5:19

**evidence**
11:14

_____

**F**

**family**
6:7

**father**
6:3

**FBI**
10:14,15
11:12

**FBI's**
11:17

**federal**
12:3,15
13:3

**funds**
6:4,6

_____

**G**

**gave**
6:24

**give**
7:10

**government**
5:15 6:3
8:9

**ground**
9:3

**grounds**
6:16 7:3,
14,25
8:14 9:17
10:6,19

_____

**H**

**high-ranking**
8:23

**Hunter**
6:1 9:13
10:2
11:3,5
12:12,25

_____

**I**

**identification**
11:23

**identified**
8:23 9:12
10:1
12:11,24

**identity**
8:9

**implement**
7:16

**implicate**
6:18 7:5
8:2,16
9:5,19
10:8,21

**including**
11:24

**individual**
11:23
12:24

**informants**
11:13

**information**
6:16,18
7:3,5,14,
16,25

_____

8:2,14,16
9:3,5,17,
19 10:6,
8,19,21
11:13
12:3,15
13:3

**instructing**
11:20
12:9,21
13:9

**intermediary**
6:2

**involved**
11:3

**involving**
11:5

**Iranian**
6:2,4
11:4,6

**Iranians**
6:5

_____

**J**

**Jacqueline**
6:8

**Joe**
6:4

**John**
5:22

**Justice**
6:9,15
7:2 11:15
12:1,5,
13,17
13:1,5

_____

**K**

**Korea**
6:5

_____

**L**

**lacks**
12:1,13
13:1

**late**
5:22

**law**
6:17 7:4,
15 8:1,15
9:4,18
10:7,20
11:17

**letter**
10:14

**located**
5:16

**long**
5:18

**lot**
5:23

_____

**M**

**matters**
11:14

**medium**
7:11

**messaging**
7:11

**met**
5:22

**method**
11:18



Minister
  8:24

Moynihan
  5:23 8:12
  9:1,14
  10:3

— N —

national
  5:23
  11:14,22
  12:6,10,
  18,23
  13:6

Number
  7:1 11:21
  12:21

numbered
  6:7

— O —

objection
  6:20 7:7,
  18 8:4,18
  9:7,21
  10:10,23

objects
  6:15 7:3,
  13,24
  8:13 9:2,
  16 10:5,
  18 11:16

offer
  6:3

official
  8:24
  12:2,14
  13:2

Officials
  11:4,6

— P —

Pakistani
  8:24

parking
  5:23

parties
  6:18 7:6,
  16 8:2,16
  9:5,19
  10:8,21

paying
  6:5

percent
  6:6

played
  5:24 6:25
  8:10,22
  9:11,25

possession
  11:10

practice
  11:12

President
  6:3

privilege
  6:17 7:4,
  15 8:1,15
  9:4,18
  10:7,20
  11:18

proper
  12:5,17
  13:5

proposed
  11:16
  12:20
  13:8

protected
  11:18

provided
  11:3,8,24

proxy
  10:2
  12:24

pursuant
  6:11

— Q —

question
  6:16 7:1,
  3,14,25
  8:14 9:3,
  17 10:6,
  19 11:17,
  21 12:8,
  21 13:9

QUESTIONS
  11:1

— R —

Reagan
  5:23

recall
  7:9,20
  11:4

receiving
  11:4

recording
  5:24 6:24
  7:10,22
  8:10,23
  9:12 10:1
  11:3,5,24

recordings
  11:8,9

related
  11:5,14

relationshi
p
  12:11

reside
  5:12

respond
  6:21 7:8,
  19 8:5,19
  9:8,22
  10:11,24
  11:21
  12:8,20
  13:8

retain
  11:13

return
  6:5

Robert
  6:1

RULE
  11:1

— S —

security
  11:14,22
  12:6,10,
  18,23
  13:6

seeks
  11:17

sensitive
  11:13

Signal
  7:12

Smith
  5:11
  6:10,11,
  21 7:8,19
  8:5,19
  9:8,21

10:11,24
  11:21
  12:4,7,
  16,19
  13:4,7

Snead
  6:8,9
  7:2,13,24
  8:13 9:2,
  16 10:5,
  18 11:15
  12:1,13
  13:1

son
  8:23

sought
  6:16 7:4,
  14,25
  8:14 9:3,
  17 10:6,
  19

South
  6:5

Special
  6:10,11,
  20 7:7,18
  8:4,18
  9:7,21
  10:10,23
  11:20
  12:4,7,
  16,19
  13:4,7

state
  5:10

stated
  6:1

States
  5:15

subject
  6:17,20
  7:4,7,15,
  18 8:1,4,



SPECIAL AGENT DAVID SMITH                          April 21, 2025
ROBERT HUNTER BIDEN vs PATRICK M. BYRNE           Index: subpoena..years

15,18
9:4,7,18,
21 10:7,
10,20,23

**subpoena**
6:12

———————————

**T**

———————————

**testified**
5:21 6:23
7:21 8:7,
21 9:10,
24 10:13
11:2

**testify**
12:6,18
13:6

**testimony**
6:13

**ties**
9:12

**told**
7:22

**Twelve**
5:20

———————————

**U**

———————————

**unfreeze**
6:4

**United**
5:15

———————————

**V**

———————————

**voice**
8:9,22
9:11,25
11:23

**voicemail**
9:25

**voicemails**
8:10,22
9:11
11:24

———————————

**W**

———————————

**Wray**
10:15

———————————

**Y**

———————————

**years**
5:20

