# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

Present: The Honorable     STEPHEN V. WILSON, U.S. DISTRICT JUDGE

| Daniel Tamayo | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings:**     ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [85]

## I.     Introduction

Defendant Patrick M. Byrne claimed in an interview that Plaintiff Robert Hunter Biden attempted to secure a bribe from the Iranian government in exchange for favors from the U.S. Government. In response, Plaintiff brought defamation claims against Defendant. Now before the Court is Defendant's motion for summary judgment. ECF No. 85. For the following reasons, Defendant's motion is DENIED.

## II.     Background

Plaintiff Robert Hunter Biden ("Plaintiff") is the son of former President of the United States Joe Biden. Defendant's Statement of Uncontroverted Facts ("DF") ¶ 1, ECF No. 85-2. Defendant is the former CEO of Overstock.com, which is an online retailer that sells a variety of products. *See* ECF No. 89-4, Ex.

| | : | |
|---|---|---|
| Initials of Preparer | | DTA |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

2.

### A. Defendant's background and his history with Plaintiff

Since leaving Overstock.com in 2019, Defendant has become a leading promoter of conspiracy theories related to the 2020 presidential election, namely that President Joe Biden stole the 2020 presidential election from President Donald Trump. Plaintiff's Additional Controverted Facts ("PF") ¶ 48. Defendant often promotes these theories on the social media platform "X" (formerly known as Twitter). *See* PF ¶¶ 50-55. For example, on January 5, 2023, Defendant posted the following message on his X account:

> "The Insurrection did not occur January 6, 2021. The Insurrection occurred on November 3, 2020. There I said it. Give me a retweet if you agree."

PF ¶ 52. Defendant also published these ideas in a book called "*The Deep Rig: How Election Fraud Cost Donald J. Trump the White House, By a Man Who did not Vote for Him: (or what to send friends who ask, "Why do you doubt the integrity of the Election 2020?")*" in March of 2021. PF ¶ 49.

Defendant accompanied his claims that the 2020 presidential election was stolen with general hostility towards Plaintiff and his father, President Joe Biden. He typically expressed this hostility through posts on the social media platforms Telegram and X. PF ¶¶ 5-15. The following are representative examples of Defendant's social media posts regarding Plaintiff:

- On March 20, 2022, Defendant posted on Telegram boasting and celebrating about a possible criminal indictment of Plaintiff, along with a mocked-up photograph of Plaintiff behind bars. PF ¶ 4, ECF No. 89-5, Ex. 3.

- On June 24, 2023, Defendant reposted on social media an article calling for Plaintiff to be sent to

| | : | |
|---|---|---|
| Initials of Preparer | | DTA |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

prison. PF ¶ 15.

- On April 7, 2022, Defendant posted on Telegram a Tweet from another person saying: "As it stands: Hunter's laptop is real, the Biden family sells access to the President." PF ¶ 5.

- On May 27, 2023, Defendant, via the social media platform "X," accused Plaintiff of having and creating child pornography. PF ¶ 12.

Starting in 2019, Defendant claimed that even though he never officially worked in public service, that he has a long-standing relationship with the U.S. Government. *See* PF ¶¶ 44-46; ECF 89-4, Ex. 2; ECF 89-41, Ex. 39. In short, Defendant claimed that he has intermittently carried out several covert missions on behalf of the United States. *Id.* These missions included helping to restore "peaceful relations" in Vietnam in 1994, helping to prevent a war with Iran in 2006, assessing the "computer science capabilities of Venezuela in 2019," and helping the FBI gather intel on Russia by having an intimate relationship with Russian agent Maria Butina. *Id.* According to Defendant, some of these requests for his help in covert missions came from the highest levels of government, including President Barack Obama and FBI Director James Comey. *Id.* Defendant has never supported these claims with documentary evidence. PF ¶ 46.

### B. The allegedly defamatory statements

On June 27, 2023, the Capitol Times Magazine published an article (the "Article") containing an interview with Defendant which included the allegedly defamatory statements at issue in this case. PF ¶ 1. On page 72 of the Article, Defendant claimed that Plaintiff attempted to acquire a bribe from the Iranian government in which the Biden family would receive $800 million in exchange for the U.S. Government releasing $8 billion of frozen Iranian funds and going easy on Iran in negotiations over the Iran-nuclear deal. PF ¶ 2. In full, Defendant stated:

| | : |
|---|---|
| Initials of Preparer | DTA |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

So in November 2021, I went back to the Middle East. I met with a group including a special Iranian figure, an old friend who let me know a World War was coming, and had a proposal to avert it. I told them I would relay the proposal but I did not think it would fly.

