Richard A. Harpootlian, *pro hac vice*
rah@harpootlianlaw.com
Phillip Barber, *pro hac vice*
pdb@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Columbia, South Carolina 29201
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

BRYAN M. SULLIVAN (SBN 209743)
bsullivan@earlysullivan.com
ZACHARY C. HANSEN (SBN 325128)
zhansen@earlysullivan.com
EARLY SULLIVAN WRIGHT GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Fl.
Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

Attorneys for PLAINTIFF
ROBERT HUNTER BIDEN

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| ROBERT HUNTER BIDEN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>PATRICK M. BYRNE, an individual,<br><br>Defendant. | **Case No. 2:23-cv-09430-SVW-PD**<br><br>*Hon. Stephen V. Wilson*<br><br>**PLAINTIFF ROBERT HUNTER BIDEN'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLACING DEFENDANT IN DEFAULT AS A SANCTION**<br><br>Complaint Filed: November 8, 2023<br>Trial Date: July 29, 2025 |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff Robert Hunter Biden ("Plaintiff") hereby files the instant Memorandum of Points and Authorities in support of placing Defendant in default as a sanction, pursuant to the show cause order the Court issued from the bench on July 29, 2025. As explained below, more than good cause exists to enter a default judgment against Defendant and in favor of Plaintiff for one dollar and to proceed to a punitive damages hearing before a jury. As evidenced by the record in this action and the Court's own statements, Defendant has repeatedly engaged in misconduct that culminated in what the Court described as a "circus" on the morning of July 29, 2025 that wasted the Court's time, that of the potential jurors for this trial, and Plaintiff's trial team that was ready to commence trial that morning.

## I. BACKGROUND

After months of delay and multiple pretrial conferences, jury selection and trial of this case was set to begin on July 29, 2025. Prospective jurors were summoned from their homes and jobs and assembled in the courthouse. Exhibits and transcripts filling many boxes were printed and brought to the courtroom. The presiding judge and chambers and courtroom staff were present in the courtroom. Plaintiff and his lawyers were present in the courtroom. But Defendant and his counsel since nearly the commencement of this action, Michael Murphy, were not present. Neither was Peter Ticktin, whose pro hac vice application had been approved the previous week.

Instead, three new lawyers appeared for Defendant for the first time that day. Thomas Yu appeared for Defendant. His practice focuses exclusively on defending law enforcement officers in lawsuits arising from the use of force or in disciplinary proceedings. *See* https://www.tomyulaw.com/. Eric Neff appeared for Defendant. Mr. Neff formerly was a Los Angeles County prosecutor, who was placed on administrative leave and later left the District Attorney's office after bringing false charges against a Michigan-based company that makes software for election offices. The victim of that baseless prosecution sued Los Angeles County, which was forced to pay $5 million to settle the claim. *See* https://www.nbclosangeles.com/investigations/la-county-pays-5-

1  million-to-settle-alleged-baseless-prosecution-of-voting-software-provider/3319783/.
2  Mr. Neff has no visible law office at all.  His address listed with the State Bar of
3  California is a single-family home in a residential neighborhood in the Newport Beach
4  area.  He admitted he has never appeared in federal court as an attorney before now.  He
5  has an undescribed "professional relationship" with Stefanie Lambert, who attempted
6  to appear for Defendant, filing a motion for admission *pro hac vice* that morning.  She
7  is Defendant's personal lawyer, Hr'g Tr. 9:25–10:1, July 29, 2025 (attached as **Exhibit**
8  **A**), and has appeared for him in numerous defamation cases in which he is a defendant.
9  She was terminated from a case representing Mr. Byrne in another federal lawsuit
10 because of gross misconduct and was recently denied pro hac vice admission in the
11 Middle District of Florida in another defamation case against Mr. Byrne because of that
12 misconduct.  She is also under felony indictment in Michigan, charged with computer
13 crimes related to election tabulators, and is free from custody on a secured cash bond.
14 After a hearing in Washington, D.C., in a case in which she represented Mr. Byrne
15 (before being removed as a sanction), she was arrested on a bench warrant pursuant to
16 a show cause order for contempt of court for failing to appear in proceeding in her
17 criminal prosecution in Michigan.  After Plaintiff brought these issues to the Court's
18 attention, it denied her motion for admission *pro hac vice*.

