Richard A. Harpootlian, *pro hac vice*
rah@harpootlianlaw.com
Phillip Barber, *pro hac vice*
pdb@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Columbia, South Carolina 29201
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

Bryan M. Sullivan, State Bar Number 209743
 bsullivan@earlysullivan.com
Zachary C. Hansen, State Bar Number 325128
 zhansen@earlysullivan.com
EARLY SULLIVAN WRIGHT
 GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048
Telephone:  (323) 301-4660
Facsimile:  (323) 301-4676

Attorneys for PLAINTIFF
ROBERT HUNTER BIDEN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ROBERT HUNTER BIDEN, an individual,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>PATRICK M. BYRNE, an individual,<br><br>　　　　　Defendant. | Case No. 2:23-cv-09430-SVW-PD<br><br>**PLAINTIFF ROBERT HUNTER BIDEN'S MOTION FOR ENTRY OF DEFAULT JUDGMENT**<br><br>Judge:　Hon. Stephen V. Wilson,<br><br>Date: January 12, 2026<br>Time: 1:30PM<br>Place: Courtroom 10A |

# **TABLE OF CONTENTS**

**Page**

Table of Contents........................................................................................................ii

Table of Authorities...................................................................................................iii

I.     Introduction ....................................................................................................1

II.    Statement of Facts ..........................................................................................3

III.   Legal Standard................................................................................................7

IV.    Information Required by Local Rule ..............................................................8

V.     The *Eitel* Factors support entry of a default judgment.................................8

       A.     Merits of Plaintiff's Claim ..................................................................9

              1.   Byrne published Defamatory Statements about Biden. .....................10

              2.   The Defamatory Statements were a statement of fact. ......................10

              3.   The Defamatory Statements were false. ............................................10

              4.   The Defamatory Statements were not privileged. .............................11

              5.   Byrne acted with actual malice in making the Defamatory Statements. 11

       B.     Damages.............................................................................................14

              1.   Plaintiff is entitled to nominal damages. ...........................................14

              2.   Plaintiff is entitled to punitive damages. ...........................................15

VI.    Conclusion.....................................................................................................27

**PLAINTIFF ROBERT HUNTER BIDEN'S TRIAL BRIEF**

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adams v. Murakami,*
    54 Cal. 3d 105 (1991) ..................................................................23, 24, 26

*Adriana Int'l Corp. v. Thoeren,*
    913 F.2d 1406 (9th Cir. 1990) .............................................................. 8

*Arizona v. ASARCO LLC,*
    773 F.3d 1050 (9th Cir. 2014) ........................................................2, 20, 22

*Baffert v. Wunderler,*
    3:23-CV-1774-RSH-BLM,
    2025 WL 1784625 (S.D. Cal. June 27, 2025) .........................................15, 16

*Bankhead v. ArvinMeritor, Inc.,*
    205 Cal. App. 4th 68 (2012) ................................................................25

*Barnes-Hind, Inc. v. Superior Court,*
    181 Cal. App. 3d 377 (1986) ...........................................................10, 14

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559 (1996) .......................................................................17

*Colucci v. T-Mobile USA, Inc.,*
    48 Cal. App. 5th 442 (2020) ...............................................................16

*Contento v. Mitchell,*
    28 Cal. App. 3d 356 (1972) ................................................................15

*Cummings v. Connell,*
    402 F.3d 936 (9th Cir. 2005) ..............................................................20

*Eastwood v. Nat'l Enquirer,*
    123 F.3d 1249 (9th Cir. 1997) .............................................................12

*Eitel v. McCool,*
    782 F.2d 1470 (9th Cir. 1986) .............................................................. 8

*Fernandes v. Singh,*
    16 Cal. App. 5th 932 (2017) ...............................................................25

*Freeman v. Giuliani*,
    1:21-cv-3354-BAH (D.D.C. Dec. 18, 2023) .............................................2, 21

*Garcia v. Myllyla*,
    40 Cal. App. 5th 990 (2019). ...........................................................2, 24

*Goldwater v. Ginzburg*,
    414 F.2d 324 (2d Cir. 1969)). ...............................................................19

*Gordon v. Duran*,
    895 F.2d 610 (9th Cir. 1990) .................................................................7

*Grenier v. Taylor*,
    234 Cal. App. 4th 471 (2015). ..........................................................9, 10

*Grimshaw v. Ford Motor Co.*,
    119 Cal. App. 3d 757 (1981) ....................................................18, 19, 23

*Harvey v. Netflix, Inc.*,
    2:24-CV-04744-RGK-AJR,
    2024 WL 4536639 (C.D. Cal. Sept. 27, 2024)........................................22

*In re First Alliance Mortg. Co.*,
    471 F.3d 977, 998 (9th Cir. 2006) .........................................................15

*Jackson v. Mayweather*,
    10 Cal. App. 5th 1240 (2017) .........................................................10, 11

*Johnson v. Ford Motor Co.*,
    35 Cal. 4th 1191 (2005) .......................................................................18

*Kaelin v. Globe Commc'ns Corp.*,
    162 F.3d 1036 (9th Cir. 1998) ...............................................................11

*Khraibut v. Chahal*,
    15-CV-04463-CRB, 2021 WL 1164940 (N.D. Cal. Mar. 26, 2021). ...........16

*Lara v. Cadag*,
    13 Cal. App. 4th 1061 (1993) ...............................................................25

*Maheu v. Hughes Tool Co.*,
    569 F.2d 459 (9th Cir. 1977) ................................................................19

*Michelson v. Hamada*,
    29 Cal. App. 4th 1566 (1994)...............................................................25

iv

*Mike Davidov Co. v. Issod,*
　　78 Cal. App. 4th 597 (2000)......................................................24, 27

*Nazerali v. Mitchell,*
　　No. S116979, 2016 BCSC 810 (Sup. Ct. of British Columbia).....................18

*Neal v. Farmers Ins. Exch.,*
　　21 Cal. 3d 910 (1978).....................................................................24

*PepsiCo, Inc. v. Cal. Sec. Cans,*
　　238 F. Supp. 2d 1172 (C.D. Cal. 2002)..................................................8

*Reader's Dig. Assn. v. Superior Court,*
　　37 Cal. 3d 244 (1984)......................................................................12

*Rufo v. Simpson,*
　　86 Cal. App. 4th 573 (2001)........................................................2, 26

*Sanders v. Walsh,*
　　219 Cal. App. 4th 855 (2013)...........................................................12

*Saunders v. Branch Banking & Trust Co. of Va.,*
　　526 F.3d 142 (4th Cir. 2008)............................................................20

*St. Amant v. Thompson,*
　　390 U.S. 727 (1968) ..................................................................7, 12

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
　　538 U.S. 408 (2003) .................................................................17, 20

*TeleVideo Systems, Inc. v. Heidenthal,*
　　826 F.2d 915 (9th Cir. 1987).............................................................8

*Thompson v. Karen Civ.,*
　　2:19-cv-5690-RSWL-AS, 2020 WL 8610841 (C.D. Cal. Aug. 10, 2020) ....15

*United States v. Dillon,*
　　1:23-CV-00355-BLW, 2024 WL 4555873 (D. Idaho Oct. 23, 2024).............8

*United States v. Jewell,*
　　532 F.2d 697 (9th Cir. 1976)...........................................................12

*Vachani v. Yakovlev,*
　　15-CV-04296-LB, 2016 WL 7406434 (N.D. Cal. Dec. 22, 2016)...............15