In the course of being there, and through a mechanism I am not going to explain here, I became aware of an additional situation. Hunter Biden was reaching out to the Iranian government in the fall of 2021 with the following offer: You Iranians have $8 billion frozen in a bank account in South Korea. My father will unfreeze it in return for $800 million being funneled into a numbered account for us. And if you do this deal with us, it will lubricate other negotiations which have recently started between us. By that, the Iranians believed that Hunter meant the [Joint Comprehensive Plan of Action] talks, which had restarted in Geneva a month or two previously. In other words, something along the lines of, "Pay us $100 million and we let you keep 10 nukes, $200 million for 20 nukes," etc. But I am making up the pricing. Hunter was doing this through a middleman, the son of the Minister of Defense of Pakistan. That son was meeting with Hunter, then relaying messages to someone in Iran. And he was being reckless enough to leave voicemails in Iran about it.

When I returned, the agencies went to work over the weekend. I was told a week later that they had confirmed it all. The voice on the voicemail that I had acquired was voice-matched to the son of the Minister of Defense of Pakistan, who had a connection to Hunter Biden. Anyway, in December, 2021, I was told that the scheme was confirmed across the agencies.

PF ¶ 2 (emphasis in original). In response to these statements, the interviewer from the Capitol Times Magazine asked Defendant to confirm his statements:

"Patrick, you are claiming that 18 months ago, the Biden Family was seeking a bribe from Iran to release funds frozen in South Korea, and to go easy in nuclear talks, and that the

| | : | |
|---|---|---|
| Initials of Preparer | | DTA |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

United States Government has been aware of this since December, 2021?"

PF ¶ 3. Defendant responded: "100% correct." *Id.*

### C.  Defendant's basis for believing the statements were true

In response to Defendant's statements regarding this alleged bribery scheme between the Biden Family and Iran, Plaintiff sued Defendant for defamation. ECF No. 1. Plaintiff's suit eventually led to Defendant's deposition, where he explained his basis for believing that the statements at issue were true.

According to Defendant, in 2021, a Lebanese citizen named Hassan El Husseini delivered to Defendant a message from Mehdi Firouzian, an Iranian government official who Defendant often referred to by the moniker "Movie Star." Def. December Deposition 254-1:25[1]; Def. Additional Uncontroverted Facts ("DAUF") ¶¶ 2-3. In that message, Firouzian told Defendant about "a war coming" and informed him that Iran wanted to speak to Defendant "as an interlocutor." Def. December Deposition 254:4-13.

Defendant met with Firouzian in Istanbul that same year, 2021. Plaintiff's Supplemental Statement of Uncontroverted Facts ("PSSUF") ¶ 5[2]; Def. December Deposition 224:1-5, 313:15-17. In that meeting, Firouzian told Defendant that Plaintiff, through the son of a high-ranking Pakistani official (often referred to by Defendant as "Doe 2"), sought a bribe from Iran. PSSUF ¶ 6. The specific terms of this bribe were that Plaintiff would arrange for the United States to release $8 billion of frozen Iranian funds in exchange for Iran wiring $800 million to the Biden family and going easy in the 2021 nuclear talks between the United States and Iran. *Id.* ¶ 6; Def. February Deposition 506:1-20. Firouzian identified "Doe 2" as

---

[1] Available in Exhibit A of Zachary Hansen's Supplemental Declaration, ECF No. 188.

[2] While the Court cites to Plaintiff's statement of facts, this is only for convenience. These facts stem from Defendant's deposition and are based on his own words.

:

Initials of Preparer                    DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|----------|-------------------|------|---------------|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

someone close to Plaintiff, but Defendant contends that he does not know Doe 2's identity. PSSUF ¶ 7.

While Firouzian was explaining this all to Defendant, he was simultaneously playing three voicemails from Doe 2. These voicemails, the transcripts of which Defendant produced during discovery, are generally hard to follow, but they contain various references to the Biden administration, South Korea, and the Iran-nuclear deal. The voicemails do not mention Plaintiff or the alleged bribery scheme between Plaintiff and Iran. *See* ECF 89-56-8, Exs. 54-56.