19     The Court noted "this is becoming, well, circus-like. And it's not the way things
20 should be." *Id.* at 12:3–4.  It asked Defendant's new counsel if they were fully prepared
21 to try the case.  Ms. Lambert assured the Court that "All three attorneys at this table
22 have read all of the Court's rulings, and we're familiar with the entire file." *Id.* at 8:16–
23 18. Mr. Yu confirmed that as well.  The Court asked Mr. Yu when he entered the case,
24 and he responded, "yesterday morning."  The Court asked, "Well, how could you have
25 you read and digested every aspect of the case?" *Id.* at 9:1–2.  Mr. Yu insisted that he
26 had.  The Court asked who would cross-examine Plaintiff.  The new lawyers did not
27 know at first, but eventually decided Mr. Yu would.  The Court stated, "this sounds like
28 a carnival." *Id.* at 12:20–21.  The Court asked Mr. Yu to state the subjects on which he

would cross-examine Plaintiff.  Mr. Yu's first response was to identify a subject the Court had already ruled was irrelevant.  The Court observed, "So you've already shown me that you are not familiar with what has -- with what the Court has ruled on," to which Mr. Yu responded, "Sure." *Id.* at 15:4–7.

Later, the Court asked Mr. Yu, "What specific designation are you referring to when you say that there's a part of the transcript where Byrne said he believed certain things to be true -- certain -- certain alleged prior acts of corruption to be true?" *Id*. at 30:23-31:10.  Mr. Yu could not answer.  The Court ordered a recess for him to find it.  After the recess, Mr. Yu stated he could not find it, but also that when he came onto the case "it was with the 100 percent understanding" that his and Mr. Neff's roles were "going to be supporting Ms. Lambert." *Id.* at 33:3-10.  Now that Ms. Lambert's pro hac vice motion was denied, Defendant "has informed us that . . . we're not authorized to represent him." *Id.* at 33:15–17.  They asked for a continuance of the trial "so he can find adequate competent counsel that is ready to proceed," *id.* at 33:19–23, directly contradicting the representations made to the Court that they were all fully prepared and ready to proceed with trial.  *Id*. at 8:12-13.  The Court noted, "This is really like a three-ring circus." *Id.* at 35:1.

At that point, Plaintiff noted Defendant had not appeared for trial, either in person or through counsel, and asked that he be placed in default.  The Court ordered a recess to consider the matter.  After the recess, Mr. Murphy had returned to the courtroom at the Court's direction.  He informed the Court that he learned he was fired that morning, and that he then immediately left to return to his office to collect the case file to transmit to Defendant's new lawyers.  *Id*. at 37:6-16.  That representation contradicts Mr. Yu's and Mr. Neff's representations that they had reviewed the file for at least a day or two before they appeared in this case.  Ms. Lambert however had earlier represented that she had been secretly working on this case since its beginning.  *Id.* at 9:23–10:7.  However, much of the case file—including Defendant's entire deposition—is marked "highly confidential—attorney's eyes only," so it is unclear how Ms. Lambert could

have read the file (or have provided to Mr. Yu and Mr. Neff in advance of Mr. Murphy providing it) without violating the Court's protective order regarding highly confidential documents. *See* ECF No. 63. The protective order allows consultants hired by trial counsel to access highly confidential documents, but Ms. Lambert represented that her office hired Mr. Murphy (*id.* at 8:10-12), so she could hardly be his hired consultant or contractor. Notably, violating a court order protecting confidential documents in another case is the misconduct which led ultimately to her pro hac vice application being denied in Florida and by this Court.

The Court then ordered Defendant to show cause why he should not be placed in default.