**PLAINTIFF ROBERT HUNTER BIDEN'S MOTION FOR A DEFAULT JUDGMENT**

**Statutes**

Cal. Civ. Code § 3294..................................................................................15, 16, 23

Cal. Civ. Code § 47..............................................................................................11

**Other Authorities**

Complaint, *US Dominion, Inc., v. Byrne*,
　　1:21-cv-2131-CJN (D.D.C. Aug. 10, 2021). ...................................................18

Immanuel Kant, *Metaphysics of Morals* (1797)....................................................24

*Interview of Patrick M. Byrne Before the House Select Committee to Investigate the
　　January 6th Attack on the U.S. Capitol*, at 16, 226, 117th Cong. 2 (July 15,
　　2022), *available at* https://www.govinfo.gov/app/details/GPO-J6-
　　TRANSCRIPT-CTRL0000915977 ......................................................3, 20, 27

John Y. Gotanda, *Punitive Damages: A Comparative Analysis*,
　　42 Colum. J. Transnat'l L. 391, 396 (2004). ...............................................23

Petition for a Writ of Mandamus,
　　*In re Attorneys Peter Ticktin and Stefanie Lambert*,
　　Case No. 25-5811 (9th Cir. Sept. 15, 2025)...................................................26

PLAINTIFF ROBERT HUNTER BIDEN'S MOTION FOR A DEFAULT JUDGMENT

## I.    **INTRODUCTION**

After months of delay and multiple pretrial conferences, jury selection and trial of this case was set to begin on July 29, 2025.  Prospective jurors were summoned from their homes and jobs and assembled in the courthouse.  The presiding judge and chambers and courtroom staff were present in the courtroom.  Plaintiff and his lawyers were present in the courtroom.  But Byrne and his counsel since nearly the commencement of this action, Michael Murphy, were not present.  Neither was Peter Ticktin, whose *pro hac vice* application had been approved the previous week.

Instead, three new lawyers appeared for Defendant for the first time that day, only one of whom was admitted to the bar of this Court.  Byrne's new lead attorney, Stephanie Lambert, had been terminated from a case representing Mr. Byrne in another federal lawsuit because of gross misconduct and had been recently denied *pro hac vice* admission in the Middle District of Florida in another defamation case against Mr. Byrne because of that misconduct.  She is also under felony indictment in Michigan, charged with computer crimes related to election tabulators, and is free from custody on a secured cash bond.  After Plaintiff brought these issues to the Court's attention, it denied her motion for admission *pro hac vice*.  Byrne's remaining attorneys then told the Court that he "has informed us that . . . we're not authorized to represent him."  The Court noted, "This is really like a three-ring circus."

At that point, Plaintiff noted Byrne had not appeared for trial, either in person or through counsel, and asked that he be placed in default.  (ECF No. 307.)  The Court ordered a recess to consider the matter.  It declined to order a default, instead ordering Byrne to provide an email address for electronic service or a physical address for mail or overnight delivery service of documents and ordering discovery into Byrne's financial condition.  (*Id.*)  Byrne, however, never provided an address for service, never retained new counsel, and refused to respond to discovery, all in violation of this Court's various orders.  When Plaintiff moved to enforce the Court's orders, the Court ordered Byrne to appear personally at a hearing on August 18, 2025.  (ECF No.

318.)  He did not appear or otherwise respond to the order.  Plaintiff renewed his motion for an entry of default, which the Court granted.  (ECF Nos. 342 & 343.)

Plaintiff now seeks a default judgment against Byrne for nominal damages plus punitive damages of $33.33 million.  The Ninth Circuit has held that analyzing the ratio of compensatory to punitive damages is inappropriate in a nominal damages case.  *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1058 (9th Cir. 2014).  Instead, the Court should look to comparable verdicts.  *Id.*  The most comparable verdict is the punitive damages award in the default judgment against Rudolph Giuliani for defamation of two Georgia election workers.  *Freeman v. Giuliani*, 1:21-cv-3354-BAH (D.D.C. Dec. 18, 2023).  Many factors suggest a higher award than in the *Freeman* case: Byrne accuses Plaintiff of conduct more reprehensible than stuffing ballot boxes, Byrne is a recidivist with a history of malicious defamation, and Byrne has far more wealth and ability to pay a judgment than Mr. Giuliani.  However, because Plaintiff was not as vulnerable to physical threats as the plaintiffs in *Freeman*, he requests an award of only 44% of the punitive damages award in that case, mirroring what would be the reduction in compensatory damages in *Freeman* if damages for emotional harm from physical threats were removed.  Because Byrne has refused to participate in Court-ordered discovery regarding his financial condition, he is estopped from objecting to any punitive damages award based on lack of evidence of his net worth.  *E.g.*, *Garcia v. Myllyla*, 40 Cal. App. 5th 990, 995 (2019).  Nevertheless, Plaintiff has provided evidence that Byrne easily has the ability to pay a judgment without being "crippled."  *Cf. Rufo v. Simpson*, 86 Cal. App. 4th 573, 621–22 (2001).  In fact, the amount requested is millions less than the amount Byrne publicly claims he has spent challenging the 2020 election results and is only one third of the minimum reasonable estimate of his ability to pay a judgment.  Decl. of David Cawley, CPA, ¶¶ 24, 36, Oct. 17, 2025 (attached as **Exhibit A**).

## II.    <u>STATEMENT OF FACTS</u>

Byrne resigned from his position as chief executive officer of Overstock.com in 2019 because his claims about working as a secret intelligence agent made it impossible for Overstock.com to obtain directors' and officers' insurance coverage. Cawley Decl. ¶ 7; Patrick Byrne, *A Message to My Former Colleagues at Overstock*, DeepCapture.com (Sept. 18, 2019) (attached as **Exhibit B**).    Following his resignation, Byrne sold his remaining equity in Overstock.com for $90 million on September 18, 2019.  Cawley Decl. ¶ 8.  He placed this money in "counter-cyclical" investments, primarily cryptocurrencies, which exploded in value during and after the Covid pandemic.  Cawley Decl. ¶¶ 10–12; Ex. B.  These investments today are worth an estimated $680 million and may be worth more than $1 billion.  Cawley Decl. ¶¶ 27–28.

Byrne used this wealth to become a leading promoter of conspiracy theories that the 2020 presidential election was stolen by Plaintiff's father, President Joe Biden, and that the violent uprising at the Capitol on January 6, 2021, was a "fed-surrection" orchestrated by enemies of President Trump, and other wildly outrageous claims.    Statement of Undisputed Facts in Support of His Motion for Default Judgment ("SUF") ¶¶ 48–56 (attached as **Exhibit C**).  As part of this, Byrne engaged in a social media campaign against Plaintiff before he published the article giving rise to Plaintiff's defamation claims in the instant case.  SUF ¶¶ 4–37, 48–56.  Byrne has also made statements that he has spent over $40 million on financing challenges to the 2020 presidential election and paying for living expenses for the families of participants in the January 6, 2021, attack on the Capitol who were being prosecuted for those criminal actions.  Cawley Decl. ¶ 24; *Interview of Patrick M. Byrne Before the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol*, at 16, 226, 117th Cong. 2 (July 15, 2022), *available at* https://www.govinfo.gov/app/details/GPO-J6-TRANSCRIPT-CTRL0000915977.