Using his mobile phone, Defendant secretly recorded Firouzian explaining the alleged bribery scheme while playing the three voicemail recordings (hereinafter, "the Recording"). PSSUF ¶ 9; Def. Feb. Deposition 510:7-13. He then returned to the United States and played the Recording (which, inside of it, included the three voicemails) for two individuals: John Moynihan, Defendant's purported contact to an interagency intelligence group within the U.S government he calls the "League of Shadows;" and David Smith, who is purportedly a member of that interagency group. PSSUF ¶¶ 11-15. Defendant gave his only copy of the Recording to David Smith. *Id.* ¶ 15. Less than a week later, John Moynihan and David Smith informed Defendant that they had analyzed the Recording using voice recognition technology and could confirm that "Doe 2" was someone close to Plaintiff. *Id.* ¶ 17.

Sometime in the next year or so, Defendant met with Firouzian again, this time in Rome. Def. Dec. Dep. 337:4-338:9. During that trip, Defendant stole from Firouzian's phone the three voicemail recordings that Firouzian played for him in Istanbul. *Id.* Defendant supports this story with travel receipts showing that he traveled to Rome in 2023. DAUF ¶ 4.

**D. John Moynihan's Affidavit**

In support of this version of events, Defendant produced only two pieces of physical evidence. First were transcripts of the three voicemails discussed above. Second was an affidavit from John Moynihan. His affidavit contained the following information:

| | : | |
|---|---|---|
| Initials of Preparer | | DTA |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

John Moynihan is a "private sector consultant." ECF No. 89-55, Ex. 53. He specializes in "corporate risk management, intellectual property rights protection asset recovery, litigation support, money laundering investigations, due diligence, legal and regulatory compliance, and security." *Id.*

Moynihan met Defendant for the first time in the Spring of 2021. Moynihan connected Defendant with an FBI agent. The FBI agent, who is not identified in Moynihan's affidavit, told Defendant to contact Moynihan if Defendant ever had any "materials to address to the FBI." An unspecified time later, Defendant told Moynihan that he was in possession of a "taped telephone conversation involving sensitive material involving high level Politically Exposed Persons." Defendant contended that the taped phone call was a conversation between the son of the current Minister of Defense from Pakistan and a cabinet member of the Iran government. Moynihan arranged for himself, Defendant, and the FBI agent to meet. *Id.*

At that meeting, Defendant played the taped telephone conversation (i.e., the Recording) out loud on the speaker of his phone. According to Moynihan, the speakers in the taped conversation discussed requesting assistance with releasing Iranian government funds "banked in North Korea." One of the participants mentioned Hunter Biden by name and noted that "assistance involving him would be requested." The participants then noted that "assistance through Hunter Biden would necessitate the involvement of law firms in the Washington, D.C. area." At the end of the meeting, the FBI agent requested that Defendant send him the phone recording "via Signal." *Id.*

### E. The Current Proceedings

On October 28, 2024, Defendant moved for summary judgment, arguing that Plaintiff does not have clear and convincing evidence that Defendant made the statements at issue with actual malice. ECF No. 85. Plaintiff opposed on November 4, 2024. ECF No. 89.

| | : | |
|---|---|---|
| Initials of Preparer | | DTA |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

### III.     Legal Standard – Motion for Summary Judgment

Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of . . . [the factual record that] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies its initial burden, the non-moving party must demonstrate with admissible evidence that genuine issues of material fact exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986) ("When the moving party has carried its burden under Rule 56 . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). "On an issue as to which the nonmoving party will have the burden of proof . . . the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

A material fact for purposes of summary judgment is one that "might affect the outcome of the suit" under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although a court must draw all inferences from the facts in the non-movant's favor, *id.* at 255, when the non-moving party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, [the] court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremukun*, 509 F.3d at 984.

| | : |
|---|---|
| Initials of Preparer | DTA |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

---

### IV.    Discussion

"Defamation is the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or that causes special damage." *Grenier v. Taylor*, 234 Cal. App. 4th 471, 586 (Ct. App. 2015). Importantly, a public figure, such as Plaintiff in this case,[3] "cannot recover [in a defamation case] unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, i.e., with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).[4] Given this actual malice standard, to defeat summary judgment, a plaintiff must show that the "record contains substantial . . . evidence . . . which, in a light most favorable to [the plaintiff], would support a jury determination under a clear and convincing standard that [the defendant] acted deliberately or recklessly." *Id.* at 521.