But the "circus" that occurred the morning of July 29, 2025, was not the first time Defendant engaged in misconduct in this case that has caused the trial date to be delayed. As set forth in detail in the November 22, 2024, Plaintiff Robert Hunter Biden's *Ex Parte* Application For An Order Granting Sanctions Against Defendant And/Or An Adverse Inference Instruction (ECF No. 151) (and the evidence submitted in support thereof), from August 20, 2024, through the first Final Pre-Trial Conference in this matter on November 25, 2024, Defendant acted to frustrate Plaintiff's efforts to depose Defendant. On August 20, 2024, Plaintiff first sought to schedule Defendant's deposition and originally agreed for the deposition to occur at the end of September in Florida, but, on September 11, 2024, Defendant stated that Plaintiff would have to travel to Dubai to conduct the deposition where Defendant had recently moved because he purportedly was informed by the U.S. Drug Enforcement Administration that the Venezuelan government had placed a $25 million bounty on his head and he was unable to travel to the United States. After much back and forth on the issue of the legal effect of taking depositions in Dubai and two informal discovery conferences, on October 30, 2024, Magistrate Judge Donahue ordered Defendant to return to the United States for his deposition and to identify to Plaintiff's counsel the district court in which he would appear within five days of the order (November 4, 2024).

1. Rather than complying with Magistrate Judge Donahue's Order, at exactly 5:00 P.M. on November 4, Defendant's counsel sent an email stating for the first time that Defendant now was or had been in Qatar that day and had experienced chest pains, that his treating physicians were recommending he not fly to the United States, and that any proceeding in this action be conducted remotely.

On November 6, 2024, Magistrate Judge Donahue held that Defendant's medical issues "do not excuse Defendant from complying with the Court order to provide written notice to Plaintiff of the district for the deposition and ordered Defendant to provide that written notice by 5:00 p.m. that day, which Defendant did by selecting the Southern District of Florida for his deposition location with the deposition to take place within 5 days. Five days later, on November 11, 2024, Defendant submitted an *Ex Parte* Application seeking a protective order to allow Defendant's deposition to occur remotely or after the date scheduled by Plaintiff due to his alleged health issues. The application was denied by the Court, which found Defendant failed to satisfy his burden to show cause as to why a protective order should be issued and which noted Defendant's noncompliance with prior orders. Defendant failed to appear for his scheduled in-person deposition on November 18, 2024, as ordered by the Court, which Plaintiff's counsel was ready and willing to facilitate.

Based on these alleged medical issues, Defendant sought to continue the trial date (ECF No. 148) on November 22, 2024—only three days before the original Final Pre-Trial Conference—with no explanation as to why Defendant waited 18 days after his medical issues were first disclosed to seek such a continuance. At the first Final Pre-Trial Conference on November 25, 2024, the Court found that Defendant's reasons for the continuance and delaying the deposition were "fraudulent" and "fantastic without believability." 11/25/25 Hr'g Tr. 7:24–8:23. Further, the Court stated:

> I believe from everything I have seen before me, [Defendant's] reasons for not appearing [at deposition] are a fraud upon the Court. And I don't think I have to accept it. This isn't just, as I said, a sidewalk view. Anyone

looking at this would conclude that had these representations are fanciful. *Id.* at 11:15–20. Defendant's counsel responded, "All I can do is present to the Court what was given to me," to which the Court responded:

> [Y]ou're in a tough position because this is—you know, as a—not to belie the Country of Denmark, but something is rotten in the state of Denmark.
>
> And, I'm not going to abide by it.

*Id.* at 12:11–16. As a result of what the Court termed Defendant's fraudulent conduct, the Court was forced to continue the original trial date of December 10, 2024. *Id.* at 12:17–24.

Despite these statements by the Court, Defendant continued to engage in machinations to deprive Plaintiff of information that led to further delay of these proceedings. Despite an earlier interrogatory asking for all information on which he relied in making the defamatory statements at issue in this case, at his December 13–14 deposition Defendant for the first time revealed that there was a *fourth* recording on which he relied. Further, Defendant refused to disclose the identities of the alleged Iranian government official who allegedly told him the Defamatory Statements or the person who arranged the meeting with that Iranian government official for Defendant— indisputably material facts. *See* ECF Nos. 168, 169, 170. As a result, Plaintiff was forced to move to re-open fact discovery to depose Defendant for a third day, to depose John Moynihan, and to depose Special Agent David Smith. Mr. Moynihan and Agent Smith's relevance was not disclosed until the disclosure of the fourth recording was made in Defendant's December 13–14, 2024 deposition. *See* ECF Nos. 168, 169, 170. Further still, Plaintiff had to move to compel Defendant to disclose the identities of the alleged Iranian government official who allegedly told him the Defamatory Statements or the person who arranged the meeting with that Iranian government official for Defendant. *See* ECF Nos. 174, 175, 176, 177, and 184. The Court granted both requests. *See* ECF Nos. 170 and 184.