Byrne claims to have played important roles in various clandestine operations conducted on behalf of the United States Government.  SUF ¶¶ 43–46.  Byrne further claims that, at times, the requests for him to deploy his "unique" skills to help the United States have come directly from the highest levels of the U.S. government, including President Barack Obama and FBI Director James Comey, personally, although they were communicated to Byrne verbally by unnamed special agents for the FBI.  SUF ¶¶ 43–46.  Byrne admits he has no documentation to support his self-aggrandizing claims—his activities purportedly have been too secret and dangerous for documentation although he has publicized his involvement those activities.  SUF ¶¶ 43–46.

Byrne claims that in 2021, his "handler," John Moynihan, a forensic accountant who investigated money laundering for the Drug Enforcement Administration for four years in the 1990s, introduced him to FBI Special Agent David Smith, whom Byrne claimed was a high-ranking member of a secret inter-agency group that Byrne calls the "League of Shadows."  SUF ¶¶ 76–77.

As part of his work for the so-called "League of Shadows," in November 2021, Byrne claims he met with an Iranian government official whom he originally identified by the codename "Movie Star."  SUF ¶¶ 69–71.  During meetings to discuss using Byrne as an "interlocutor" between Iran and the United States to prevent a world war, Movie Star said in passing that, through an unidentified intermediary, Plaintiff sought a bribe from Iran in return for releasing $8 billion in frozen funds from South Korea and for concessions in negotiations regarding Iran's nuclear weapons program.  SUF ¶¶ 69–72.  Byrne claims to have surreptitiously recorded a conversation with Movie Star (the "Recording") and later to have surreptitiously obtained three voicemail recordings (the "Voicemails") from Movie Star's smartphone.  SUF ¶¶ 73–74.  Byrne further claims that Moynihan and Agent Smith listened to these "Voicemails" and that Agent Smith authenticated the identity of the speaker.  SUF ¶¶ 80–82.

On June 27, 2023, Byrne published an article in the "Capitol Times Magazine" (the "Article") describing his exploits as a secret agent and Movie Star's alleged statements that Plaintiff sought a bribe from Iran (the "Defamatory Statements"). SUF ¶¶ 1–3.    In response to the Defamatory Statements, the unidentified "interviewer" asked Byrne to confirm "that 18 months ago, the Biden Family was seeking a bribe from Iran to release funds frozen in South Korea, and to go easy in nuclear talks . . . ."  Byrne responded: "100% correct."  SUF ¶ 3.

Shortly before publishing the Defamatory Statements in the Article, Byrne published the Defamatory Statements during multiple media appearances.  SUF ¶¶ 4–18.  After the Article was published on June 27, 2023, Byrne repeatedly reposted the Article on various social media platforms encouraging his over 400,000 followers to share it to as many people as possible and promoted the Article during right-wing media appearances, encouraging people to read and purchase copies of the magazine for themselves.  SUF ¶¶ 19–25, 31–34; https://x.com/PatrickByrne.

On October 8, 2023, shortly after news broke of the horrific terrorist attacks by Hamas against Israel, Byrne twice reposted the Defamatory Statements on his social media account on X (formerly known as Twitter) suggesting that Plaintiff's alleged treasonous dealings with Iran contributed to the terrorist attacks by Hamas against Israel, causing more than 1,400 civilian deaths.  SUF ¶¶ 26–28.  These re-postings by Byrne have been viewed by more than 100,000 people.  SUF ¶¶ 26–28.

The day after Plaintiff filed this lawsuit Byrne posted on X on November 9, 2023, taunting Plaintiff over the lawsuit.  Over 72,000 people viewed that post, in which Byrne said: "Hunter's lawsuit against me (my interpretation): "Now that I've got Daddy's DOJ under control… Let's silence Byrne with a lawsuit + gag order." Good luck with that.  PS Hunter, my 1st witness is a 35 year federal agent who will attest I told the truth and FBI verified it."  SUF ¶ 29.

The Defamatory Statements are false.  SUF ¶¶ 38, 47.  Indeed, Plaintiff never contacted or tried to contact directly, or indirectly through any other person or entity,

anyone in the Iranian government in the fall of 2021 or at any other time and does not know the son of any official in the Ministry of Defense of Pakistan nor has he had any communication, directly or indirectly through any other person or entity, with that person.  SUF ¶¶ 38, 47.

The evidence establishes that Byrne had no basis for making the Defamatory Statements and this conclusion is supported by Byrne's own witnesses.  SUF ¶¶ 109–113.  Moynihan testified that the content of the Recording was not that Biden knew about the release of funds or a bribe; rather it was that the speakers on the Recording were going to seek Biden's assistance in the future.  SUF ¶¶ 101–105.  Indeed, Moynihan testified that it sounded as if Biden was not involved at that time.  SUF ¶¶ 101–105.  Further, Moynihan also testified that he does not remember the words "bribe," "father," "10%," or "$8 billion" being in the Recording at all—all facts stated by Byrne in his article.  SUF ¶¶ 101–05.

Byrne testified that he gave Agent Smith the only copy of the Recording that Byrne ever possessed, and that Agent Smith instructed Byrne to delete the Recording from his device after sending it to Agent Smith.  SUF ¶¶ 75–82.  But Agent Smith testified that he did not recall receiving *any* recording from Byrne, and Moynihan testified that he does not know whether Agent Smith received the Recording.  SUF ¶¶ 96–100.

Most notably, Byrne claims that Agent Smith had the speaker's voice matched to the son of someone high up in the Pakistani Ministry of Defense by various "intergovernmental agencies" including the FBI, CIA, and NSA, but Agent Smith testified that such statement by Byrne was false and that he did not recall receiving *any* recording from Byrne related to or involving Hunter Biden and Iran.  *Compare* SUF ¶¶ 75–82 *with* SUF ¶¶ 96–100.

When denying Byrne's summary judgment motion, the Court stated that "[a] reasonably jury could believe that [Byrne's] story is made up" and that Byrne's "story is far-fetched."  SUF ¶ 109.  Indeed, the Court stated:

Finally, the substance of Firouzian's [a/k/a "Movie Star"] claims themselves is an obvious reason to doubt their veracity.  While technically possible, they are undoubtedly far-fetched and fantastical. The son of the sitting President accepting a nearly one-billion-dollar bribe from one of the United States' foreign adversaries would be one of the most blatant instances of political corruption in United States history.   In other words, Firouzian's claims "are so inherently improbable that only a reckless man would have put them in circulation." *See St. Amant* [*v. Thompson*], 390 U.S. [727,] 732 [(1968)].

In sum, Firouzian's complete lack of evidence supporting his story, his identity as an Iranian government official, and the sheer outlandishness of his claims were all obvious reasons to doubt the truth of his claims. From these obvious reasons a rational jury could reasonably find that Defendant did in fact doubt the truth of Firouzian's claims, and yet published the statements at issue regardless.  Such reckless disregard for the truth would support a finding of actual malice.  *See St. Amant,* 390 U.S. at 733 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant").

SUF ¶ 110.

## III.   **LEGAL STANDARD**

Byrne is in default.  (ECF No. 344.).  Under Rule 55(b) of the Federal Rules of Civil Procedure, the Court may enter a default judgment following the entry of default.  In the Central District of California, motions for default judgment must set forth: (1) when and against which party the default was entered; (2) the identification of the pleading to which default was entered; (3) whether the defaulting party is an infant or incompetent person, and if so, whether that person is adequately represented; (4) that the Soldiers' and Sailors' Civil Relief Act of 1940 does not apply; and (5) that notice of the application has been served on the defaulting party, if required.  L.R. 55-1.