A plaintiff can establish actual malice by showing that the author "in fact entertained serious doubts as to the truth of his publication." *Id.* at 510. Alternatively, the plaintiff can bring evidence demonstrating that the defendant "acted with a high degree of awareness of . . . probable falsity." *Id.* (quotations omitted). "If a plaintiff can come forward with clear and convincing evidence from which a jury could find actual malice, he is entitled to a trial even if there is conflicting evidence on the issue." *Kaelin v. Goble Commc'ns Corp.*, 162 F.3d 1036, 1042 (9th Cir. 1998).

"[A]ctual malice can be proved by circumstantial evidence." *Reader's Dig. Assn. v. Superior Ct.*,

---

[3] The parties do not dispute that Plaintiff is a public figure.

[4] While Plaintiff sues under California's defamation laws, Supreme Court cases are nonetheless relevant because "the First Amendment safeguards for freedom of speech and press limit state [defamation] law." *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995).

| | : | |
|---|---|---|
| Initials of Preparer | | DTA |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

37 Cal. 3d 244, 258 (1984).[5] Indeed, "[e]vidence of negligence, of motive and intent may be adduced for the purposes of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity." *Id.* Similarly, a "failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable, or known to be biased against the plaintiff . . . may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of the publication." *Id.* at 257-58.

What's more, the "defendant in a defamation action brought by a public official cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). Rather, the "finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the information or the accuracy of his reports." *Id.*

---

[5] Because this is a diversity case, the Court must apply the substantive law of the forum state, including their choice of law rules. *Erie R.R. Co. v. Thompkins*, 304 U.S. 64, 78 (1938); *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1141 (9th Cir. 2010). "In general, the law of the forum applies unless a party 'timely invokes the law of a foreign state.'" *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1043 (C.D. Cal. 1998) (quoting *Sommer v. Gabor*, 40 Cal. App. 4th 1455, 1467 (1995). Neither party has invoked the law of a foreign state. Quite the contrary, both cite California law. Accordingly, California defamation law applies in this case. Moreover, even if there was a conflict, the Court would almost certainly apply California law given that Plaintiff resides in that state. *See Matter of Yagman*, 796 F.2d 1165, 1170-71 (9th Cir. 1986) (applying California law over New York law in a defamation case because "California's interest would be more impaired if its laws were not applied" given that the plaintiffs lived in California and thus "it is the state where the damage to plaintiffs' reputation, if any, would have occurred").

| | : | |
|---|---|---|
| Initials of Preparer | | DTA |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|----------|-------------------|------|---------------|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

To be clear, circumstantial evidence of the type described above "is relevant only to the extent that it reflects on the subjective attitude of the publisher." *Reader's Dig. Assn.*, 37 Cal. 3d at 258. "The failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on the controversy. Similarly, mere proof of ill will on the part of the publisher may likewise be insufficient." *Id.* (citations omitted).

Given the standards outlined above, the question for the Court is simple: could a reasonable jury, based on the evidence in the record, rationally find by clear and convincing evidence that Defendant published the statements at issue with actual malice—i.e., "with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Masson*, 501 U.S. at 510. As explained below, the answer to that question is clearly yes: there is sufficient circumstantial evidence in this case to support a jury finding of actual malice.

### A. A reasonable jury could find that there were obvious reasons for Defendant to doubt the veracity of the alleged bribery scheme.

"[R]ecklessness [sufficient to establish actual malice] may be found where there are obvious reasons to doubt the veracity of" the source of the information publicized by the defendant. And here, there are certainly "obvious reasons to doubt the veracity" of Defendant's sources.

Defendant learned of the alleged bribery scheme from just one source: Mehdi Firouzian, an Iranian government official. In telling Defendant of the alleged scheme, Firouzian provided no direct evidence. In fact, he did not claim to have ever interacted with the Plaintiff. Instead, he merely asserted that his story was true and played Defendant three voicemail recordings, none of which implicated Plaintiff or even related to the alleged scheme. In short, Defendant had only Firouzian's word to rely on.

|  | : |  |
|--|---|--|
| Initials of Preparer | | DTA |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

Moreover, not only was Firouzian a stranger to Defendant, but he also worked for the Iranian government. As a country with interests often adverse to the United States, the Iranian government, and in turn its officials, have clear incentives to fabricate stories that would stain the current administration or otherwise create controversy within the United States government. Making up a story about the President of the United States' son facilitating a nearly one-billion-dollar bribe does exactly that.