As a result of Defendant's "shenanigans," *see* Hr'g Tr. 34:24–25, a trial originally scheduled for December 10, 2024, was continued to March 4, 2025, then again to July 29, 2025. Now, Defendant wants another continuance because he decided not to appear for trial and to fire five attorneys over the past two days. These actions by Defendant are not an accident; they are a part of an intentional design to cause as much disruption to these proceedings as possible in an ongoing effort to continue to harass Plaintiff and delay justice. For the reasons set forth below, the Court should deny his request for a continuance, enter a default judgment against him for nominal damages, and proceed to empanel a jury for a punitive damages hearing. *Cf. New Show Studios LLC. v. Needle*, No. 2:14-CV-01250-CAS (MRWX), 2016 WL 7017214, at *10 (C.D. Cal. Dec. 1, 2016) (granting default judgment for nominal damages in defamation case in which the defendant failed to appear at trial).

## II.   LEGAL STANDARD

The Court has inherent power to impose the sanction of default judgment. "The inherent powers of federal courts are those which are necessary to the exercise of all others," including "the well-acknowledged inherent power . . . to levy sanctions in response to abusive litigation practices." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–65 (1980) (internal quotation marks omitted). "A specific finding of bad faith . . . must 'precede any sanction under the court's inherent powers.'" *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (quoting *Piper*, 447 U.S. at 767).

Courts have inherent power to dismiss an action or enter a default judgment "when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Fjelstad v. American Honda Motor Co.*, 762 F.2d 1334 (9th Cir. 1985); *Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982) ("It is firmly established that the courts have inherent power to dismiss an action or enter a default judgment to ensure the orderly administration of justice and the integrity of their orders." (citations omitted)). There are "five factors that a district court must consider before dismissing

a case or declaring a default: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990).

The notice provisions of Rule 55(b)(2) of the Federal Rules of Civil Procedure do not apply when the trial court grants default as a sanction for failure to appear at trial rather than for failure to defend the action. *Ringgold Corp. v. Worrall,* 880 F.2d 1138, 1141 (9th Cir. 1989).

## III.   ARGUMENT

In *Ringgold*, the Ninth Circuit affirmed the entry of default judgment against a non-appearing defendant who was aware of an impending trial and who failed to appear, personally or through counsel, on the trial date. 880 F.2d 1138, 1141. The *Ringgold* court followed the reasoning of *Brock v. Unique Racquetball & Health Clubs, Inc.*, in which the Second Circuit affirmed the entry of default judgment where a party's counsel failed to appear for trial. 786 F.2d 61 (2d Cir. 1986). "'In this context, a trial judge, responsible for the orderly and expeditious conduct of litigation, must have broad latitude to impose the sanction of default for nonattendance occurring after a trial has begun.'" *Ringgold*, 880 F.2d at 1141 (quoting *Brock*, 786 F.2d at 64).

The same rule controls here. Defendant was aware of the trial set to begin on July 29, 2025, yet he decided not to appear personally (*see* ECF No. 272)—despite assuring the Court he would do so only one week prior—and he failed to appear through counsel. Instead, Defendant fired the lawyer who had represented him since nearly the beginning of this action on the morning trial was to begin and new lawyers appeared on his behalf that morning—lawyers who demonstrated that they were totally unprepared to try a case set for trial beginning that very morning despite their express representations to the Court otherwise. When the Court denied Ms. Lambert's application for admission pro hac vice, and exposed their complete unpreparedness for

trial, his new counsel reversed their representation to the Court that they were prepared to try the case and instead represented that they were retained to support Ms. Lambert and were not authorized to actually try the case and requested a continuance. Defendant however cannot request a continuance based on his decision to terminate Mr. Murphy. *See, e.g.*, *New Show Studios*, 2016 WL 7017214, at *9 ("[The defendant's] last minute decision not to be represented by [his previous counsel], upon which [the defendant's] sole request for a continuance was based, is no more availing. [Defendant] is entitled to hire counsel of his choice, but he cannot be permitted to relieve his counsel on the eve of trial without arranging to appear on his own behalf or through new counsel.").