A defendant's default does not automatically entitle the plaintiff to a default judgment.  *See Gordon v. Duran*, 895 F.2d 610, 612 (9th Cir. 1990).  Granting a default judgment is within the court's discretion.  *See id.*  The Ninth Circuit has

enumerated the following factors (the *Eitel* factors) that a court may consider in determining whether to grant default judgment: (1) the merits of the plaintiff's substantive claim; (2) the sufficiency of the complaint; (3) the sum of money at stake in the action; (4) the possibility of prejudice to the plaintiff; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decision on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

"Upon entry of default, the well-pleaded allegations of the complaint relating to a defendant's liability are taken as true, with the exception of the allegations as to the amount of damages." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174–75 (C.D. Cal. 2002) (citing *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987)). "Thus, the plaintiff is required to provide proof of all damages sought in the complaint." *Id.* The defaulting defendant, however, is not allowed to present evidence without first having the default set aside. *United States v. Dillon*, No. 1:23-CV-00355-BLW, 2024 WL 4555873, at *2 (D. Idaho Oct. 23, 2024).

Where a default judgment has been entered as a sanction, "a party has no right to jury trial under either Fed. R. Civ. P. 55(b)(2), . . . or the Seventh Amendment." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1414 (9th Cir. 1990).

## IV.   <u>INFORMATION REQUIRED BY LOCAL RULE</u>

The information required by Local Rule 55-1 is provided in the Declaration of Phillip D. Barber, Nov. 10, 2025 (attached as **Exhibit D**).

## V.   <u>THE *EITEL* FACTORS SUPPORT ENTRY OF A DEFAULT JUDGMENT.</u>

The Court found the complaint to be sufficient when it denied Byrne's motion for summary judgment. SUF ¶¶ 109-110. There is no possibility of a dispute concerning material facts because Byrne waived his ability to dispute material facts

when he failed to appear at trial and refused to obey the Court's repeated orders to appear personally or through counsel in the period leading up to the rescheduled trial date. (ECF Nos. 330 and 344.) The default was entered as a sanction and so is not due to excusable neglect. (*Id.*) In so sanctioning Byrne, the Court found Byrne's actions prejudiced Plaintiff. (*Id.*) The Court respected the policy favoring a decision on the merits by giving Byrne repeated opportunities to avoid entry of a default by appearing personally or through counsel—even after Byrne failed to appear for trial— but Byrne steadfastly refused to defend this action. Further, because full discovery of the substantive merits of the claim occurred, the Court is not asked to enter judgment solely on unsubstantiated complaint allegations. Rather, the Court is asked to consider the evidence that Plaintiff marshalled for presentation at trial, had Byrne not fled on the morning of jury selection. Entry of a default judgment therefore will not undermine the policy favoring decisions on the merits.

The *Eitel* remaining factors are the merits of Plaintiff's substantive claim, and the amount of damages claimed. Each is discussed in detail below.

### A.    Merits of Plaintiff's Claim

Clear and convincing evidence in this case demonstrates that Byrne defamed Plaintiff and did so with actual malice. SUF ¶¶ 109–113. "The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1259 (2017) (internal citations omitted); *Grenier v. Taylor*, 234 Cal. App. 4th 471, 486 (2015). A plaintiff who is a public figure can only recover by proving, by clear and convincing evidence "that the libelous statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Jackson*, 10 Cal. App. 5th at 1259 (footnotes and internal citations omitted). Each element is established by substantial evidence.

### 1. Byrne published Defamatory Statements about Biden.

Byrne made the Defamatory Statements about Biden in the Capitol Times, on social media platforms like X, in the Book, and in multiple interviews on podcasts. SUF ¶¶ 1–3, 14–34. The Defamatory Statements accused Plaintiff of committing and conspiring to commit criminal acts and so are defamatory per se. *See Barnes-Hind, Inc. v. Superior Court*, 181 Cal. App. 3d 377, 385 (1986) ("Perhaps the clearest example of libel per se is an accusation of crime.").

### 2. The Defamatory Statements were a statement of fact.

"[S]tatements cannot form the basis of a defamation action if they cannot be reasonably interpreted as stating actual facts about an individual. Thus, rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt and language used in a loose, figurative sense will not support a defamation action." *Grenier,* 234 Cal. App. 4th at 486. The Defamatory Statements were statements of fact (albeit untrue) about Plaintiff's alleged solicitation of a bribe from Iran. SUF ¶¶ 1–3, 14–34.

### 3. The Defamatory Statements were false.

Biden has denied all of Byrne's claims. SUF ¶¶ 38, 47. Biden had never engaged in business with a country under sanctions by the United States government or government officials from such countries, and since his drug-addiction recovery he has not done any business except for his artwork and writing his book. SUF ¶¶ 38, 47. Byrne has no evidence supporting his claims. SUF ¶¶ 109–113. Moynihan, who purportedly listened to the Recording, testified that it sounded as if Biden was not involved at that time. Indeed, Moynihan had no recollection of hearing the words "bribe," "father," "10%," or "$8 billion" in the Recording —all so-called facts stated by Byrne in his article. SUF ¶¶ 101–102. In direct contradiction of Byrne's defamatory statements, Agent Smith testified he had never heard any such recording. *Compare* SUF ¶¶ 75–82 *with* SUF ¶¶ 96–100.

### 4. The Defamatory Statements were not privileged.

Under California Civil Code § 47, a privileged publication or broadcast is one made: (i) in the proper discharge of an official duty; (ii) in any legislative, judicial, or any other official proceeding authorized by law; (iii) in a communication, without malice, to a person interested therein by one who is also interested therein; and (iv) by a fair and true report in a public journal, of a judicial, legislative, or other public official proceeding. Byrne cannot meet his burden to prove that his Defamatory Statements were privileged under § 47 because Byrne's statements were made to the general public in the Capitol Times and on social media. His statements were not part of a public duty nor were they in connection with any legislative or judicial proceeding or any course authorized by law or a fair reporting of such actions. SUF ¶¶ 1–3, 14–34.

### 5. Byrne acted with actual malice in making the Defamatory Statements.

Because Plaintiff concedes he is a public figure for this case, Plaintiff must prove by clear and convincing evidence "that the libelous statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Jackson*, 10 Cal. App. 5th at 1259 (footnotes and internal citations omitted). The Ninth Circuit recognizes that "[d]irect evidence to this effect is extremely difficult to obtain, so actual malice may be proven by circumstantial evidence, given the totality of the circumstances surrounding the publication." *Kaelin v. Globe Communications Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998).

> A defamation plaintiff may rely on inferences drawn from circumstantial evidence to show actual malice. A failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable, or known to be biased against the plaintiff—such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.

11

*Sanders v. Walsh*, 219 Cal. App. 4th 855, 873 (2013) (internal quotation marks and alterations omitted).

The Supreme Court holds that statements "of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).  Similarly, an inference of actual malice may be drawn "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation[,] ... [or] where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 731 (footnote omitted); *see also Eastwood v. Nat'l Enquirer,* 123 F.3d 1249, 1251 (9th Cir. 1997) ("Reckless disregard" also applies if the defendant had "'obvious reasons to doubt the veracity'" of its statements, but engaged in "'purposeful avoidance of the truth.'"); *United States v. Jewell,* 532 F.2d 697, 700 (9th Cir. 1976) (en banc) (holding willful blindness is tantamount to knowledge).  The accumulation of evidence regarding these factors and the inferences that can be drawn from them "indicate that the publisher himself had serious doubts regarding the truth of his publication" and establishes a defendants' reckless disregard for the truth or of his knowledge of falsity. *See Reader's Dig. Assn. v. Superior Court*, 37 Cal. 3d 244, 257–58 (1984).