Finally, the substance of Firouzian's claims themselves is an obvious reason to doubt their veracity. While technically possible, they are undoubtedly far-fetched and fantastical. The son of the sitting President accepting a nearly one-billion-dollar bribe from one of the United States' foreign adversaries would be one of the most blatant instances of political corruption in United States history. In other words, Firouzian's claims "are so inherently improbable that only a reckless man would have put them in circulation." *See St. Amant*, 390 U.S. at 732.

In sum, Firouzian's complete lack of evidence supporting his story, his identity as an Iranian government official, and the sheer outlandishness of his claims were all obvious reasons to doubt the truth of his claims. From these obvious reasons a rational jury could reasonably find that Defendant did in fact doubt the truth of Firouzian's claims, and yet published the statements at issue regardless. Such reckless disregard for the truth would support a finding of actual malice. *See St. Amant*, 390 U.S. at 733 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant").

## B. Failure to Investigate

"[R]eckless disregard for the truth may be evidenced in part by failure to investigate thoroughly and verify the facts." *Widener v. Pacific Gas & Electric Co.*, 75 Cal. App. 3d 415, 434 (1977); *see also Reader's Dig. Assn*, 37 Cal. 3d at 258 (listing a "failure to investigate" as a piece of circumstantial evidence that can support a finding of actual malice).

Here, despite the obvious reasons to doubt the veracity of Firouzian's story, Defendant made no

| | : |
|---|---|
| Initials of Preparer | DTA |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

attempts to verify the truth of Firouzian's claims. Yes, he gave the Recording to David Smith, who allegedly confirmed that Doe 2 was close to Plaintiff. But that Doe 2 had some sort of prior relationship with Plaintiff does little to verify that Plaintiff tried to solicit from Iran the largest bribe in United States history. From this lack of investigation, a reasonable jury could infer that Defendant recklessly disregarded the substantial possibility that Firouzian's story was not true.

### C. Defendant has exhibited ill-will toward Plaintiff in the past.

"[A]nger and hostility toward the plaintiff . . . may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." *Reader's Dig. Assn*, 37 Cal. 3d at 258. Defendant's "anger and hostility" towards Plaintiff is well documented. In the preceding years, Defendant has made several negative social media posts about Plaintiff, at one point celebrating Plaintiff's potential criminal indictment and even going as far to call for Plaintiff to be sent to prison. PF ¶ 4, ECF No. 89-5, Ex. 3; PF ¶ 15.[6] Another time, Defendant accused Plaintiff of having and creating child pornography. PF ¶ 12. This is all over the backdrop that Defendant spent years challenging the legitimacy of President Joe Biden's presidency—Plaintiff's father. PF ¶¶ 48-55. This hostility towards Plaintiff provides a motive for Defendant to recklessly disregard the possibility that the statements at issue were false, and thus serves as circumstantial evidence of actual malice. *See Sanders v. Walsh*, 219 Cal. App. 4th 855, 874 (2013) (holding that the defendant's "hostile attitude towards plaintiff [is] substantial evidence to support the trial court's finding of malice").

### D. A reasonable jury could find that Defendant's story is made up.

So far, the Court has analyzed whether, taking Defendant's story as true, a jury could find that he made his statements with a reckless disregard for the truth. But there is also evidence to support a jury

---

[6] The Court again cites to Plaintiff's statement of facts for convenience. Defendant's social media posts regarding Plaintiff are well-documented and are attached to Plaintiff's statement of facts.

|  |  | : |  |
|---|---|---|---|
| Initials of Preparer | | DTA | |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

finding that Defendant's story is not true—that it is entirely fabricated. A reasonable jury could reach this conclusion based on three distinct but related considerations: (1) the inherent implausibility of Defendant's narrative; (2) his failure to produce credible supporting evidence; (3) the internal contradictions and inconsistencies within his account; and (4) the deposition testimony of Mr. Moynihan and Mr. Smith contradicts his story. As explained below, each of these factors, individually or in combination, could lead a jury to conclude that Defendant's story is a product of his imagination, which would constitute clear evidence of actual malice.

### 1. Defendant's story is far-fetched.

To start, the entire premise of Defendant's story—that he has for decades acted as a covert agent for the United States government—strains credulity, especially since he fails to support this claim with any evidence.