On these facts, the "five factors that a district court must consider before dismissing a case or declaring a default" weigh strongly in favor of a default judgment. The public's interest in expeditious resolution of litigation and the court's need to manage its docket weigh in favor of entering default, because Defendant's nonappearance at trial prevents the Court from moving this matter toward disposition. The third factor—prejudice to Plaintiff—weights in favor of entering default. Plaintiff was prejudiced by Defendant's nonappearance because he expended time and incurred costs in preparing his case to proceed with trial as scheduled. *Cf. Thompson v. Gomez*, No. 1:18-CV-00125-SAB (PC), 2022 WL 10140852, at *2 (E.D. Cal. Oct. 17, 2022) (finding parties "unquestionably" prejudiced by opposing party's failure to appear at trial because they "expended time and incurred substantial costs in preparing their case, . . . appeared in-person on [the first day of trial], and were ready to proceed"). "The fourth factor, resolution of cases on their merits, always weighs against" terminating sanctions (*Dreith v. Nu Image, Inc.*, 648 F.3d 779, 788-89 (9th Cir. 2011)), but here this factor carries almost no weight because Defendant only disputed one element of defamation—actual malice (ECF No. 268 at 21)—and if a default is entered Defendant's malice would still be litigated on the merits before a jury in a punitive damages hearing. Furthermore, the Court's order denying Defendant's summary judgment motion on the actual malice prong definitively found substantial evidence on

which a jury could find Defendant liable for defamation finding that only the jury's determination of Defendant's credibility was the remaining issue, but Defendant has chosen not to appear despite repeated under oath promises that he would attend trial and multiple representations to the Court of the same by Mr. Murphy. Finally, the fifth factor—the availability of less drastic sanctions—weighs in favor of entering default. Other than a terminating sanction, the only available sanctions are evidentiary sanctions or monetary sanctions. Evidentiary sanctions have no value if evidence is never presented at trial. Monetary sanctions are unlikely to be effective against a deliberately absent party who both possesses great wealth and who has shown his repeated willingness to flout the orders of the Court as set forth above relating to Defendant's efforts to delay or avoid his deposition, which the Court itself described as "perpetrating a fraud on the Court." And the assessment and enforcement of monetary sanctions would delay, rather than expedite, moving this case toward disposition.

Lastly, the record supports a specific finding that Defendant has acted in bad faith. It is now apparent Defendant has never really intended to defend this case on the merits. Defendant only intended to use this case as a megaphone to continue his harassment and defamation of Plaintiff. When the Court ordered that he would not be able to do so, Defendant decided both not to attend trial himself and to replace his counsel with someone having a proven record of disobeying court orders on his behalf. When the Court denied her *pro hac vice* application, he decided not to proceed with trial at all. His new lawyers reversed themselves and confessed they were wholly unprepared to litigate this case—admitting they are just local counsel retained at the last minute as a vehicle for Ms. Lambert to perform the "circus" Defendant desires in the courtroom and the "carnival" that the Court stated would not be allowed to occur.

## IV.  CONCLUSION

For the foregoing reasons, the Court should enter a default judgment in favor of Plaintiff in the amount of one dollar and proceed to a punitive damages hearing before a jury.

Dated: July 30, 2025   By:   */s/ Phillip D. Barber*

Richard A. Harpootlian, *pro hac vice*
rah@harpootlianlaw.com
Phillip Barber, *pro hac vice*
pdb@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Columbia, South Carolina 29201
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

BRYAN M. SULLIVAN (State Bar No. 209743)
bsullivan@earlysullivan.com
ZACHARY C. HANSEN (State Bar No. 325128)
zhansen@earlysullivan.com
EARLY SULLIVAN WRIGHT GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Fl.
Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

*Attorneys for Plaintiff
Robert Hunter Biden*

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**