The evidence set forth below demonstrates, by clear and convincing evidence, that Byrne acted with actual malice in making the Defamatory Statements.  SUF ¶¶ 109–113.

> a.  <u>Byrne had no reliable or credible information supporting the truth of the Defamatory Statements.</u>

Byrne has identified no verifiable, actual sources and no reasonable, valid, or factual basis to have made the Defamatory Statements, as follows:

- <u>Recording.</u>  Byrne claims that the Recording of Movie Star telling him about the Defamatory Statements supports his claims.  SUF ¶¶ 75–82,

96–100.    However, the Recording has not been produced because, according to Byrne, it was given to Agent Smith and never returned although Agent Smith testified that he never received the Recording. SUF ¶¶ 75–82, 96–100. Moynihan purportedly listened to the Recording but said it did not indicate Biden had any knowledge of the scheme and that it he did not recall it mentioning the words bribe, father, 10%, or $8 billion.  SUF ¶¶ 101–102.

- <u>Voicemails.</u>  Byrne claims that the Voicemails provide information supporting the Defamatory Statements.  SUF ¶¶ 39, 41, 74. The Voicemails do not identify the caller, nor do they contain any information about Plaintiff or the Defamatory Statements.  They do not even mention Plaintiff's name, any bribe, or any information in the Defamatory Statements.  SUF ¶¶ 39, 41, 74.

- <u>Agent Smith Verification of Identity of the Speaker on the Voicemails.</u> Byrne claims that Agent Smith caused the identity of the speaker on the Voicemails to be identified.  SUF ¶¶ 75-82, 96-100.  However, Agent Smith denies doing this or ever possessing the Recording or Voicemails. SUF ¶¶ 75–82, 96–100.

Based on the foregoing, the Court concluded that "a jury could reasonably conclude that Defendant's story is fabricated based on material contradictions between his account and the testimony of Mr. Moynihan and Agent Smith—the very witnesses Defendant relies upon to corroborate his extraordinary claims."  SUF ¶ 111.

        b.    *Byrne's past conduct shows anger and hostility toward Plaintiff and his father, President Joe Biden.*

In the year or so prior to the publication of the Article, Byrne on numerous occasions taunted Plaintiff on various social media platforms regarding various subjects and, since this case was filed, Byrne has regularly taunted Plaintiff about this lawsuit.  SUF ¶¶ 4–37.  Byrne has continuously disseminated and promoted his Defamatory Statements to as many people as he possibly could on social media and in podcast interviews.  SUF ¶¶ 4–37.  Most egregiously, in October 2023, Byrne posted screenshots on X of his Defamatory Statements insinuating that Plaintiff was complicit in the Hamas terrorist attack on Israel on October 7, 2023—the worst mass

murder of the Jewish people since the Holocaust killing over 1,400 Jewish people.
SUF ¶¶ 26–28.  To further spread his disdain and ill-will for the Biden family, Byrne
has engaged in a social media campaign against Plaintiff's father, President Joe Biden,
and has sought to defame Plaintiff to embarrass President Biden, who Byrne appears
to blame for all the problems in the United States.  SUF ¶¶ 48–56.  Based on the
foregoing, the Court concluded that "Defendant has exhibited ill-will toward Plaintiff
in the past."  SUF ¶ 109.

> c. *Byrne was beyond reckless in making the Defamatory
> Statements given his incendiary claims in the Article about
> being a secret government operative.*

Throughout his life, without any evidence whatsoever, Byrne has claimed to
have played important roles in various clandestine "operations" conducted on behalf
of the United States Government and that, at times, the requests for him to deploy his
"unique" skills to help the United States have come directly from the highest levels
of the U.S. government, including President Barack Obama and FBI Director James
Comey.  SUF ¶¶ 43–46.  Such desire for attention as having "covert" and "secret"
information is motive to make the Defamatory Statements with actual malice and
supports a jury finding of actual malice.  As the Court has noted:

> To start, the entire premise of Defendant's story—that he has for
> decades acted as a covert agent for the United States government—
> strains credulity, especially since he fails to support this claim with any
> evidence.

SUF ¶ 113.

**B.    Damages**

**1.    *Plaintiff is entitled to nominal damages.***

The allegation that Plaintiff committed heinous crimes is defamatory per se.
*See Barnes-Hind, Inc.*, 181 Cal. App. 3d at 385 ("Perhaps the clearest example of
libel per se is an accusation of crime.").  "[I]n an action for damages based on

language defamatory [p]er se, damage to plaintiff's reputation is conclusively presumed and he need not introduce any evidence of actual damages in order to obtain or sustain an award of damages" and "[w]ithout presenting evidence of damage, [Plaintiff] is entitled to receive compensation for this assumed harm in whatever sum [the Court] believe[s] is reasonable . . . . [but] at least a nominal sum, such as one dollar." *Thompson v. Karen Civ.*, 2:19-cv-5690-RSWL-AS, 2020 WL 8610841, at *9 (C.D. Cal. Aug. 10, 2020), *aff'd sub nom. Thompson v. Civ.*, No. 20-55955, 2023 WL 3562968 (9th Cir. May 19, 2023) (internal quotation marks omitted).

## 2. *Plaintiff is entitled to punitive damages.*

"There is no doubt that if an award of nominal damages is made in a [defamation] case where malice is shown, an award of punitive damages is proper." *Contento v. Mitchell*, 28 Cal. App. 3d 356, 359 (1972). "Punitive damages can be recovered on a defamation claim upon default judgment." *Baffert v. Wunderler*, No. 3:23-CV-1774-RSH-BLM, 2025 WL 1784625, at *8 (S.D. Cal. June 27, 2025). "Where plaintiffs have established libel *per se*, they need not prove actual injury to anchor a punitive award; if such an award is otherwise appropriate, the libel *per se* can itself support punitive damages." *Vachani v. Yakovlev*, No. 15-CV-04296-LB, 2016 WL 7406434, at *9 (N.D. Cal. Dec. 22, 2016). "In considering a request for punitive damages, courts first determine whether punitive damages are appropriate and then determine a reasonable amount of punitive damages." *Id.* (internal quotation marks omitted).

### a. <u>Punitive damages are appropriate.</u>

"Under California law, punitive damages are appropriate where a plaintiff establishes by *clear and convincing evidence* that the defendant is guilty of (1) fraud, (2) oppression or (3) malice.'" *In re First Alliance Mortg. Co.*, 471 F.3d 977, 998 (9th Cir. 2006) (citing Cal. Civ. Code § 3294(a)) (emphasis in *First Alliance*). "'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and

conscious disregard of the rights or safety of others."  Cal. Civ. Code § 3294(c)(1). "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.'"  Cal. Civ. Code § 3294(c)(2). "'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.'"  Cal. Civ. Code § 3294(c)(3).

As explained above, Byrne acted with actual malice toward Plaintiff, engaging in despicable conduct with a willful disregard for Plaintiff's rights.  Byrne also engaged in intentional misrepresentations and deceit with the intent to injure Plaintiff. Punitive damages therefore are appropriate.

### b. *In this case an award of $33.33 million in punitive damages is reasonable*

"'[T]here is no fixed standard to determine the appropriate amount of punitive damages, but California courts consider three factors: (1) the reprehensibility of the defendant's conduct, (2) the plaintiff's injury in reasonable relation to the punitive damages, and (3) the defendant's wealth, considering the amount sufficient to punish and deter future wrongful conduct.'"  *Baffert*, 2025 WL 1784625, at *8 (quoting *Khraibut v. Chahal*, No. 15-CV-04463-CRB, 2021 WL 1164940, at *21 (N.D. Cal. Mar. 26, 2021)).  Of these, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Colucci v. T-Mobile USA, Inc.*, 48 Cal. App. 5th 442, 457 (2020).