Defendant's credibility is further undermined by other, similarly outlandish claims, which are often contradictory. For example, earlier in this litigation, Defendant claimed that he could not perform his deposition in the United States because the Venezuelan government had placed a $25 million bounty on his head. PF ¶¶ 61-65. But later, Defendant changed his story, instead claiming that it was criminals in West Africa, not the Venezuelan government, who threatened his safety. *Id.* As the Court has already stated, these statements are "fantastic without believability." PSSUF ¶ 26.

Defendant's story regarding the statements at issue could similarly earn a jury's skepticism. Defendant contends that an Iranian governmental official reached out to him to explain this alleged bribery scheme between Plaintiff and Iran. But this story begets more questions than answers. Why is Defendant, an American businessman, in contact with an Iranian government official? And if Plaintiff is engaging in a bribery scheme that largely benefits Iran, why is an Iranian government official revealing that scheme to Defendant? Even more curious, if Defendant did tell an intra-agency intelligence group about Plaintiff's actions, why has Plaintiff not suffered any consequences? Surely if Plaintiff was engaging in a corrupt

|  | : |  |
|---|---|---|
| Initials of Preparer | | DTA |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

exchange with Iran, a United States intelligence group would do something about it.

**2.  Defendant fails to support his story with supporting evidence.**

Beyond his own testimony, Defendant produces only three categories of purported evidence: the voicemail recordings, John Moynihan's affidavit, and travel receipts showing that he traveled to Rome. Each piece of evidence, however, falls far short of substantiating his extraordinary claims.

As already explained, the voicemail recordings—which are supposedly central to Defendant's narrative—do not implicate Plaintiff or reference the alleged bribery scheme in any discernible way. While Moynihan's affidavit does confirm that Defendant met with Moynihan and David Smith and played some form of recording, it corroborates none of the substantive elements of Defendant's story. The affidavit provides no independent verification that Defendant met with Firouzian, that he operates as a covert agent, or that the Recording contains what Defendant claims it contains. Finally, while the travel receipts establish that Defendant visited Rome, they prove nothing more. They do not confirm that Defendant met Firouzian there, stole voicemails from his phone, or engaged in any of the other dramatic activities Defendant describes.

**3.  Defendant's story contains internal inconsistencies.**

Beyond lacking supporting evidence, Defendant's story contains several internal inconsistencies that undermine its credibility.

First, Defendant claims he told Congressman James Comer—who spent years investigating Plaintiff's alleged criminal conduct—about the Iran bribery scheme. PSSUF ¶ 24. Yet Congressman Comer never publicly mentioned any connection between Plaintiff and Iran or investigated Plaintiff for Iran-related activities. *Id.* ¶ 25. If Defendant were truly a covert agent with credible intelligence about an $800 million bribery scheme, Congressman Comer surely would have pursued this lead.

| | : |
|---|---|
| Initials of Preparer | DTA |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

Second, Defendant claims he no longer possesses the Recording because he gave it to David Smith via Signal.[7] Moynihan Affidavit at 1. ECF No. 104 at 3. He then claims he deleted it from his phone, pursuant to standard policy in covert operations. Def. February Deposition 511:8-512:24, ECF No. 224-4. This raises an obvious question: if the Recording was so sensitive that Defendant needed to delete it from his phone, why did he keep the three voicemail recordings he allegedly stole from Firouzian? The voicemails contain essentially the same sensitive material as the Recording, since the Recording merely captures Firouzian playing those same voicemails aloud. Defendant's inconsistent treatment of supposedly equivalent evidence suggests he is not being truthful about his reasons for not producing the Recording.

### 4. Moynihan and Smith's depositions contradict Defendant's narrative.

Finally, a jury could reasonably conclude that Defendant's story is fabricated based on material contradictions between his account and the testimony of Mr. Moynihan and Agent Smith—the very witnesses Defendant relies upon to corroborate his extraordinary claims. The Court will start with Mr. Moynihan.

### a. Contradictions between Defendant's narrative and Mr. Moynihan's deposition and affidavit

While Mr. Moynihan's affidavit provides some general corroboration of Defendant's story—confirming that he connected Defendant with Agent Smith and facilitated a meeting where Defendant played a recording—the specific details reveal fundamental inconsistencies that undermine Defendant's credibility.