In addition to the standards set forth in substantive California law, an award of punitive damages must be constitutionally reasonable under the Due Process clause. To do so, a reviewing court considers "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized

or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538
U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).
Again, "the most important indicium of the reasonableness of a punitive damages
award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S.
at 575.

### i.    Reprehensibility

Byrne's lies about Plaintiff are especially reprehensible for five reasons.

*First*, Byrne falsely accused Plaintiff of conspiring with enemy nations and
terrorists against his own country for personal profit—in other words, of committing
treason while his father was the sitting President by agreeing to help America's
enemies kill Americans for money. SUF ¶ 2. This amounts to a false accusation of
treason—among the worst crimes imaginable, on a level with child molestation.

*Second*, Byrne did so not because Plaintiff is a public official, but because
Plaintiff's father was a public official Byrne did not like. *See* SUF ¶¶48–49. Attacking
politicians whom one does not like by publishing lies about their families is
reprehensible.

*Third*, Byrne engaged in trickery and deceit with intentional malice. SUF
¶ 110; *cf. Gore*, 517 U.S. at 576 (1996) (observing trickery, deceit, and intentional
malice are especially reprehensible).

*Fourth*, Byrne's defamation of Plaintiff was a well-planned exercise supported
by extensive financial resources. SUF ¶¶ 1–27; Cawley Decl. ¶¶ 8–32. This was not
an ill-considered angry outburst or letter to the editor. Byrne authored an entire issue
of a magazine to defame Plaintiff and then continued to publicize the Defamatory
Statements on social media and in interviews in a variety of mediums, including a
film paid for and featuring Byrne and one of Byrne's books. He did so as part of a
multimillion-dollar effort to discredit the Plaintiff's father, then-President Joe Biden.
SUF ¶¶ 48–49. Byrne spent millions to defame Plaintiff. *See* SUF ¶¶ 1–27.

**PLAINTIFF ROBERT HUNTER BIDEN'S MOTION FOR A DEFAULT JUDGMENT**

*Fifth*, Byrne is a recidivist.  Evidence of reprehensibility includes evidence of recidivism.  *See Johnson v. Ford Motor Co.*, 35 Cal. 4th 1191, 1204 (2005) (holding "a civil defendant's recidivism remains pertinent to an assessment for culpability" for punitive damages); *Grimshaw v. Ford Motor Co.*, 119 Cal. App. 3d 757, 810 (1981) ("The primary purposes of punitive damages are punishment and deterrence of like conduct by the wrongdoer and others.").

Byrne has a long history of publishing malicious falsehoods to advance his own pecuniary interests.  Going back 15 years, in 2011 Byrne became angry with Canadian businessman Altaf Nazerali because he believed Mr. Nazerali was short-selling stocks.  Since Mr. Nazerali has a Middle Eastern-sounding name, Byrne published articles declaring that Mr. Nazerali was an arms dealer and financier for Osama Bin Laden and Al-Qaeda, with close links to Saudi Arabian and Pakistani intelligence agencies and to Colombian drug cartels and the Russian mafia.  The Supreme Court of British Columbia held that Byrne and his associates "engaged in a calculated and ruthless campaign to inflict as much damage on Nazerali's reputation as they could achieve.  It is clear on the evidence that their intention was to conduct a vendetta in which the truth about Nazerali himself was of no consequence."  5/6/16 *Nazerali v. Mitchell*, No. S116979, 2016 BCSC 810, Correct Judgment (Sup. Ct. of British Columbia).  Like this case, the Supreme Court of British Columbia noted that after Mr. Nazerali filed his lawsuit, instead of toning down his libelous rhetoric, Byrne doubled down and continued to harass Mr. Nazerali with falsehoods spread online. *See id.*  Mr. Nazerali was awarded over $1 million in damages for defamation, including punitive and aggravated damages. *Id.*

Byrne was not deterred in the slightest.  In 2020, he funded and published outlandish claims that voting machines made by Dominion Voting Systems used Venezuelan election-stealing software controlled by George Soros to change election results.  *See* Complaint, *US Dominion, Inc., v. Byrne*, 1:21-cv-2131-CJN (D.D.C. Aug. 10, 2021).  He even claimed, with no evidence whatsoever, Dominion murdered

**PLAINTIFF ROBERT HUNTER BIDEN'S MOTION FOR A DEFAULT JUDGMENT**

a Democratic National Committee member to cover up election rigging in 2016. *Id.*
Most recently, in this very case, Byrne defamed his own lawyer's associate, claiming
her unprofessional appearance was the reason he fired his lawyers and failed to attend
trial rather than his desire to avoid answering questions about his own finances.[1] (*See*
ECF No. 348.)

"The primary purposes of punitive damages are punishment and deterrence of
like conduct by the wrongdoer and others." *Grimshaw v. Ford Motor Co.*, 119 Cal.
App. 3d 757, 810 (1981). For these reasons, substantial punitive damages are needed
to deter Byrne's reprehensible conduct:

> The book, magazine or newspaper publisher who with actual malice
> prints defamatory falsehoods about a public official or public figure has
> put himself beyond the pale of the First Amendment. A jury award of
> punitive damages against one who publishes falsehoods with actual
> malice serves two wholly legitimate purposes: (1) the protection of the
> libeled individual's reputation and (2) the protection against like abuse
> of all other persons similarly situated.

*Maheu v. Hughes Tool Co.*, 569 F.2d 459, 479 (9th Cir. 1977) (quoting *Goldwater v.
Ginzburg*, 414 F.2d 324, 341 (2d Cir. 1969)). Substantial punitive damages are
needed to protect other persons similarly situated with Plaintiff, i.e., family members
of public officials, from like abuse, i.e., multimillion dollar defamation campaigns
falsely accusing those family members of horrible crimes. To date, Byrne's lies have

---

[1] Other examples of Byrne's willingness to misrepresent facts under oath and to
defame people exist in this case. In opposing Plaintiff's efforts to have Byrne reveal
the name of the Iranian government official who told him the Defamatory Statements,
Byrne accused one of Plaintiff's then counsel of record, Abbe Lowell, Esq., of being
a "mafia lawyer" and Plaintiff's other counsel of record, Bryan Sullivan, Esq., of
being part of the purported scheme to solicit a bribe from Iran. (ECF No. 177.) Also,
earlier in this case, the Court said Byrne's claims, submitted under oath, that his
deposition had to be delayed because the Venezuelan government had a $25 million
bounty on him, were "fraudulent" and "fantastic without believability" and that they
were "a fraud upon the Court." SUF ¶ 90.