---

[7] Signal is an instant messaging application.

| | : | |
|---|---|---|
| Initials of Preparer | | DTA |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

Most significantly, Moynihan's account of what the Recording actually contained directly contradicts Defendant's version. According to Moynihan, the voices on the Recording discussed the need to get Plaintiff involved in their plans—suggesting future recruitment rather than ongoing participation. Plaintiff's Additional Controverted Facts ("PACF") ¶ 10, ECF No. 224-1. This directly contradicts Defendant's claim that the Recording documented Plaintiff's active participation in a bribery scheme already in progress. Moreover, Moynihan did not recall hearing the key terms that would be central to any such scheme—he did not recall hearing "bribe," "father," "10%," or "$8 billion" in the Recording. *Id.* ¶ 11. The absence of these critical terms from Moynihan's recollection raises serious questions about whether the Recording contained the damaging content Defendant claims.

Mr. Moynihan also clashes with Defendant regarding what the Recording actually was. Defendant contends the Recording captures a live conversation between himself and Firouzian, during which Firouzian described the alleged bribery scheme while playing three voicemails. But Moynihan described the Recording as a "taped phone call" and stated that Defendant characterized it as "a conversation between the son of the current Minister of Defense from Pakistan [(Doe 2)] and a cabinet member of the Iran government." Moynihan Affidavit at 2, ECF No. 104 at 3. These are fundamentally different descriptions of the same purported evidence—the difference between a live conversation with background voicemails and a direct phone call between two foreign officials.

The contradictions extend beyond the contents and nature of the Recording. Defendant claims that Moynihan relayed to him the results of voice recognition analysis confirming that Doe 2 was someone close to Plaintiff. Def. February Deposition 225:2-18, ECF No. 188 at 20. Moynihan, however, testified that he never communicated any authentication results to Defendant and had no knowledge of what Agent Smith did with the Recording after receiving it. PACF ¶ 13; Moynihan Deposition 123:13-16, ECF No. 229-1 at 261. Even more problematically, Moynihan testified that he did not even know whether Defendant actually gave the Recording to Agent Smith. PACF ¶ 12. This contradiction goes to the heart of Defendant's claim that government officials validated his intelligence.

|  | : |
|---|---|
| Initials of Preparer | DTA |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

Finally, Defendant testified that Moynihan told him about completing a 2-3 day FBI course specifically about Defendant's intelligence career. *Id.* ¶ 16. Moynihan denied any knowledge of such a course. *Id.* ¶ 17. This contradiction is again something a jury could find damaging because it suggests Defendant may be fabricating details to enhance his credibility as a government asset.

### b. Contradictions between Defendant's narrative and Agent Smith's deposition

A jury could plausibly find that Agent Smith's deposition testimony contradicts Defendant's narrative. As the FBI agent who allegedly received the Recording and conducted the voice authentication that supposedly validated Defendant's claims, Smith's testimony directly undermines the foundation of Defendant's story. In his deposition, Agent Smith denied the accuracy of several key assertions by Defendant:

- That Agent Smith instructed Defendant to delete the Recording from his device after sending to him and that Agent Smith watched Defendant do so. *Id.* ¶ 3.
- That Agent Smith confirmed that one of the people speaking on the voicemails was the son of a high-ranking official with the Pakistani Minister of Defense who had close ties to Plaintiff and communicated that information to Defendant. *Id.* ¶ 7.
- That FBI Director Christopher Wray sent a letter to thousands of FBI agents telling them not to have any contact with Defendant. *Id.* ¶ 9.

These contradictions are particularly significant because they go directly to the core elements of Defendant's story that purportedly validate his claims. The alleged voice authentication and government confirmation form the backbone of Defendant's assertion that his story has been officially verified. Agent Smith's denial of these claims significantly undermines any suggestion of government corroboration.

| | : |
|---|---|
| Initials of Preparer | DTA |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

Beyond these specific denials, Agent Smith also generally disputed the accuracy of Defendant's entire account of their meeting at Ronald Reagan Airport, though he did not specify exactly which portions of Defendant's story he disagreed with. Deposition of David Smith, 5:21-6:22, ECF No. 224-5. This further undermines the credibility of Defendant's narrative.

Defendant contends that the Court should not consider Agent Smith's written deposition on two grounds: (1) Plaintiff's counsel failed to serve the court reporter with Defendant's objections to Plaintiff's questions during the deposition; and (2) Plaintiff's counsel made unauthorized modifications to some of Defendant's cross-examination questions. The Court rejects both arguments.