**PLAINTIFF ROBERT HUNTER BIDEN'S MOTION FOR A DEFAULT JUDGMENT**

cost him a $1 million judgment and estimated legal fees of $2 or $3 million. That has

not been close to sufficient to deter him, especially in light of his willingness to spend

$40 million on challenges to the 2020 election and to support criminal defendants who

attacked the Capitol on January 6, 2021. Cawley Decl. ¶ 24; *Interview of Patrick M.*

*Byrne Before the House Select Committee to Investigate the January 6th Attack on*

*the U.S. Capitol*, at 16, 226, 117th Cong. 2.

ii.    *Relationship of the Plaintiff's Injury to the Punitive*
*Award*

The second *Gore* "guidepost"—the relationship between harm to the plaintiff

and the punitive damages award—is a factor both in substantive California law and a

Due Process limiting factor. *State Farm*, 538 U.S. at 424. However, the Ninth Circuit

has recognized that "[w]hen only nominal damages are awarded, application of a *Gore*

ratio analysis is not appropriate." *ASARCO*, 773 F.3d at 1058) (collecting cases from

the Fourth, Fifth, and Sixth Circuits). This is because "'[n]ominal damages are not

intended to compensate a plaintiff for injuries, nor to act as a measure of the severity

of a defendant's wrongful conduct.'" *Id.* (quoting *Cummings v. Connell*, 402 F.3d

936, 945 (9th Cir. 2005)). The purpose of the *Gore* analysis is to compare the punitive

damages award to the "true" harm, but where compensatory damages are capped or

only nominal damages are awarded, "there is no meaningful way to apply a *Gore* ratio

analysis because the true harm is not measured." *ASARCO*, 773 F.3d at 1058.

In a nominal damages case, then, the punitive damages award is compared to

the "true" harm not by looking to ratios between classes of damages, but instead by

looking to the reprehensibility of the conduct and comparing the punitive damages

award to other cases involving similar claims. *Id.* (citing *Saunders v. Branch Banking*

*& Trust Co. of Va.*, 526 F.3d 142, 154 (4th Cir. 2008).

The fact pattern of this case—a billionaire repeatedly and relentlessly publishes

that the son of the then-President has conspired with America's enemies for a bribe

of nearly one billion dollars—is admittedly unique. Plaintiff submits the most similar

**PLAINTIFF ROBERT HUNTER BIDEN'S MOTION FOR A DEFAULT JUDGMENT**

comparison case is *Freeman v. Giuliani*, 1:21-cv-3354-BAH (D.D.C. Dec. 18, 2023). In that defamation case, the defendant, Mr. Giuliani, had falsely accused two innocent Georgia election workers of stuffing ballot boxes and intentionally counting the same ballots multiple times, and many other illegal activities. *Freeman*, ECF No. 1. A default judgment was entered against Mr. Giuliani because he refused to cooperate with discovery. *Freeman*, ECF No. 95. After a damages trial before a jury, the two plaintiffs were each awarded $16,171,000 in compensatory damages for defamation, $20 million in compensatory damages for intentional infliction of emotional distress, and together $75 million in punitive damages. *Freeman*, ECF 135.

In this case, too, Plaintiff was the target of outrageous lies in an attempt to discredit the election of Joe Biden as President. Comparing the two cases, several factors suggest the punitive damages awarded in this case should be greater than the punitive damages awarded in *Freeman*:

*First*, Byrne accuses Plaintiff of treason, conduct far more reprehensible than stuffing local ballot boxes.

*Second*, Byrne is a recidivist with a much longer history of malicious defamation who lacks Mr. Giuliani's commendable prior public service.

*Third*, Byrne has far more wealth than Mr. Giuliani. *See generally* Cawley Decl. Indeed, based on Byrne's own statements, his wealth is estimated to be $680 million and may be worth more than $1 billion and has spent $40 million on challenging the 2020 Presidential election and supporting January 6 criminal defendants. *Id.*

On the other hand, some factors suggest the punitive damages award in this case should be less than the amount awarded in *Freeman*:

*First*, Plaintiff is a public figure (albeit only because he is a close family member of a public official), whereas the *Freeman* plaintiffs were private citizens engaged in public service.

*Second*, the *Freeman* plaintiffs were subjected to direct abuse and threats of physical harm because of Mr. Giuliani's accusations. Plaintiff, on the other hand, had a Secret Service security detail when Byrne defamed him. The *Freeman* plaintiffs therefore were much more vulnerable than Plaintiff.

On balance, Plaintiff argues this last factor outweighs the other factors sufficiently that the punitive damages awarded in this case should only be 44% of the amount awarded in *Freeman*. This reduction mirrors the hypothetical reduction in the *Freeman* compensatory damages that would occur if the damages for intentional infliction of emotional distress—awarded mostly because of the direct abuse and physical threats *Freeman* plaintiffs suffered—were removed.

The obvious counter argument to this argument is the lack of compensatory damages. While a ratio analysis is inappropriate, *ASARCO*, 773 F.3d at 1058, one might nevertheless argue that if Byrne's conduct is indeed so reprehensible, then there should be substantial evidence proving comparable damage to Plaintiff's own reputation. Without such evidence, one might argue the defamation must not have been so reprehensible. In *Freeman*, by contrast, the punitive damages were approximately equal to the compensatory damages awarded.

Such a counterargument essentially is an argument that it is more reprehensible to defame a saint than a sinner having no reputation to harm. In some contexts, the argument has some intuitive appeal. Hurting an innocent does seem more reprehensible than hurting a criminal. In other contexts, the argument fails. Sexual assault is not considered less reprehensible based on how likeable the victim is. In the context of the instant case, the argument also fails. California has not adopted the libel-proof doctrine. *See Harvey v. Netflix, Inc.*, No. 2:24-CV-04744-RGK-AJR, 2024 WL 4536639, at *8 (C.D. Cal. Sept. 27, 2024) (noting "it does not appear that any California court has recognized the libel-proof doctrine"). No man should be proscribed from the equal protection of our laws, no matter what people think of him. The law does not allow Byrne to fabricate claims that family members of public

officials committed treason by taking bribes from foreign terrorists in exchange for an agreement to secretly use the power of public office against their own country— even if those family members have poor reputations with the public. Instead, the law provides for punitive damages to deter Byrne and others from similar actions in the future. Cal. Civ. Code § 3294; *see Grimshaw v. Ford Motor Co.*, 119 Cal. App. 3d 757, 810 (1981) ("The primary purposes of punitive damages are punishment and deterrence of like conduct by the wrongdoer and others."). Punitive damages are a public statement against unacceptable behavior that is not intended to compensate a plaintiff for lost reputation.

The further outrage here is that the lie was amplified by Byrne's millions of dollars. For purposes of compensatory damages, the victim of the defamation is the defamed person. But punitive damages are not meant to compensate a plaintiff for his own injury. So, for purposes of punitive damages, the victims of the defamation are the persons deceived by it—not the plaintiff, who of course was not deceived— but the public to whom the defamation was published.[2] *See Adams v. Murakami*, 54 Cal. 3d 105, 110 (1991) (holding punitive damages' "purpose is a purely *public* one. The public's goal is to punish wrongdoing and thereby to protect itself from future misconduct, either by the same defendant or other potential wrongdoers.") In a real sense, the victim of a lie is the person who is deceived by it. Byrne invented and published (at great expense) horrible lies about the family of the man the public elected to lead their country to promote his own personal desires. Byrne's lies treat the public as a mere means to his own ends, in a way to which they could not possibly

---

[2] As an aside, this is why civil law countries traditionally prohibit punitive damages in private actions and limit damages in private actions to an amount that restores a party to its pre-injury condition. *See* John Y. Gotanda, *Punitive Damages: A Comparative Analysis*, 42 Colum. J. Transnat'l L. 391, 396 (2004). "By contrast, punitive damages have been an institution of the common law for more than 200 years." *Id.*

**PLAINTIFF ROBERT HUNTER BIDEN'S MOTION FOR A DEFAULT JUDGMENT**

consent, infringing their freedom to make their own decisions.  *See generally*
Immanuel Kant, *Metaphysics of Morals* (1797).