**First**, Defendant cites no authority—and the Court is aware of none—requiring court reporters in written depositions to receive or read into the record objections from parties who are neither conducting the deposition nor representing the deponent. Federal Rule of Civil Procedure 31, which governs written depositions, imposes no such obligation.

**Second**, while Plaintiff's counsel did make unauthorized alterations to three of Defendant's cross-examination questions, these modifications do not warrant excluding Smith's entire deposition. The Court acknowledges at the outset that Plaintiff's counsel acted improperly in modifying Defendant's questions without authorization. Such conduct is inappropriate and should not have occurred. However, the Court's disapproval of this conduct does not automatically require exclusion of the deposition testimony.

The alterations themselves were minimal and did not substantively change the questions' meaning or scope. A comparison of the original and modified questions demonstrates their inconsequential nature. Below is a side-by-side comparison of Defendant's original cross-questions and Plaintiff's changes, with the changes highlighted in bold.

- Original cross-question #2: If Mr. Byrne provided any **recording** to you, did you ask him to delete the **recording** from any device in his possession?

| | | : | |
|---|---|---|---|
| Initials of Preparer | | DTA | |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|---|---|---|---|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

- <u>Altered cross-question #2</u>: If Mr. Byrne provided any **recordings** to you, did you ask him to delete the **recordings** from any device still in his possession?

- <u>Original cross-question #4</u>: Did the National Security Agency confirm the voice identification of the individual on the three voicemails **included on the recording** provided to you by Mr. Byrne?
- <u>Altered cross-question #4</u>: Did the National Security Agency confirm the voice identification of the individual on the three voicemails **including the recording** provided to you by Mr. Byrne?

- <u>Original cross-question #5</u>: Did the National Security Agency confirm that the **identified individual** has or had a relationship or connection to Hunter Biden?
- <u>Altered cross-question #5</u>: Did the National Security Agency confirm that the **identified** has or had a relationship or connection to Hunter Biden?

These modifications—changing "recording" to "recordings," "included on" to "including," and omitting the word "individual"—are stylistic rather than substantive. They do not alter the fundamental inquiry posed by each question or create any meaningful prejudice to Defendant. The singular-to-plural change in question #2 is particularly insignificant given that Agent Smith's negative response would apply equally to one recording or multiple recordings. Similarly, the grammatical modifications in questions #4 and #5 do not change the core subject matter being explored.

Moreover, the practical impact of these alterations is minimal. Agent Smith declined to answer cross-questions #4 and #5 entirely, as his counsel asserted he lacked authorization to respond to questions involving the National Security Agency. For cross-question #2, Smith's unequivocal "no" response—which favors Plaintiff—would have been the same regardless of whether the question referenced "recording" or "recordings."

| | : |
|---|---|
| Initials of Preparer | DTA |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-09430-SVW | Date | July 18, 2025 |
|----------|-------------------|------|---------------|
| Title | *Robert Hunter Biden v. Patrick M. Byrne* | | |

**Third**, and perhaps most significantly, this objection does not affect the Court's ultimate determination. The Court's summary judgment analysis does not depend on Agent Smith's deposition testimony. Even excluding Smith's deposition entirely, the record contains sufficient evidence from which a reasonable jury could find actual malice by clear and convincing evidence. Defendant's procedural objections therefore do not undermine the Court's conclusion that summary judgment is inappropriate.

In sum, there is enough evidence for a reasonable jury to find that Defendant made up his story and knowingly lied when he made the statements at issue. To be clear, the Court is not deciding whether Defendant is telling the truth—that is for the jury. But his story lacks supporting evidence, contradicts itself, and conflicts with key deposition testimony. A reasonable jury could conclude from all this that Defendant fabricated his account out of actual malice for Plaintiff. *Reader's Digest Assn.*, 37 Cal. 3d at 257 ("Professions of good faith [by the defendant] will be unlikely to prove persuasive . . . where a story is fabricated by the defendant [or] is the product of his imagination."). Even if the jury doesn't find that he made it up entirely, they could still reasonably conclude that he recklessly ignored the possibility that his statements were false. This which would also support actual malice.

Accordingly, looking at the evidence in the light most favorable to Plaintiff, a reasonable juror could find by clear and convincing evidence that Defendant made his statements with actual malice. Since this is the only disputed element of defamation, the Court denies Defendant's motion for summary judgment.

### V.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

|  |  | : |  |
|--|--|---|--|
| Initials of Preparer | | DTA | |