### iii.  *Defendant's Extraordinary Wealth*

Whether a punitive damage award exceeds the level necessary to properly
punish and deter the defendant depends upon the defendant's financial circumstances:

> Also to be considered is the wealth of the particular defendant;
> obviously, the function of deterrence, will not be served if the wealth
> of the defendant allows him to absorb the award with little or no
> discomfort. By the same token, of course, the function of punitive
> damages is not served by an award which, in light of the defendant's
> wealth and the gravity of the particular act, exceeds the level necessary
> to properly punish and deter.

*Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 928 (1978).  Therefore, a plaintiff who
seeks punitive damages ordinarily must introduce evidence of a defendant's net worth.
*Adams*, 54 Cal. 3d at 113.  "However, a defendant who thwarts a plaintiff's ability to
meet this obligation may forfeit the right to complain about the lack of evidence of his
or her financial condition."  *Garcia*, 40 Cal. App. 5th at 995.  Where a defendant
refuses to produce requested documents or to appear to testify regarding his net worth,
he is estopped from challenging a punitive damages award on grounds that the plaintiff
failed to introduce evidence of his net worth.  *Id.* at 997 ("His refusal to produce
documents or to appear to testify is the reason that Plaintiffs did not have evidence of
his net worth.   [Defendant] is therefore estopped from challenging the punitive
damage award on the ground that Plaintiffs failed to introduce such evidence."); *see
also, e.g.*, *Mike Davidov Co. v. Issod*, 78 Cal. App. 4th 597, 609 (2000) ("In this case,
the defendant's records were the only source of information regarding his financial
condition available to plaintiff.  By his disobedience of a proper court order, defendant
improperly deprived plaintiff of the opportunity to meet his burden of proof on the
issue.  Defendant may not now be heard to complain about the absence of such
evidence.").

As the Court is aware, Byrne has refused to cooperate in financial discovery. Financial discovery was ordered as a sanction for Byrne's last-minute failure to appear in person or through counsel at trial.  (ECF No. 311.)  Plaintiff served discovery requests on Byrne through his most recent counsel.  (ECF No. 316.)  Byrne did not respond.  Plaintiff moved to compel his response and his deposition.  (ECF No. 329.) Byrne refused to obey the Court's orders to appear and to provide a means for service of documents.  The Court ordered him to show cause why he should not be held in contempt, and he again did not respond, so the Court entered a default against him as a sanction for his refusal to participate in the financial discovery that itself was ordered as a sanction against him.  (ECF No. 341.)  This blatant refusal to comply with this Court's orders is highlighted by the fact that Byrne did not disappear entirely—rather, he had the two attorneys who were refused admission to this Court due to prior misconduct repeatedly seek to overturn that decision and to obtain a stay through filings with the Ninth Circuit and before this Court.  (ECF No. 347).  If Byrne can engage in such frivolous conduct, he should not be allowed to avoid a punitive damages award through his intentional conduct in refusing to cooperate with discovery orders.  *See Fernandes v. Singh*, 16 Cal. App. 5th 932, 942 (2017), *as modified on denial of reh'g* (Nov. 2, 2017) ("A defendant is in the best position to know his or her financial condition, and cannot avoid a punitive damage award by failing to cooperate with discovery orders.").

Further, "[a]lthough net worth is the most common measure of the defendant's financial condition, it is not the only measure for determining whether punitive damages are excessive in relation to that condition." *Bankhead v. ArvinMeritor, Inc.*, 205 Cal. App. 4th 68, 79 (2012), *as modified* (Apr. 25, 2012) (internal quotation marks omitted).  This is because "'[n]et worth' is subject to easy manipulation and ... should not be the only permissible standard." *Id.* (quoting *Lara v. Cadag*, 13 Cal. App. 4th 1061, 1064–1065 & fn. 3 (1993)); *see also Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1595–96 (1994) (recognizing that net worth can be manipulated where the net

worth statement submitted to a bank as part of a loan application, showed a far higher net worth figure than the statement submitted for court); *Rufo*, 86 Cal. App. 4th at 622 (upholding punitive damages award that exceeded the wealthy individual defendant's net worth, because the evidence showed that the defendant would not be financially "destroyed by the award."). "[T]he purpose of punitive damages is not served by financially destroying a defendant.  The purpose is to deter, not to destroy." *Adams*, 54 Cal. 3d at 112.  "The ultimately proper level of punitive damages is an amount not so low that the defendant can absorb it with little or no discomfort, nor so high that it destroys, annihilates, or cripples the defendant." *Rufo*, 86 Cal. App. 4th at 621–22.

Although Byrne has refused to obey Court-ordered discovery into his financial condition, Plaintiff has been able to assemble considerable information on his financial condition based on public records and Byrne's public statements.  *See* Cawley Decl.  As set forth in the declaration of Plaintiff's expert, Mr. Byrne conservatively has about $686 million on hand just from the sale of his final holdings in Overstock.com in September 2019—and he at least has a minimum of $140 million. Cawley Decl. ¶ 32.  As the Court is aware, Byrne paid his previous counsel $500,000 just to fire them on a whim on the first day of trial.  Petition for a Writ of Mandamus, *In re Attorneys Peter Ticktin and Stefanie Lambert*, Case No. 25-5811 (9th Cir. Sept. 15, 2025), Dkt. Entry 2.1, at 14.  A previous defamation judgment of about $1 million did nothing to deter Byrne.  Unlike those sums, a $33.33 million award is not so low that Byrne can absorb it "with little or no discomfort."  Even if the award does not affect his lifestyle, Plaintiff believes an award of that size will cause Byrne discomfort and so satisfy the purpose of punitive damages.  But it will not "destroy" or "cripple" Byrne.  An award of $33.33 million would be less than 5% of his most likely earnings from his recent investment of the proceeds from his Overstock.com sale.  *See* Cawley Decl. ¶ 30.  It would be much less than the $40 million that Byrne publicly stated he spent on financing challenges to the 2020 presidential election and paying for living expenses for the families of participants in the January 6, 2021, attack on the Capitol

who were being prosecuted for those criminal actions.  Cawley Decl. ¶ 24; *Interview of Patrick M. Byrne Before the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol*, at 16, 226, 117th Cong. 2.  At a minimum, Byrne has the ability to pay a judgment of over $100 million, of which $33.33 million is less than one-third.  Cawley Decl. ¶ 32; *cf. Mike Davidov Co.*, 78 Cal. App. 4th at 607 ("[A]n award of punitive damages may be excessive when, for example, such award exceeded one-third of the defendant's net worth.").

## VI.    **CONCLUSION**

For the foregoing reasons, the Court should enter a default judgment against Defendant Patrick M. Byrne in the amount of $1 in nominal damages and $33.33 million in punitive damages.

Dated:  November 18, 2025

RICHARD A. HARPOOTLIAN, PA

By:    */s/ Phillip D. Barber*

Richard A. Harpootlian, *pro hac vice*
rah@harpootlianlaw.com
Phillip Barber, *pro hac vice*
pdb@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Columbia, South Carolina 29201
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

BRYAN M. SULLIVAN (State Bar No. 209743)
bsullivan@earlysullivan.com
ZACHARY C. HANSEN (State Bar No. 325128)
zhansen@earlysullivan.com
EARLY SULLIVAN WRIGHT GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Fl.
Los Angeles, California 90048
Telephone: (323) 301-4660
Facsimile: (323) 301-4676

*Attorneys for Plaintiff*
*Robert Hunter Biden*

**PLAINTIFF ROBERT HUNTER BIDEN'S MOTION FOR A DEFAULT JUDGMENT**